# EXHIBIT A

LEXSEE 1995 U.S. DIST. LEXIS 14484

**DAVID J. PETR, plaintiff, v. DELAWARE AIR NATIONAL GUARD, WALTER G. POWELL, Lt. Colonel, and SHEILA E. WIDNALL, Secretary of the Department of the Air Force, defendants.**

**Civil Action No. 94-327-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*1995 U.S. Dist. LEXIS 14484*

**September 28, 1995, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee filed an amended complaint against defendants, Delaware Air National Guard and supervisor, and Defendant Secretary of the Air Force claiming due process violations under *42 U.S.C.S. § 1983,* discrimination in violation of the Rehabilitation Act, wrongful discharge, breach of contract, and intentional infliction of emotional distress. Defendants filed a motion to dismiss or, alternatively, for summary judgment.

**OVERVIEW:** The federal employee was terminated from his position as a technician for the Delaware Air National Guard (Guard) after he did not show up for work for two weeks without explanation. The employee, who claimed that his absence was caused by severe depression which required hospitalization, unsuccessfully requested appellate review. The employee filed an action seeking redress for employment discrimination and wrongful discharge. Defendants filed a motion to dismiss or for summary judgment. The court granted defendants summary judgment on all claims. The court held that 1) the National Guard was a state agency that had not waived its sovereign immunity under the Eleventh Amendment and had not consented to federal jurisdiction, 2) Guard officers had official immunity from suits for damages by their subordinates, 3) all § 1983 claims were dismissed in the absence of any state defendants, 4) the wrongful termination claims were precluded by Title VII, the Nation Guard Technicians Act, the United States' sovereign immunity, the absence of jurisdiction for the breach of contract claim, and the failure to exhaust his administrative remedies under the Federal Tort Claims Act.

**OUTCOME:** In the former employee's wrongful discharge and employment discrimination action, the court entered summary judgment against the employee on all claims and in favor of all defendants. The court dismissed defendants' motion to dismiss for failure to prosecute as moot.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN1] *Fed. R. Civ. P. 56(c)* provides that a party is entitled to a summary judgment where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Where the nonmoving party opposing summary judgment has the burden of proof at trial on the issue for which summary judgment is sought, he must then make a showing sufficient to establish the existence of an element essential to his case. If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. Moreover, the mere existence of some evidence in support of the nonmoving party will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmoving party on that issue.

1995 U.S. Dist. LEXIS 14484, *

*Governments > State & Territorial Governments > Claims By & Against*
*Governments > Federal Government > Employees & Officials*
*Civil Procedure > State & Federal Interrelationships > Choice of Law*
[HN2] The United States Court of Appeals for the Third Circuit describes the National Guard as having a unique "hybrid" status, combining elements of both federal and state law. Within each state, the National Guard is a state agency, under state authority and control. At the same time, the activity, makeup, and function of the National Guard is provided for, to a large extent, by federal law.

*Governments > State & Territorial Governments > Claims By & Against*
*Constitutional Law > State Autonomy*
[HN3] A suit in which the state or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment. Eleventh Amendment immunity may be waived when there has been an unequivocal indication that the state intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment.

*Governments > State & Territorial Governments > Claims By & Against*
*Governments > State & Territorial Governments > Employees & Officials*
*Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > Coverage*
[HN4] In suits under § 1983 for damages, the United States Supreme Court holds that state officials acting in their official capacity are not "persons."

*Constitutional Law > Civil Rights Enforcement > Immunity > Public Officials*
*Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > Coverage*
[HN5] The United States Court of Appeals for the Third Circuit holds that officers of the National Guard have official immunity from suits for damages by their subordinates.

*Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > State Action*
*Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > Coverage*
[HN6] *42 U.S.C.S. § 1983* applies only to state actors, not federal agencies or officers.

*Governments > Federal Government > Employees & Officials*
[HN7] Under *32 U.S.C.S. § 709,* the National Guard may employ civilians as technicians for administration, training, and maintenance and repair of supplies. Technicians employed under this section are paid from federal funds and are explicitly designated employees of the United States. *32 U.S.C.S. § 709(d).*

*Labor & Employment Law > Discrimination > Title VII*
[HN8] Title VII provides the exclusive remedy for federal employees seeking redress for employment discrimination.

*Labor & Employment Law > Discrimination > Title VII*
*Labor & Employment Law > Discrimination > Disability Discrimination > Rehabilitation Act*
[HN9] The United States Court of Appeals for the Third Circuit holds that Title VII supplies the exclusive remedy for suits against federal agencies under the Rehabilitation Act.

*Labor & Employment Law > Discrimination > Title VII*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies*
[HN10] Where Title VII remedies are available, they must be exhausted before a plaintiff may file suit.

*Labor & Employment Law > Discrimination > Title VII*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies*
[HN11] Title VII gives the Equal Employment Opportunity Commission (EEOC) the authority to enforce the Civil Rights Act. *42 U.S.C.S. § 2000e-16.* Federal regulations make clear that the EEOC's authority extends to employees of the military. 29 C.F.R. § 1613.201(b). These regulations also lay out the specific steps that federal employees must take to pursue claims of discrimination, beginning with consultation with an EEOC counselor. 29 C.F.R. § 1613.213.

*Labor & Employment Law > Discrimination > Title VII*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Exhaustion of Remedies*
[HN12] Additional claims are preempted by Title VII where they constitute mere attempts to bypass the administrative and remedies restrictions of Title VII by the simple expedient of putting a different label on the pleadings.

1995 U.S. Dist. LEXIS 14484, *

*Labor & Employment Law > Wrongful Termination > Remedies*
*Administrative Law > Judicial Review > Reviewability > Jurisdiction & Venue*
[HN13] The National Guard Technicians Act limits the review by the Merit Systems Protection Board of National Guard technicians' terminations. Under *32 U.S.C.S. § 709*(e)(3), a technician may be separated from his employment by the adjutant general for cause. Section 709(e)(5) provides that the employee's right of appeal from such a termination shall not extend beyond the adjutant general of the jurisdiction concerned. *32 U.S.C.S. § 709*(e)(5).

*Governments > Federal Government > Claims By & Against*
[HN14] The United States, its agencies, and its officials acting in their official capacity cannot be sued for damages unless it has specifically consented to be sued. In instances where sovereign immunity has been waived, plaintiffs must comply with the conditions attached to the waiver.

*Governments > Federal Government > Claims By & Against*
*Contracts Law > Breach > Causes of Action*
[HN15] The United States has consented to be sued for breach of contract. *28 U.S.C.S. §§ 2679, 1346.* The United States Code clearly states, however, that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States. *28 U.S.C.S. § 1346*(a)(2).

*Torts > Public Entity Liability > Federal Causes of Action*
*Torts > Public Entity Liability > Claim Presentation*
[HN16] The Federal Tort Claims Act (FTCA) provides the exclusive avenue for tort claims against the United States. *28 U.S.C.S. § 2679*(a). The FTCA requires that tort claims be presented first to the appropriate federal agency. *28 U.S.C.S. §§ 2675*(a), 2401(b).

**COUNSEL:**  [*1] Barbara H. Stratton, Esquire, of Knepper and Stratton, Wilmington, Delaware, attorney for plaintiff. Of counsel: William F. Splitgerber, Jr., Esquire, Fallston, Maryland.

David A. Green, Esquire, Assistant United States Attorney, attorney for defendants.

**JUDGES:** Sue L. Robinson, District Judge

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM OPINION

Dated: September 28, 1995

Wilmington, Delaware

**Sue L. Robinson,** District Judge

### I. INTRODUCTION

Plaintiff David J. Petr filed this action against the Delaware Air National Guard and Lt. Colonel Walter G. Powell on February 14, 1994. n1 Plaintiff alleges that he was wrongfully terminated from his position with the Delaware Air National Guard after an episode of severe depression caused him to be absent from his job without leave for two weeks. In his amended complaint, plaintiff presents claims of violation of due process under *42 U.S.C. § 1983,* discrimination in violation of the Rehabilitation Act, wrongful discharge, breach of contract, and intentional infliction of emotional distress. (D.I. 30) Presently before the court is defendants' motion to dismiss or in the alternative for summary judgment.

n1 Plaintiff filed an amended complaint on September 5, 1995, adding Sheila E. Widnall, Secretary of the Air Force, as a defendant. (D.I. 30)

[*2]

### II. BACKGROUND

Plaintiff was originally hired as a supply technician by the Delaware Air National Guard in 1988. At the time of his discharge, he was working as a management assistant. (D.I. 30 at P III) On January 28, 1991, plaintiff did not show up for work, nor did he report for work at any time during the following two weeks. (D.I. 30 at P VI) He did not contact his supervisor or anyone else at his workplace to explain his absence. (D.I. 30 at P VI) Plaintiff claims that his absence was caused by a bout of severe depression, anxiety, and other psychological problems. (D.I. 30 at PP IV, V) These problems eventually led to a two week hospitalization. (D.I. 30 at P VII)

As a result of his abandonment of his position, plaintiff's employment with the Delaware Air National Guard was terminated. He received notification on February 14,

1991. (D.I. 30 at P IX) Upon learning of his termination, plaintiff contacted defendant Powell by telephone. Powell, the Support Personnel Management Officer, told plaintiff that he could appeal his termination by requesting either an appellate review or an administrative hearing in writing. (D.I. 30 at P XII) Plaintiff formally requested an [*3] appellate review on March 15, 1991. Included with his request was a report from his doctor. (D.I. 30 at P XIII) n2 After several inquiries to his congressional representatives, plaintiff learned that his appeal was unsuccessful. (D.I. at PP XVI, XVIII)

n2 According to a letter attached as an exhibit to plaintiff's original complaint, defendants claim that plaintiff submitted no evidence for consideration in the appellate review. (D.I. 1 at Exhibit 12) This dispute, however, is not material.

## III. DISCUSSION

Defendants have moved for dismissal for failure to prosecute, n3 or in the alternative for summary judgment. Because the court finds that plaintiff's claims are all administratively barred, defendants' motion for summary judgment will be granted.

n3 Since the filing of defendants' motion on February 21, 1995, plaintiff has obtained local counsel and filed an amended complaint. (D.I. 13, 30) Defendants' motion to dismiss for failure to prosecute is therefore moot.

[*4]

### A. Standard for Summary Judgment

[HN1] *Federal Rule of Civil Procedure 56(c)* provides that a party is entitled to a summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Where, as here, the nonmoving party opposing summary judgment has the burden of proof at trial on the issue for which

summary judgment is sought, he must then make a showing sufficient to establish the existence of an element essential to his case. If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. [*5] *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* Moreover, the mere existence of some evidence in support of the nonmoving party will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmoving party on that issue. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).*

### B. State Defendants

As noted above, plaintiff has sued the Delaware Air National Guard and Lt. Colonel Powell. [HN2] The Third Circuit has described the National Guard as having a unique "hybrid" status, combining elements of both federal and state law. *Johnson v. Orr, 780 F.2d 386, 388 (3d Cir. 1986); Jorden v. National Guard Bureau, 799 F.2d 99, 101 (3d Cir. 1986).* "Within each state the National Guard is a state agency, under state authority and control. At the same time, the activity, makeup, and function of the Guard is provided for, to a large extent, by federal law." *New Jersey Air National Guard v. Federal Labor Relations Authority, 677 F.2d 276, 278-79 (3d Cir. 1982).*

### 1. Claims Against the Delaware Air National Guard [*6]

Although federal law plays a significant role in the functioning of the National Guard, each state's National Guard itself is a state agency. Plaintiff's claims against the Delaware Air National Guard, therefore, must be dismissed. Plaintiff is suing a state agency for damages and such a claim is barred by the Eleventh Amendment. In *Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 100, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984),* the United States Supreme Court stated that [HN3] "a suit in which the State or one of its agencies or departments is named as the defendant is Proscribed by the Eleventh Amendment." In *Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238 n.1, 87 L. Ed. 2d 171, 105 S. Ct. 3142 (1985),* the Supreme Court noted that Eleventh Amendment Immunity may be waived when there has been an "unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." No showing exists that Delaware has waived this immunity. See *Ospina v. Dept. of Corrections, 749 F. Supp. 572, 578 (D. Del. 1990).* The court, therefore, will grant summary judgment in

favor of the Delaware Air National Guard for each [*7] of plaintiff's claims.

### 2. Claims Against Lt. Colonel Powell

Plaintiff's claims against defendant Powell must likewise be dismissed. It is true that supervisors of technicians in the National Guard have been found to act "under color of state law" for the purposes of suits under § 1983. *Johnson v. Orr, 780 F.2d 386, 392 (3d Cir. 1986).* [HN4] In suits under § 1983 for damages, however, the Supreme Court has held that state officials acting in their official capacity are not "persons." *Will v. Michigan Dept. of State Police, 491 U.S. 58, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989).* Plaintiff does not indicate in either his original or his revised complaint that he is bringing claims against defendant Powell in anything other than his official capacity. The complaint states that "Defendant is a government agency." (D.I. 30 at P II) n4 In addition, [HN5] the Third Circuit has held that officers of the National Guard have official immunity from suits for damages by their subordinates. *Jorden v. National Guard Bureau, 799 F.2d 99, 107-08 (3d Cir. 1986).* Plaintiff has not requested any relief aside from damages. The court, therefore, will grant summary judgment in favor of defendant [*8] Powell on all claims.

n4 Plaintiff's brief does offer arguments concerning qualified immunity in response to defendants' brief, but neither the brief nor the complaint contains any allegations identifying any conduct on the part of this defendant that might form the basis of an individual claim. The brief merely states that defendant Powell "violated the constitutional rights of plaintiff," and in the same section states that "he was named as the head of his agency." (D.I. 23 at 35)

Because all claims will be dismissed against the only state defendants in this case, plaintiff's § 1983 claim must be dismissed in its entirety. See *Long v. Parker, 390 F.2d 816, 819 (3d Cir. 1968)* [HN6] (§ 1983 applies only to state actors, not federal agencies or officers).

### C. Employment Discrimination Claim

#### 1. Plaintiff's Employment Status

Another anomalous feature of the National Guard's hybrid nature is the status of its civilian employees. [HN7] Under *32 U.S.C. § 709,* the National Guard may employ civilians as technicians [*9] for administration, training, and maintenance and repair of supplies. Technicians employed under this section are paid from federal funds and are explicitly designated "employee[s] of the

United States." *32 U.S.C. § 709(d).* Plaintiff contends that without discovery, he does not know whether he was a technician and thus a federal employee under § 709. This contention does not create an issue of material fact. Plaintiff must be aware of the description and title of a job he held for three years. Whether that title and job description match those of the statute involve an interpretation of law, not an issue of material fact. Plaintiff does not cite any authority to support the proposition that civilians may be employed by the National Guard as non-technicians, outside the aegis of § 709. The official record of termination submitted by defendants with their brief cites § 709 as the legal authority for plaintiff's termination. (D.I. 10 at Exhibit 5) In addition, plaintiff refers to himself repeatedly in his amended complaint as a technician (e.g., D.I. 30 at PP III, XIX, XXV, XXX, XXXII, XXXVIII, XLI) and bases his § 1983 claim on defendants' alleged failure to follow the "National [*10] Guard Technician Personnel Regulations regarding Discipline and Adverse Action." (D.I. 30 at P XIX) This court concludes, therefore, that plaintiff was a federal employee covered by the provisions of § 709 throughout his tenure with the Delaware Air National Guard.

#### 2. Preemptive Effect of Title VII

[HN8] Title VII provides the exclusive remedy for federal employees seeking redress for employment discrimination. *Brown v. General Services Administration, 425 U.S. 820, 48 L. Ed. 2d 402, 96 S. Ct. 1961 (1976).* The Supreme Court held in Brown that by implementing the 1972 amendment to the Civil Rights Act, Congress intended to create "an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Id. at 829.*

Plaintiff has brought his discrimination claim under the Rehabilitation Act. The Rehabilitation Act incorporates the enforcement mechanisms and remedies of Title VII. *29 U.S.C. § 794a.* [HN9] The Third Circuit has recently held that Title VII supplies the exclusive remedy for suits against federal agencies under the Rehabilitation Act. *Spence v. Straw, 54 F.3d 196 (3d Cir. 1995).* Thus, Title VII preempts all other federal [*11] constitutional and statutory claims based on the same set of facts.

#### 3. Failure to Exhaust Administrative Remedies

Before bringing suit in a federal court, plaintiff must exhaust his administrative remedies. [HN10] "Where Title VII remedies are available, they must be exhausted before a plaintiff may file suit." *Spence, 54 F.3d at 200.* Plaintiff does not dispute the existence of this requirement, but rather contends that he has complied with it. Plaintiff claims that by requesting an appellate review of his termination, he has done all that is necessary. This contention is simply incorrect.

[HN11] Title VII gives the Equal Employment Opportunity Commission the authority to enforce the Civil Rights Act. *42 U.S.C. § 2000e-16.* Federal regulations make clear that the EEOC's authority extends to employees of the military. 29 C.F.R. § 1613.201(b). These regulations also lay out the specific steps that federal employees must take to pursue claims of discrimination, beginning with consultation with an Equal Employment Opportunity Counselor. 29 C.F.R. § 1613.213. Plaintiff does not claim to have fulfilled this requirement, and an affidavit submitted by defendants confirms this fact. [*12] (D.I. 10 at Exhibit 8) Therefore, the court concludes that plaintiff has failed to exhaust his administrative remedies and, accordingly, summary judgment must be granted in favor of federal defendant Widnall on plaintiff's employment discrimination claim.

### D. Wrongful Termination Claims

As plaintiff correctly points out, [HN12] additional claims are preempted by Title VII where they constitute mere "attempts to bypass the administrative and remedies restrictions of Title VII 'by the simple expedient of putting a different label on the pleadings.'" *Baird v. Haith, 724 F. Supp. 367, 373-74 (D. Md. 1988),* quoting *Brown, 425 U.S. at 833.* At least to some extent, plaintiff has laid out a distinct factual predicate for his claims of wrongful termination, breach of contract, and intentional infliction of emotional distress.

Federal employees' claims stemming from improper dismissals are ordinarily covered by the Civil Service Reform Act. This act provides the exclusive remedy for wrongful dismissals, and requires an initial determination by the Merit Systems Protection Board (MSPB). [HN13] The National Guard Technicians Act, however, limits the MSPB's review of National Guard Technicians' [*13] terminations. Under *32 U.S.C. § 709*(e)(3), a technician may be separated from his employment by the adjutant general for cause. Section 709(e)(5) provides that the employee's right of appeal from such a termination "shall not extend beyond the adjutant general of the jurisdiction concerned."

The purpose underlying the unreviewability of removals for cause by the adjutant general is the recognition that such decisions have a military component. *Ne-Smith v. Fulton, 615 F.2d 196, 201 (5th Cir. 1980).* This purpose is underscored in this case by the fact that plaintiff's absence occurred during the critical period of the Gulf War when, as plaintiff acknowledges, many National Guard members had been called into active duty. (D.I. 30 at P VIII)

Plaintiff at bar did exhaust his administrative remedies under the National Guard Technicians Act, *32*

*U.S.C. § 709,* by appealing his dismissal to the adjutant general. The only federal remedy remaining to plaintiff for his alleged wrongful termination would be suit under *42 U.S.C. § 1983* for violations of constitutionally protected rights by individuals acting under color of state law. See *Johnson v. Orr, 780 F.2d at 395.* Plaintiff is precluded [*14] from pursuing such a cause of action, however, because he failed to name proper state actors and because he asserts only a § 1983 damage action. *Jorden v. National Guard Bureau, 799 F.2d at 107-08* (State military defendants are immune from a damages action under § 1983).

### E. Sovereign Immunity

Even if plaintiff's wrongful termination claims were not precluded by Title VII and the National Guard Technicians Act, plaintiff could not pursue those claims in this court. Plaintiff's suit is against his former employer, the United States. As a basic principle, [HN14] the United States, its agencies, and its officials acting in their official capacity cannot be sued for damages unless it has specifically consented to be sued. *United States v. Sherwood, 312 U.S. 584, 586, 85 L. Ed. 1058, 61 S. Ct. 767 (1941).* In instances where sovereign immunity has been waived, plaintiffs must comply with the conditions attached to the waiver. *Lehman v. Nakshian, 453 U.S. 156, 160, 69 L. Ed. 2d 548, 101 S. Ct. 2698 (1981).*

[HN15] The United States has consented to be sued for breach of contract. *28 U.S.C. § § 2679, 1346.* The United States Code clearly states, however, that "the district courts shall [*15] not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States . . . ." *28 U.S.C. § 1346*(a)(2). This court, therefore, is without jurisdiction to hear plaintiff's breach of contract claim, and will dismiss it accordingly.

[HN16] The Federal Tort Claims Act (FTCA) provides the exclusive avenue for tort claims against the United States. *28 U.S.C. § 2679*(a). The FTCA requires that tort claims be presented first to the appropriate federal agency. *28 U.S.C. § § 2675*(a), 2401(b). Plaintiff does not claim to have complied with this requirement. This court, therefore, cannot hear his claim under the Federal Tort Claims Act.

### IV. CONCLUSION

For the foregoing reasons, summary judgment will be entered against plaintiff on all claims and in favor of all defendants. An order consistent with this opinion shall issue.

# EXHIBIT B

LEXSEE 2000 U.S. DIST. LEXIS 14998

**BYRON H. LAMPKIN, Plaintiff, v. WILLIAM S. COHEN, SECRETARY DEPARTMENT OF DEFENSE, Defendant.**

**CIVIL ACTION NO. 00-CV-657**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2000 U.S. Dist. LEXIS 14998*

**October 12, 2000, Decided**
**October 12, 2000, Filed**

**DISPOSITION:** [*1] Motion for Summary Judgment filed by Defendant granted.

**COUNSEL:** For BYRON H. LAMPKIN, PLAINTIFF: BYRON H. LAMPKIN, YEADON, PA USA.

For WILLIAM S. COHEN, DEFENDANT: SUSAN DEIN BRICKLIN, U.S. ATTORNEY'S OFFICE, PHILA, PA USA.

**JUDGES:** ROBERT F. KELLY, J.

**OPINIONBY:** ROBERT F. KELLY

**OPINION:**

### MEMORANDUM

ROBERT F. KELLY, J.

October 12, 2000

Before this Court is the Motion for Summary Judgment filed by Defendant, William S. Cohen, Secretary of the Department of Defense ("Defendant"). Plaintiff Byron H. Lampkin ("Mr. Lampkin"), an employee of the Defense Industrial Supply Center in Philadelphia, Pennsylvania ("DISC"), brings this action *pro se* alleging that he was discriminated against because of his race, color and sex or retaliated against when he was not selected for three different job promotions within the DISC. For the reasons that follow, the Motion is granted.

### I. BACKGROUND.

Mr. Lampkin, an African American male, is currently an Inventory Manager at DISC. He has held that position at various grades for approximately seventeen years, which is the length of his career at DISC. In 1997,

Mr. Lampkin applied for a position as Commodities Business Specialist GS 1101-09 Target 11. He [*2] was informed that although he was qualified for the position, he was not ranked among the best qualified candidates for the position. Accordingly, he was not referred for an interview. His application for the position had been reviewed under Article 13 of the union agreement, the crediting plan, and although he received the maximum number of points for experience, he did not receive sufficient points in performance, education and training categories. Forty-two people were referred for the position of Commodity Business Specialist. Of the forty-two, eight were African American males.

In June of 1997, Mr. Lampkin applied for the position of Customer Liaison Specialist GS-0301-11. Mr. Lampkin was evaluated by a three member panel for this position. Again, he was ranked as qualified for the position but not among the best qualified candidates. He was not referred for an interview. However, before an individual was selected for the position, the position was canceled, and no one actually obtained the position. Nonetheless, Mr. Lampkin complains that his score in the experience category, 40 out of 60, was unfair and was based upon race, color, sex and/or retaliation for his having filed [*3] an EEO complaint concerning the first position. The three people who made up the panel, two of whom were African American males, denied that their decision was based upon race, color, or sex. They also claimed not to have been aware of Mr. Lampkin's previous EEO complaint, and that they had not retaliated against him.

In September of 1997, Mr. Lampkin applied for the position of Supply Management Specialist GS-2003-09 Target 11. He was referred for an interview for this position. He does not object to the ranking process that was employed in connection with this position, even though it was the same ranking process that was used in connec-

2000 U.S. Dist. LEXIS 14998, *

tion with the two previous positions, and was governed by Article 13. Mr. Lampkin was interviewed by a Mr. Buckman for approximately forty-five minutes, but does not remember what questions were asked. Five people were selected for this position, three black females and two white males. Mr. Lampkin asserts that he was discriminated against because he believes that the two white males who were selected for the position were less qualified than him. Mr. Buckman testified in his affidavit that he did not the consider race, color or sex of any of the [*4] candidates in making his selections, but rather focused on each applicant's answers to job-related questions.

Mr. Lampkin filed this *pro se* Complaint on February 4, 2000. The Complaint asserts an undefined claim of discrimination without citing to any statute or law which is alleged to have been abridged. However, because Mr. Lampkin claims the discrimination was based on his race, color or sex, we will assume that he is asserting a disparate treatment claim under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000-*e et seq. ("Title VII"). Moreover, because he complains that the selection process itself is discriminatory, we will assume that Mr. Lampkin is also asserting a claim of disparate impact under Title VII. Finally, Mr. Lampkin appears to be asserting a theory that he was denied the promotions in retaliation for his EEO activity. He seeks a promotion to an unspecified position of Grade GS-11, retroactive pay from the time the discrimination occurred, and $ 25,000 punitive damages for "mental anguish." (Compl. at P 4).

Discovery having been completed, Defendant filed this summary judgment motion on August 14, 2000. Mr. Lampkin did not [*5] respond to this motion. By Order dated September 26, 2000, this Court directed Mr. Lampkin to file a proper response. Apparently in an attempt to comply with this Court's Order, Mr. Lampkin submitted his own Motion for Summary Judgment on October 5, 2000. n1 We will treat Mr. Lampkin's Motion as a response to Defendant's Motion.

n1 Mr. Lampkin failed to file this motion with the Clerk of Court. It was officially filed on October 10, 2000.

## II. STANDARD OF REVIEW.

While *pro se* complaints are entitled to liberal construction, the plaintiff must still set forth facts sufficient to survive summary judgment. *Shabazz v. Odum, 591 F. Supp. 1513 (1984)*(citing *King v. Cuyler, 541 F. Supp. 1230, 1232 n.3 (E.D.Pa. 1982))*. "Summary judgment is

appropriate when, after considering the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact remains in dispute and 'the moving party is entitled to judgment as a matter of law.'" *Hines v. Consolidated Rail Corp., 926 F.2d 262, 267 (3d Cir. 1991)* [*6] (citations omitted). "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The moving party carries the initial burden of demonstrating the absence of any genuine issues of material fact. n2 *Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362 (3d Cir. 1992)*, cert. denied, *507 U.S. 912, 122 L. Ed. 2d 659, 113 S. Ct. 1262 (1993)*. Once the moving party has produced evidence in support of summary judgment, the nonmovant must go beyond the allegations set forth in its pleadings and counter with evidence that demonstrates there is a genuine issue of fact for trial. *974 F.2d at 1362-63*. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. [*7]

n2 "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Professional Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D.Pa.)* (citations omitted), aff'd, *172 F.3d 40 (3d Cir. 1998)*.

## III. DISCUSSION.

In order to establish a claim of disparate treatment under Title VII, a plaintiff must show that he is a member of a protected class and was qualified for an employment position, but that he was either not hired for that position or was fired from it "under circumstances that give rise to an inference of unlawful discrimination." *Hampton v. Borough of Tinton Falls Police Dep't, 98 F.3d 107 (3d Cir. 1996)*(quoting *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981))*. [*8] Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate one or more legitimate, non-

discriminatory reasons for its employment decision. Id. If one or more such reasons are proffered, the presumption of discrimination created by the prima facie case is dispelled, and the plaintiff must prove that the employer's proffered reason or reasons was pretext and that the real reason for the employment decision was discriminatory. Id.

In order to establish a claim of disparate impact discrimination under Title VII, a plaintiff is required to demonstrate that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern. *Newark Branch, NAACP v. Town of Harrison, 940 F.2d 792, 798 (3d Cir. 1991)*(citing *Dothard v. Rawlinson, 433 U.S. 321, 329, 53 L. Ed. 2d 786, 97 S. Ct. 2720 (1977))*. Moreover,

> the evidence in these disparate impact cases usually focuses on statistical disparities.... A comparison between the racial composition of those qualified persons in the relevant labor market and that of those in the jobs at issue typically forms the proper basis for the [*9] initial inquiry in a disparate impact case. Once the plaintiffs have succeeded in establishing a prima facie case of disparate impact, the focus shifts to a business justification for continued use of the challenged practice which the employer may offer. The employer bears the burden of production with respect to whether a challenged practice serves, in a significant way, the legitimate employment goals of the employer. Of course, the burden of persuasion with respect to business justification remains with the plaintiffs. Should the plaintiffs be unable to discredit the legitimate business justification asserted, they may, nonetheless, prevail, where they are able to suggest a viable alternative to the challenged practice which has the effect of reducing the disparate impact and the employer refuses to adopt the alternative.

Id. (internal citations and quotations omitted).

To establish a claim of retaliation under Title VII, a plaintiff must show that: (1) he engaged in a protected activity; (2) his employer took an adverse employment action after or at the same time as the employee's protected activity; (3) there was a causal link between the protected activity and the [*10] adverse action. *Williams v. Pennsylvania State Police, 108 F. Supp. 2d 460,*

*465 (E.D.Pa. 2000)*(citing *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000))*.

A review of Mr. Lampkin's complaint, response to Defendant's summary judgment motion and deposition reveals that he has failed to produce any evidence to support his allegations. n3 Although he insists that he was not promoted based on his race, color or sex and discriminated against in retaliation for his EEO activity, he cannot identify any individual who was responsible for the alleged discrimination. He insists merely that "management" was responsible. When asked repeatedly who discriminated against him in connection with the three jobs at issue in this case, Mr. Lampkin replied only "People. The rating system. The people who knows (sic) that I do a good job, the management, and everybody that's been over me down through the years." (Lampkin Dep. at 91). When asked for specific names of individuals, Mr. Lampkin replied that he would "rather not say," or does not remember. Id. at 84-85.

> n3 Mr. Lampkin's three and a half page response to this motion merely reiterates the allegations contained in his one and a half page complaint and discussed in his deposition.

[*11]

Moreover, with regard to the first position, when asked to provide any evidence that he was discriminatorily not selected for the first position, Mr. Lampkin replied only:

> A. When I look at the Agency, when I look at the people in my section, when I look at people within the building, when I look at my qualifications, when I look at Article 13, and when I look all around me and when I see that the Agency withholds evidence and would not allow me to see who they selected, their performance appraisals and education, yes, there's plenty of evidence.
>
> Q. Is there anything else that you can think of?
>
> A. No, not right offhand.

Id. at 31. Further, while Mr. Lampkin claims that the rating system discriminates against African-American men, and that therefore he is the subject of disparate impact discrimination, out of the forty-two applicants re-

ferred for interviews for this position, eight of them (nineteen percent) were African American males. According to the NAACP Federal Sector Task Force report dated October 23, 1998, upon which Mr. Lampkin relies in support of his claims, the DISC task force for Fiscal Year 1997 was only eight percent African American male. [*12] n4 As such, Mr. Lampkin has failed to establish that the rating system at issue had an adverse impact on the African American males who were referred for interviews for this position.

> n4 Mr. Lampkin has provided no information concerning the applicant pool for this job, and the NAACP Federal Sector Task Force report is the only "evidence" he has referenced which concerns the makeup of the work force at DISC.

With regard to the second position, this position was cancelled and therefore was never obtained by any individual. Nine of the thirty-two people who were referred for interviews for this position were African American, and four of them were male. Nonetheless, Mr. Lampkin claims that his evaluation by the three member panel for this position was discriminatory. The only "evidence" that Mr. Lampkin cites to in support of this allegation is that he believes he was given low scores in retaliation for having complained about not being selected for the first position. (Lampkin Dep. at 40). He provides no evidence [*13] to rebut the panel members' assertions that they were unaware that he had filed a previous complaint. Id. at 38. He claims that although the three individuals who formulated his scores in evaluating him for this position, two of whom were black males, "had nothing to do with [the discrimination]", they were given orders to discriminate against him by "management." Id. at 35. When asked for specific evidence supporting this allegation, Mr. Lampkin asserted only that "It's all there in black and white. It's retaliation for me having a complaint. Okay?" Mr. Lampkin concedes that he has no evidence to support this claim other than the fact that he believed his scores were too low. Id. at 36-37.

Finally, with regard to the third position, Mr. Lampkin does not believe that the referral process was discriminatory, because he was deemed qualified for and referred for an interview. Id. at 45. Two white males and three African American females were selected for this position. However, he claims he was retaliated against because he is a black male, since the two white males whom he believes were less qualified were selected for

the position. At no time during the interview [*14] did anyone mention Mr. Lampkin's race, sex or color. Id. at 54. Mr. Lampkin's only support for his claim with regard to this position is that his division chief discriminated against him by failing to "put in a good word" for him and instead "saying nothing." Id. at 87, 86. When asked for evidence that his division chief had in fact failed to support him, Mr. Lampkin replied, "Because it's obvious. Everything is right in my packet." Id. at 88.

Moreover, with regard to his retaliation allegations in connection with this position, Mr. Lampkin has again failed to provide any evidence that any of the relevant decision-makers were even aware of his EEO activity, or the identities of the members of "management" who were directing them to retaliate against him. Rather, the only evidence that Mr. Lampkin has offered is the mere fact that he was not selected. Id. at 57.

In attempting to survive a summary judgment motion, the non-moving party must "raise more than a mere scintilla of evidence in its favor." *Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)*(citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))* [*15] When opposing a summary judgment motion, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions. Id. (citing *Celotex Corp., 477 U.S. 317 at 325)*. Moreover, "unsubstantiated and subjective beliefs and opinions are not competent summary judgment evidence." *Forsyth v. Barr, 19 F.3d 1527* (5th Cir.), cert. denied, *513 U.S. 871 (1994)*. In the instant case, as illustrated above, Mr. Lampkin's claims are based solely upon his subjective suspicions that he was discriminated against by "management" because he was not part of the "good old boy system." He has produced no specific evidence to support his claims, nor has he even identified any individuals who were responsible for the alleged discrimination. As such, his claims cannot survive summary judgment, and are therefore dismissed.

An appropriate Order follows.

**ORDER**

AND NOW, this 12th day of October, 2000, upon consideration of Defendant's Motion for Summary Judgment, and Plaintiff's Response thereto, it is hereby ORDERED that the Motion is GRANTED.

BY THE COURT:

Robert F. Kelly, J.

# EXHIBIT C

LEXSEE 2004 U.S. DIST. LEXIS 15711

**CAROL JONES v. HOSPITAL OF UNIVERSITY OF PENNSYLVANIA**

**CIVIL ACTION NO. 03-CV-4938**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2004 U.S. Dist. LEXIS 15711*

**August 5, 2004, Decided**
**August 5, 2004, Filed; August 6, 2004, Entered**

**PRIOR HISTORY:** *Jones v. Hosp. of Univ. of Pa., 2004 U.S. Dist. LEXIS 9691 (E.D. Pa., May 24, 2004)*

**DISPOSITION:** Defendant's motion for summary judgment was granted.

**COUNSEL:** [*1] For CAROL JONES, Plaintiff: SAMUEL A. DION, DION & GOLDBERGER, PHILADELPHIA, PA.

For HOSPITAL OF UNIVERSITY OF PENNSYLVANIA, Defendant: FRANK J. CONLEY, LITTLER MENDELSON, P.C., PHILADELPHIA, PA. KRISTINE GRADY DEREWICZ, LITTLER MENDELSON, PC, PHILADELPHIA, PA.

**JUDGES:** R. Barclay Surrick, Judge.

**OPINIONBY:** R.Barclay Surrick

**OPINION: Surrick, J.**

August 5, 2004

**MEMORANDUM & ORDER**

Presently before the Court is Defendant Hospital of the University of Pennsylvania's ("HUP") Motion for Summary Judgment. For the following reasons, Defendant's Motion will be granted.

**I. FACTS**

Plaintiff, Carol Jones, began employment with Defendant, the Hospital of the University of Pennsylvania, as a night shift patient care observer ("PCO") on July 30, 2001. Plaintiff was not pregnant when she began her employment with Defendant. (Br. in Opp'n to Mot. for Summ. J. at 2-3.) Between September 15, 2001, and November 24, 2001, Plaintiff used three sick days, two vacation days, and one personal day. (Jones. Aff., attached as Ex. B of Br. in Opp'n to Mot. for Summ. J.) On November 27, 2001, Plaintiff's supervisor, Tilly Heggs, n1 prepared Plaintiff's performance evaluation. The evaluation was generally [*2] favorable, as Plaintiff earned marks of "2" on a 0-4 scale, indicating that Plaintiff "Consistently Meets Standards." However, due to Plaintiff's absenteeism, Heggs extended Plaintiff's probationary period for an additional ninety days. n2 In late November or early December 2001, Plaintiff informed Heggs that she was pregnant. (Id. at 3.) Plaintiff alleges that in March 2002, Plaintiff explained that she was experiencing problems with her pregnancy, including back pain. Plaintiff states that on March 20, 2002, she was "forced to call out sick due to back pain which was related to her pregnancy." (Br. in Opp'n to Mot. for Summ. J. at 3.) On March 26, 2002, Plaintiff's doctor wrote Defendant a letter, requesting that Plaintiff be moved to the day or evening shift. For the purposes of this Motion, Defendant admits that it denied this request. (Def. HUP's Mot. for Summ. J. at 4.) Plaintiff alleges that during this same time, Heggs stated that Plaintiff needed to rethink her job options at HUP, that Plaintiff should rethink what she wanted to do, and that she "couldn't just keep calling out and bringing her notes." (Jones Dep. at 33, Ex. P to Br. in Opp'n to Mot. for Summ. J.) Shortly [*3] thereafter, Plaintiff submitted a request for a leave of absence. It was granted. (Id. at 33-34.)

n1 Defendant employs three PCO supervisors. Unless schedules have been altered to accommodate vacations and other absences, Heggs is responsible for the night shift, Nancy Williams is responsible for the evening shift, and Jean Romano is responsible for the day shift. (Romano Decl. at P 2.)

n2 In addition to numerical evaluations, Heggs included the following:

> Carol understands the role of Patient Care Observer. She maintains a safe environment and protects the patient from injury. Carol documents patients behavior on the flow sheet. Carol received a coaching on November 23, 2001, for unscheduled absences.
>
> Plan:
>
> Extend probationary period for the next 90 days, due to excessive absenteeism. Ms. Jones received a copy of the Absence Control Policy, we reviewed policy and discussed the patterns of absenteeism. Continue to monitor absenteeism.
>
> Goals:
>
>> 1. Call out 2 hours prior [to] the shift.
>>
>> 2. Maintain flexibility with assignment (floor care or 1:1).
>>
>> 3. Decrease the usage of unscheduled absences.
>>
>> 4. Identify learning needs of the CNA role.
>>
>> 5. Increase compliance with policies.

(Ex. B to Br. in Opp'n to Summ. J.)

[*4]

Plaintiff began her maternity leave on April 1, 2002, gave birth on July 18, 2002, and returned to work on October 1, 2002. When Plaintiff returned from leave, Heggs was on vacation for her honeymoon and did not return until October 10, 2002. (Heggs Dep. at 7-10, Ex. R to Br. in Opp'n to Summ. J.) During Heggs's absence,

Williams supervised patients on the night shift. On October 8, 2002, during her second shift back from maternity leave, Plaintiff was terminated for sleeping during a one-on-one (1:1) observation of a suicidal patient. n3 Plaintiff denies this allegation.

> n3 According to Plaintiff, a 1:1 "is when a patient care observer is assigned to watch a patient who cannot be left alone because they may be a danger to themselves or others. Examples of patients that are a danger to themselves or others are persons with dementia, suicidal ideations, or drug abuse problems." (Br. in Opp'n to Summ. J. at 6, n.2 (citing Heggs Dep. at 19; Miller Dep. at 8-9).)

According to Elizabeth Miller, a part-time nursing [*5] coordinator at HUP, Plaintiff was sitting in a chair, with her eyes closed, and she did not move or respond as Miller came into the room, and stood in front of Plaintiff, observing her for one to two minutes. (Miller Dep. at 13-14, Ex. S to Br. in Opp'n to Summ. J.) Miller testified that after determining that the patient was not in need of immediate assistance, she went to the nurse's station to ask Pat Piesieski, a nursing coordinator, to witness Plaintiff sleeping. (Id. at 14.) Miller indicated that when she and Piesieski returned to the room, Piesieski pushed the door open, which made a loud noise. The noise awakened Plaintiff causing her to sit up. Miller describes Plaintiff's eyes as "very red" indicating that Plaintiff "appeared to be sleepy." (Id. at 15.) Plaintiff contends that she was not asleep when Miller walked into the room. Plaintiff states that her back was to the door, but through the reflection in the window, she saw that someone had partially entered the room for a moment, but left immediately. (Jones Dep. at 45-46, Ex. P to Br. in Opp'n to Summ. J.)

Piesieski spoke with Jones in a conference room and explained that she could be disciplined for sleeping [*6] on the job. She instructed Plaintiff to go home until a supervisor could be notified. Miller and Piesieski explained their observations in individual email messages. n4 Williams decided that termination was appropriate. Defendant's Human Resources Generalist Jeanne Esposito confirmed that termination was appropriate. Williams called Plaintiff and asked her to return to work for a meeting. At the meeting Williams informed Plaintiff that her employment would be terminated.

> n4 Miller's email message to Heggs, sent at 8:52 a.m. on October 8, 2002, states:

2004 U.S. Dist. LEXIS 15711, *

Dear Tilly,

At approx. 0530 on Oct. 8, I walked into F1268 to check on A. Wade, on 1:1 SL. Carol Jones, PCO, was slumped in the arm-chair, with her body and her head leaning over on the right arm of the chair. Her eyes were closed. I walked over and stood beside her, she neither moved nor acknowl-edged my presence.

I called Pat Piesieski, who entered the room with me. This time Carol sat up when she heard us enter. Her eyes were reddened, and she appeared sleepy. Pat and I dis-cussed with her the seriousness of not properly observing the patient and informed her that disciplinary action of some sort would follow. She was sent home.

(Ex. K to Br. in Opp'n to Mot. for Summ. J.)

[*7]

On March 28, 2003, Plaintiff filed a Charge of Dis-crimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC dismissed Plaintiff's charge on August 1, 2003. (Jt. Case Rep. at 1.) On Au-gust 29, 2003, Plaintiff filed the instant Complaint alleg-ing violations of Title VII, *42 U.S.C. § 2000e et seq.*, and the Family and Medical Leave Act ("FMLA"), *29 U.S.C. § 2601 et seq.* On December 19, 2003, the parties agreed to a voluntary dismissal of Plaintiff's FMLA claim. (Doc. Nos. 5, 6.) Plaintiff presently claims that Defendant's proffered reason for terminating Plaintiff, sleeping while on suicide watch, was a pretext for De-fendant's pregnancy discrimination. n5 Defendant claims that it had a legitimate, nondiscriminatory reason for its actions. Defendant asserts that following Plaintiff's six-month leave, she was restored to her previous position. (Jt. Case Report at 2.) Defendant maintains that Plaintiff was terminated for performance reasons; specifically, for sleeping during suicide watch.

n5 Plaintiff attempts to establish discrimina-tion with broad brush accusations of a conspiracy among Defendant's supervisors to discriminate against her. As we will discuss hereinafter in greater detail, the evidence, even viewed in a

light most favorable to the Plaintiff, does not support such a claim. We also observe that while Plaintiff makes these broad allegations, we have responded by analyzing the facts in detail. After a thorough examination of the facts, we conclude that the record before us simply does not support Plaintiff's accusations.

[*8]

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c).* The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970).* Once the moving party carries this initial burden, the nonmov-ing party may not rest upon the mere allegations in its pleading, but must set forth specific facts showing that there is a genuine issue for trial. *FED. R. CIV. P. 56(e).* However, in considering the motion, we will not resolve factual disputes or make credibility determinations, and we must view facts and inferences in the light most fa-vorable to the nonmoving party. *Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).*

Plaintiff claims pregnancy discrimination under Ti-tle [*9] VII, for allegedly "discriminating against, retali-ating against, failing to reasonably accommodate, and terminating plaintiff based on her pregnancy." (Compl. at P 14.) To establish this claim, Plaintiff must demonstrate that "she was treated less favorably than a nonpregnant employee under identical circumstances and that her pregnancy was the reason she was treated less favora-bly." *Sacavage v. Jefferson Univ. Physicians, Civ.A. No. 99-3870, 2000 U.S. Dist. LEXIS 8634, at *2 (E.D. Pa. June 20, 2000)* (citing *Piraino v. Int'l Orientation Re-sources, Inc., 137 F.3d 987, 990 (7th Cir. 1998)).* Plain-tiff must establish that "Defendant treated similarly situ-ated nonpregnant employees 'more favorably.'" Id. (citing *Hunt-Golliday v. Metropolitan Water Reclamation Dist., 104 F.3d 1004, 1011 (7th Cir. 1997)).*

Under the McDonnell Douglas burden shifting framework, Plaintiff carries the initial burden of proving a prima facie case of discrimination. *McDonnell Doug-las Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* If Plaintiff is able to establish a prima facie case, the burden of production shifts to De-fendant [*10] to "articulate some legitimate, nondis-

criminatory reason" for the adverse employment decision. Id. Once Defendant has "demonstrated a legitimate reason for the employment action, the presumption of discrimination raised by the prima facie case is rebutted." *Sacavage, 2000 U.S. Dist. LEXIS 8634, at *6* (citing *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)).* Plaintiff will then be required to "satisfy her ultimate burden of proving, by a preponderance of the evidence, that the defendant's proffered reason is not the 'true reason' for the decision, but instead is merely a pretext for discrimination." Id. (citing *Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 136 (3d Cir. 1997)* (internal citations omitted)). "A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false and that discrimination was the real reason." *Hicks, 509 U.S. at 516.* Further, "it is not enough .... to disbelieve the employer; the fact-finder must believe the plaintiff's explanation of intentional discrimination." *Id. at 520.*

## III. DISCUSSION [*11]

### A. Alleged Pregnancy Discrimination

#### 1. Prima Facie Case

Defendant first asserts that Plaintiff fails to establish a prima facie case of pregnancy discrimination under the *Pregnancy Discrimination Act* (PDA) because Plaintiff was not a member of the protected class. To establish a prima facie case of pregnancy discrimination, Plaintiff must offer sufficient evidence that she was: (1) a member of the protected class; (2) qualified for the position; (3) suffered an adverse employment decision; and (4) non-members of the protected class were treated more favorably. n6 *Goosby v. Johnson & Johnson Medical, Inc., 228 F.3d 313, 318-19 (3d Cir. 2000)* (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1993)*).

> n6 Plaintiff has identified several comparators in support of her contention that nonmembers of the protected class were treated more favorably and in support of her argument that Defendants reason for terminating her was pretext. We will identify these comparators by initials to preserve confidentiality.

[*12]

Defendant contends that Plaintiff was not a member of the protected class at the time of the October 8, 2002, termination because she was no longer pregnant. Plaintiff had returned from maternity leave one week prior to her termination, and had delivered her baby on July 18, 2002, two and one-half months prior to the adverse em-

ployment decision. Plaintiff contends that, despite her non-pregnant state, she was still covered by the PDA because "protections of the Pregnancy Discrimination Act of 1978 extend not only to women who are presently pregnant, but also extend before and after their pregnancy." (Br. in Opp'n to Mot. for Summ. J. at 16, n.6.) Although the Third Circuit has not had opportunity to address this issue directly, in Geraci v. Moody-Tottrup, Int'l, Inc., that court indicated that the elements of a prima facie case "must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination." *82 F.3d 578, 581 (3d Cir. 1996).* While the Geraci court focused on the defendant employer's knowledge of the employee's pregnancy, not whether a nonpregnant employee is covered by the PDA, n7 their approach [*13] is instructive. Acknowledging this approach, the district court in Solomen v. Redwood Advisory Co. stated: "Pregnancy also differs from most other protected personal attributes in that it is not immutable. While some effects of pregnancy linger beyond the act of giving birth, at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions,' for purposes of the PDA." *183 F. Supp. 2d 748, 753 (E.D. Pa. 2002)* (quoting *42 U.S.C. § 2000e(k)).* The Solomen court ultimately concluded that the plaintiff, who had given birth eleven months before being terminated, and had returned to work seven months prior, was no longer covered by the PDA. In reaching this conclusion, however, the court stated that "in many pregnancy discrimination claims, concerns about the plaintiff's membership in the protected class do not arise because the employee obviously suffered the adverse employment action during pregnancy, maternity leave, or shortly after returning to work." *Id. at 753* (emphasis added). See also *Briody v. American Gen. Fin., Co., 1999 U.S. Dist. LEXIS 8405, Civ.A. No. 98-2728, 1999 WL 387269* [*14] *(E.D. Pa. May 28, 1999)* (questioning whether plaintiff's previous pregnancy (plaintiff had returned from maternity leave approximately four weeks prior) had influenced employer's decision to transfer); *Hayman v. WYXR-FM, 1992 U.S. Dist. LEXIS 12501, Civ.A. No. 91-6444, 1992 WL 210113 (E.D. Pa. Aug. 21, 1992)* (defining class membership as pregnant or on maternity leave). The Solomen court went on to conclude that when a plaintiff is not within temporal proximity to her pregnancy, her membership in the protected class is less clear and she must therefore "introduce evidence sufficient to allow the case to go to a jury, that she was 'affected by pregnancy, childbirth or related medical conditions' at the time of the adverse employment action." *Id. at 754.* In the instant case, Plaintiff had given birth two and one-half months prior to being terminated and had only returned to work one week prior to being terminated. We conclude that Plaintiff has demonstrated sufficient temporal proximity

to her pregnancy to fall within the protected class of the PDA.

n7 The PDA states, in part:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work....

*42 U.S.C. § 2000e(k).*

[*15]

With regard to the remaining elements of a prima facie case, in light of Plaintiff's satisfactory work evaluation, we conclude that she was qualified for the position. Moreover, it is undisputed that Plaintiff suffered an adverse employment action. Plaintiff's allegation that members outside of the protected class were treated more favorably is problematic. For reasons discussed hereinafter in greater detail, we conclude that Plaintiff's comparators are not sufficient to support Plaintiff's position.

### 2. Legitimate Reason for the Termination

Defendant contends that even if Plaintiff were able to establish a prima facie case of discrimination, summary judgment is appropriate because Plaintiff cannot meet her ultimate burden under McDonnell Douglas. "Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the plaintiff's termination." *Rhett v. Carnegie Ctr. Assocs (In re Carnegie Ctr. Assocs.), 129 F.3d 290, 295 (3d Cir. 1997)* (citing *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*). Defendant has rebutted Plaintiff's prima facie case [*16] by proffering that it fired Plaintiff for sleeping while on suicide watch. Defendant has provided the statements of Miller n8 and Piesieski, both of whom observed Plaintiff sleeping while performing a one-on-one suicide watch in support of this legitimate nondiscriminatory reason. While Plaintiff denies that she was asleep during that shift, we note that "in pretext discrimination cases such as this, 'the employer need not prove that the tendered

reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 n.6 (3d Cir. 1998)* (quoting *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)*).

n8 Miller testified as follows:

> A. I walked into the room. The door was ajar approximately halfway. As I entered the room I noted that her chair was facing the patient at an angle so that her back was to the door. And I saw her slouched like this. Her head was visible from the right side of the back of the chair and it was supported by her hand and her arm on that side.
>
> Q. So, she was leaning on her arm?
>
> A. Yes, like this, with her head down.
>
> Q. And how far into the room did you walk when you saw that?
>
> A. I walked all the way into the room at that point.
>
> Q. So, what happened after that?
>
> A. I turned and looked at her. I stood between the patient and her - I stood facing her and looking her right in the face for approximately, I don't know, a minute or two. Her eyes were closed. She did not respond to me being in there. I looked at the patient. The patient was asleep. And then I left the room.

(Miller Dep. at 13-14, Ex. S to Br. in Opp'n to Summ. J.)

[*17]

### 3. Pretext

Since Defendant has come forward with a legitimate, nondiscriminatory explanation for Plaintiff's termination, Plaintiff must produce sufficient evidence to raise a genuine issue of fact as to Defendant's true reasons for her termination. To meet this burden, Plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of" Defendant's decision to terminate Plaintiff's employment. *Id. at 644.* We conclude that Plaintiff has failed to show pretext through either option.

Applying the first option to the instant case, it is apparent that Plaintiff has not discredited Defendant's reason for her termination. Miller reported observing Plaintiff asleep for one to two minutes while on suicide watch, and Pieskieski informed Williams that Plaintiff appeared to be waking up as Pieskieski walked into the room. Plaintiff insists that she was not asleep and suggests that her testimony is sufficient to demonstrate pretext. Even if we were to assume [*18] that Miller and Piesieski fabricated their stories, (or misinterpreted Plaintiff's actions), n9 Plaintiff has not demonstrated either that Williams, or the human resources personnel involved in Plaintiff's termination, actually knew that Plaintiff was not sleeping. "It is not enough to show that an employer's decision was wrong; the issue is 'whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.'" *Younge v. St. Paul Fire & Marine Ins. Co.*, 2002 U.S. Dist. LEXIS 12293, *Civ.A. No. 01-4218,* 2002 WL 32351166, *6 (E.D. Pa. June 20, 2002)* (quoting *Jones v. School Dist. of Phila., 198 F.3d 403, 413 (1999)*); *Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997).* "To survive summary judgment, [plaintiff] must demonstrate: such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Id. (quoting *Fuentes, 32 F.3d at 765).* [*19] See also *Quinn v. Pa. Civ. Serv. Comm'n, 2002 U.S. Dist. LEXIS 11386, Civ.A. No. 01-4044, 2002 WL 32349097, *3 (E.D.Pa. March 25, 2002)* ("Instead, it must be shown that the employer's articulated reason was 'so plainly wrong that it cannot have been the employer's real reason.'") (internal citations omitted).

n9 Plaintiff admits that prior to the night in question, she had had limited contact with Miller and Pieskieski, and that none of the contacts were negative.

Q. To the best of your knowledge, you had not worked with Betty [Miller] before?

A. No. I thought she was a doctor when she came in the room.

Q. Pat [Piesieski], you testified you worked with before, but you never had any kind of bad words with her?

A. No.

(Jones Dep. at 84-85, Ex. A. to Def. HUP's Mot. for Summ. J.) Other than Plaintiff's assertions that the coordinators were "out to get" her, Plaintiff does not attempt to explain why Miller and Piesieski would fabricate their stories. (Id. at 83-83.)

In this [*20] case, two employees reported to Williams that Plaintiff was asleep on suicide watch. Based on that information, Williams moved forward with disciplinary measures, in accordance with Defendant's disciplinary policy. Plaintiff suggests that because Williams's shift often overlaps with that of Heggs, Williams was aware of and influenced by Heggs's discriminatory animus toward Plaintiff. However, Plaintiff has offered no evidence to support the alleged influence or Heggs's discriminatory animus. Without at least some evidence supporting the alleged influence, we cannot accept Plaintiff's accusations as true. Moreover, Plaintiff concedes that there was no negative history between her and Williams.

Q. And how about Nancy Williams, had you worked with her before?

A. She gave me my assignment when I came in or if I called out, she might have took the call out or something, but that was it.

Q. So you hadn't had much interaction with her?

A. No.

Q. Had you ever had any bad interaction with her?

A. No.

(Jones Dep. at 85, Ex. A. to Def. HUP's Mot. for Summ. J.) Because Plaintiff has provided no evidence to discredit the legitimate, nondiscriminatory [*21] reason articulated by Williams and supported by two witnesses, we are compelled to conclude that Plaintiff has failed to establish pretext for discrimination.

We are also not persuaded that Plaintiff has demonstrated pretext by proving that invidious discrimination was more likely than not a motivating or determinative cause of Defendant's decision. Plaintiff contends that Defendant's proffered reason for terminating her was pretext because there was "substantial evidence of discriminatory intent based upon the disparate treatment she experienced as a pregnant woman as compared to her non-pregnant co-workers." (Br. in Opp'n to Summ. J. at 22.) However, Plaintiff fails to provide support for the allegation of disparate treatment with appropriate comparators. The record indicates that Plaintiff, like the comparators proffered by Defendant, received warnings before being terminated for sleeping on the job. Heggs testifies that prior to Miller and Piesieski observing Plaintiff sleeping on October 8, 2002, she gave Plaintiff two verbal warnings for sleeping.

Q. Is it true that you never - you personally never caught Carol Jones ever sleeping; is that correct?

A. That's incorrect. [*22]

Q. Incorrect?

A. That's incorrect.

Q. You caught Carol Jones sleeping?

A. I caught Carol-

Q. When?

A. -Jones sleeping, yes.

Q. When?

A. I don't recall the dates, but I caught her sleeping on two separate occasions.

Q. Did you give her a written warning?

A. I gave her a warning, mm-hmm, and I documented on my file.

(Heggs Dep. at 20-21, Ex. R to Br. in Opp'n to Summ. J.) Heggs testified that on September 19, 2001, she wrote the following for Plaintiff's file: "Found Carol Jones doing 1:1 with eyes closed, blanket around shoulders, opened eyes upon entering the room. Reviewed sleep policy with employee and gave Carol Jones a verbal warning." (Heggs Dep. at Ex. 1, Ex. R of Br. in Opp'n to Mot. for Summ. J.) Heggs also testified that sometime in January 2002, she wrote: "Carol Jones assigned to do 1:1 with [illegible] found eyes closed, blanket around shoulders, curtain pulled. Opened eyes when called name, eyes red. Again reiterated the sleeping policy. Told employee if found sleeping again she may be terminated." (Id.) n10

n10 Apparently Defendant's counsel provided Plaintiff's counsel with the notes describing these verbal warnings as part of its response to Plaintiff's request for production of documents. (Heggs Dep. at 21-22 (providing counsel's on-the-record discussion of notes for Plaintiff's file)). Plaintiff attempts to discredit these handwritten entries in her personnel file by implying that they were created long after Plaintiff's termination. In support of this accusation, Plaintiff points out that the notes have a facsimile transmittal date of September 2003, and do not provide a precise date for the January 2002 incident. We are not persuaded that a date on a facsimile indicates that the document was created at that time. Plaintiff also alleges that the notes were not attached to the personnel file received by Plaintiff's counsel. We are also not persuaded by the statement of Plaintiff counsel's assistant that the notes were not in the personnel file when she reviewed it, and that "based on ... expertise and experience as an attorney, my review of the 'anecdotal' notes attached as Exhibit 2 were prepared for the purposes of litigation and were not prepared contemporaneously with plaintiff's employment." (Lindsay Decl. at PP 4, 7, Ex. H to Br. in Opp'n to Summ. J.) There is simply no support for this conclusion.

In addition, Plaintiff claims that none of the other personnel files contained similar notes. This assertion is incorrect. The files of D.K., A.G., and D.J. each contained notes, addressed to no particular individual, that describe disciplinary events. (Exs. J, K, and N to Br. in Opp'n to Mot. for Summ. J.) Plaintiff further cites to the fact that she received a positive work evaluation, just four days after the alleged sleeping incident in September 2001. This fact does not significantly enlighten the issue. It is interesting in light of

Plaintiff's insistence that she never slept at work, that Plaintiff stated that upon returning from leave, she was "extra careful and even took over-the-counter stimulants to ensure that she would stay awake." (Br. in Opp'n to Mot. for Summ. J. at 5.)

[*23]

Even if the personnel notes in question are problematic, Plaintiff has failed to demonstrate pretext because she has relied upon inappropriate comparators to support her position. Plaintiff has failed to find a single comparator who was under Williams's supervision n11 and was found sleeping while performing a 1:1 observation of a suicidal patient. In concluding that a plaintiff had failed to prove pretext because his comparators were not similarly situated, the court in Bailey v. United Airlines stated: "In order for employees to be deemed similarly situated, 'the individuals with whom a plaintiff seeks to be compared must have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Civ.A. No. 97-5223, *2002 U.S. Dist. LEXIS 11636, at *26 (E.D. Pa. June 26, 2002)* (citing *Bullock v. Children's Hosp. of Phila, 71 F. Supp. 2d 482, 487 (E.D. Pa. 1999)*). "Comparators should have worked with the same supervisor, have been subjected to the same standards, and have engaged in the same conduct." Id. (citing *Taylor v. Procter & Gamble Dover Wipes, 184 F. Supp. 2d 402, 410 (D. Del. 2002)*; [*24] *O'Neill v. Sears, Roebuck and Co., 108 F. Supp. 2d 433, 439 (E.D. Pa. 2000)*; *Grande, 83 F. Supp. 2d at 565.)*

n11 Plaintiff claims that, even though Heggs was on vacation for her honeymoon when Plaintiff was terminated, Heggs was somehow involved in the decision to terminate her. Despite this claim, Heggs states that she was not involved in the decision to terminate Jones. (Heggs Aff. at P 21.) Moreover, there is nothing in the record to indicate that Miller, Piesieski, or Williams involved Heggs in the termination decision. (Miller Dep. at 20-22, Ex. S to Br. in Opp'n to Summ. J.) As mentioned, Heggs was on vacation when Plaintiff returned from maternity leave. Plaintiff and Heggs had not worked together for more than six months. Heggs states that on October 9, 2002, while in Connecticut, she received a call from Williams to brief her on the events that had taken place since Heggs left for vacation, two weeks prior. Among other things, Williams informed Heggs that Plaintiff had been terminated for sleeping on the job. (Heggs Aff. at P 20.) Heggs testified that she did not receive an email detail-

ing the event until she returned to work on October 10, 2002. (Heggs Dep. at 14-15, Ex. R to Br. in Opp'n to Summ. J.)

Rather than focusing on disciplinary decisions of Williams, Plaintiff spends considerable time establishing that Heggs did not terminate sleeping employees on their first offense. This is not contested. In fact, it actually supports Heggs's contention that she gave Plaintiff the benefit of this same policy when she gave her two verbal warnings.

[*25]

In comparing herself to nonpregnant PCOs who were found sleeping on the job, but were not terminated, Plaintiff cites to the personnel files of D.K. and A.G. However, Plaintiff has failed to cite anything in the record that indicates that D.K. was sleeping during suicide watch. D.K.'s first warning was documented on March 10, 1999. At that time, D.K. was found sleeping while on break in the break room. Approximately four years later, on January 28, 2003, D.K. was found sleeping while observing a patient, but there is nothing to indicate that the patient was suicidal. D.K. was suspended for three days, and was limited in the number of overtime shifts she could work. Finally, when D.K. was found sleeping just two weeks later, her employment was terminated. Even if D.K. had been observing a suicidal patient on January 28, 2003, nowhere in D.K.'s personnel file does it indicate that Williams was involved in the decision to suspend, rather than terminate D.K. In fact, references in D.K.'s personnel file indicate that, at least prior to the January 28, 2003 incident, D.K. had worked the night shift, which was not under Williams's supervision. (Ex. J of Br. in Opp'n to Mot. for Summ. J. [*26] ) In any event, Plaintiff has failed to demonstrate that D.K. received different discipline by the same supervisor, for the same offense.

With respect to A.G., it appears that she was found sleeping on scheduled breaks. (Ex. K to Br. in Opp'n to Mot. for Summ. J.) While this behavior is less than satisfactory, we cannot agree that A.G.'s actions were similar to Plaintiff's act of sleeping while on a one-on-one observation of a suicidal patient. The record indicates that on September 28, 2002, A.G. returned from break forty minutes late because she had fallen asleep. (Id.) She received a written warning and was suspended for three days. Then, on April 4, 2003, A.G. fell asleep a second time while on break, and a note was placed in her file. n12 (Id.) Plaintiff has not provided any evidence that A.G. was found sleeping while performing a one-on-one observation of a suicidal patient. It is self evident that sleeping on break, even if it does violate employment policies, does not meet the standard of "engaging in the

2004 U.S. Dist. LEXIS 15711, *

same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." Bailey, 2002 U.S. Dist. LEXIS 11636, [*27] at *26. Moreover, the record indicates that despite the fact that A.G. was a night shift worker and was normally under Heggs's supervision, (Heggs Decl. at P 4), Romano was responsible for A.G.'s discipline on September 28, 2002, because Heggs was on vacation, (Romano Decl. at PP 5-6). Unlike Plaintiff, Williams was not responsible for disciplining A.G.

> n12 While unclear from the record, it appears that A.G. was terminated on June 10, 2003, for unstated reasons. The Personnel Action Form indicates that A.G. was voluntarily terminated and eligible for rehire. (Ex. L to Br. in Opp'n to Mot. for Summ. J.)

Plaintiff also attempts to compare her actions to those of D.J. and D.A. While it appears that D.J. left a patient unattended while performing one-on-one observation, on July 5, 2001, and again on July 21, 2001, it is undisputed that as a day shift PCO, she was under the supervision of Romano, not Williams. (Romano Decl. at P 3 ("In July 2001, D. J. was working on day shift. Accordingly, I was responsible for [*28] her management and discipline.").) n13

> n13 Williams authored the email informing Romano that D.J. had left a patient unattended on July 5, 2002. However, it appears that Williams was relaying that information from an employee, Kitty Johnson, who had heard it from another employee, Dan Finnegan, and Williams neither observed nor received the information at the time of the incident. While Plaintiff emphasizes the fact that Williams authored an email and file note, these documents do not indicate that Williams was D.J.'s supervisor responsible for making disciplinary decisions. In fact, the correspondences suggest that Williams was conveying this information to the responsible supervisor, Romano. (Electronic correspondence from Williams to Romano of 7/5/2001, Ex. N of Br. in Opp'n to Mot. for Summ. J.)

Likewise, Williams's note that on July 21, (year unstated), D.J. was found talking at the desk, when she was supposed to be observing a patient, does not indicate that Williams was responsible for disciplining D.J. In fact, the note states that the incident occurred on the day shift,

which is supervised by Romano. (Ex. N of Br. in Opp'n to Mot. for Summ. J.; Romano Decl. at 3, 7 (stating that Romano was responsible for disciplinary decisions regarding day-shift PCOs).)

[*29]

Plaintiff's comparison to D.A. is also unavailing. D.A. was found reading a magazine, not sleeping, while performing a one-on-one. (Electronic Correspondence from Sullivan to Williams of 10/3/2002, Ex. O to Br. in Opp'n to Mot. for Summ. J.) The patient's wife was in the room at the time. Again, these facts are not comparable to those involving Plaintiff. Plaintiff was found sleeping while performing a one-on-one observation of a suicidal patient, an offense with potentially very serious consequences for both the patient and the hospital.

We are also unpersuaded by Plaintiff's argument that she was required to file a Motion to Compel in order to obtain the personnel files. We are aware of the procedural history of this case and we fail to see the relationship between the fact that Plaintiff was required to file a motion to compel and the appropriateness of the comparators. Plaintiff next contends that the paperwork in the personnel files indicate that the comparators were actually supervised by Williams. In support of this claim, Plaintiff cites to an email message from Amy Avellino to Williams, discussing A.G.'s sleeping on September 30, 2002. Plaintiff claims that the fact that [*30] Avellino addressed the message to Williams indicates that Williams was A.G.'s supervisor. However, Plaintiff fails to address the fact that the message begins by stating, "I'm not sure who I should direct this to." (Electronic Correspondence from Avellino to Williams of 9/30/02, Ex. K of Br. in Opp'n to Summ. J.) In addition, the Plan for Improvement Form that documents A.G.'s suspension for this incident clearly identifies Romano as A.G.'s supervisor. (Id.) Plaintiff also argues that it was the same human resources department that was involved in all of these disciplinary decisions. (Sur Reply Br. in Opp'n to Mot. for Summ. J. at unnumbered 2-3.) However, Plaintiff does not even attempt to establish that the same person in that department was involved in each of these decisions.

Plaintiff points to the fact that Defendant's policy did not require automatic termination for sleeping on the job. Nevertheless, Plaintiff does not dispute Defendant's assertion that the Summ. J. at 12.) Moreover, it is clear that Defendant has terminated other individuals for sleeping on the job. The affidavit of Jeanne Esposito, Defendant's Human Resources Generalists, lists three patient care observers, [*31] D.K., C.D., and L.M., who were terminated between February 2003 and June 2004 for sleeping while on duty. (Esposito Aff. at P 3.)

We are also unpersuaded by Plaintiff's attempt to establish pretext through Heggs, the individual that Plaintiff claims demonstrated animus toward her. Even viewing the facts in the light most favorable to Plaintiff there is no evidence that Heggs was involved in the decision to terminate Plaintiff. As discussed above, Heggs was on vacation when the decision to terminate Plaintiff was made. Heggs has testified that she was not aware of the firing until after it took place. Williams, Miller, and Piesieski, testified that they did not communicate with Heggs until after Plaintiff had been terminated, and Plaintiff fails to point to any evidence to the contrary. n14 Plaintiff also fails to provide evidence that Williams was influenced by Heggs's alleged discriminatory motive. n15 In addition, Plaintiff states that she had had no negative interactions with Miller and Piesieski, the employees who reported observing Plaintiff sleeping. In fact, Plaintiff completely fails to address why Miller and Piesieski would cooperate in Heggs's alleged discriminatory acts [*32] by fabricating such a story. In addition, as discussed herein, Plaintiff testifies that she had had no negative interactions with Williams prior to the termination. (Jones Dep. at 85, Ex. A to Br. in Opp'n to Mot. for Summ. J.)

n14 Miller states that she sent Heggs an email after observing Plaintiff sleeping. However, Millers states that Heggs did not respond, and Heggs states that she did not check her work email until she reported back to work, two days after the termination.

n15 While Plaintiff does emphasize the fact that the supervisors' shifts overlapped by at least an hour and there was communication among these employees, this is not evidence that Williams was influenced by Heggs's alleged discriminatory animus.

Plaintiff's case appears to depend on Plaintiff establishing Heggs's discriminatory animus. Plaintiff's attempts to characterize Heggs's statements concerning her conduct as discriminatory are contradicted by Plaintiff's own assertions that Heggs did not like her subordinates to call out [*33] sick. The fact that Heggs strictly enforced attendance policies does not suggest that she was acting in a discriminatory manner in violation of the PDA. In fact, Plaintiff's own brief suggests that Heggs put pressure on D.A., a non-pregnant employee who had missed several days of work. n16 It appears that Heggs was consistent in her disapproval of employees utilizing what she observed as "too much sick time."

n16 Plaintiff's brief also notes in a section entitled, "Ms. Williams did not like her subordinates to be out sick," that Williams warned D.A. that she "need[ed] to be healthy and utilize less sick time for the coming year." (Br. in Opp'n to Mot. for Summ. J at 5 (quoting Ex. E at 4).) Evidently, absenteeism was a priority of Defendant.

It is well-established that the PDA does not mandate that an employer excuse a pregnant employee's absences, if it would not excuse those of a non-pregnant employee. "The Pregnancy Discrimination Act requires the employer to ignore an employee's pregnancy, but ... not [*34] her absence from work, unless the employer overlooks the comparable absences of nonpregnant employees ... in which even it would not be ignoring pregnancy after all." *Pacourek v. Inland Steel Co., 858 F. Supp. 1393, 1400 (N.D. Ill. 1994)* (quoting *Troupe v. May Dep't Stores Co., 20 F.3d 734, 738 (7th Cir. 1994)*).

In sum, we conclude that Plaintiff has not met her burden of establishing that Defendant's decision to terminate her, after two eye witnesses reported seeing Plaintiff sleeping while performing a 1:1 observation of a suicidal patient, was pretext for discrimination under the PDA.

**B. Plaintiff's Request for Accommodation**

While unclear from the Plaintiff's filings, it appears that Plaintiff may be claiming that Defendant's refusal to move Plaintiff to the day or evening shift was a form of discrimination under the PDA. However, Plaintiff has provided no evidence that Defendant was more willing to move nonpregnant employees from the night shift. In addition, Williams's deposition testimony demonstrates that a move from the night shift was a difficult request to accommodate because the night shift was less desirable.

Q. So you [*35] have no problem getting people to work night shift as opposed to day shift?

A. It's more of a problem working night shift.

Q. Most people want to work the day shift, right?

A. Well, when we established this patient care observer job, it was realized that we would have to rotate everyone, that there wasn't really a permanent shift unless they would want permanent evenings or permanent nights.

...

Q. There are some people that are permanently night shift, but not really anybody that's permanently day shift; is that what you're saying?

A. That is correct.

(Williams Dep. at 7-8, Ex. Q to Br. in Opp'n to Summ. J.) Plaintiff has failed to provide evidence to support her suggestion that Defendant was willing to accommodate the transfer of nonpregnant employees or that nonpregnant employees were provided with the requested accommodation. n17 Plaintiff's claim that Defendant failed to accommodate Plaintiff is without merit. n18

> n17 Plaintiff's Brief simply states that Plaintiff was "aware that there was an opening on the day shift that she could have taken." (Br. in Opp'n to Mot. for Summ. J. at 4.) In her deposition testimony, Plaintiff explains that at the time she requested the accommodation, her schedule indicated that someone had left the day shift. However, Plaintiff did not know if that day-shift employee had simply gone on vacation or had actually vacated the position. In addition, Plaintiff has failed to indicate that Defendant had a need to fill that vacated position, or that Defendant filled it with a non-pregnant employee. Without such information, we will not second-guess Defendant's staffing decisions, or assume that its decision to deny Plaintiff's request was motivated by discriminatory animus.

[*36]

> n18 We also note that if Plaintiff is alleging that Defendant violated the PDA for failing to accommodate her transfer request, that claim would be barred by the statute of limitations. Plaintiff alleges that the accommodation request was denied in March 2002, but she did not file her complaint with the EEOC until March 28, 2003. (Jt. Case Report at 1.) Therefore, Plaintiff's accommodation claim falls outside of the 300-day limitations

period. *AMTRAK v. Morgan, 536 U.S. 101, 105, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002)* (applying a 300-day statute of limitations period and holding that discrete acts of alleged discrimination do not fall within an exception to the limitations period, even if plaintiff allegedly suffers subsequent discriminatory acts).

### C. Retaliation Claim

For the reasons discussed above, Plaintiff has also failed to establish a discriminatory retaliation claim under the PDA. In order to establish a prima facie case of discriminatory retaliation under Title VII, a plaintiff must establish that: (1) "she engaged in a protected employee activity; (2) the employer took [*37] an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action." *Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).* Like other discrimination, courts analyze retaliation claims under the McDonnell Douglas burden shifting framework. *Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003).* Therefore, in light of our conclusion that the facts viewed in a light most favorable to the Plaintiff fail to demonstrate that Defendant's proffered reason for terminating Plaintiff was pretext, Plaintiff's retaliation claim will be dismissed.

### IV. CONCLUSION

For the foregoing reasons, Defendant Hospital of the University of Pennsylvania's Motion for Summary Judgment will be granted.

An appropriate Order follows.

### ORDER

AND NOW, this 5th day of August, 2004, upon consideration of Defendant Hospital of the University of Pennsylvania's Motion for Summary Judgment, (Doc. No. 20), and all papers filed in support thereof, and opposition thereto, it is ORDERED that Defendant's Motion is GRANTED.

IT IS SO ORDERED.

BY [*38] THE COURT:

R. Barclay Surrick, Judge