# EXHIBIT D

LEXSEE 1994 U.S. DIST. LEXIS 17092

**SUZANNE H. KERSHAW v. LES ASPIN, Secretary, Department of Defense**

**CIVIL ACTION No. 94-216**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1994 U.S. Dist. LEXIS 17092*

**December 5, 1994, Decided**
**December 5, 1994, Filed**

**COUNSEL:** [*1] SUZANNE H. KERSHAW, PLAINTIFF, PRO SE, PHILA., PA.

For LES ASPIN, SECRETARY, DEPARTMENT OF DEFENSE (DEFENSE LOGISTICS AGENCY), DEFENDANT: JAMES G. SHEEHAN, ASSISTANT U.S. ATTORNEY-CIVIL DIVISION, PHILA, PA. KAREN ELIZABETH ROMPALA, ASST. U.S. ATTORNEY, PHILA, PA.

**JUDGES:** Dalzell, J.

**OPINIONBY:** STEWART DALZELL

**OPINION:**

MEMORANDUM

Dalzell, J.

On January 13, 1994, Suzanne H. Kershaw filed a pro se form complaint seeking "monetary awards for merited past performance [and] compensation for pain and suffering", Complaint, P 4. When the form required a recitation of the facts that form the basis of her claim, including names, dates and places, Kershaw wrote: "Discriminated [against] based upon Race and Sex [--] Col. Roland Hassebrock, Col (Rt) Tom Mohney, Anthony Cherego, Katie Morris, Wade Harmon, John Madden, DCMAO Phila -work place " Complaint, P 3.

Kershaw appended to her complaint a copy of the U.S. Equal Employment Opportunity Commission's December 10, 1993 denial of her request for reconsideration of its earlier decision to deny Kershaw relief (rather than append her Notice-of-Right-to-Sue letter, as the form complaint instructed). n1 From this EEOC denial, and from defendant's motion for summary judgment, we glean that she claims race and sex discrimination in her employment as an Administrative Contracting Officer

with the Defense Logistics Agency, the real defendant at interest. Motion for Summary Judgment, unnumbered page 1.

> n1 The EEOC denial informed Kershaw that she had the right to file a civil action within ninety days of the issuance of the denial. Denial of Request for Reconsideration, appended to Complaint, at 6.

[*2]

The Secretary n2 has moved to dismiss the complaint for failure to state a claim upon which relief may be granted or, alternatively, for summary judgment. n3 In Kershaw's response, she reiterates that she "has been treated differently than those who were [her] coworkers." Response to Motion for Summary Judgment, at 2. For the reasons set forth in this memorandum, we will treat the motion as one for summary judgment, and grant it.

> n2 It has not escaped our attention that William J. Perry has replaced Les Aspin as Secretary of Defense. Given the provisions of *Fed. R. Civ. P. 25(d)(1)*, as well as the fact that Kershaw's complaint is really with the Defense Logistics Agency, we feel safe in taking the Rule at its word in "disregarding" the change in Secretaries. Cf. Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio, No. 93-5559, slip op. at 5 n.1 (3d Cir. November 16, 1994) (disposing of an appeal despite the failure to substitute parties). For convenience, we shall refer to the defendant as "the Secretary".

> n3 When the Secretary filed his motion, by Order dated October 6, 1994 we directed the

Case 1:05-cv-00205-SLR    Document 43-3    Filed 03/14/2006    Page 3 of 33

Page 2
1994 U.S. Dist. LEXIS 17092, *

Court's pro se Writ Clerk "to arrange for plaintiff to interview counsel from the Court's Plaintiff's Employment Panel at the earliest practicable date", and directed plaintiff to respond to the motion "by the earlier of (a) thirty days after counsel agrees to represent her, or (b) November 28, 1994." Regrettably, Kershaw did not obtain counsel.

[*3]
Legal Standard

When considering a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, we must of course take all allegations contained in the complaint as true and construe them in a light most favorable to the plaintiff. *H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249 (1989)*; *Rocks v. City of Phila., 868 F.2d 644, 645 (3d Cir. 1989)*. When deciding a 12(b)(6) motion, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." *Fed.R. Civ. P. 12(b)*.

Summary judgment is, of course, appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. Germane to the present motion, the moving party bears the burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)*, [*4] but the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)* (citations omitted). A party opposing a summary judgment motion may not rest upon mere allegations, general denials, or vague statements. If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Bixler v. Central Penn Teamsters Health & Welfare Fund, 12 F.3d 1292 (3d Cir. 1993)*; *Trap Rock Indus. Inc. v. Local 825, Int'l Union of Operating Engineers, 982 F.2d 884, 980-91 (3d Cir. 1992)*

Discussion

It is no easy matter to decipher what is at issue here. Kershaw seems to desire to appeal to us the EEOC's denial of her request to reconsider its earlier decision since she appended that denial to her complaint. n4 The Secre-

tary entertains his own doubts as to what issues Kershaw thinks she is litigating in this action: "Plaintiff[,] however, apparently believes that she appealed the final decision of the agency which adopted [*5] the administrative judge's recommended finding that she had not been the victim of discrimination for the period of 1989 to 1990. (Attachment D -- Deposition Transcript, p.7)" Motion for Summary Judgment, unnumbered page 6.

n4 The only issue presented in this denial was whether the previous EEOC decision properly affirmed the Defense Logistics Agency's final decision to reject certain allegations contained in Kershaw's complaint on the grounds that the rejected allegations were untimely and failed to state a claim for a continuing violation. See Denial of Request for Reconsideration, appended to Complaint, at 1.

In the present procedural posture, it will not do to guess at what issues Kershaw intends to litigate. We need only look to the complaint, the exhibits, the affidavits, and the remainder of the record "as would be admissible in evidence" to determine if summary judgment should be granted. *Fed. Civ. P. 56(c)* and (e). While a pro se litigant must be afforded a more liberal interpretation of her complaint [*6] than a represented plaintiff, *Haines v. Kerner, 404 U.S. 519, reh'g denied, 405 U.S. 948 (1972)*, this judicial grace does not relieve the pro se plaintiff of the burden of coming forth with some evidence to rebut defense affidavits that refute her claims. *Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 586*.

The gravamen of Kershaw's dispute with her employer seems n5 to be that she was treated differently from other similarly-situated employees because of her race and sex with regard to work assignments, special projects, evaluations and recognition of her work performance, and that she did not receive a monetary award when white male employees did. n6 See Denial of Request for Reconsideration, appended to Complaint, at 1; Motion for Summary Judgment, unnumbered page 2. If true, Kershaw could pursue a cause of action against the Secretary under section 703(a)(1) of Title VII of the Civil Rights Act of 1964. n7

n5 We repeat that the complaint itself and the response to the Secretary's motion are bereft of facts. We deduce the basis of Kershaw's dispute only through the appended EEOC decision and the defendant's motion. An exhibit to a complaint is considered part of the complaint itself, *Fed. R. Civ. P. 10(c)*, and we shall assume that Kershaw

adopts the facts expressed in that EEOC denial as her own.

[*7]

n6 We are not told the amount of award in question.

n7 That provision provides, in relevant part:

(a) It shall be an unlawful employment practice for an employer--

(1) . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . .

*42 U.S.C. § 2000e-2(a)(1).*

The Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973),* established the basic order and allocation of burdens of proof in a Title VII employment discrimination case. As is by now familiar, the plaintiff must first establish by a preponderance of the evidence a prima facie case of discrimination. *Id., at 802.* Second, if the plaintiff succeeds in making the prima facie case, the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's's" differential treatment. Id. Third, if the defendant succeeds in its carrying [*8] its burden of production, the employee then has an opportunity to prove by a preponderance of the evidence that the reason the employer proffered was not the genuine reason for the differential treatment, but was actually a pretext for discrimination. *Id., at 804.*

Though the burden of production shifts to the defendant at the second stage, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).* Recent cases interpreting McDonnell Douglas have made it clear that "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742, 2752 (1993)* (emphasis in original).

Applying the rules of McDonnell Douglas and its progeny, n8 we think Kershaw has not proffered a prima facie case of discrimination. Kershaw's complaint is devoid of facts that would enable [*9] a finder of fact to determine that she was the subject of race and sex discrimination.

The EEOC decision appended to the complaint focuses on whether Kershaw adequately demonstrated a continuing violation, but nowhere does it set forth the facts upon which Kershaw bases her claim. See Denial of Request for Reconsideration, appended to Complaint, at 1, 3-5.

n8 We note that "the McDonnell Douglas methodology was never intended to be rigid, mechanized, or ritualistic," *Hicks, 113 S. Ct. at 2753* (citations and quotation marks omitted), and that "the ultimate question [is] discrimination vel non." *United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 714 (1983),* quoted in *Hicks, 113 S. Ct. at 2753.*

For instance, the EEOC decision discusses the fact that Kershaw was graded by three different supervisors, id. at 3, and failed to receive a monetary award. Id. Nowhere does Kershaw state anything from [*10] which we may glean that she, a black woman, was disadvantaged in her job because of her protected status, or that, say, a similarly-situated white male was advantaged when she was not. Kershaw would have us infer that she has a prima facie case of discrimination against the Defense Logistics Agency without giving us any "specific facts" upon which to make such an inference.

We do not mean to advocate an overly formalistic rule of pleading employment discrimination, but we cannot on a Rule 56 motion accept a generic conclusion such as "Discriminated based upon Race and Sex," Complaint, P 3, and allow the case to proceed to trial. The Federal Rules of Civil Procedure leave no doubt that a plaintiff must be more diligent than Kershaw to survive a summary judgment motion:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, [*11] if appropriate, shall be entered against the adverse party.

*Fed. R. Civ. P. 56(e).*

In his rebuttal of Kershaw's claims, the Secretary has articulated a legitimate, nondiscriminatory reason for Kershaw's supposed differential treatment. For example, regarding Kershaw's work assignments, Kershaw's supervisor, Catherine C. Morris, has sworn that:

Ms. Kershaw alleges that two of the most complex contractors, Action Mfg., and DeVal, Inc., were given to Mr. Jackson, a white male, and that these two complex contractors were not given to her team. What Ms. Kershaw neglects to state, is that when I was redistributing the workload in my section, Ms. Kershaw specifically stated that she did not want either Action Mfg. or DeVal, Inc. transferred to her team.

Affidavit of Catherine C. Morris, appended to Motion for Summary Judgment, Exhibit J, P 4.

In addition, the Secretary has articulated a legitimate, nondiscriminatory reason why Kershaw did not receive a monetary award. Linda Ward, an Employee Relations Specialist with the Defense Personnel Support Center, has sworn that no employee is entitled to an award and that the decision to grant such an award is based upon the discretion of [*12] the employee's supervisor. See Affidavit of Linda Ward, appended to Motion for Summary Judgment, Exhibit F, PP 2, 4. In the view of Kershaw's supervisor, Kershaw did not deserve an award: "Ms. Kershaw was not nominated for a Sustained Superior Performance Award, because after thoroughly reviewing the quality and quantity of her work output, I did not believe that her performance as an Administrative Contracting Officer merited an SSP award." Affidavit of Catherine C. Morris, appended to Motion for Summary Judgment, Exhibit J, P 8. According to Morris, the alleged differential treatment was performance-related and had nothing to do with race or sex: "the work Ms. Kershaw performed on those contract [sic] is not similar in quality or quantity to the work performed by Mr. Jackson, the ACO under my supervision who received a monetary award." Id., P 4 (emphasis in original). Morris added that "the fact that Ms. Kershaw is a black female played absolutely no role in my decision not to nominate her for an award and played absolutely no role in my distribution of the workload." Id., P 9. Kershaw has introduced no Rule 56(e) materials to rebut these assertions.

Kershaw's [*13] own performance ratings appear to support Morris's assessment of plaintiff. In three separate evaluations covering a period of three years, Kershaw received ratings of 3.3, 3.7, and 4.3. Performance ratings, appended to Motion for Summary Judgment, Exhibits G, H, and I. These scores equated with ratings of "fully successful" (3.3 and 3.7) and "highly successful" (4.3), the third and second highest categories out of five. Id. Kershaw did not receive any scores that placed her in the highest category of "exceptional." Id.

In the abstract, Kershaw's evaluations are meaningless to the issues at hand. Perhaps no Administrative Contracting Officers at the Defense Logistics Agency receive "exceptional" reviews. We do not know how

Kershaw's scores compare with those of "Mr. Jackson", the white male ACO who we are told received an unspecified monetary award. The point, however, is that Kershaw, who at all times has the burden of proving intentional discrimination, *Burdine, 113 S. Ct. at 2752,* has not provided us with this or any other information. Her epistolary response to the motion does not include an affidavit from anyone, nor does it contain any [*14] facts from any source to assist us. n9

n9 Notably, we only learned about "Mr. Jackson" from the Secretary in Morris's affidavit.

Even assuming, arguendo, that Kershaw has met her burden of making a prima facie case, she still has not proffered the evidence needed to survive the Secretary's motion for summary judgment. As our Court of Appeals recently held in *Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994),* regarding the application of Hicks to summary judgments in Title VII cases,

We consider the evidence that a plaintiff, who has made out a prima facie case, must adduce to survive a motion for summary judgment when the defendant offers a legitimate reason for its employment action in a "pretext" employment discrimination case. We hold that, to do so, the plaintiff generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or [*15] 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Id., at 762.*

Kershaw can satisfy neither of Fuentes's alternative prongs. Her response to the Secretary's motion states: "I have setforth [sic] the facts of that which occurred in the workplace which is my experience and is not perjury." Response to Motion for Summary Judgment, at 1. She adds that she believes that "there is a double standard that exists when it comes to me performing my duties and responsibilities as a civil servant." Id. at 2. n10 What Kershaw does not do is supply us with any "specific facts" that cast doubt upon the reasons the Secretary has provided concerning why she did not receive an award. Kershaw has also failed to file anything that would enable a jury to infer that discrimination was at all involved, much less "more likely than not a motivating or determinative cause", of the Secretary's decisions regarding her employment. In sum, Kershaw has failed to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the em-

1994 U.S. Dist. LEXIS 17092, *

ployer's [*16] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Fuentes, 32 F.3d at 765* (emphasis in original) (footnote and citations omitted).

> n10 Kershaw's response also contains many off-the-mark comments. For example, "Daniel Webster defined due process of law as follows; which hears before it condemns, which proceeds upon inquiry and which renders judgment only after trial"; "with no disrespect, I believe that DLA, EEOC and the District Attorney's Office are confused as to issues, timeframes and factual information that was provided by myself and a management official, who is an African American",; and "quality should be a [sic] important part of processing EEO cases." Response to Motion for Summary Judgment, at 1-2.

Conclusion

Kershaw has not shown that a prima facie case of unlawful discrimination exists [*17] here. Moreover, she has not presented any evidence that casts doubt upon the reasons the Secretary has given for her alleged differential treatment so that a factfinder could reasonably conclude that these reasons were spurious. She has not proffered any evidence that would allow a factfinder to infer that unlawful discrimination more likely than not guided the Secretary's decision not to grant her a monetary award. In short, the record here is insufficient as a matter of law to create a triable issue of material fact as to whether race and sex discrimination played any part in the Secretary's decision not to grant Kershaw an award.

Accordingly, we shall grant the Secretary's motion for summary judgment. An appropriate Order follows.

ORDER

AND NOW, this 5th day of December, 1994, upon consideration of defendant's motion for summary judgment, and in accordance with the accompanying memorandum, it is hereby ORDERED that:

1. The motion is GRANTED;

2. JUDGMENT IS ENTERED in favor of defendant Secretary, Department of Defense and against plaintiff Suzanne H. Kershaw; and

3. The Clerk of the Court shall CLOSE this case statistically.

BY THE COURT:

Stewart Dalzell, J.

# EXHIBIT E

LEXSEE 2000 U.S. DIST. LEXIS 14469

**JOHNSON, PLEAS A, Plaintiff, vs. OLIN CORPORATION, UNITED STEEL WORKERS OF AMERICA, UNITED STEEL WORKERS LOCAL 1999-14, Defendants.**

**CAUSE NO. IP98-1456-C-B/S**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION**

*2000 U.S. Dist. LEXIS 14469; 6 Wage & Hour Cas. 2d (BNA) 941*

**September 29, 2000, Decided**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**DISPOSITION:** Defendants' motions for summary judgment GRANTED.

**COUNSEL:** For JOHNSON, PLEAS A, plaintiff: GARY P GOODIN, GOODIN ORZESKE & STEVENS, INDIANAPOLIS, IN.

For OLIN CORPORATION, defendant: JOHN T NEIGHBOURS, BAKER & DANIELS, INDIANAPOLIS, IN.

For UNITED STEEL WORKERS OF AMERICA, UNITED STEEL WORKERS LO 1999-14, defendants: RICHARD J SWANSON, MACEY MACEY AND SWANSON, INDIANAPOLIS, IN.

For UNITED STEEL WORKERS OF AMERICA, UNITED STEEL WORKERS LO 1999-14, defendants: WILLIAM SCHMELLING, ASST. GENERAL COUNSEL, UNITED STEEELWORKERS OF AMERICA, CHICAGO, IL.

**JUDGES:** SARAH EVANS BARKER, CHIEF JUDGE, United States District Court, Southern District of Indiana.

**OPINIONBY:** SARAH EVANS BARKER

**OPINION:**

### ENTRY GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, Pleas A. Johnson ("Johnson"), alleges that Defendant, Olin Corporation ("Olin"), wrongfully terminated him and that Defendants, The United Steel Work-

ers of America ("International Union") and The United Steel Workers of America, Local 1999-14 ("Local Union") (collectively "Union Defendants"), participated and acquiesced in Olin's wrongful activity. Count I contends that Olin's termination of Johnson and the wrongful [*2] actions of the Union Defendants occurred while Johnson was on leave from work, in violation of the Family and Medical Leave Act ("FMLA"), *29 U.S.C. § § 2601* et. seq.; Count II asserts that the same conduct was based on Johnson's age, in violation of the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § § 621* et seq.; Count III maintains that Olin and the Union defendants harassed and terminated Johnson in retaliation for Johnson's pursuit of statutorily protected activities, in violation of the ADEA; Count IV alleges that the defendants' actions were in retaliation for his pursuit of worker's compensation benefits and constitute wrongful discharge under Indiana law; Count V asserts that the defendants' actions constitute breach of contract under Indiana law; Count VI contends that the Union defendants' actions violated their duty of fair representation, in violation of the Labor Management Relations Act, *29 U.S.C. § § 141* et seq.; finally, Count VII alleges that the defendants' actions deprived Johnson of his pension, in violation of the Employee Retirement Income Security Act, *29 U.S.C. § § 1001* [*3]  et seq. n1 The defendants have filed two motions for summary judgment, pursuant to *Federal Rule of Civil Procedure 56*, one by Olin and one by the Union Defendants. For the reasons discussed below, we GRANT both motions in their entirety.

n1 Johnson concedes that the Defendants are entitled to summary judgment with respect to his ERISA claims. See Plaintiff, Pleas A. Johnson's (Amended) Resp. to Def. Union's Mot. for Summ. J. at 9. Therefore, summary judgment is

Case 1:05-cv-00205-SLR   Document 43-3   Filed 03/14/2006   Page 9 of 33

Page 2
2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

GRANTED in favor of Olin and the Union Defendants on Count VII.

## Background

Bridgeport Brass Corporation is a manufacturer conducting business in Indianapolis under the assumed name of Olin Brass Indianapolis ("Olin"). See Def. Olin's Br. in Supp. of its Mot. for Summ. J. ("Olin's Br."), Statement of Material Facts not in Dispute ("Olin's Facts") PP 1-2. Johnson, born January 3, 1934, was hired by Olin as a box maker in 1951 and paid as an hourly employee for the next 46 years, until April 24, 1998; other than a brief period of [*4] time in 1989 when Johnson was classified as a "fork truck operator," he worked as a box maker during his entire tenure at Olin. See Olin's Facts PP 3-4, 10-11; Memorandum of Law in Supp. of Union Defs.' Mot. for Summ. J. ("Unions' Memo."), Statement of Material Facts ("Unions' Facts") P 2. n2 Johnson's duties as a box maker included "'cutting lumber, nailing skids, cutting them to size, nailing them up, stacking them, and hauling the finished boxes out.'" Olin's Facts P 9 (quoting Johnson Dep. at 15).

n2 There is significant overlap and no conflict between Olin's undisputed material facts and the Union Defendants' undisputed material facts and we cite to them interchangeably.

The United Steelworkers of America ("International Union") is the exclusive bargaining representative of certain hourly-paid employees of Olin, including Johnson, and United Steelworkers of America Local Union 1999-14 ("Local Union") assisted the International Union in representing those employees. See Unions' Facts P 3. From 1969 [*5] until 1984, Johnson was a union steward for the Local Union. See Olin's Facts P 5.

Olin and the Union Defendants negotiated a Collective Bargaining Agreement ("CBA") which governed the terms and conditions of Johnson's employment with Olin and was in force during all times relevant to this action. See Olin's Facts PP 4, 6. Among the management rights reserved to Olin under the CBA are "'the right to hire, transfer, promote, demote, assign, retain, suspend or discharge its employees for just cause ...; to relieve employees of lack of work, or for other production requirements; to make or amend such reasonable or necessary rules.'" Olin's Facts P 7 (quoting Article Ten of the CBA). Article 16, Section One of the CBA further provides that Olin may discharge an employee for "just cause." Unions' Facts P 4. The CBA also contains a grievance procedure through which all complaints and grievances are to be processed. See Olin's Facts P 8.

Examples of conduct defined as "just cause" for termination are found in the Rules and Regulations for Safety and General Conduct at the Indianapolis plant ("Conduct Rules") reissued by Olin in June, 1994 and again in March, 1997. See Affidavit [*6] of Terry Sitze, Olin's Manager of Administrative Services, Ex. 2 (June, 1994 Conduct Rules), Ex. 3 (March, 1997 Conduct Rules). The 1994 Conduct Rules included a section of offenses titled "Group III" about which "violation ... is totally unacceptable employee conduct and will result in discharge." One of the Group III offenses was "Making False Claims or misrepresentation in an attempt to obtain sickness of [sic] accident insurance benefits or Workmen's Compensation." The 1997 Conduct Rules also included a section of offenses that would subject an employee to immediate termination or discharge for "falsifying any record or giving false information or making false claims; ...." See also Unions' Facts P 4 (stating that "Conduct Rule 3-2 provides that falsification of claims for benefits from the Employer is grounds for discharge.").

There is no dispute that Johnson filed a number of grievances in the months prior to the conclusion of his employment with Olin in which grievances Johnson described his supervisor's conduct as "harassment." First, on February 12, 1998, Johnson filed a grievance with the Local Union in which he complained that his foreman, George Anderson (born [*7] March 2, 1938), harassed him that day by issuing a verbal warning to him for "'not taking care while walking on a wet floor;'" although denying that the warning constituted harassment, Olin agreed to remove the warning from Johnson's file. See Olin's Facts PP 15-16. Next, on February 19, 1998, Johnson filed a grievance complaining that Anderson should have asked another employee to perform a task Anderson had required Johnson to do; again, while denying that Anderson's request was harassment, Olin settled the grievance with the Local Union. See id. P 17. On March 26, 1998, Johnson filed a grievance seeking overtime pay for four hours of work performed on March 8 and March 15, 1998; Olin settled this grievance by paying Johnson one hour of overtime but denied that it had violated the CBA. See id. P 18.

Finally, Johnson complained about several actions which took place on April 7, 1998, actions that Johnson believed constituted harassment. First, Anderson and Ed Holleran (the Production Control Supervisor, born May 23, 1937) issued a verbal warning regarding Johnson's productivity wherein, according to Johnson, Holleran said, "'[you are] an old man and you're were [sic] [*8] out. And it's time you give some serious consideration about getting out of the box shop.'" Id. P 21 (quoting Johnson Dep. at 31). Olin denied that Holleran had harassed Johnson, which denial the Local Union accepted.

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

See id. On that same day, Anderson limited the number and length of times that Johnson could use the bathroom during a twelve-hour shift because he believed that Johnson was making too many trips to the bathroom. See id. P 22. Olin admits that Anderson said that "if [Johnson's] age or health were causing a problem that required so many bathroom trips, he should get medical attention." Id. Olin settled this grievance with the Local Union after removing the time limitations that Anderson had placed on Johnson's restroom use. See id.

The next day, April 8, 1998, Johnson reported to his Group Leader that he had injured his shoulder pulling lumber off a wagon and loading it onto a conveyor belt. On April 9, 1998, Johnson reported the injury to Anderson, who sent Johnson to Olin's Safety Office. See id. P 23. Johnson reported back to Anderson that he had been given a twenty-pound lifting restriction and directed to return to work; Olin sent him home [*9] on a temporary disability leave of absence after determining that it had no work which complied with that restriction. See id. PP 24-25; Unions' Facts P 5. Before leaving the facility, Johnson signed Olin's Injury Policy, a portion of which stated that "an employee who knowingly submits a false work-related injury claim will not receive benefits and will be disciplined." Olin's Facts P 26.

At this point, we face the first dispute between the parties over the factual record before us. Olin contends that its company physician, Dr. David Katz ("Dr. Katz"), also examined Johnson on April 13, 1998, after Johnson was placed on a temporary disability leave of absence who concluded that, based on his physical examination and Johnson's description of how his shoulder felt, Johnson had a sprained muscle in his shoulder and instruction him not to lift any items over his head. See Olin's Facts P 27. Olin further contends that Dr. Katz placed Johnson on a ten-pound lifting restriction, which contention Johnson disputes. Compare id. with Plaintiff Pleas A. Johnson's Response to Defendant's Statement of Material Facts ("Pl's Resp. to Olin's Facts") P 27.

Both parties cite to Johnson [*10] deposition (pages 99 and 100) to support their respective positions. However, the visit to Dr. Katz which Johnson describes in that part of his deposition appears to be Johnson's visit on the day that he was initially placed on the temporary disability leave of absence. See Johnson Dep. at 99-100. Johnson later testified in his deposition that he did not remember visiting Dr. Katz at any time between the day he saw Dr. Katz on April 8, 1998 (the day he was placed on disability leave) and the last day of his employment with Olin. See Johnson Dep. at 103. Olin further cites as support an affidavit signed by Dr. Katz wherein he describes a single visit with Johnson on April 13, 1998, in which he first examined and diagnosed Johnson and placed him on a ten-pound lifting restriction. See Katz

Aff. PP 3-4. Although Olin asserts that Johnson was examined twice, once on the day he was placed on disability leave and told he had a twenty-pound weight restriction and a second time when Dr. Katz told Johnson of a ten-pound weight restriction, the undisputed facts yield the following conclusion: that Johnson was examined a single time by Dr. Katz, on the day Johnson reported his injury [*11] (sometime between April 8, 1998, and April 13, 1998), at which time Dr. Katz told Johnson not to lift any items over his head and placed Johnson on a ten-pound weight restriction; Johnson's testimony nonetheless was that he was told of a twenty-pound weight restriction and not notified of a ten-pound restriction. n3

> n3 The Unions' Facts, citing only to Johnson's amended complaint, state that Johnson visited a physician who placed him on a twenty-pound lifting restriction and that Olin then placed him on a temporary disability leave of absence. See Unions' Facts P 5.

The remainder of the testimony about Johnson's visit to Dr. Katz is undisputed. Dr. Katz prescribed Tylenol for the pain, Olin's medical personnel arranged for Johnson to attend physical therapy and Johnson was to report back to Dr. Katz in two to three weeks. See Olin's Facts P 28.

During Johnson's leave of absence, he went to his son's auto body shop on almost a daily basis. See Olin's Facts P 31. Johnson testified at his deposition [*12] that, while at the shop, he engaged in physical activity, including sweeping leaves and putting them in a trash bin, driving a tractor, "hauling a cutting torch one day behind the shop" and cutting metal with it, sweeping the floor and picking up paper. Johnson Dep. at 107 (emphasis added); Olin's Facts P 32. Johnson disputes that he "hauled a cutting torch," citing his affidavit to the effect that he "used the cutting torch, which I never lifted ...." Johnson Aff. P 33. We infer from this inconsistency that Johnson is either attempting to contradict his earlier deposition testimony through his own affidavit or he is trying to clarify that "hauling" does not require "lifting." In either event, we regard the dispute as immaterial.

In an effort to minimize fraud, Olin sometimes authorizes an independent investigation company to conduct covert videotape surveillance on an employee who is off work due to a reported work-related injury. See Olin's Facts P 29. Olin and the case manager for Olin's worker's compensation carrier, based on the circumstances surrounding a reported work-related injury, will determine whether such surveillance is required. One indicator that Olin views [*13] as suspicious, thus warranting videotape surveillance, is a close proximity in

Case 1:05-cv-00205-SLR    Document 43-3    Filed 03/14/2006    Page 11 of 33

Page 4

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

time between an employee's receipt of discipline and a report of work-related injury by that employee. See id. Olin has used this type of videotape evidence previously to justify termination of employees for violating the Conduct Rule about falsifying claims for benefits from the company. See Unions' Facts P 9.

Between April 9 and April 19, 1998, Olin's Safety Manager, Scott Stoner ("Stoner"), learned of the timing between Johnson's reported injury and the instances of company discipline described above. Stoner reviewed the timing and nature of Johnson's claimed injury, as well as "other suspicious circumstances on a prior worker's compensation claim involving Johnson" with the worker's compensation carrier's case manager, and concluded that Johnson's case warranted the use of videotape surveillance. See Olin's Facts P 30. Thereafter, Johnson was videotaped performing various physical activities on April 21 and 22, 1998. See id. P 33; Unions' Facts P 5-6.

On April 23, 1998, Olin's Labor Relations Supervisor, David Kern ("Kern"), received copies of the surveillance tapes, which he viewed [*14] with Stoner and Dr. Katz. See Olin's Facts P 34. The videotape showed Johnson performing a variety of activities including welding involving the use of his left shoulder, driving a tractor, sweeping, lifting a shovel with his left arm to deposit material into a trash barrel, and lifting wood overhead with his left arm. See Olin's Facts P 35. Based on his observations of the activities depicted in the videotape, Dr. Katz concluded that Johnson's activities were in direct violation of his restrictions, Johnson's activities were inconsistent with the information Johnson had provided to Dr. Katz, the left arm appeared to be functioning normally, and Johnson had fabricated his injury report. See id. PP 36-37. Dr. Katz then communicated these conclusions to Kern. See id. P 37.

Olin alleges that, based on Dr. Katz's opinions, Kern concluded that Johnson had submitted a false injury claim in violation of Olin's policy, which warranted immediate discharge. See id. P 38. Olin also alleges that "due to Johnson's longevity with the Company, Kern also decided to give Johnson the option to resign/retire or be discharged. Kern also consulted with Terry Sitze, Manager of Administrative [*15] Services, who agreed with Kern's decision concerning Johnson." Olin's Facts P 38. Kern further testified that his decision regarding Johnson's employment was "based solely on Kern's conclusion that Johnson had submitted a false work-related injury claim. ... Kern did not consider Johnson's age, any pension benefits to which he might be entitled at the time or in the future, any grievances or complaints Johnson previously made, or any other factors." Id. P 39. Johnson disputes this last assertion, claiming that the "decision making process was so tainted by age discrimination that Kern cannot be decided to [sic] have rendered a decision

independent of these considerations. Olin Brass constantly displayed an intent to force Johnson out of the company based on his age." Pl.'s Resp. to Olin's Facts P 39.

Johnson does not dispute the activities observed on the videotape, Dr. Katz's conclusions, or that Dr. Katz communicated these conclusions to Kern. Instead, Johnson disputes the correctness of Dr. Katz's conclusions that the activities were inconsistent with Johnson's restrictions and that Johnson fabricated his injury or claim, citing his own affidavit as well as that of Charles [*16] Rice, a co-worker in Olin's Box Shop Department. See Pl.'s Resp. to Olin's Facts P 36-37. Johnson's affidavit states that:

> Dr. Katz stated that I must continue to work the shoulder and that I must not leave it completely inactive because it would freeze up ...[,] ordered me to attend physical therapy and referred me ... for this physical therapy. When I attended physical therapy for my left shoulder injury, I had to perform a variety of exercises so that I could work my left shoulder. They told me I must also perform these exercises at home several times a day in order to work and exercise the shoulder.

Johnson Aff. PP 21, 27-28. Johnson also states that he reviewed the videotape and that "none of the activities I performed on the video tape violated my restrictions." Johnson Aff. P 31. Rice's affidavit relates the details of a document which he "saw on George Anderson's desk" which "indicated that Pleas Johnson should continue to use his shoulder or arm so that there would be no tightening of the tendons in his shoulder or arm ... [and] indicated that Pleas Johnson could perform light duty." Rice Aff. P 10. Setting aside for the moment the obvious hearsay problems [*17] in Rice's affidavit testimony, both Rice and Johnson testify that Johnson was to continue using his shoulder, that he should not leave it "completely inactive" to avoid tightening of the shoulder. Johnson cites no testimony from a qualified medical professional that identifies exactly what activities Johnson was restricted from performing, or that the activities observed on the videotape were ones that either Dr. Katz or the physical therapist instructed Johnson to continue performing. Nor does he provide any evidence that Dr. Katz's belief was not honestly held or was tainted in some way. At best, this testimony indicates Johnson's belief that none of the activities he performed while being videotaped violated his restrictions.

After Kern reached his decision regarding Johnson's employment, he contacted the Local Union Unit President, Steven Griffith ("Griffith"), to inform him of the allegations and Olin's decision. On April 24, 1998, Griffith viewed the videotape himself and Kern told him of the reasoning that led to Olin's decision. See Olin's Facts P 40; Unions' Facts P 8. Johnson and the Unions disagree over what additional information was conveyed at the meeting between [*18] Kern and Griffith.

The Unions contend, and Olin concurs, that Kern informed Griffith that the evidence warranted immediate discharge but that, due to Johnson's age and years of service to the company, Olin would allow him to voluntarily retire and receive his full pension benefits. Compare Unions' Facts P 10 with Olin's Facts P 40. Johnson disputes Union's Fact P 10, stating that Kern informed Griffith that "a hearing would be held prior to Johnson's discharge. ... They had set a time and contacted the Union about the hearing and prior to that hearing, Pleas Johnson had retired." Plaintiff Pleas A. Johnson's Resp. to Def.'s Statement of Mat. Facts (Pl.'s Resp. to Unions' Facts) P 10 (internal citation omitted) (citing Sitze Dep. at 36). Sitze's deposition states that Olin had set a hearing, on or about April 24, 1998, at 9:00 am, in which Johnson would have had the opportunity to rebut the allegations of fabrication. See Sitze Dep. at 36-37. Sitze further testified that Griffith was informed of this hearing, but that prior to its being conducted, Johnson chose to retire. See id.

On that same day, April 24, 1998, Johnson returned to the plant to obtain a refill on [*19] Tylenol tablets, but when he arrived, Stoner, Olin's Safety Manager, informed Johnson that Olin management wanted to meet with him. See Olin's Facts P 41. Johnson arrived at the Personnel Department, where Kern and Griffith were waiting, and Griffith and Johnson left to have a conversation about the videotape, Olin's decision, and Johnson's options. See Olin's Facts P 42; Unions' Facts P 11. Johnson and the Unions dispute what was said during that conversation.

The Unions cite an affidavit signed by Griffith in which he testifies that he informed Johnson of the videotape and its contents, and the fact that such videotape evidence had been used previously by Olin to justify the discharge of other employees. See Griffith Aff. P 8. Griffith also testifies that he told Johnson of the option Olin was providing to voluntarily retire thus allowing Johnson to receive his full pension and not have any discipline appear on his employment record. See id. Griffith claims to have further told Johnson that he could choose how to proceed, but that it was Griffith's personal opinion, based on his experience with other cases where employees were discharged for filing false claims and [*20] where such videotape evidence was available, that Johnson's

chances of mounting a successful challenge to a possible discharge were not good. See id.; Griffith Suppl. Aff. P 5. Griffith also testified that he told Johnson that a discharge would not affect his entitlement to a full retirement pension, since Johnson's right to those benefits was protected by ERISA, and that Johnson understood those rights. See Griffith Suppl. Aff. P 8.

According to Griffith, Olin, at the time of this conversation between himself and Johnson, had already prepared a retirement letter which Johnson could sign and which Griffith had in his possession. See Griffith Aff. P 8. Johnson indicated that he understood his options, voluntarily signed the letter and went to Olin's office to have the retirement processed. See id. Olin's allegations support the Unions' version of the facts, and further indicate that Griffith and Johnson returned from their meeting and submitted a statement, signed by Johnson, which requested immediate retirement. See Olin's Facts P 43, n4

> n4 The Unions also cite portions of Johnson's deposition as supporting Griffith's version of the events. However, the Unions failed to provide us with these excerpts. The Unions submitted only the Griffith affidavits in support of their joint motion, although their motion for summary judgment also stated that it relied upon all evidence submitted by Olin in support if its motion for summary judgment. See Motion for Summary Judgment by Defendants United Steelworkers of America and United Steelworkers of America, Local 1999-14 at 1 ("In support of this motion [we] rely on the attached affidavit of Steven Griffith, [our] own supporting memoranda of law ... and any affidavits, exhibits and arguments which it is anticipated are being submitted by the Defendant Employer Olin Corporation."). The Unions anticipated that Olin would submit portions of the Johnson deposition which Olin neglected to submit. Any reliance on those non-submitted excerpts is therefore unsupported.

[*21]

Johnson characterizes the conversation between Griffith and himself somewhat differently. Johnson testified that Griffith came out of his meeting with Kern carrying a sheet of paper and the two of them went to a trailer to talk. See Johnson Dep. at 112-13. n5 Johnson further testified that Griffith told him that the videotape showed Johnson sweeping and shoveling dirt, to which Johnson responded, "That's not right." See Johnson Dep. at 113. Johnson remembers Griffith saying that if Johnson chose not to retire, but rather to be discharged, the

Unions were "not going to even try to represent [him]." Johnson Dep. at 114. Johnson claims to have then said, "Well, in that case I don't have no choice but to take my retirement. But I want you to know right now, I'm taking it under protest, because there's nothing doing, and this is just nothing doing but firing me." Johnson Dep. at 114. The only other testimony about the Griffith/Johnson conversation which any party provided to us on this motion is Johnson's statement in his affidavit repeating this characterization of the conversation. See Johnson Aff. P 37. n6

n5 Like the Unions, Johnson also cites to evidence which he has not submitted (for example, Griffith Dep. at 17-18 -- the only portion of the Griffith deposition submitted by any party is pages 27-28 which do not discuss the testimony for which the Griffith deposition is cited -- and Johnson Dep. at 119. Page 113 of the Johnson deposition is cited above as it was submitted by the parties and appears to support Johnson's assertion.

[*22]

n6 Johnson also contests the timing of the preparation of the retirement papers he signed; however, the timing is immaterial.

Johnson does not recall Griffith informing him of his right to a hearing and asserts that other similarly situated younger employees and Union members were able to attend similar hearings and dispute Olin's allegations. See Pl.'s Resp. to Unions' Facts, Statement of Additional Material Facts PP 17-18. The Unions respond that grievances are automatically filed for those discharged by Olin, but that since Johnson retired and was not discharged, no grievance was filed. See Union Defs.' Reply to Pl. Johnson's Statement of Additional Material Facts and Mem. in Resp. to Pl.'s Reply to the Union Defendants' Mot. for Summ. J. PP 15-17.

Johnson also makes the unsupported assertion that Olin has treated younger employees more favorably than Johnson was treated when Olin has been presented with similar circumstances involving the allegation of fraudulent injury claims. n7 Olin responds by citing testimony from Kern listing former employees whom Olin had terminated from their [*23] employment after allegations of filing false injury claims: James Hoopingarner, age 39, discharged after being videotaped; Angela Collins, age 33, resigned after being videotaped; Kathy Hoopingarner, age 39, resigned after being videotaped; Paula Gallen, age 39, discharged after being videotaped; Velvet

Jones, age 32, discharged without videotape surveillance and later reinstated by an arbitrator after she filed a grievance challenging her discharge; Brad Killion, age 22, allowed to resign without videotape surveillance; and Jermaine Coleman, age 24, allowed to resign without videotape surveillance. See Kern Aff. P 9; Kern Suppl. Aff. P 3-6.

n7 The only support provided by Johnson for this assertion is the affidavit of Velvet Jones wherein she testified about her discharge due to allegations of filing a false claim and reinstatement by an arbitrator after Jones filed a grievance challenging the discharge. See Affidavit of Velvet Jones P 8. This "assertion" is not factual but is instead a legal conclusion drawn from the relevant facts.

[*24]

Johnson claims that he was subjected to protracted age discrimination during his final years with Olin. See Pl.'s Resp. to Olin's Facts, Statement of Additional Material Facts PP 17-18. Johnson testified in his affidavit that Anderson frequently told Johnson that he was "too damn old to work here" and that he needed to retire; that on more than one occasion Holleran asked Johnson when he would retire and told him that he ought to consider retiring; that Holleran told Johnson that he "could no longer maintain the pace of production, that [he] was an old man, [he] was wore [sic] out, and [he] ought to seriously consider getting out of here." Johnson Aff. PP 6-17. Johnson presents affidavits from co-workers, Charles Rice, Darrell Everroad, and Velvet Jones corroborating Johnson's testimony. See Rice Aff. PP 5-8, 11; Everroad Aff. PP 5-6; Jones Aff. PP 6-7.

That Johnson did not contest his retirement with Olin is not in dispute, nor did he file a grievance protesting the circumstances of that retirement, or ask for the Unions' assistance in contesting the circumstances surrounding the conclusion of Johnson's employment with Olin. See Olin's Facts P 44; Unions' Facts [*25] P 13. However, Johnson explains these failures as a response to Griffith's alleged comment that the Union would not support or represent him in challenging his retirement/discharge (although Griffith states that it was Local Union policy to automatically file a grievance when an employee was discharged by Olin). See Johnson Aff. P 37; Griffith Suppl. Aff. P 8. n8

n8 The Unions also contend that Johnson never named the Union (as opposed to the Local Union) in any charge of discrimination filed by

Case 1:05-cv-00205-SLR    Document 43-3    Filed 03/14/2006    Page 14 of 33

Page 7

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

Johnson with the Equal Employment Opportunity Commission. See Unions' Facts P 14. Johnson responds that he did file a charge of discrimination with the EEOC against the Union, by and through the Local Union. See Compl., Ex. A.

Discussion

Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party [*26] is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998).

With a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" to cite evidence of a genuine factual dispute precluding summary judgment. Id. at 322-23. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in [his] favor on a material question, then the court must enter summary judgment against [him]." Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994) [*27] (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)); Celotex, 477 U.S. at 322-24; Anderson, 477 U.S. at 249-52).

In considering a motion for summary judgment, a court must draw all reasonable inferences in a light most favorable to the non-movant. See Spraying Sys. Co. v. Delavan, Inc., 975 F.2d 387, 392 (7th Cir. 1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enters., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). However, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but also required. See Celotex, 477 U.S. at 322; Herman v. City of Chicago, 870 F.2d 400, 404 (7th Cir. 1989).

Johnson's Claims

A concise explication of our decision in this case is made difficult by a complaint [*28] that includes six substantive claims arising under three separate federal statutes (the ADEA, FMLA, and LMRA) as well as two state law causes of action (state law retaliation and breach of contract), and names three defendants. Our analysis is made even more difficult because the Defendants' actions, alleged to have given rise to Plaintiff's complaint, are not all clearly described nor is the connection among each of the counts and the various defendants; indeed, some of the counts are interrelated and overlapping.

Our reading of the (amended) complaint, the parties' submissions on the motion for summary judgment and the evidence submitted in support of those briefs and memoranda indicates that Johnson is of the view that the various defendants violated his rights in the following ways: n9 prior to his "discharge," his supervisors in the Box Shop engaged in the following actions because of his age and in violation of the ADEA -- giving him verbal warnings for "not taking care while ... walking on a wet floor" and for unsatisfactory production levels, limiting the number and length of bathroom breaks while on shift, failing to promote him, failing to give him overtime pay. In addition, [*29] Johnson alleges that his discharge was based on his age, in violation of the ADEA; in retaliation for his seeking his rights protected by the ADEA; in retaliation for his having sought worker's compensation benefits, in violation of Indiana law; in violation of his rights protected by the FMLA; and a breach of contract, in violation of Indiana law. Johnson also alleges that the Union Defendants breached a duty of fair representation, in violation of the LMRA.

> n9 We assume that Johnson is bringing each of the following claims against all of the defendants, unless otherwise noted.

Age Discrimination in Employment Act Claims

Disparate Treatment

Johnson's primary claim is that Olin and the Unions unlawfully discriminated against him because of his age, as asserted in Count II, so we begin our analysis there. The ADEA makes it unlawful to "discharge any individual or otherwise discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 L. Ed. 2d 105, 120 S. Ct. 2097, 2105 (2000) [*30] Michas v. Health Cost Controls, 209 F.3d 687, 692 (7th Cir. 2000). To succeed on a discrimination claim under the ADEA, a plaintiff must show that an

Case 1:05-cv-00205-SLR    Document 43-3    Filed 03/14/2006    Page 15 of 33

Page 8

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

adverse employment action would not have occurred "but for" his employer's motive to discriminate on the basis of his age. See *Fuka v. Thomson Consumer Elecs., 82 F.3d 1397, 1403 (7th Cir. 1996);* see also *Michas, 209 F.3d at 692* (describing plaintiff's burden as demonstrating that age was a "determining factor" in an employer's discharge decision).

A plaintiff pursuing an ADEA claim has two means by which to make a prima facie case of such discrimination: by presenting direct evidence that age was a determining factor in the employer's decision or by presenting indirect evidence via the burden-shifting method of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)* to "demonstrate that the employment decision 'was motivated by the employer's discriminatory animus.'" *Michas, 209 F.3d at 692* (quoting *Bellaver v. Quanex Corp., 200 F.3d 485, 492 (7th Cir. 2000)); Fuka, 82 F.3d at 1402;* [*31] see also; *Cowan v. Glenbrook Sec. Servs., Inc., 123 F.3d 438, 442 (7th Cir. 1998)* (stating that a plaintiff can establish a prima facie case of discrimination either by presenting direct evidence of a discriminatory motive or by employing the burden-shifting method of McDonnell Douglas). No matter which proof structure is utilized, the plaintiff must tie the discrimination to some form of an "adverse employment action" to make a case of discrimination. See, e.g., *Olefsky v. William Grant & Sons, Inc., 2000 U.S. Dist. LEXIS 2692,* No. 98 C 0076, *2000 WL 263974,* at *4 (N.D. Ill. Mar. 6, 2000) (noting that plaintiff utilizing direct evidence paradigm must provide nexus between alleged "ageist" remarks and an adverse employment action).

Before considering the proof-paradigm appropriate to Johnson's evidence, we must determine which of the actions alleged are truly adverse employment actions. Minor changes in work conditions are not adverse employment actions under the ADEA. See *Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 273 (7th Cir. 1996)* (holding that lateral transfer involving no reduction in pay and no more than a minor change in work conditions was [*32] not adverse employment action). "Not everything that makes an employee unhappy is an actionable adverse employment action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996).* Instead, the employer's alleged conduct must have some "tangible job consequence." *Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998).*

The Seventh Circuit has held that unfair or undeserved reprimands do not qualify as adverse employment actions if they carry no job consequences. See *Sweeney, 149 F.3d at 556.* Likewise, negative performance evaluations, standing alone, do not constitute an adverse em-

ployment action, although they may be considered under certain circumstances as evidence of discrimination. See *Smart, 89 F.3d at 442;* see also *Mattern v. Eastman Kodak Co., 104 F.3d 702, 708 (5th Cir. 1997)* (holding verbal threat of being fired, reprimand for not being at assigned work station, a missed pay increase, and being placed on "final warning" do not constitute [*33] adverse employment actions). Against this backdrop, we turn to the actions alleged in the case at bar.

First, Johnson alleges that he was discriminated against when he received unwarranted verbal warnings for "not taking care while ... walking on a wet floor" and for unsatisfactory production levels. Johnson points to no job-related consequences resulting from these verbal warnings, alleging rather that they form the basis of an independent cause of action. Not only do Sweeny and Smart indicate that this conduct cannot form the basis of an independent cause of action, but Johnson also has failed to contradict Olin's contention that these warnings did not alter the terms or conditions of his employment.

Johnson also contends that he was discriminated against when his supervisor regulated the length and time of his bathroom breaks. As with the verbal warnings, Johnson does not address Olin's arguments that no material job-related effect flowed from the bathroom restrictions and thus that the restrictions were not an adverse employment action. Absent some evidence to the contrary, we find that the verbal warnings Johnson received and Olin's restrictions in time and length of [*34] Johnson's use of the bathroom while on his shift were not adverse employment actions capable of independently sustaining an ADEA cause of action.

Johnson further alleges that he was denied overtime because of his age. While a denial of overtime pay may constitute an adverse employment action, the evidence establishes that any dispute over such denial has already been settled in a manner that was satisfactory to Olin, the Local Union, and Johnson. It is undisputed that Johnson filed a grievance complaining about the alleged overtime deficiencies and that the Local Union and Olin reached an agreement to settle this grievance by paying Johnson one hour of overtime pay. Johnson did not contest this settlement; having accepted it, he cannot now bring suit based upon the same conduct. See *Campbell v. Morton Grove Pharm., Inc., 1998 U.S. Dist. LEXIS 17701,* No. 98- C-0037, *1998 WL 786452,* at *4 (N.D. Ill. Nov. 5, 1998).* Thus, the alleged denial of overtime benefits does not constitute an adverse employment action.

Johnson also alleges that during his employment with Olin, he was denied promotions because of his age. See Amended Compl. P 16. Although there is nothing additional presented either in [*35] the complaint or the statements of material fact as to the circumstances sur-

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

rounding these alleged failures to promote, Johnson testified that the two instances to which he is referring occurred six and eight-to-ten years ago. See Johnson Dep. at 78-79.

Timely filing of a charge of age discrimination with the EEOC is a prerequisite to maintaining an action under the ADEA. See *29 U.S.C. § 626*(d); *Hamilton v. Komatsu Dresser Indus., 964 F.2d 600, 603 (7th Cir. 1992)*. In Indiana, a plaintiff must file a charge of discrimination with the EEOC within 180 days of the challenged employment action. See *29 U.S.C. § 626*(d)(1); *Daugherity v. Traylor Bros., Inc., 970 F.2d 348, 350 n.2 (7th Cir. 1992)* (citations omitted); *Vaught v. R.R. Donnelley & Sons Co., 745 F.2d 407, 410 n.2 (7th Cir. 1984)*; *Young v. Lincoln Nat'l Corp., 937 F. Supp. 1326, 1334 (N.D. Ind. 1996)*. Plainly, claims of discrimination that occurred over six years ago are have not been timely filed, no matter how generously we construe the limitations period, and Johnson may not now bring charges based upon [*36] this conduct. n10

> n10 We further note that Johnson has not addressed this contention in his summary judgment briefs, neither attempting to describe the circumstances surrounding the alleged failure to promote nor indicating what method of proof he is utilizing to pursue this claim. Although none of the parties' statements of material fact included any of the circumstances surrounding these actions, Olin's discussion of the claim in its brief clearly indicated to Johnson that the claim was a part of the motion for summary judgment. Thus, even if Johnson's claim had been timely filed with the EEOC, he would have waived it with respect to this motion.

Having ruled out the pre-discharge conduct as independent bases for any cause of action, we are left with the allegation that Olin acted in a discriminatory manner when it discharged Johnson. This contention, if proven, embodies tangible job consequences that may be actionable under the ADEA, so we must determine whether Johnson's allegations that relate thereto establish [*37] age-based discrimination.

Direct or Indirect Evidence

Johnson contends that the evidence in this case is sufficient to utilize the "direct evidence" proof structure discussed above, while Olin counters that the case may only proceed under the burden-shifting method identified in McDonnell Douglas. Direct evidence is "'evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or

presumption.'" *Cowan, 123 F.3d at 443* (quoting *Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997)*). Evidence qualifies as "direct" evidence when it "in and of itself suggests that the person or persons with the power to hire, fire, promote, and demote the plaintiff were animated by an illegal employment criterion." *Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997)*. For a plaintiff to successfully establish direct evidence of discriminatory intent, it "essentially requires an admission by the decisionmaker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000)*. Such direct evidence [*38] of discriminatory intent is "rarely found." Id.

Direct evidence "'must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question.'" *Cowan, 123 F.3d at 443* (quoting *Randle v. LaSalle Telecomm., Inc., 876 F.2d 563, 569 (7th Cir. 1989)*). Thus, "seemingly stray remarks" can only qualify as direct evidence if they were "'related to the employment decision in question.'" *Fuka, 82 F.3d at 1403* (quoting *McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 686-87 (7th Cir. 1991)*). If such a connection is not shown, the remarks alone are insufficient to give rise to an inference of discrimination "even when uttered by the ultimate decisionmaker." *Fuka, 82 F.3d at 1403*.

Johnson alleges that he has direct evidence of discriminatory intent surrounding the decision to terminate him by Olin. Johnson cites comments made by his supervisors, Anderson and Holleran, that allegedly demonstrate an age-based animus. For example, Johnson testified that his supervisors would call him "Old Man" and express a desire that Johnson retire so that younger [*39] employees could be brought into the Box Shop. See Pl., Pleas A. Johnson's (Amended) Resp. to Def. Olin's Mot. for Summ. J. ("Johnson's Amended Resp. to Olin") at 2-3. Johnson further alleges that he was subjected to age-related harassment and discipline, including the verbal warnings, limitations on his bathroom use, failure to promote him and failure to pay him overtime as described above. Some of these actions, specifically the verbal warnings and bathroom restrictions, occurred in October 4, 1995, February 22, 1998, and March 9, 1998. See id. at 3. Johnson also believes that Anderson and Holleran created unrealistic production goals for the Box Shop and placed the blame exclusively on Johnson when they were not met. See id. at 8. The comments attributed to Anderson and Holleran as well as the discipline and various actions taken with respect to Johnson are Johnson's "direct evidence" of discriminatory intent that he says pervaded Olin's decision to terminate him.

Perhaps recognizing that none of these actions can be directly attributed to the one person who decided to

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

terminate Johnson -- Kern -- he attempts to link the allegedly discriminatory animus with Kern. Johnson [*40] first attempts to link this "animus" to Kern through Scott Stoner, the Olin official who authorized the use of the videotape surveillance of Johnson. It is undisputed that Stoner initiated the surveillance due to a suspicion that was based on the proximity in time between the (allegedly discriminatory) discipline Johnson received and his injury. It is further undisputed that it was Kern's review of this videotape that ultimately led to his conclusion to terminate Johnson. However, while Johnson alleges that Stoner must have consulted with Anderson and Holleran prior to initiating the videotape investigation, Olin denies this charge, and Johnson is unable to support this allegation. Compare Johnson's Amended Resp. to Olin at 10-11 with Def. Olin's Suppl. Reply Br. in Supp. of its Mot. for Summ. J. ("Olin's Suppl. Reply") at 10.

Unable to link the discriminatory animus to Kern through Stoner, Johnson attempts to link the discriminatory intent directly to Kern through Holleran. Although Holleran had no role in the ultimate decision to terminate Johnson, Holleran met with Kern at some time prior to the day Johnson was injured. See Holleran Dep. at 31. Holleran testified that [*41] during this meeting he told Kern that Holleran felt the work in the Box Shop was taking its toll on Johnson. See id. at 32. Holleran also conveyed his concern about Johnson's ability to remain free from injury, telling Kern that he hoped Johnson would bid on another position outside of the Box Shop and that if Johnson did not take such action, Holleran would "very much like to take steps to disqualify him before he injured himself further." Id. at 31, 32.

Holleran also apparently documented a meeting with Johnson in the form of a memorandum, dated April 8, 1998 (See Holleran Dep., Ex. 1) in which he described a verbal warning given to Johnson the day before for inadequate work production and Johnson's contention that the warning was "just another case of discrimination and harassment against him." Id. Holleran wrote that he told Johnson

that he was sixty-five years old, the most senior man, not only in the plant, but in the Box Shop. That over the years he had made his contribution but now I felt that the hard physical work involved in the Box Shop was taking a physical tow [sic] on his body and that he could no longer maintain the pace. I added that the [*42] two of us are almost the same age and that their [sic] are things that I can't do as well as I use [sic] to and I accept my limita-

tions and make decisions and adjustments accordingly. ...

The work in the Box Shop is physically demanding and it's my judgment that your body is tired and you are not able to maintain your share of the work. ... You [sic] body is tired, you are no longer able to carrying [sic] the load you once did and because of this fact the crew must pick-up the slack and this I cannot allow. ...

[Johnson] asked me if I was asking him to quit. I answered that by no stretch of the imagination was I asking him to quit, I was just advising him that He needed to think about looking for a job outside the Box Shop

Holleran Dep., Ex. 1. Holleran testified that he showed the memorandum to Kern, but he did not recall whether he gave a copy of it to Kern. See Holleran Dep. at 47.

Olin contends that even if the age-related statements were communicated by Holleran to Kern, there is no evidence that Kern considered these statements when he decided to terminate Johnson. We agree with Olin on this point. Even if we impute to Holleran an age-based animus [*43] based on what he wrote in this memorandum, Johnson has not produced evidence that Kern had any such animus or that Kern was provided a copy of Holleran's memorandum or that he considered it when he decided to discharge Johnson two weeks later. All Johnson provides is speculation and innuendo. This evidence is simply not the "rarely available" smoking-gun evidence necessary to make out a direct evidence case of discrimination. At best, it is the classic "stray remark" evidence not attributable to the decision maker and not related to the employment action at issue. It therefore cannot constitute direct evidence of a discriminatory animus. Cf. *Venters, 123 F.3d at 973* (providing as an example of direct evidence "I won't hire you because you're a woman" and "I'm firing you because you're not a Christian.").

In the absence of direct evidence, Johnson must rely on the more common indirect method of proof. To establish a prima facie case of age discrimination, Johnson must show that: (1) he was a member of a protected class; (2) he met Olin's legitimate business expectations; (3) he suffered an adverse employment action; and (4) that similarly situated employees outside [*44] the protected class were treated more favorably. See *Radue, 219 F.3d at 617, Pitasi v. Gartner Group, Inc., 184 F.3d 709, 716 (7th Cir. 1999).*

Case 1:05-cv-00205-SLR   Document 43-3   Filed 03/14/2006   Page 18 of 33

Page 11

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

If plaintiff fails to state a prima facie case, we "need not proceed any further in the McDonnell Douglas analysis." *Fisher v. Wayne Dalton Corp., 139 F.3d 1137, 1142 (7th Cir. 1998)* (citing *Coco v. Elmwood Care, Inc., 128 F.3d 1177, 1178 (7th Cir. 1997); Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1147 (7th Cir. 1997)).* Absent proof of a prima facie case, plaintiff has failed to raise an inference of discriminatory intent and summary judgment must be entered in favor of the defendant. See *Fisher, 139 F.3d at 1142.*

If a prima facie case is established, we proceed to the next stage in the analysis. The defendant may refute the inference that it acted with discriminatory intent by providing a legitimate, non-discriminatory reason for its actions. See *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 67 L. Ed. 2d 207, 101 S. Ct 1089 (1981), Pitasi, 184 F.3d at 716; Mills v. Health Care Service Corp., 171 F.3d 450 at 454.* [*45] Then, the burden shifts back to the plaintiff to provide enough evidence to show a dispute exists about whether the defendant's given justification is a pretext for discrimination. See *Pitasi, 184 F.3d at 716; Mills, 171 F.3d at 454.* A plaintiff may prove the defendant's proffered justifications are pretextual either directly, by showing that a discriminatory basis more likely than not motivated the employer, or indirectly by demonstrating that the reasons are unworthy of belief. See *Jackson v. E.J. Brach Corp., 176 F.3d 971 at 983.* The latter may be established by showing the explanation: 1) has no basis in fact; 2) did not actually motivate the action; or 3) was insufficient to motivate the action. See id.; *Johnson v. City of Fort Wayne, 91 F.3d 922, 931 (7th Cir. 1996); Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1364-65 (7th Cir. 1988)* (citations omitted).

"The ultimate burden remains with the plaintiff-employee to persuade the trier of fact that the defendant-employer intentionally discriminated against him ....." *Pitasi, 184 F.3d at 716* (internal quotations omitted). However, a showing by the plaintiff [*46] that his employer's reasons for firing him were lies or completely insupportable may sustain the inference that the employer's real motive was improper and may be sufficient to satisfy the plaintiff's burden to prove that discrimination was the true reason for the decision. See *Reeves, 530 U.S. at ___, 120 S. Ct. at 2108; Jackson, 176 F.3d at 984* (citations omitted). With these general standards in mind, we turn to Johnson's claim.

Olin contends that Johnson has failed to state a prima facie case of discrimination, more specifically, that Johnson has failed to show that substantially younger, similarly situated employees were treated more favorably. See *Hartley v. Wisconsin Bell, Inc., 124 F.3d 887, 892 (7th Cir. 1997)* Johnson is contesting Olin's decision to terminate him based upon its belief that Johnson had

falsified an injury claim. Thus, the relevant comparison group is other employees of whom Olin has had evidence of such a falsified claim.

Olin cites evidence that each time it has been confronted by a suspicion of a falsified injury claim, it has taken steps to discharge the suspected employee. See Olin's Br. at 18-19. Olin [*47] identifies three employees, who were ages 32, 39 and 39, respectively, whom Olin discharged based upon videotape surveillance, and four employees who opted to resign after being confronted with Olin's suspicions, whose ages ranged from 22 to 39. See id. Johnson does not contest this evidence and provides no instances where Olin's termination policy was applied in a manner different from his. The only comparison provided by Johnson is to Velvet Jones, a 32 year-old employee, who was discharged by Olin and, after a Local Union-initiated grievance, was reinstated by an arbitrator. See Johnson's Amended Resp. to Olin at 13; Jones Aff. P 8. Johnson argues that this "clearly establishes that a substantially younger employee who had allegedly violated the injury policy by submitting false information was permitted to continue her employment and the Union fought for her to be reinstated." Johnson's Amended Resp. to Olin at 13.

Johnson's comparison might be an accurate one if the allegation were that Olin refused to reinstate Johnson after a grievance had been filed and an arbitrator had ordered him to be reinstated. However, it is undisputed that neither Johnson nor the Local Union [*48] ever sought his reinstatement; in fact, Johnson concedes that he voluntarily resigned under protest.

This comparison between Johnson and Jones is inapposite; viewed correctly, Olin treated the two employees exactly the same: when confronted by allegations of a false injury claim, it considered terminating them. The fourth prong of the prima facie case contemplates different treatment by the entity being charged with discrimination, in this case Olin. Johnson has presented no evidence that Olin was in league with the Local Union in not pursuing a grievance or had any influence over the Local Union's decision not to file a grievance. Johnson may not assert that the Local Union treated him differently and use this allegation as a basis for liability on the part of Olin. Johnson therefore has failed to make out a prima facie case against Olin for his termination.

If we were to continue this analysis to the pretext stage of the McDonnell Douglas analysis, Johnson still fails to present an issue of material fact that could defeat summary judgment on his ADEA claim. Olin has presented a legitimate, non-discriminatory reason for its decision, to wit, that based on the videotape and Dr. [*49] Katz's statements that Johnson was acting in a way that was inconsistent with a shoulder injury, Kern be-

Case 1:05-cv-00205-SLR    Document 43-3    Filed 03/14/2006    Page 19 of 33

Page 12
2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

lieved Johnson had falsified his injury claim. Johnson attempts to establish pretext in two ways, by citing the same evidence discussed above in our direct evidence discussion and by showing that Kern's belief was somehow mistaken.

The opportunity to argue pretext does not allow the plaintiff simply to second-guess the employer's decision. We do not sit as a super personnel department that reexamines an entity's business decisions. See *Bahl v. Royal Indem. Co., 115 F.3d 1283, 1292 (7th Cir. 1997), Mechnig, 864 F.2d at 1365.* The question we must answer at the pretext stage of analysis is not "whether the employer's reasons for a decision are 'right but whether the employer's description of its reasons is honest." *Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997)* (quoting *Gustovich v. AT & T Communications, Inc., 972 F.2d 845, 848 (7th Cir. 1992)); see also Bahl, 115 F.3d at 1291* ("When we consider whether an employer's justification for dismissing its employee is pretextual, [*50] the inquiry is not whether the reason for the firing was a correct business judgment but whether the decision makers honestly acted on that reason.").

Both parties agree that Johnson's burden at this juncture is to show that Olin's stated reason is "a lie, specifically, a phony reason for some reason." *Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995).* Plaintiff's counsel appears to be under the mistaken view that such a burden may be satisfied by contesting the factual basis for the employer's belief without addressing the honesty of that belief. As noted above, we are not a super personnel department and we will not overturn an honestly made, though arguably mistaken, decision. See *Kariotis, 131 F.3d at 677; Bahl, 115 F.3d at 1291.*

Thus, while Johnson disputes whether the videotape actually showed him lifting more weight than Dr. Katz's restrictions imposed, he does not dispute that Dr. Katz informed Kern of his belief that Johnson's activities violated those restrictions. We fully agree with Johnson that "[a] reasonable fact-finder could infer from the facts and circumstances surrounding this incident that Pleas Johnson [*51] did not submit false injury claims, violate the work restrictions imposed by Olin's own physicians, or attempt to obtain leave based on these injuries." However, that possible inference does not carry the day for Johnson. The only evidence to show that Kern did not honestly believe that Johnson had falsified his claim are the statements made by Anderson and Holleran, and Johnson simply has not provided any basis for linking these statements in any way to the ultimate decision to discharge him. Thus, they do not form a basis for pretext. Johnson's ADEA claim that Olin discharged him because of his age fails as a matter of law. n11

n11 Johnson submitted Reeves as additional authority supporting his claim. The relevant holding in that case is that a plaintiff may sometimes satisfy his burden of persuasion simply by establishing a prima facie case and producing enough evidence to disbelieve the employer's proffered explanation. See Reeves, 530 U.S. at   , 120 S. Ct. at 2108. Johnson has failed to put forth evidence that would cause a reasonable fact finder to disbelieve Olin's explanation for its decision so Reeves does not alter our analysis.

[*52]

Turning to the Union Defendants, Johnson fares no better in establishing an ADEA claim. The International Union contends that it was not named in Johnson's charge of discrimination before the EEOC and therefore is not properly subject to suit in this court. See Unions' Suppl. Reply Br. in Supp. of Mot. for Summ. J. ("Unions' Suppl. Reply") at 4. Once again, Johnson's responsive brief does not address this argument by the International Union; however, he asserts that his EEOC charge against the Local Union was sufficient to support joinder of the International Union in this case. See Plaintiff Pleas A. Johnson's Response to (Union) Defendant's Statement of Material Facts ("Pl.'s Resp. to Unions' Facts") P 14.

As a general rule, a party not named in an EEOC charge may not be sued for discrimination. See *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890, 905 (7th Cir. 1981)* (Title VII); *Anderson v. Montgomery Ward & Co., 852 F.2d 1008, 1016 (7th Cir. 1988)* (noting similarities between filing requirements of ADEA and Title VII). An exception exists where the facts indicate that the unnamed party was put on sufficient [*53] notice by the EEOC charge. See *Eggleston, 657 F.2d at 906;* see also *Johnson v. Palma, 931 F.2d 203, 209 (2d Cir. 1991)* (holding international union not properly joined after applying four factors: 1) whether the role of the unnamed party could, through reasonable effort by the complainant, be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named party are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party) *Glus v. G.C. Murphy Co., 562 F.2d 880, 888 (3d Cir. 1977)).* Johnson's unsupported assertion to the contrary, Johnson's

Case 1:05-cv-00205-SLR    Document 43-3    Filed 03/14/2006    Page 20 of 33

Page 13

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

submissions do not address whether the International Union was put on notice by the naming of the Local Union before the EEOC. On these facts, we conclude [*54] that, with respect to the ADEA charges, the International Union is not properly a party to this suit and is entitled to judgment as a matter of law on those claims.

As for the Local Union, the Union Defendants contend that they cannot be held liable for money damages under the ADEA. See *29 U.S.C. § 626(b); Neuman v. Northwest Airlines, Inc., 1982 U.S. Dist. LEXIS 13141,* No. 79- *C-1570, 1982 WL 313,* at *3 (N.D. Ill. April 30, 1982). We need not address this argument, because we find that Johnson cannot assert an ADEA claim against the Local Union, based upon the undisputed evidence presented to us. Assuming that Johnson could make out a prima facie case of discrimination under the ADEA based on the Local Union's conduct relating to his separation from Olin, the Local Union has provided a legitimate reason for its actions and Johnson has failed to establish any pretext. The Local Union asserts that it did not believe Johnson's claim had any merit and it therefore did not wish to pursue it through a grievance and recommended to Johnson that he accept voluntary retirement. Giving Johnson the benefit of all reasonable inferences, he simply has not come forward with any evidence [*55] that the Local Union's actions were taken on account of his age. Therefore, the Local Union is entitled to summary judgment on Johnson's disparate treatment claims in Count II.

Retaliation

Counts III and IV allege that Johnson's termination was in retaliation for filing grievances based upon age-based discrimination and for asserting worker's compensation rights. In order to make a prima facie case of retaliation under ADEA, the plaintiff must show: (1) that he engaged in protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. See *Trahant v. Royal Indem. Co., 121 F.3d 1094, 1098 (7th Cir. 1997).* The burden-shifting standards discussed above apply to a retaliation claim as well, so a successful prima facie case shifts the burden to Olin to state a legitimate non-discriminatory reason in response to which Johnson must show pretext. See *Hunt-Golliday v. Metropolitan Water Reclamation Dist., 104 F.3d 1004, 1014 (7th Cir. 1997).*

Count IV asserts a state-law retaliation claim, alleging that Plaintiff was terminated in retaliation for asserting worker's compensation [*56] rights, a claim made actionable by *Frampton v. Central Ind. Gas Co., 260 Ind. 249, 297 N.E.2d 425 (Ind. 1973).* n12 Indiana has adopted the Title VII burden-shifting analysis to retaliation claims. See *Indiana Civil Rights Comm'n v. Culver*

*Educ. Found., 535 N.E.2d 112, 115 (Ind. 1989), Fuller v. Allison Gas Turbine Div., 670 N.E.2d 64, 68 (Ind. Ct. App. 1996).* We therefore analyze together these two retaliation claims.

n12 Indiana is an at-will employment state. See *McClanahan v. Remington Freight Lines, Inc., 517 N.E.2d 390, 392 (Ind. 1988), Frampton, 297 N.E.2d at 253.* Frampton recognized a limited exception to this rule as applied to a discharge solely for exercising a statutorily conferred right. See *id. at 253.*

Olin contends that Johnson fails to make out a prima facie case because he has failed to establish a causal link between his actions and the prejudicial response. However, suspicious timing may [*57] constitute circumstantial evidence sufficient to support a claim of discrimination that will satisfy the requirements of a prima facie case. See *Hunt-Golliday, 104 F.3d at 1014.* If Johnson succeeds in making a prima facie case of retaliation, Olin's reason for the termination -- its honestly held belief that Johnson had filed a false injury claim -- rebuts the inference of retaliation and, as discussed above, defeats the claim of pretext. Thus, Johnson's retaliatory discharge claims fail as well. n13

n13 Although Johnson asserts his retaliation claims against all of the parties, he makes no separation retaliation claims against the Union Defendants under either the ADEA or Indiana law. Johnson identifies no protected acts on his part that occurred prior to the Local Union's decision not to pursue his claim that would satisfy the prima facie case. Nor does he refute the Local Union's contention that it believed that Johnson's claim lacked merit and that is why it was not interested in seeking a grievance on his behalf. Thus, to the extent that Johnson's retaliatory discharge claims against the Union Defendants are independent of those asserted against Olin, they too fail.

[*58]

FMLA "Entitlement" Claim

Count I asserts that the same conduct described in Count II also violates the Family and Medical Leave Act of 1993, *29 U.S.C. § 2601* et seq. The FMLA establishes two categories of protections for employees, only one of which is relevant to the case at bar.

Case 1:05-cv-00205-SLR    Document 43-3    Filed 03/14/2006    Page 21 of 33

Page 14

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

The FMLA contains prescriptive protections that are expressed as substantive statutory rights. See *King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir 1999)*. The Act provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve work weeks in any twelve-month period for a serious health condition, as defined by the Act. Id.; see *29 U.S.C. § 2612*(a)(1). After the period of qualified leave expires, the employee is entitled to be reinstated to the former position or an equivalent one with the same benefits and terms of employment that existed prior to the exercise of the leave. Id.; *Haefling v. United Parcel Serv., Inc., 169 F.3d 494, 498 (7th Cir. 1999)*.

To ensure the availability of these guarantees, the FMLA declares it "unlawful for any employer to interfere [*59] with, restrain, or deny the exercise or the attempt to exercise, any right provided." *29 U.S.C. § 2615*(a)(1); *King, 166 F.3d at 891*. An employee alleging a deprivation of these substantive guarantees must demonstrate by a preponderance of the evidence only his entitlement to the disputed leave. In such cases, the intent of the employer is immaterial. See *King, 166 F.3d at 891* (citing *Diaz v. Fort Wayne Foundry Corp., 131 F.3d 711, 713 (7th Cir. 1997)*) A claim brought under this substantive right provision of the FMLA is known as an "entitlement claim." n14

n14 The second category of protections embodies an anti-discrimination component similar to Title VII, which prohibits an employer from discriminating or retaliating against an employee who requests or takes medical leave pursuant to the statute. See *King, 166 F.3d at 891*. In this case, Johnson does not specify which type of claim he is advancing. However, Johnson makes no allegation that Olin or the Unions either discriminated or retaliated against him for requesting leave. Rather, he claims that Olin and the Unions interfered with his exercise of his FMLA right to take medical leave. Thus, we assume that Johnson advances only an "entitlement" claim under the FMLA and that the retaliation provisions are not at issue.

[*60]

An important caveat operates to qualify the protections afforded by the FMLA. An employee who requests or takes protected leave under the FMLA is not entitled to any greater rights or benefits than he would be entitled to had he not requested or taken leave. See *Kariotis, 131 F.3d at 680-81, Clay v. City of Chicago Dep't of Health, 143 F.3d 1092, 1094 (7th Cir. 1998)*. Therefore, an employer is entitled to dismiss an employee for any lawful

reason at any time, whether before, during, or after an employee requests or takes leave pursuant to the FMLA, as long as the employer does not discriminate or retaliate against the employee for requesting or taking such leave. Id.; see *29 C.F.R. § 825.216(a)* ("An employee has no greater right to reinstatement or other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."); *Stoops v. One Call Communications, Inc., 141 F.3d 309, 311 (7th Cir. 1998)* (accepting as "legitimate and controlling" the Secretary of Labor's FMLA regulations).

In Kariotis, the plaintiff was discharged from her position after the defendant decided [*61] that she had fraudulently accepted disability benefits. *131 F.3d at 674*. The defendant fired the plaintiff for disability fraud after having videotaped her off-duty activities. See *id. at 677*. Prior to terminating the plaintiff, representatives of the defendant viewed the videotape, but failed to present it to the company physician to ascertain whether the activities caught on the videotape actually contradicted the claimed disability. See id. The Seventh Circuit acknowledged that this "investigation" was impulsive and arguably came to the wrong conclusion about the plaintiff's fraud. See *id. at 678*. Despite these defects, the court determined that the employer terminated the employee based on an "honest suspicion" that the she had committed fraud, which honest suspicion was enough to satisfy the FMLA's requirements. See *id. at 681*. The Seventh Circuit held that "because Navistar lawfully could have terminated Kariotis after suspecting she committed fraud while on duty, the company can discharge her after it suspected she committed fraud while on leave." Id.

We are left with the same question that we faced with respect to Johnson's discrimination claims, namely, [*62] whether Olin had an honest belief that Johnson had filed a fraudulent claim of disability when it decided to discharge him. Johnson is no more successful in refuting this claim with respect to the FMLA claim than he has been in refuting it with respect to his discrimination claims. For the reasons explicated above, we find that Johnson's FMLA claims fail as a matter of law and all of the defendants are entitled to summary judgment on Count I.

Breach of Contract and Labor and Management Relations Act Claims

Count V asserts that Johnson's termination constituted a breach of contract under Indiana law. Count VI asserts that the Unions violated their duty of fair representation, in violation of the Labor and Management Relations Act ("LMRA"), *29 U.S.C. §§ 141* et seq. Defendants argue that Johnson's state law breach of contract claims are preempted by Section 301 of the LMRA, since that section governs disputes regarding collective

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

bargaining agreements. See Olin's Reply at 10-11. In response, Johnson contends that "while the collective bargaining agreement provides a back-drop to Johnson's breach of contract claims, it is clear that the union breached [*63] its duty of fair representation." Johnson's Amended Resp. to Olin at 18.

Section 301 provides an independent federal cause of action for contract disputes between an employee and a labor organization. See *29 U.S.C. § 185*(a). Section 301 serves to preempt a state law breach of contract claim when "the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06, 100 L. Ed. 2d 410, 108 S. Ct. 1877 (1988).* Indeed, "the preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.'" *McCarty v. Reynolds Metals Co., 883 F. Supp. 356, 359-60 (S.D. Ind. 1995)* (quoting *Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 23, 77 L. Ed. 2d 420, 103 S. Ct. 2841 (1983)).* However, "not every dispute concerning employment or tangentially involving a provision of a collective-bargaining agreement" is preempted by Section 301. *Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211, 85 L. Ed. 2d 206, 105 S. Ct. 1904 (1985).* [*64]

In Lingle, the Supreme Court held that Section 301 did not preempt a claim of retaliatory discharge for filing a worker's compensation claim. *Lingle, 486 U.S. at 407.* The Court determined that neither the elements of the state-law claim nor the employer's defense required the trial court to interpret any term of a collective bargaining agreement. See id. Thus, the Supreme Court found the retaliatory discharge claim was "independent" of the collective bargaining agreement for Section 301 preemption purposes in that "resolution of the state-law claim does not require construing the collective bargaining agreement." Id.

The only breach of contract allegation made by Johnson against Olin is that it terminated him without following the procedures outlined in the CBA. See Amended Compl. P 50. In contrast to Johnson's Frampton claim discussed above, we are unable to see a way to resolve this claim without construing the CBA. The rights Johnson asserts are not statutorily conferred or independent of the CBA; any extra rights enjoyed by Johnson in the security of his employment flowed directly from the CBA.

With respect to the Unions, Johnson contends [*65] that the basis for his state-law breach of contract claim is the Unions "breach[of] its duty of fair representation." Johnson's Amended Resp. to Olin at 18. However, Johnson makes no effort to identify how such a duty is incorporated into a state-law cause of action, independent of the LMRA.

We have been unable to find such an independent cause of action under Indiana law. Rather, the Supreme Court has held that "the duty of fair representation, unlike state tort and contract law, is part of federal labor policy." *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6, 493 U.S. 67, 79, 107 L. Ed. 2d 388, 110 S. Ct. 424 (1989);* see also *Serstel Corp. v. Gibbs, 417 N.E.2d 372, 374 (Ind. Ct. App. 1981)* (holding that claim by plaintiff-employee against union for alleged breach of collective bargaining agreement was only actionable under Section 301 and applying federal law to plaintiff's claim). In addition, to resolve Johnson's claim we would be required to construe the CBA, the only contract at issue in this case. Thus, Johnson's alleged state-law claim falls within the heartland of those claims held to be preempted by Section 301. We hold [*66] that breach of contract claim asserted in Count V is therefore preempted by Section 301 of the LMRA, and the defendants are entitled to summary judgment with respect to Count V. n15

n15 We need not decide whether Johnson has properly asserted a Section 301 claim against Olin. Such a claim is predicated upon our finding that the union breached its duty of fair representation. See *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry, 494 U.S. 558, 108 L. Ed. 2d 519, 110 S. Ct. 1339 (1990), United Parcel Serv., Inc. v. Mitchell, 451 U.S. 56, 63, 67 L. Ed. 2d 732, 101 S. Ct. 1559 (1981),* limited on other grounds by *DelCostello v. International Bhd of Teamsters, 462 U.S. 151, 76 L. Ed. 2d 476, 103 S. Ct. 2281 (1983)* (discussing selection of statute of limitations); *Filippo v. Northern Ind. Public Serv. Corp., 141 F.3d 744, 748 (7th Cir. 1998).* As we explain below, Johnson has made no such showing in this case. Further, to the extent that Johnson is able to assert a state-law claim for breach of the duty of fair representation, his claim must be analyzed according to the standards for a breach of such duty under the LMRA. See Johnson's Amended Reply to Olin at 19 (adopting Johnson's analysis in support of his breach of duty under the LMRA to his breach of contract claim). Thus, even if his state-law claim survived, it would be necessarily tied to his LMRA claim and would fail for the reasons explicated below.

[*67]

Finally, we are left with Count VI: Johnson's allegations that the Union breached its duty of fair representa-

Case 1:05-cv-00205-SLR    Document 43-3    Filed 03/14/2006    Page 23 of 33

Page 16

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

tion, in violation of the LMRA. A union breaches its duty of fair representation only when its actions are arbitrary, discriminatory or carried out in bad faith. See *Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 76, 113 L. Ed. 2d 51, 111 S. Ct. 1127 (1991)* ("O'Neill"); *Vaca v. Sipes, 386 U.S. 171, 190, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967); Filippo v. Northern Ind. Public Serv. Corp., 141 F.3d 744, 748 (7th Cir. 1998).* This is a tripartite standard, each element being distinct and requiring separate analysis. See *O'Neill, 499 U.S. at 77, Filippo, 141 F.3d at 748-49.* To defeat a motion for summary judgment, a plaintiff must proffer specific facts supporting at least one of these elements. See id.; *Griffin v. Air Line Pilots Ass'n, Int'l, 32 F.3d 1079, 1083 (7th Cir. 1994).*

The "arbitrary" prong of the fair representation test is very deferential, see *O'Neill, 499 U.S. at 76-79; Griffin, 32 F.3d at 1083,* requiring the court to examine [*68] the objective adequacy of the union's actions. See *Trnka v. Local Union No. 688, 30 F.3d 60, 63 (7th Cir. 1994).* It is not our role to second guess tactical decisions made by the bargaining unit; we begin to question such decisions only when "'the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational.'" *Filippo, 141 F.3d at 749* (quoting *O'Neill, 499 U.S. at 67* and *Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 97 L. Ed. 1048, 73 S. Ct. 681 (1953)); Griffin, 32 F.3d at 1083.*

A union need not pursue every grievance asserted by an employee. See *Vaca, 386 U.S. at 191-92; Dahnke v. Teamsters Local 695, 906 F.2d 1192, 1196 (7th Cir. 1990).* So long as a colorable argument could be made at the time of the union's decision not to pursue a grievance that such grievance was meritless and that the union did not treat substantially similar grievances differently from the plaintiff's, the decision cannot be regarded as arbitrary. See *Trnka, 30 F.3d at 61.* A union must provide some minimal investigation to an employee grievance, [*69] but "the thoroughness of this investigation depends on the particular case, and only an egregious disregard for union members' rights constitutes a breach of the union's duty." *Filippo, 141 F.3d at 749.*

In contrast to the objective focus of the arbitrariness inquiry, unfair representation as discrimination or bad faith requires a separate, but related, analysis into the subjective motivation behind the union's action. See *Crider v. Spectrulite Consortium, Inc., 130 F.3d 1238, 1243 (7th Cir. 1997); Trnka, 30 F.3d at 63.* If a union has an honest belief that a grievance lacks merit, a plaintiff cannot later attempt to construe the union's decision as discriminatory or in bad faith. See *Dahnke, 906 F.2d at 1197.*

The undisputed evidence in the case at bar establishes that Olin had a videotape which it believed showed Johnson acting in violation of his medical restrictions. It is further undisputed that Steve Griffith, the Local Union President, met with Olin officials who showed him the tape and informed him of their intention to terminate Johnson based upon such evidence. Griffin knew that Olin had previously used similar [*70] videotape evidence to successfully discharge other employees and Griffith testified that upon viewing the videotape, he was of the opinion that there was little chance of a successful grievance.

Johnson asserts that the Local Union acted arbitrarily by not pursuing a grievance on his behalf and that Griffith "deliberately misled" Johnson with respect to his rights to a hearing whereby he could contest the company's allegations. Plaintiff, Pleas A. Johnson's (Amended) Response to Defendant Union's Mot. for Summ. J. ("Johnson's Amended Resp. to Unions") at 7. Johnson attempts to use the Local Union's previous pursuit of a grievance on behalf of Velvet Jones as evidence that its refusal to pursue a grievance in Johnson's case was arbitrary. See id. at 8-9. However, a union has no obligation to pursue each and every claim pressed by a member, regardless of its merits. See, e.g., *Dahnke, 906 F.2d at 1196* (holding that a union's mere refusal to pursue a grievance is not insufficient to support a finding that the union breached a duty of fair representation). The fact that the Local Union did not intend to pursue a grievance on Johnson's behalf is not enough to show [*71] that the Local Union's actions were "egregious" or irrational, and Johnson has provided no other evidence that would allow us to conclude that the Local Union's actions were arbitrary.

Likewise, even if we assume that Griffith neglected to tell Johnson about a planned hearing and that Griffith told Johnson that the Local Union would not support Johnson if he pursued a grievance against Olin, Johnson provides no evidence beyond his own bare assertions as to Griffith's intent in an effort to create a genuine issue of material fact as to Griffith's intent thus allowing Johnson to survive summary judgment on this claim. But a plaintiff's bare assertions of bad faith or discrimination are insufficient to create a genuine issue of material fact when questions of motive or intent arise in summary judgment proceedings. See *Dahnke, 906 F.2d at 1196.*

It is undisputed that Griffith told Johnson that he had seen the videotape and left Johnson with two choices -- to be discharged or to voluntarily retire. See Johnson Dep. at 113-14; Griffith Dep. at 17-18. Griffith further testified that he told Johnson that based on the videotape and similar previous discharges of other [*72] employees, there was little chance of a successful arbitration. See Griffith Dep. at 42, 43. Assuming that Griffith did not actually relay these opinions to Johnson, Johnson still has failed to provide us with any evidence to dispute that

2000 U.S. Dist. LEXIS 14469, *; 6 Wage & Hour Cas. 2d (BNA) 941

Griffith honestly held these views or to show that Griffith's intent was discriminatory or in bad faith. The Unions are therefore entitled to summary judgment on Johnson's claim for breach of the duty of fair representation in Count VI.

Conclusion

Having failed to refute the legitimate reasons put forth by Olin and the Unions for their various actions taken with respect to Johnson's separation from Olin, Johnson cannot prevail in this litigation. Olin and the Union Defendants are entitled to judgment as a matter of law on each claim in Johnson's complaint. n16

n16 Counsel for Plaintiff has also filed a motion for reconsideration of sanctions previously imposed by this court on November 10, 1999. We stand by our conclusions previously stated in that entry. Plaintiff's motion for reconsideration is DENIED.

[*73]

It is so ORDERED this 29th day of September 2000.

SARAH EVANS BARKER, CHIEF JUDGE

United States District Court

Southern District of Indiana

# EXHIBIT F

LEXSEE 2003 U.S. DIST. LEXIS 10096

**REGINALD K. SEABROOK, Plaintiff, v. DIANE GADOW, and STATE OF DELAWARE/DYRS, Defendants.**

**Civil Action No. 01-802-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 10096*

**June 10, 2003, Decided**

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted.

**COUNSEL:** Reginald K. Seabrook, Plaintiff, Pro se, Bear, Delaware

Michael F. Foster, Esquire, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

**MEMORANDUM OPINION**

Dated: June 10, 2003
Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

Plaintiff Reginald K. Seabrook filed this action on December 4, 2001 against defendants Diane Gadow, Superintendent of Ferris School, and the State of Delaware/Department of Youth Rehabilitation Services (DYRS). (D.I. 1) Plaintiff alleges discrimination based on his race and gender under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000(e), et seq.*, ("Title VII"). The court has jurisdiction over plaintiff's claims pursuant to *28 U.S.C. § 1331.* Currently before the court is defendants' motion for summary judgment. (D.I. 14) For the following reasons, defendants' motion is granted.

**II. Background**

Plaintiff, an African American male, began employment with DYRS on December 15, 1997. (D. [*2] I. 16 at A4) Plaintiff was hired as a Youth Rehabilitation Treatment Supervisor at the Ferris School in Wilmington, Delaware. (Id.) At the time plaintiff was hired by DYRS there were eight Rehabilitation Treatment Supervisors: two Caucasian males, one Caucasian female and five African American males, including plaintiff. (D.I. 17 at 321) Plaintiff's direct supervisor was Program Manager, Llionel Henderson ("Henderson"), an African American male, who was supervised by the Superintendent of Ferris School, Dianne Gadow ("Gadow"), a Caucasian female. (Id.)

**A. First Request for Plaintiff's Termination**

On November 2, 1998, during plaintiff's probationary employment period, Henderson requested termination of plaintiff's employment with DYRS for failure to follow directives, insubordination, and tampering with or attempting to influence the findings of investigations into allegations of abuse. (D.I. 16 at A11) The request for termination was submitted by Henderson, but on May 1, 1999 Henderson drafted and signed a letter to Charles T. Watkins, Personnel Administrator, stating that on October 27, 1998 Gadow directed him to submit the request for plaintiff's termination. (D.I. [*3] 17 at 281) Although Henderson claims he was directed to submit the request for termination by Gadow, in the course of the Department of Services for Children, Youth and Their Families investigation into plaintiff's Affirmative Action complaint, Henderson stated he was not coerced into making the November 2, 1998 request for termination by anyone, including Gadow. (D.I. 17 at 208) Plaintiff was informed of the request for termination on November 2, 1998 by internal memorandum from Henderson. (D.I. 16 at A11) Henderson's request for termination of plaintiff was the result of allegations of violations of DYRS protocol n1 on October 13, 1998 and October 23, 1998. (Id.) On October 13, 1998, plaintiff was alleged to have vio-

lated bedtime and activity protocol by keeping residents of Ferris School in the school gymnasium after program hours. (Id.) In addition, the request for termination alleged plaintiff compelled residents to engage in structured exercise activities on October 23, 1998 in violation of the program model, which forbids the use of exercise as discipline. n2 (Id.) Henderson's request for termination also stated plaintiff was directed to abstain from contact with [*4] residents while an investigation into the October 23, 1998 activities was conducted, but plaintiff violated the direct instruction by initiating contact with residents with the purpose of hindering the investigation. (Id.) As a result of the questions surrounding plaintiff's actions, on December 11, 1998 plaintiff's probationary period with DYRS was extended for an additional six months. (D.I. 16 at A16)

> n1 On September 14, 1998, plaintiff signed an internal memorandum acknowledging receipt of a Ferris School Standard Operating Procedure Manual and accepting responsibility for becoming familiar with the manual. (D.I. 17 at 218)

> n2 The allegations of abuse stemming from the October 23, 1998 incident were subsequently determined to be unsubstantiated. (D.I. 16 at A12)

Gadow reviewed the recommendation for termination and forwarded the recommendation to Deputy Director, Michael Alfree ("Alfree") n3 Alfree denied the request for termination, instead suspending plaintiff for thirty days. (D.I. 17 at 121) [*5] Plaintiff received written notice of the suspension from Gadow on December 24, 1998. (D.I. 16 at A12-A13) Plaintiff was given the opportunity to appeal the suspension within fifteen days of receiving the disciplinary letter. (Id.)

> n3 Under standard agency procedure, the direct supervisor of the employee in question initiates a recommendation for termination, which is then reviewed by the Superintendent and forwarded to the Division Director. (D.I. 17 at 121)

Henderson claims prior to leaving his position at the Ferris School, he prepared a year-end employee review for plaintiff for 1998. n4 (D.I. 17 at 281) According to a letter signed by Henderson on May 1, 1999, plaintiff was rated as "Exceeding Expectations," despite the previous request for termination. (Id.) Plaintiff claims Gadow withheld Henderson's review and directed acting Program Manager, Christopher Stetzer, to evaluate plaintiff's

job performance although Stetzer had never supervised plaintiff. (D.I. 19 at 4-5)

> n4 There is no copy of the review in the record.

[*6]

## B. Corrective Action Plan

On January 26, 1999, plaintiff's new program manager, Annette Coston ("Coston"), an African American female, sent plaintiff a Corrective Action Plan outlining additional responsibilities as a result of plaintiff's questionable actions. (D.I. 16 at A15) The plan moved plaintiff from the "B" shift (2:00 p.m. to 10:00 p.m.) to the "A" shift (11:00 a.m. to 7:00 p.m.) so he would be directly supervised by Coston while working. The plan also required weekly meetings between plaintiff and Coston to discuss plaintiff's supervision of students, documentation of any physical contact between plaintiff and students, and consent from Coston and the Treatment Team for any treatment strategies regarding students at Ferris School. (Id.) Plaintiff agreed to the Corrective Action Plan by signing and dating the document on January 26, 1999. (Id.)

## C. Pre-decision Hearing Regarding Thirty Day Suspension

On February 3, 1999, a pre-decision meeting was held to hear evidence regarding plaintiff's pending suspension. (D.I. 16 at A14) Plaintiff, plaintiff's union representative Joe Conaway, Gadow and Coston were present at the meeting. (Id.) During the meeting, [*7] plaintiff argued the thirty day suspension was unwarranted because he was sufficiently disciplined by a written reprimand for the October 23, 1998 incident. (Id.) Following the pre-decision meeting, Gadow concluded that the reprimand plaintiff referenced was directed to plaintiff's failure to follow directives, not the October 23, 1998 incident, which subsequently was determined to be unsubstantiated. (Id.) As a result, Gadow determined that the thirty day suspension was warranted to supplement the letter of reprimand because of plaintiff's violations of DYRS protocol and failure to follow directives. (Id.) Plaintiff's suspension began on February 24, 1999 and ended on March 25, 1999. (D.I. 17 at 42)

## D. Second Request for Plaintiff's Termination

On March 8, 1999, a second request for plaintiff's termination from Ferris School was submitted by Gadow to Sherese Brewington-Carr ("Brewington-Carr"), Division Director. (D.I. 16 at A16) Gadow's response to plaintiff's Equal Employment Opportunity Commission (EEOC) complaint states Coston initially submitted a

request for termination to Gadow on March 5, 1999. n5 (D.I. 17 at 119) The request for termination cited three violations [*8] of plaintiff's Corrective Action Plan as grounds for termination: n6 (1) on February 20, 1999 plaintiff entered the Ferris School on his day off; (2) on February 22, 1999 plaintiff held a parent meeting without prior approval by Coston and the Treatment Team, and without the Treatment Specialist assigned to the case; n7 and (3) on February 24, 1999 plaintiff escorted a student out of the cluster without informing other staff, keeping the student out past bedtime and two hours past the end of plaintiff's shift. (D.I. 16 at A16-A17) The request for termination also stated plaintiff's behavior while with the Ferris School resident on February 24, 1999 was unprofessional, although not in direct violation of the Corrective Action Plan, because plaintiff told the resident he was upset about the thirty day suspension. (Id. at A17) Plaintiff was informed of the request for termination on March 31, 1999 and also notified of his right to address the charges at a pre-decision meeting. (Id. at A18)

n5 There is no copy of Coston's request for termination in the record.

n6 Plaintiff claims he was originally informed by Coston that the request for termination was submitted because plaintiff brought contraband (a toothbrush and Vaseline) into Ferris School. (D.I. 19 at 5) Plaintiff further claims the reasoning for the request for termination was later changed when it was found the allegations regarding the contraband were false. (Id.)

[*9]

n7 Plaintiff claims the chairperson for the meeting and the case supervisor were present at the parent meeting. (D.I. 19 at 5) In addition, plaintiff notified Coston through email of the meeting and also claims Coston walked past the meeting, seeing the parties present. (D.I. 17 at 327; D.I. 19 at 5)

While the request for termination was pending, Coston completed a State of Delaware Employee Performance Review to evaluate plaintiff's job performance as Treatment Specialist Supervisor from January 1, 1999 through April 30, 1999. (D.I. 17 at 94) Plaintiff's overall performance was listed as "Needs Improvement." (Id.) Plaintiff claims the evaluation originally stated plaintiff "Meets Expectations," but Gadow told Coston to change the overall evaluation from "Meets Expectations" to "Needs Improvement." (D.I. 19 at 5) In the evaluation, under "Areas of specific performance deficiencies or

unsatisfactory work," Coston cited an incident where students were allowed in plaintiff's office unsupervised in violation of Ferris School policies and procedures. (D.I. 17 at 94) Plaintiff signed the review, [*10] but commented that the designation of plaintiff's overall performance as "Needs Improvement" was unfair because it was based on problems raised under the Corrective Action Plan, and not his 1999 Performance Plan. n8 (Id. at 95) Also, on May 13, 1999, plaintiff's Corrective Action Plan was revised. (Id. at 282) The revised plan returned plaintiff to the "B" shift and ended the mandatory weekly meetings between plaintiff and Coston. (Id.)

n8 The 1999 Performance Plan outlines plaintiff's job responsibilities, separate from the additional responsibilities outlined in the January 26, 1999 Corrective Action Plan. (D.I. 17 at 96)

### E. Denial of Second Request for Termination

A pre-termination hearing was held on May 20, 1999. (D.I. 16 at A20) Plaintiff, Brewington-Carr, Gadow, Personnel Officer Karen Smith, and plaintiff's union representative Patricia Bailey, were present at the hearing. (Id.)

A decision as to the request for termination was reached on June 18, 1999 by Brewington-Carr. (D.I. [*11] 15 at A20) The claim plaintiff violated the Corrective Action Plan on February 20, 1999 by entering Ferris School on his day off was removed from the charges because plaintiff's actions were not a violation of a directive under the Corrective Action Plan. (Id. at A22) The February 22 and 24, 1999 incidents were determined to be violations of the Corrective Action Plan and Ferris School policy and procedures. (Id.) Brewington-Carr determined plaintiff's actions were serious, but termination would be too severe, therefore, plaintiff was demoted to the position of Treatment Specialist, effective July 1, 1999. (Id. at A23)

On June 30, 1999, Coston completed another State of Delaware Employee Performance Review, evaluating plaintiff's job performance from May 1, 1999 through June 30, 1999. (D.I. 17 at 93) Plaintiff's overall performance was rated as "Meets Expectations" and no areas of specific performance deficiencies or unsatisfactory work were listed. (Id.)

### F. Plaintiff's Request for Educational Leave

On August 9, 1999, plaintiff submitted a request for educational leave to pursue a Masters in Public Administration at Wilmington College. (D.I. 17 at 295-296) [*12] DYRS does allow for educational leave to "promote professional growth and development," but the pol-

icy allows Division Directors to use discretion when granting leave. (Id. at 189) Plaintiff requested to take off work every other Friday, Saturday and Sunday to attend classes, in addition to being off one weekend a month for military duty. (Id. at 173) Plaintiff's request for educational leave was denied. DYRS maintains the request was denied because of operating requirements and the "adverse impact" granting the leave would have on Ferris School. (Id.) Plaintiff submitted a proposed schedule which would allow him the necessary time off to attend classes, but the proposal was denied because it did not provide for adequate staffing. (Id. at 312) After plaintiff was denied educational leave, he called DYRS to notify them he would be using three sick days on October 21, 22, and 23, 1999, which coincided with the educational leave request plaintiff submitted. (Id. at 319-320) Plaintiff received a written reprimand for using sick days to attend educational classes, a violation of Merit Rules. n9 (Id.)

n9 Plaintiff was also reprimanded for failure to submit the proper documentation to his supervisors prior to taking military leave on October 15, 16 and 17, 1999. (D.I. 17 at 319-320)

[*13]

### G. Affirmative Action Complaint

As a result of the disciplinary actions taken against plaintiff, he filed an affirmative action complaint with the Department of Services for Children, Youth and their Families. (D.I. 17 at 208) Plaintiff's complaint claimed he had been subjected to punitive racial harassment by Gadow. (Id.) Norwood J. Coleman ("Coleman") issued a report summary with respect to the charges on October 25, 1999. (Id.) By reviewing materials submitted by plaintiff and interviewing witnesses, Coleman concluded plaintiff had not produced any evidence to show the disciplinary actions taken against him were discriminatory, and no supporting evidence was uncovered in the course of the investigation. (Id.)

### H. EEOC Complaint

Plaintiff submitted a complaint to the Delaware Department of Labor on November 8, 1999, alleging he was discriminated against based on his race under *Title VII of the Civil Rights Act of 1964* ("Title VII"). (D.I. 17 at 16) The Delaware Department of Labor lacked jurisdiction because the state law statute of limitations had expired, but the case was forwarded to the Equal Employment Opportunity Commission in Philadelphia. (Id. [*14] at 27) The complaint alleged plaintiff's thirty day suspension, demotion to Treatment Specialist, and denial of educational leave were discriminatory. (Id. at 16) After

conducting an investigation, on September 5, 2001 plaintiff was notified by the EEOC that its investigation concluded there was not sufficient evidence to support a violation of Title VII. (Id. at 13) Plaintiff was also informed of his right to file suit against defendants within ninety days of receipt of the EEOC notice. (Id.)

### III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* The moving party bears the burden of proving that no genuine issue of material fact exists. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude [*15] that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita, 475 U.S. at 587* (quoting *Fed. R. Civ. P. 56(e)*). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).* The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled [*16] to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993)* (quoting *Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)).*

### IV. DISCUSSION n10

n10 Plaintiff filed a form complaint with the court, in which he alleged discrimination based on his race and sex by defendants' disciplinary actions. (D.I. 1) In plaintiff's reply to defendants' motion for summary judgment, plaintiff makes additional allegations of disparate treatment and handling of military duty, unfair treatment in evaluations, hiring promotion, and grievances. (D.I. 19) Where the plaintiff is a pro se litigant, the court has an obligation to construe the complaint liberally. See *Haines v. Kerner, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972)*. Moreover, the parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Hicks v. ABT Assocs, Inc., 572 F.2d 960, 966 (3d Cir. 1978)*. To the extent that plaintiff's November 8, 1999 EEOC charge of discrimination encompasses plaintiff's later allegations, the court will consider them in addition to those in his complaint.

[*17]

In response to defendants' motion for summary judgment, plaintiff argues the motion is premature because defendants filed the motion prior to receiving plaintiff's response to their interrogatories. (D.I. 20) Under *Rule 56(b)*, a defending party may move for summary judgment at any time. *Fed R. Civ. P. 56(b)*. Under *Rule 56*, defendants do not have to wait for plaintiff's response to their interrogatories to file a motion for summary judgment, therefore, the motion is properly before the court.

As a preliminary matter, Congress did not intend to create a cause of action against individual employees under Title VII. See *Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1078 (3d Cir. 1996)*. Thus, plaintiff's claims against the individual defendant, Diane Gadow, are dismissed.

In his claims against DYRS, plaintiff alleges that he was subject to discrimination in violation of *Title VII of the Civil Rights Act of 1964* n11 Claims brought pursuant to Title VII are analyzed under a burden-shifting framework; if plaintiff makes a prima facie showing of discrimination, the burden shifts to defendants to establish a legitimate, nondiscriminatory reason for their actions. [*18] See *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. If defendants carry this burden, the presumption of discrimination drops from the case, and plaintiff must

"cast sufficient doubt" upon defendants' proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. *Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996)* (en banc).

n11 The anti-discrimination provision of Title VII provides:

> It shall be an unlawful employment practice for an employer -- (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*42 U.S.C. § 2000e-2(a)*.

[*19]

**A. Disparate Treatment Claim**

Generally, to state a disparate treatment in employment claim under Title VII, a plaintiff must offer evidence "adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the act." *EEOC v. Metal Serv. Co., 892 F.2d 341, 348 (3d Cir. 1990)*. First, plaintiff must state a prima facie case of race or gender discrimination. See *McDonnell Douglas, 411 U.S. at 802*. He can do so by showing by a preponderance of the evidence that: (1) he is a member of the protected class; (2) he suffered an adverse employment action; and (3) similarly situated members of the opposite sex and members of other races were treated more favorably. See id.

Plaintiff claims he was the victim of deliberate harassment and intimidation by Gadow because he is an African American male. (D.I. 17 at 332) According to plaintiff, the disciplinary actions against him and the denial of educational leave were not consistent with the treatment of other DYRS employees. Plaintiff claims

racial discrimination caused him to be subjected to more severe disciplinary actions than white male Treatment Specialist [*20] Supervisors. (Id. at 16) Plaintiff further claims race and gender were the motivating factors in denying him educational leave, while a white female employee's request was granted. (Id.)

In the present action, plaintiff fails to establish a prima facie case of gender discrimination. Although plaintiff, a male, suffered an "adverse employment action," plaintiff has failed to show similarly situated members of the opposite sex were treated more favorably. Plaintiff does specify two employees who he believes received more favorable treatment despite having worse disciplinary records, but plaintiff has not introduced any evidence to support his claim. Even if plaintiff's claim that the two employees received more favorable treatment were substantiated, both employees are also males, precluding any inference of discrimination based on gender. (D.I. 19 at 6)

Plaintiff has also failed to establish a prima facie case of race discrimination. Plaintiff has not introduced evidence that plaintiff's race was a factor in the claimed disparate treatment. First, six out of eight Treatment Specialist Supervisors at the Ferris School are African American males; therefore, it is a difficult burden [*21] to prove other employees were treated more favorably due to racial discrimination. Second, plaintiff's immediate supervisors, Henderson and Coston, are both African American, thus, there is little support that the requests for plaintiff's termination were motivated by racial discrimination. Even if plaintiff's claims that Gadow directed Henderson and Coston to request his termination were credited as true, plaintiff has failed to introduce any evidence that Gadow, a white female, was in any way motivated by plaintiff's race.

In the alternative, if the court found that plaintiff had established a prima facie case of race or gender discrimination, under the shifting burden standard, defendants have shown legitimate nondiscriminatory reasons for the disciplinary actions against plaintiff. See *McDonnell Douglas, 411 U.S. at 802.* Given plaintiff's numerous violations of DYRS protocol, his Corrective Action plan and directives from supervisors, defendants have demonstrated sufficient cause for plaintiff's thirty day suspension and demotion. With respect to the denial of plaintiff's request for educational leave, denying the leave to provide for adequate staffing on weekends [*22] is a legitimate reason, not based on discriminatory motives.

Furthermore, plaintiff has failed to introduce evidence to support any claim that defendants' motives are fabricated. "Speculation and belief are insufficient to create a fact issue as to pretext. Nor can pretext be established by mere conclusory statements of a plaintiff who

feels that [he] has been discriminated against." *Washington v. Occidental Chemical Corp. 24 F. Supp. 2d 713, 722 (S.D. Tex. 1998).* Plaintiff has failed to present any evidence that would support his claim that defendants' actions were motivated by racial or gender discrimination. Although during his employment plaintiff did receive some favorable employee evaluations, such evaluations do not necessarily lead to the inference that defendants' asserted reasons for the disciplinary actions are pretextual. Without evidence to support plaintiff's claim, his generalized belief that he has been subject to unlawful discrimination does not establish a case for discrimination under Title VII.

## B. Hostile Work Environment Claim

To state a Title VII claim premised on a hostile work environment, plaintiff must show: (1) that he suffered [*23] intentional discrimination because of race or sex; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected plaintiff; (4) that the discrimination would detrimentally affect a reasonable person of the same race or sex in that position; and (5) the existence of respondeat superior liability. See *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996).*

Plaintiff argues the consistent disparate treatment he has received has created a hostile work environment at Ferris School. (D.I. 17 at 332) In addition to his other claims, plaintiff argues he was denied a reasonable place to work while being investigated for abuse, as well as unfairly reprimanded for tardiness and taking military leave, although other employees were not reprimanded. (Id.) In response, defendants argue the evidence introduced into the record supports their contention that the disciplinary actions against plaintiff were always in response to his violations of DYRS policy. (D.I. 15 at 17) Defendants further argue that plaintiff's allegations are baseless because he concludes he was discriminated against simply because he was disciplined. [*24] (Id.)

By failing to establish that he suffered from intentional discrimination because of his race or gender, plaintiff has failed to prove a prima facie case for hostile work environment. Although plaintiff was disciplined by DYRS for his actions and denied educational leave, defendants' actions were not discriminatory, but the result of plaintiff's violations of DYRS procedures and his supervisors' directives. Therefore, based on the record presented, the court concludes that plaintiff fails to carry his burden of proving a prima facie case on his hostile work environment claim.

## V. CONCLUSION

2003 U.S. Dist. LEXIS 10096, *

For the reasons stated, defendants' motion for summary judgment is granted. An appropriate order shall issue.

**ORDER**

At Wilmington this 10th day of June, 2003, consistent with the memorandum opinion issued this same day;

IT IS ORDERED that:

1. Defendants' motion for summary judgment (D.I. 14) is granted.

2. The clerk is directed to enter judgment in favor of defendants and against plaintiff.

Sue L. Robinson

United States District Judge

## CERTIFICATE OF SERVICE

I, Sarah E. DiLuzio, hereby certify this 14th day of March, 2006, I caused the foregoing **OPENING BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the U.S. District Court District of Delaware via CM/ECF (Official Court Electronic Document Filing System) and served two (2) true and correct copies upon *pro se* Plaintiff via overnight mail, to the following address:

> George Witcher, *Pro Se*
> 2621 Jessup Street
> Wilmington, Delaware  19802

Sarah E. DiLuzio (I.D. #4085))
POTTER ANDERSON & CORROON LLP
1313 North Market Street—6th Floor
Post Office Box 951
Wilmington, Delaware  19899-0951
 (302) 984-6044 - Telephone
 (302) 658-1192 - Facsimile
sdiluzio@potteranderson.com - Email

718908