## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

GEORGE WITCHER,                          )
                                         )
                    Plaintiff,           )
                                         )
          v.                             )        C.A. No. 05-205 (SLR)
                                         )
SODEXHO, INC.,                           )
                                         )
                    Defendant.           )

## APPENDIX TO DEFENDANT SODEXHO, INC.'S OPENING BRIEF
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

POTTER ANDERSON & CORROON LLP
Jennifer Gimler Brady (I.D.# 2874)
Sarah E. DiLuzio (I.D. #4085)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000 - Telephone
jbrady@potteranderson.com
sdiluzio@potteranderson.com

*Attorneys for Defendant Sodexho, Inc.*

Dated: March 14, 2006
723452

# TABLE OF CONTENTS

Deposition of George M. Witcher
Taken January 12, 2006 ................................................................................................. A1

Statement of Gary Rogers
(Witcher Deposition Exhibit No. 1) ............................................................................. A70

Gary Rogers' Constructive Counseling Notice
Dated October 3, 2004 (Witcher Deposition Exhibit No. 2) ......................................... A71

Excerpts from the Sodexho Employee Handbook
(Witcher Deposition Exhibit No. 3) .............................................................................. A75

Excerpt from the Sodexho Employee Handbook
(Dated January 2002) ................................................................................................... A83.1

Employee Handbook Acknowledgment signed by George Witcher
Dated September 27, 2003 (Witcher Deposition Exhibit No. 4) .................................. A84

Notes of June 17, 2004 Meeting with George Witcher
Dated June 17, 2004 (Witcher Deposition Exhibit No. 6) ........................................... A85

Letter from Patty Weick, Sr. Human Resource Manager, to George Witcher
Dated July 7, 2004 (Witcher Deposition Exhibit No. 7) .............................................. A86

Donna Haughney's Constructive Counseling Notice
Dated July 12, 2004 (Witcher Deposition Exhibit No. 8) ............................................ A89

Charge of Discrimination filed by George M. Witcher
Dated July 8, 2004 (Witcher Deposition Exhibit No. 9) .............................................. A90

George Witcher's Performance and Development Appraisal
Dated April 21, 2005 (Witcher Deposition Exhibit No. 10) ......................................... A92

George Witcher's Constructive Counseling Notice
Dated February 25, 2005 (Witcher Deposition Exhibit No. 11) ................................... A94

George Witcher's Resignation Letter Effective July 8, 2005
Dated June 23, 2005 (Witcher Deposition Exhibit No. 12) .......................................... A96

Letter from Gordon Ellis, Human Resource Director, to George Witcher
Dated July 6, 2005 ((Witcher Deposition Exhibit No. 14) ........................................... A97

# W&F

## WILCOX & FETZER LTD.

In the Matter Of:

# Witcher

## v.

# Sodexho, Inc.

## C.A. # 05-2005 SSR

—————————————

Transcript of:

George M. Witcher

January 12, 2006

—————————————

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

A1

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GEORGE WITCHER,                    )
                                   )
            Plaintiff,             )
                                   )   Civil Action
v.                                 )   No. 05-2005 SSR
                                   )
SODEXHO, INC.,                     )
                                   )
            Defendant.             )

     Deposition of GEORGE M. WITCHER taken pursuant to
notice at the law offices of Potter, Anderson &
Corroon, 6th Floor, 1313 North Market Street,
Wilmington, Delaware, beginning at 9:11 a.m. on
Thursday, January 12, 2006, before Lucinda M. Reeder,
Registered Diplomate Reporter and Notary Public.
APPEARANCES:
          SARAH E. DiLUZIO, ESQ.
          POTTER ANDERSON & CORROON LLP
            1313 North Market Street
            Wilmington, Delaware  19801
            for the Defendant.
ALSO PRESENT:
  ARDRA M. O'NEAL, ESQ. SODEXHO, INC.
  PATTY WEICK, SODEXHO, INC.


- - - - - - - - - - - - - - - - - - - - - - - - - - --
              WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477

A2

Witcher                                  v.                        Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR              January 12, 2006

Page 2

1       GEORGE M. WITCHER, the witness
2   herein, having first been duly sworn on oath,
3   was examined and testified as follows:
4   BY MS. DiLUZIO:
5       Q.  Good morning, Mr. Witcher. We met this
6   morning. But for the record, my name is Sarah
7   DiLuzio. I'm an attorney for Potter, Anderson &
8   Corroon. I am the attorney representing Sodexho in
9   this litigation. To my right is Ms. Ardra O'Neal, who
10  is also an attorney with Sodexho, and then Ms. Patty
11  Weick, who I think you know, is also a representative
12  of Sodexho. She's in the human resources department.
13      Now Mr. Witcher, I am going to be asking
14  you a series of questions. It's important that you
15  give verbal responses so that the court reporter here
16  can take down everything you say. She can't take down
17  a head nod or a shake of the head. So it's important
18  that you give verbal responses to questions I ask you.
19      If there is any question I ask you you
20  don't understand or didn't hear, just let me know.
21  I'll be happy to repeat or rephrase any questions if
22  necessary.
23      Also, if you need a break of any kind, I'd
24  be happy to -- just let me know. We'll take a break

Page 3

1   if you need to take break, something to drink or for
2   any other reason.
3       Mr. Witcher, are you under the influence
4   of any medications that could impair your ability to
5   understand the questions I am asking you today or to
6   answer them fully?
7       A.  There is a possibility. I am taking quite a
8   few different prescription medications that could
9   alter my memory. I am not certain of all of the
10  different type medications. I am taking something
11  like ten different medications because of the injury I
12  sustained back in September.
13      Q.  Okay, sir. You have taken those medications
14  this morning?
15      A.  Yes, I have. I have taken some of them this
16  morning.
17      Q.  Okay.
18      A.  Just before I left.
19      Q.  And you feel they would impair your ability to
20  recall events?
21      A.  It's a possibility, yes.
22      Q.  Do you believe, sir, you the medications that
23  you are on would impair your ability to understand the
24  questions that I am asking you?

Page 4

1       A.  I don't think so, no.
2       Q.  Do you know, sir, the names of any of the
3   medications that you are on?
4       A.  Other than my insulin, no. Well, I know I am
5   taking Verapamil. And I can't recall the rest of it.
6       Q.  Are any of these pain medications or narcotics,
7   that you know of?
8       A.  I am taking Naprosyn -- I think it's Naprosyn
9   500. Rinran (sic.) for depression. But the other
10  medications, I am not -- I started to get a list of
11  it. So I thought I couldn't bring anything in, so
12  that's why I didn't.
13      Q.  Okay. Well, Mr. Witcher, this is a legal
14  proceeding, and it is being transcribed. So I just
15  want to be careful that if we go forward or before we
16  go forward, it's clear that you are able to answer
17  best you can and recall events as best you can.
18  Otherwise, the record will not be clear.
19      A.  I feel like I can.
20      Q.  Okay. Have you been on these medications for
21  some time?
22      A.  Well, I had -- my injury was September the 7th,
23  a spinal cord injury. I was operated on the 9th of
24  September. I have been on the medication since my

Page 5

1   accident in September.
2       Q.  I see. Do you have any idea at this point how
3   long you will be taking these medications or how long
4   your recovery will be?
5       A.  The doctor told me that it could be anywhere
6   from another three to six months. They do expect a
7   full recovery, but it's just a slow process.
8       Q.  Sure. And you expect that you will be under
9   these -- you will be taking these medications for that
10  time period?
11      A.  Yes.
12      Q.  For the duration?
13      A.  Yes. It's my understanding.
14      Q.  Sure. If you don't mind, Mr. Witcher, I just
15  wanted to take a little break before we go any further
16  and just consult with my client and see if maybe there
17  might be a better time to go forward or, you know,
18  with your current medications if today is a good day.
19  You said you do feel that you are able to understand
20  the questions?
21      A.  Yes.
22      Q.  And answer them fully?
23      A.  Yes, I do.
24      Q.  Okay. Your concern is the recall of events.

**A3**

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Witcher                                    v.                              Sodexho, Inc.
George M. Witcher                    C.A. # 05-2005 SSR                January 12, 2006

Page 6

1    Is that correct?
2    A. Yes. I feel pretty confident that at least 80
3    to 95 percent that I would be able to recall the
4    events, yes.
5    Q. And you feel comfortable going forward with
6    there deposition today?
7    A. I would prefer to go forward because it's an
8    expense for me to hire an ambulance service to come
9    out. So I would rather go forward while I'm here.
10       MS. DiLUZIO: Okay. Can you give us a
11   couple minutes?
12       THE WITNESS: Sure.
13       MS. DiLUZIO: Thank you sir.
14       Go off the record for a couple minutes.
15       (Recess taken.)
16   BY MS. DiLUZIO:
17   Q. We've returned from the break, Mr. Witcher.
18   Thank you for giving us a few minutes. We are going
19   to proceed with the deposition. But I just want to go
20   over my instructions again, which are instruction that
21   I give any witness, that if there is any question I
22   ask you, any part of which you find unclear in any way
23   or you have trouble hearing -- because we do have some
24   fans going on overhead here -- just let me know. I'm

Page 7

1    happy to repeat a question, rephrase it or ask it in
2    another way if it would help you understand. Okay?
3    A. Okay.
4    Q. Again, if you need a break of any kind, we're
5    happy to oblige that.
6        Now, we went over a little bit of your
7    medications and so forth. But is there any reason you
8    couldn't respond truthfully to the question I am
9    asking you?
10   A. I am sorry. Would you repeat that?
11   Q. Sure. Is there any reason you could not
12   respond truthfully to any question I might ask you
13   today?
14   A. No.
15   Q. Mr. Witcher, can you identify for me all the
16   facts that support your claim in this litigation that
17   you were discriminated on based on your age by
18   Sodexho?
19   A. Okay. Identify in what manner?
20   Q. Sort of list for me the facts that support your
21   belief that Sodexho discriminated against you based
22   upon your age?
23   A. Okay. You want me to list them now or are you
24   asking me a question, can I do it?

Page 8

1    Q. No. I am going to ask you to go ahead and list
2    them if you can.
3    A. Okay. Go ahead and list them. There was an
4    incident that took place, roughly, around the 14th of
5    August, 2003 where the manager at that time was, I
6    believe Mr. Rogers, called me in his office and made
7    reference to my age in a derogatory manner.
8    Q. Is there anything else?
9    A. Well, we reported it. There was supposed to be
10   a follow-up. I reported it to the manager. The
11   manager, the manager over at -- I was at the library,
12   the Foulk Road library when this here occurred -- I
13   reported it to the manager over at -- I can't think of
14   where I was working out of at the time. But he in
15   turn reported it to the general manager who called me
16   and talked to me about it, said that they would --
17   that was Ms. Congo, Anita Congo -- and told me there
18   would be a follow-up in regard to that. She was
19   going to talk to Gary Rogers, who was the manager.
20       I didn't hear anything else in reference
21   to that until after the claim that came up. And this
22   was in reference top me cussing in the kitchen. And
23   which there were other folks who had cussed on
24   numerous occasions. One, Erica Knight. One --

Page 9

1    Q. Mr. Witcher, I don't mean to cut you off.
2    A. Sure.
3    Q. But I am going to come back and hit all of
4    these incidents in detail with you.
5    A. Okay.
6    Q. But right now, I think what I would prefer is
7    if you could sort of tell me broadly: This incident,
8    this incident, this incident. Just sort of give me a
9    list --
10   A. Okay.
11   Q. -- of facts, events that support your claims
12   here. And then we can go back and explore each one of
13   those incidents in more detail.
14   A. Well, this is what I thought I was doing.
15   Q. That's fine. I didn't mean to cut you off
16   A. I am doing it to the best of my ability.
17   Q. Okay.
18   A. Again, the incident that I just made reference
19   to was in reference to the cussing in the kitchen.
20   Q. Okay
21   A. And I was called into the office where other
22   employees younger than myself had committed the same
23   sort of incident, and their treatment was just the
24   opposite from what mine was.

A4

3 (Pages 6 to 9)

Witcher                                    v.                          Sodexho, Inc.
George M. Witcher                    C.A. # 05-2005 SSR                January 12, 2006

Page 10

1    Q.   Okay. Are there any other events?
2    A.   Yes. Well, March, roughly, March the 14th,
3    2004, Mark Teoli and Chad Street called me in the
4    office. It was in reference to the length of time
5    that I was taking to make the deliveries. Chad was
6    telling me that he could make the deliveries quicker
7    than what I was doing it. And Mark Teoli made
8    reference to the fact that I was too old to do the
9    job.
10   Q.   Okay. Is there anything else?
11   A.   No.
12   Q.   No. Okay. So that is three incidents, just to
13   clarify. The first being that a Mr. Gary Rogers made
14   a reference to your age, what you believe to be in a
15   derogatory manner.
16        The second was an incident in which you
17   were disciplined for language, use of bad language.
18        And the third being an incident with Mark
19   Teoli and Chad Street, where Mark Teoli made a
20   reference to your age. Is that correct?
21   A.   Right. But it wasn't in that order.
22   Q.   Sure.
23   A.   The second would be third, third would be
24   second.

Page 11

1    Q.   Okay. But that's everything as far as you can
2    recall?
3    A.   Yes.
4    Q.   The incident with Mr. Rogers, you said you
5    believe that happened in August of 2003. Is that
6    correct?
7    A.   Yes.
8    Q.   As a matter of fact, I think you said August
9    14th.
10   A.   Around that time, yes.
11   Q.   So next in time would be the third incident you
12   mentioned with Mr. Teoli. And I'm sorry. You said
13   that was in March of 2004?
14   A.   In March, mm-hmm, yeah, 2004.
15   Q.   The third incident, the discipline for cussing
16   in the kitchen, do you have a time frame for that?
17   A.   I believe that was June of 2005. I'm sorry.
18   2004.
19   Q.   2004. Okay. Again, these three incidents are
20   the whole universe of things that support your claim
21   that you were discriminated upon based upon your age?
22   A.   Yes.
23   Q.   Let's go back through them then one by one, and
24   we can explore them in detail. The first incident --

Page 12

1    we'll just go chronologically -- with Mr. Rogers.
2    A.   Yes.
3    Q.   What was Mr. Rogers' position in relation to
4    your position? Was he your supervisor?
5    A.   He was my manager.
6    Q.   He was your manager?
7    A.   Manager, yes.
8    Q.   What was your position with Sodexho at that
9    time, Mr. Witcher?
10   A.   I was a driver, food preparer.
11   Q.   Where were you located?
12   A.   Well, I was working out of -- I don't know why
13   I can't think of the name of the -- where I was
14   working out of at that particular time. But it was
15   Barley Mills. I was working out of Barley Mills, the
16   kitchen over at Barley Mills.
17   Q.   Is that a Sodexho site?
18   A.   It's a site. It's a DuPont site, but I believe
19   Sodexho had the contract, yes.
20   Q.   Okay. To provide kitchen services?
21   A.   Right.
22   Q.   Okay.
23   A.   For the cafeteria for DuPont employees.
24   Q.   Okay. So you prepared food there at the

Page 13

1    cafeteria. Is that correct?
2    A.   I prepared food in the kitchen.
3    Q.   In the kitchen. Okay.
4    A.   Right. But the food I prepared in the kitchen
5    was delivered elsewhere, outside the DuPont site.
6    Q.   You would do those deliveries?
7    A.   Yes.
8    Q.   Where would you make deliveries to?
9    A.   To the Foulk Road New Castle County Library and
10   the Newark New Castle County Library.
11   Q.   Okay. What were your hours of -- you know, in
12   a day, what were your hours?
13   A.   6:00 to 2:00 o'clock.
14   Q.   6:00 a.m. to 2:00 p.m.?
15   A.   Yes.
16   Q.   Was that Monday through Friday?
17   A.   Yes.
18   Q.   What would your typical day look like? Would
19   you initially report to the kitchen at Barley Mill or
20   would you report somewhere else?
21   A.   Right. I would report to the kitchen at Barley
22   Mills. This is prior to me being moved after the
23   incident on June 2004. But I would report to the
24   kitchen at Barley Mills, prepared the food and then

A5

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Witcher                              v.                        Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR              January 12, 2006

Page 14

1   made delivery to the two different locations I
2   mentioned, Fould Road New Castle County Library,
3   Newark New Castle County Library.
4       Q.   Then would you check back in at another
5   location or after your last delivery could you simply
6   go home?
7       A.   After the last delivery, I'd go back to the
8   kitchen and then I would leave.
9       Q.   Now, you said that you believed Mr. Rogers was
10  your manager at that time. We're talking about August
11  of 2003.
12      A.   Yes.
13      Q.   Do you know his title?
14      A.   All I know, that he was just a manager. I am
15  not certain.
16      Q.   Was he the individual to whom you were supposed
17  to report or was he just a manager?
18      A.   Well, he was the manager in charge of the
19  library account. I just worked out of the kitchen at
20  Barley Mills.
21      Q.   Which library was Mr. Rogers located in?
22      A.   He was located in the New Castle County Foulk
23  Road Library.
24      Q.   So his responsibility was just for that

Page 15

1   library?
2       A.   For both libraries.
3       Q.   He was responsible for both?
4       A.   Both, yes.
5       Q.   And if you, for example, needed a day off,
6   would Mr. Rogers be the manager to whom you would
7   speak with?
8       A.   Yes.
9       Q.   He was. Do you, Mr. Witcher, know the age of
10  Mr. Rogers?
11      A.   No, I don't.
12      Q.   Did you perceive him to be older or younger
13  than yourself?
14      A.   Younger.
15      Q.   Younger. How long was Mr. Rogers your
16  supervisor?
17      A.   It's hard to say because I know he got sick. I
18  would say, maybe three months, four months. Something
19  like that. It's hard to say.
20      Q.   Let me just back up a minute. When did you
21  begin your employment with Sodexho?
22      A.   I began my employment April, I believe it was
23  April the 7th, 2003.
24      Q.   2003. Okay. This incident you said occurred

Page 16

1   in August of 2003?
2       A.   Correct.
3       Q.   So about four months later. Was Mr. Rogers
4   your manager for much longer after this incident
5   occurred?
6       A.   No. But Mr. Rogers was not the manager when I
7   first started.
8       Q.   I see. Okay.
9       A.   Basically, I believe it was Congo, Juanita
10  Congo the general manager, kind of oversee the
11  account. They had several different manager
12  supervisors that came into that particular library,
13  handled that library account.
14      Q.   You mentioned Ms. Congo. Do you know her
15  relationship to Mr. Rogers? For example, was she --
16      A.   She was the general manager. She was the
17  supervisor.
18      Q.   She was his supervisor?
19      A.   Right.
20      Q.   You said before Mr. Rogers there was someone
21  else?
22      A.   Yes.
23      Q.   In between you and Ms. Congo, for example, in
24  the chain of command?

Page 17

1       A.   You said between me and Ms. Congo.
2       Q.   Right. For example, Mr. Rogers was your
3   manager?
4       A.   Right.
5       Q.   And he reported to Ms. Congo?
6       A.   Right, exactly.
7       Q.   There was another individual before Mr. Rogers?
8       A.   Yes.
9       Q.   Do you remember that individual's names?
10      A.   No, I cannot.
11      Q.   Did you see Mr. Rogers on a daily basis?
12      A.   Most of the time, yes.
13      Q.   How about Ms. Congo, did you see her daily?
14      A.   No, no.
15      Q.   How often would you have contact with
16  Ms. Congo?
17      A.   You mean after this -- Mr. Rogers --
18      Q.   Typically.
19      A.   Typically?
20      Q.   Yes.
21      A.   Not that often. Maybe once a week, once every
22  two weeks. And that was just in passing through the
23  Barley Mill kitchen. We didn't have conversation
24  other than speaking.

A6

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Witcher                                            v.                              Sodexho, Inc.
George M. Witcher                      C.A. # 05-2005 SSR              January 12, 2006

Page 18

1    Q.  Okay.  Now, during the time --
2    A.  Excuse me.  May I take one second for a minute?
3    Q.  Absolutely.
4        (Brief recess taken.)
5    BY MS. DiLUZIO:
6    Q.  Mr. Witcher, during the time that Gary Rogers
7    was your manager, did he conduct any performance
8    evaluations of your work?
9    A.  No.
10   Q.  As far as you know, did Mr. Rogers set the
11   terms of your employment?  Did he say how much you
12   were going to be paid and when you would work, for
13   example?
14   A.  My schedule was pretty much set.  The salary
15   that I received was established when I was hired by
16   Mrs. Congo, Juanita Congo.  That is the person who
17   hired me.
18   Q.  Could you tell me more specifically what it was
19   Mr. Rogers said to you and the context in which he
20   said it?
21   A.  He called me back into the office.  I made my
22   deliveries to the library.
23       And very seldom I go back into the office
24   unless supplies come in.  A lot of times they're back

Page 19

1    in the office.
2        But he called me back in the office.  He
3    just made reference to my age.  And, you know, the
4    conversation just got -- it became a little annoying
5    to me.  And even though he didn't come out and say
6    it -- but there was a reference a couple days earlier
7    about someone that was kind of, you know, carrying on,
8    and I think that's why he made the reference to my age
9    about me being the oldest person, oldest person in the
10   kitchen area.  And the age reference started to become
11   a little annoying to me because they just kept talking
12   my age, my age like I should be influence over people.
13   I personally think -- I don't know, but my personal
14   opinion was that it was in reference to some things
15   that had taken place a couple days earlier in the
16   Barley Mill kitchen that had nothing really to do with
17   me.
18   Q.  I see.  Under what pretext did Mr. Rogers ask
19   you back to the office?  Was there something he wanted
20   to tell you about, something he wanted to ask you?
21   A.  It was something that he wanted to ask me.
22   That's when the conversation came up about the age
23   factor.  I asked him, "Well, what does my age have to
24   do with anything?  I didn't lie on the application.

Page 20

1    If you look at the application, you will see that, you
2    know, I put my correct age down.  If you want my
3    license to verify it.  I don't understand why all this
4    reference to my age.  What is it that you are trying
5    to say?"
6        And he never would just come out directly
7    and tell me what he was saying.  But I was offended by
8    it, and I let him know I was offended by it, by his
9    constant reference to my age.  What does that have to
10   do with anything?
11   Q.  How long was this conversation, would you say?
12   A.  I would say, perhaps, 15, 20 minutes.
13   Q.  Fifteen, 20 minutes.  You said there was more
14   than one reference to your age during the course of
15   this conversation?
16   A.  Yes.  There were several references as far as
17   my age was concerned.
18   Q.  Could you be more specific?  Do you recall
19   specifically what was said?
20   A.  Well, I mean, I have been as specific as I can
21   be that I can recall in reference -- that he just made
22   reference to the fact that, you know, my age -- I am
23   the older person that's working in the kitchen.  I
24   said, "What does that have to do with anything?  I

Page 21

1    don't understand.  Why are you referring to me and my
2    age?"  He said, "Well, You are old enough to know
3    better."  "Know better about what?"
4        He never did come out directly.  That's
5    why I became very offended by it.  That's why I made
6    the complaint about it because he never did come out
7    specifically and tell me what he was talking about.
8        I just assumed because of the incident
9    that directly I had nothing to do with it at all.  But
10   it was in reference to -- I feel personally -- I don't
11   know because he didn't come out and tell me
12   specifically what he was talking about -- but I feel
13   it was in reference to another young man that worked
14   in the kitchen along with me.
15   Q.  I see.  And you said that you let Mr. Rogers
16   know that you found his reference to your age
17   offensive?
18   A.  Yes, I did.
19   Q.  And what was Mr. Rogers' response to you when
20   you let him know that?
21   A.  He wasn't apologetic.
22   Q.  He was not apologetic?
23   A.  He was not apologetic, no.
24   Q.  You said you made a complaint regarding this

**A7**

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Witcher                                    v.                           Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR                January 12, 2006

Page 22

1  incident?
2  A.  Yes, I did.
3  Q.  And to whom did you make that complaint?
4  A.  I made it to Mark Teoli.
5  Q.  And who was Mark Teoli?
6  A.  Mark Teoli was, I guess, the supervisor and
7  executive chef.
8  Q.  Where was he located?
9  A.  Barley Mills.
10  Q.  Would you say he was Mr. Rogers' superior?
11  A.  No.
12  Q.  Was he then, in your mind, on the same level
13  with Mr. Rogers?
14  A.  No.
15  Q.  Okay  How would you perceive that relationship
16  then, that Mr Rogers was superior to Mr. Teoli?
17  A.  No.
18  Q.  Or are we talking about two completely
19  different areas?
20  A.  Two completely different areas because, see, my
21  situation I guess is a little unique because I worked
22  out of Barley Mills.  So when I was over there, at the
23  time, Chad Street was the manager.  Mark Teoli was
24  under Chad Street.

Page 23

1          When I got back to the Barley Mills
2  kitchen, I made the complaint to at that time the
3  supervisor that was in charge over at Barley Mills.
4  And I knew that he would forward my complaint to
5  Mrs. Juanita Congo, who was the general manager who
6  was over top of Teoli, Mr. Rogers and that whole,
7  whole section.
8  Q.  Okay.  Would Ms. Congo also have been the
9  supervisor of Mr Street?
10  A.  Yes.
11  Q.  Was that a verbal complaint?
12  A.  Yes, it was.
13  Q.  You said the day that it occurred, that
14  incident occurred with Mr. Rogers, you went back to
15  Barley Mill and told Mr. Teoli?
16  A.  Yes, I did.
17  Q.  When you first reported this to Mr. Teoli, what
18  was his response to you?
19  A.  He just listened to the information.  I believe
20  he wrote something down.  I didn't receive a copy of
21  it.  He told me that he would forward it.
22  Q.  Did he tell you specifically who he would
23  forward it to?
24  A.  To Ms. Juanita Congo.

Page 24

1  Q.  And in response to your complaint, did you hear
2  from Ms. Congo --
3  A.  Yes, I did.
4  Q.  -- or anyone else?
5  A.  Yes, I did.
6  Q.  About how long after you made the complaint did
7  you hear from Ms. Congo?
8  A.  I would say within two weeks.  I am not sure.
9  Q.  What was your contact with Ms. Congo?  Did she
10  call you?  Did she come and see you?
11  A.  She came to Barley Mills.
12  Q.  What did she say to you?
13  A.  We sat down and we went over the complaint.
14  Q.  Okay.  Did Ms. Congo indicate what was going to
15  happen next?
16  A.  Yes.  She said that she would talk to
17  Mr. Rogers.  And at that time -- then after that, she
18  would forward it to Mrs. Patty Weick, who I guess was
19  the manager of human resources, and that they would
20  get back in contact with me.
21  Q.  Did Ms. Congo tell you such comments that
22  Mr. Rogers made to you were not appropriate?
23  A.  Yes, she did.
24  Q.  Did she apologize to you?

Page 25

1  A.  Yes, she did, on behalf of the company.
2  Q.  Did she tell you it was a violation of company
3  policy to make references to age?
4  A.  I can't recall if she made that comment or not.
5  Q.  Were you aware that it was a violation of
6  company policy for a manager to make references to an
7  individual's age?
8  A.  Yes, I was.
9  Q.  You said that Ms. Congo indicated that she
10  would speak with Mr. Rogers?
11  A.  Yes.
12  Q.  Do you know if that occurred?
13  A.  No, I don't.
14  Q.  Did you hear back from Ms. Congo after this
15  first conversation?
16  A.  In reference to that incident?
17  Q.  Yes.
18  A.  No, I did not.
19  Q.  You did not hear again from Mr. Rogers
20  regarding the incident?
21  A.  No, I did not.
22  Q.  How were things left between you and Ms. Congo?
23  Did she say, this is what's going to happen next --
24  A.  Yes.

A8

7 (Pages 22 to 25)

Witcher                              v.                    Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR         January 12, 2006

Page 26

1    Q.  -- this is what is going to happen?
2    A.  Yes.
3    Q.  What exactly was that?
4    A.  She told me she -- I think I had made reference
5    to it earlier -- she said that she was going to speak
6    to Mr. Rogers, right, and then she would forward it on
7    to Patty Weick, the manager of human resources, and
8    then at some point, we would get together and resolve
9    the matter.
10   Q.  Did she tell you that she was going to have
11   Mr. Rogers apologize to you?
12   A.  I can't recall.  She may have.
13   Q.  Do you recall if Ms. Congo indicated that
14   Mr. Rogers would be disciplined for having made this
15   reference to your age?
16   A.  No, she didn't.
17   Q.  She did not.  Do you know if in fact Mr. Rogers
18   was disciplined?
19   A.  No, I don't.
20   Q.  Just to back up a minute, Mr. Witcher.
21   Mr. Rogers you said you believed he was your manager
22   in charge of the libraries
23   A.  Yes.
24   Q.  Did he set forth for you what your work duties

Page 27

1    were?  Did he direct your work?  Did he say,
2    "Mr. Witcher or, George, this is what I want you to do
3    today"?
4    A.  No.  My work was truly standard.  I kind of
5    worked independently.  I knew basically what was being
6    prepared.  It was a daily routine.  Everything was the
7    same every day.  Unless, now, he would have set forth
8    any menu changes, for instance, that we were going to
9    do a different type salad or a different type
10   sandwich, he would indicate that.  He would also
11   supervise the number of items that would be delivered
12   to both of the different libraries.
13   Q.  So what you are saying, your daily tasks were
14   set forth before Mr. Rogers became your manager?
15   A.  No.  What I am saying is that the orders,
16   basically, I did the same thing every day.  The only
17   difference is it's the number of quantities, you know,
18   that was ordered for that particular day.  But the
19   type of items that I made, that I would prepare, was
20   basically the same.  It was a daily routine.
21   Q.  Okay.  So you would not say -- let me rephrase
22   that  Would you say that Mr. Rogers directed your
23   tasks on a daily basis or gave you assignments on a
24   daily basis?

Page 28

1    A.  No, he didn't give me assignments on a daily
2    basis because everything basically was the same,
3    except for -- the orders, basically, would come down
4    from the supervisor or cafeteria workers because
5    they knew the quantities of items that they needed for
6    that next day.  Mr. Rogers was just the manager over
7    top of the cafeteria, the daily cafeteria operation.
8    But I, basically, worked independently.
9    Q.  Did Mr. Rogers train you when you first became
10   hired?
11   A.  Mr. Rogers wasn't there when I was first hired.
12   Q.  Did Mr. Rogers -- I know you said he did not
13   evaluate you during the time he was your manager.
14   Would he have been the individual who would have
15   evaluated you?
16   A.  Yes, he would have.
17   Q.  Now, when Mr. Rogers took over for the person
18   who previously had been in that position, did he train
19   you?  Did he say, "Hey, I'm the manager now; here's
20   what I expect"?
21   A.  No.  Because everything as I said, repeatedly,
22   my job was a daily routine job.  So there was no -- if
23   there was going to be changes, the changes would be in
24   reference to the menu.  If we were going to make a

Page 29

1    different type sandwich, if we were going to make a
2    different type salad or some other items that they
3    wanted me to deliver to the library, you know, then he
4    would set forth and place these changes that were
5    going to be made.
6    Q.  I am going to show you a document, Mr. Witcher.
7           (Witcher Deposition Exhibit No. 1 whereas
8    marked for identification.)
9    BY MS  DiLUZIO:
10   Q.  I am showing you what's been marked as Witcher
11   Exhibit 1.  It appears to be a letter written by Gary
12   Rogers.  Have you ever seen this letter before,
13   Mr. Witcher?
14   A.  Yes.  The first time I saw this letter was when
15   I received a copy of my complete file from EEOC.  I
16   never received a copy of this letter prior to then,
17   no.
18   Q.  Feel free to take a minute to read the letter
19   or look over it.
20   A.  Oh.  Yeah.  I am familiar with it.  I seen it.
21   I seen, like I said, when I received a copy of my
22   complete file from EEOC, that's when I seen this
23   letter.
24   Q.  Okay  And in this letter, Mr. Rogers writes,

**A9**

Witcher                                                    v.                                    Sodexho, Inc.
George M. Witcher                                   C.A. # 05-2005 SSR                    January 12, 2006

Page 30

1  it says, "Attention Carol" at the top. Do you know
2  who that reference is?
3  A. Carol Sexton.
4  Q. Who was Carol Sexton?
5  A. At that time, she was the general manager.
6  Q. The general manager of?
7  A. That was in charge of, I guess, our section in
8  Barley Mill kitchen/libraries.
9  Q. Was she in the same position as Ms. Congo?
10 A. Yes, she was. As a matter of fact, she kind of
11 took over Ms. Congo's accounts.
12 Q. So at that point Ms. Congo was no longer
13 general manager; it was Ms. Sexton?
14 A. Right.
15 Q. Do you know about when occurred, that change
16 occurred from Ms. Congo to Ms. Sexton?
17 A. I can't recall now.
18 Q. In this letter that we have identified as
19 Exhibit 1, Mr. Rogers sets forth his version of the
20 events that you described in which he referenced your
21 age. You disagree with his version of events as set
22 forth in this letter?
23 A. Yes. Yes, I do.
24 Q. Specifically, Mr. Rogers says that he

Page 31

1  apologized to you when you indicated to him that you
2  became offended by what he had said to you. Is that
3  not correct?
4  A. That is not correct.
5  Q. He did not apologize?
6  A. He did not apologize.
7  Q. When you said to him -- let me back up. What
8  exactly did you say to him? Did you say, "Hey,
9  Mr. Rogers, I find that offensive"? What exactly did
10 you say to him?
11 A. I can't recall what I said to him verbatim, but
12 I remember I said that "I find it offensive. I can't
13 understand why you bring up the reference to my age."
14 And, again, I went on to explain to him "I didn't lie
15 on the application section, if you want to see my
16 driver's license to verify my age. I don't understand
17 what is this reference to my age, what it's all about.
18 I don't understand it."
19 Q. Mr. Rogers, how did he respond to that?
20 A. He -- I can't recall him responding to that at
21 all.
22 Q. He just simply -- the conversation ended?
23 A. To the best of my knowledge, yes.
24 Q. And at that point you left the office? You

Page 32

1  went home? You went on to your next delivery?
2  A. I went on to my next delivery, yes.
3  Q. Just so I am clear, you were having this
4  discussion with Mr. Rogers. He made some references
5  to your age. You said, "I find that offensive; I
6  don't see what my age has anything to do with this."
7  And he made no response. The conversation was over,
8  you walked out of the room.
9  A. Yes, to the best of my knowledge.
10 Q. That was it?
11 A. To the best of my knowledge, yes.
12 Q. You said there were several, I think you said,
13 references to your age throughout the course of this
14 conversation with Mr. Rogers?
15 A. Right.
16 Q. Three, four. Can you be more specific?
17 A. At least four.
18 Q. At least four. Were there more than four?
19 A. I said at least four.
20 Q. Right.
21 A. Could be.
22 Q. Could have been more than four?
23 A. Yes.
24 Q. Was there less than ten references to your age?

Page 33

1  A. I would say so.
2  Q. So between four and ten could we narrow that
3  down somewhat?
4  A. I would say, perhaps, between four and seven.
5  I am not certain.
6  Q. Okay. I am going to show you another document
7  Mr. Witcher 2.
8       We'll mark this Witcher Exhibit 2, please.
9       (Witcher Deposition Exhibit No. 2 was
10 marked for identification.)
11 BY MS. DiLUZIO:
12 Q. The court reporter has handed you what's been
13 marked Witcher Exhibit 2. It's entitled "Constructive
14 Counseling Notice for Mr. Gary Rogers." It's a total
15 of four pages. Have you seen this document before?
16 A. No, I haven't.
17 Q. You have not. Would you take a minute and look
18 over that? Let me know when you have had a chance to
19 review it.
20 A. Now what's the question in reference to this?
21 Q. I just want you to review it first.
22 A. Okay.
23 Q. Now, the constructive counseling notice has
24 attached notes that appear to have been written by

**A10**

9 (Pages 30 to 33)

Witcher                                   v.                        Sodexho, Inc.
George M. Witcher                    C.A. # 05-2005 SSR          January 12, 2006

Page 34

1    Juanita Congo. Is that correct?
2    A.  I would say so.
3    Q.  And Ms. Congo dates these notes at October 3
4    and October 6th and October 7, 2003. Is that correct?
5    A.  That's what she has dated, right.
6    Q.  You had indicated that you thought this
7    occurred in August?
8    A.  In August.
9    Q.  Do you still believe this occurred in August,
10   this incident with Mr. Rogers or could you be
11   mistaken?
12   A.  I could be mistaken, but I believe it to be in
13   August. I could have been mistaken.
14   Q.  It could have been October?
15   A.  It could have been.
16   Q.  In the notes Ms. Congo details that she
17   received your complaint and spoke with you about it.
18   Is that correct?
19   A.  That's correct.
20   Q.  Ms. Congo also indicates in these notes that
21   she had a follow-up conversation with you on October
22   6th. Do you recall that conversation?
23   A.  No, I do not.
24   Q.  You do not. So when Ms. Congo says in her

Page 35

1    notes that she came by to see you at Barley Mill and
2    let you know that she had spoken with Mr. Rogers and
3    that Mr. Rogers would be apologizing to you, you do
4    not recall that taking place?
5    A.  No, I do not.
6    Q.  Did it not take place or you just don't recall
7    if it did or did not?
8    A.  I don't recall it taking place.
9    Q.  So it could have?
10   A.  It could have.
11   Q.  It does appear from this document then that
12   Mr. Rogers was counseled regarding this incident. Is
13   that correct?
14   A.  Yes.
15   Q.  Moving on to the next incident. You indicated
16   in March of 2004 an incident with Mr. Teoli and Chad
17   Street in which there was a reference made to your
18   age. Is that correct?
19   A.  Correct.
20   Q.  That would be our next incident in time?
21   A.  Correct.
22   Q.  You said the date for that was? I'm sorry.
23   Could you tell me again.
24   A.  I believe around March. I am not sure.

Page 36

1    Q.  Of 2004?
2    A.  Yes.
3    Q.  And Mr. Teoli, I believe you indicated was the
4    supervising chef at Barley Mill. Is that correct?
5    A.  Right.
6    Q.  Did you consider Mr. Teoli your supervisor or
7    manager?
8    A.  While I was working in Barley Mills, yes.
9    Q.  While you were in the kitchen, you would have
10   considered him your manager?
11   A.  I would have considered him my supervisor.
12   Q.  Supervisor. Okay. Did he direct your
13   activities on a daily basis?
14   A.  No. He just -- he ordered the food. If there
15   was items that I needed, then I would go to him in
16   terms of if I needed -- say, for instance, they were
17   out of bread or they were out of whatever, out of
18   stock of the food that I needed to prepare, Mark Teoli
19   would be the person that I would have went to.
20   Q.  Did Mr. -- if you needed a day off, for
21   example, would Mr. Teoli have been the person you
22   would have spoken with that about?
23   A.  No.
24   Q.  Would Mr. Teoli have been responsible for

Page 37

1    giving you a performance review?
2    A.  No.
3    Q.  Okay. Now, you indicated in your general
4    description that on or around March 14th, 2004
5    Mr. Teoli and a Mr. Chad Street called you into the
6    office?
7    A.  Yes.
8    Q.  Could you tell me who Chad Street is?
9    A.  Chad Street was the manager in charge of the
10   Barley Mill kitchen.
11   Q.  So he would have been Mr. Teoli's supervisor?
12   A.  Yes.
13   Q.  When you said you were called into the office,
14   where exactly is that?
15   A.  The office?
16   Q.  Yes. Is that at Barley Mill?
17   A.  Yes, mm-hmm.
18   Q.  Is that in the kitchen area?
19   A.  Yes.
20   Q.  Who called you into the office that day?
21   A.  I believe it was Chad.
22   Q.  And was that in the morning or the afternoon?
23   A.  Morning.
24   O.  Before you made your deliveries?

**A11**

Witcher                                    v.                          Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR              January 12, 2006

Page 38

1   A.  Yes.
2   Q.  What was the purpose of that meeting?
3   A.  Talking about a job description.  They wanted
4   to define my job description.
5   Q.  Was this a prearranged meeting or you just came
6   in that morning and Chad said, "Hey, come back here
7   into the office"?
8   A.  No, it wasn't prearranged.  He just called me
9   in.
10  Q.  They indicated they were putting together a job
11  description for your position  Is that right?
12  A.  Yes.  Well, they wanted to define the job
13  description, yes.
14  Q.  Did they indicate why that was?
15  A.  Well, I can't recall them indicating why that
16  was.  I just assume I am just like free-lancing for
17  the most part.  And I think they just wanted to have a
18  more definitive reason or more definitive job
19  description of exactly what it is that I am supposed
20  to be doing because I don't think at that point,
21  really, it was defined.
22      I was just told by Mrs. Congo when I was
23  first hired what I would prepare, where I would go.
24  And because I was kind of like floating, right, here,

Page 39

1   when I was at Barley Mill kitchen, I was under
2   supervision of management over there.  When I was out
3   in the streets making the delivery, I was just kind of
4   on my own or under the supervision of management as
5   far as the library was concerned.  So I think it
6   wasn't really clear on exactly what it is that they
7   thought I should do and how it should be -- exactly
8   how it should be done.  This is my interpretation of
9   why they wanted to kind of lock in a job description.
10  This is my understanding.  Now, I could be, you know,
11  totally wrong, in what my opinion is, what
12  it was that they were trying to make clear.
13  Q.  Okay.  Just to back up a minute.  You indicated
14  that, basically, your job was to come in, prepare the
15  food and then deliver it to these two libraries?
16  A.  Exactly.
17  Q.  Did you have a menu where there were different
18  things every day?
19  A.  Basically, it was the same every day.  Only
20  difference was quantity, for the most part.
21  Q.  Are we talking sandwiches?
22  A.  Sandwiches and salads.  From time to time, I
23  would take brownies, fruit.
24  Q.  Did you have any other responsibilities in the

Page 40

1   kitchen other than making the food that you needed to
2   deliver?
3   A.  Yes.  I think maybe that's another thing they
4   really needed to define because I had the
5   responsibility that was placed on me by Teoli, Mark
6   Teoli, to make deliveries to the Chestnut Run kitchen
7   or cafeteria because they didn't have a kitchen area.
8   So to deliver whatever items that they needed.  Also
9   to deliver supplies to them.
10  Q.  When was this additional responsibility added
11  to what you needed to do?
12  A.  Well, I would say, maybe a month after I
13  started.
14  Q.  That direction came solely from Mr. Teoli?
15  A.  From Mr. Teoli to me, yes.
16  Q.  He just said, Hey, from now on, can you also
17  stop by Chestnut Run, something to that effect?
18  A.  Right.
19  Q.  Were there other employees, Mr. Witcher, who
20  had similar duties to you yours?  Were there other
21  employees who made deliveries, for example?
22  A.  Yes.
23  Q.  Who were those individuals?
24  A.  I can't think -- they didn't make deliveries as

Page 41

1   far as sandwiches are concerned.  But they made
2   deliveries because the person that did catering made
3   deliveries when they had catering orders to the DuPont
4   site.  He also made deliveries to the Chestnut Run
5   site as well.  But he did not make deliveries to the
6   libraries.  If I didn't work, sometimes he would make
7   the deliveries or Chad would make the deliveries or
8   Mark Teoli.  But I can't think of the young man that
9   made the catering deliveries and also supplies to
10  Chestnut Run from time to time.
11  Q.  Would that individual have had the same freedom
12  that you seemed to enjoy in his daily activities?
13  A.  No, I don't -- no, no, no.  Because he worked
14  directly under Chad and Mark Teoli out of the Barley
15  Mill kitchen.
16  Q.  So would you consider your -- I believe you
17  said this -- would you consider your situation, your
18  job position unique within the Sodexho organization?
19  A.  I don't -- I wouldn't say it's so unique.  I
20  think it was more confusing than being unique.
21  Q.  I guess my question is:  Unique in that you did
22  not have a supervisor standing over your shoulder
23  watching, directing your work on a daily basis.  Is
24  that accurate?

A12

11 (Pages 38 to 41)

Witcher                                                                    Sodexho, Inc.
George M. Witcher                    v.                                  January 12, 2006
                           C.A. # 05-2005 SSR

---

Page 42

1    A. Well, I had a supervisor, I would say, when I
2  was in the kitchen, and Mr. Teoli would tell me
3  that -- he would observe me, but, no, I didn't have
4  nobody standing over my shoulder.
5    Q. And no one rode along with you while you made
6  your deliveries. Right?
7    A. On a couple of occasions Mark Teoli would go
8  with me.
9    Q. Why would he ride with you?
10   A. Well, he would go with me to make a delivery
11  if we had a very, very large amount, right, which very
12  seldom occurred. I also made deliveries as far as
13  catering was concerned, when there was catering events
14  was concerned. Like once a year, they did this thing
15  with the DuPont, DuPont would -- Jeff Gordon. Jeff
16  Gordon Day, they would have a big setup or, what have
17  you, when they had special events where there was
18  extra duties as far as making deliveries, then someone
19  would ride with me. But on the norm, no.
20   Q. On those special events someone would ride with
21  you to help you --
22   A. Right.
23   Q. -- carry everything out basically?
24   A. Right. Nobody never rode with me just to

Page 43

1  observe what I was doing.
2    Q. You said they called you into the office that
3  morning and said they wanted to define your position?
4    A. Right.
5    Q. Then what happened?
6    A. Then they start talking about -- I remember
7  Chad was talking about the length of time that I took
8  making the deliveries from the time I left Barley
9  Mills until the time I got back.
10   Q. What did he say about that?
11   A. That he thought, you know, that I could do it
12  in a shorter time frame.
13   Q. Did he say why he believed that?
14   A. No, he didn't. Well, yes, he did. Because he
15  said that in his going back and forth that he was able
16  to get down there and back in a shorter time frame
17  than I was taking.
18   Q. So are we talking about the length of time that
19  it took you to get from Barley Mill to the libraries?
20   A. Yes.
21   Q. Then back to Barley Mill again?
22   A. Right.
23   Q. How did you respond to that comment by
24  Mr. Street?

---

Page 44

1    A. Well, I responded by saying, you know, driving
2  conditions change, especially on I-95, there's
3  accidents, there's construction. I am not a fast
4  driver, number one. You know, eyesight is not what it
5  used to be, so I am more cautious in driving. When I
6  was younger, you know, caution wasn't a factor, a big
7  factor.
8    Q. You indicated that your hours were 6:00 a.m. to
9  2:00 p.m. --
10   A. Right.
11   Q. -- on a normal day? Why was Mr. Street
12  concerned with the time it took you to make these
13  deliveries if you had 6:00 to 2:00?
14   A. Well, not to get into Mr. Street's mind because
15  he didn't tell me exactly why, but I can give you my
16  opinion of why I think he was concerned about that.
17  Because when I got back to the kitchen, then there was
18  things at the kitchen that they were having to do,
19  like lay out the trays of bacon for the next morning
20  breakfast or help on the line. That kind of stuff
21  there.
22   Q. So when you returned to Barley Mill after
23  making your deliveries, you did additional work in the
24  kitchen?

Page 45

1    A. If I got back in enough time, yes.
2    Q. And who told you to do that?
3    A. I believe it was Ms. Congo.
4    Q. Was that when you were initially hired
5  Ms. Congo indicated that if you got back from your
6  deliveries in time you could then help out in the
7  kitchen till 2:00?
8    A. Yes.
9        MS. DiLUZIO: Okay. Mr. Witcher, do you
10  want to take a short five-minute break?
11       THE WITNESS: I'm fine. If you want to
12  take one, that's all right with me.
13       MS. DiLUZIO: I think the court reporter
14  might need a little break. So let's take five
15  minutes.
16       (Recess taken.)
17  BY MS. DiLUZIO:
18   Q. Mr. Witcher, we left off talking about this
19  March 2004 incident with Mark Teoli and Chad Street.
20  And you indicated that Mr. Street commented to you
21  about the length of time it took you to make your
22  deliveries to the libraries and get back to the Barley
23  Mill kitchen. That's correct?
24   A. Correct.

---

**A13**

Witcher                                                     v.                              Sodexho, Inc.
George M. Witcher                              C.A. # 05-2005 SSR                    January 12, 2006

Page 46

1   Q.   Your response to Mr. Street was what, again?
2   I'm sorry.
3   A.   That because of differing driving conditions,
4   you know, driving on 95, most of the time, a lot of
5   time, there is backup, construction.  And I am just a
6   lot more cautious in driving now than what I was, say,
7   15, 20 years ago.
8   Q.   Is that what you said to Mr. Street?
9   A.   Yes.
10  Q.   What was his response to that explanation?
11  A.   He didn't respond.  Mark Teoli was the one that
12  commented, "Well, are you just too old for the job?"
13  Q.   That's how he responded to your explanation?
14  A.   That's what Mark Teoli said.
15  Q.   Did Mr. Street make any additional comment?
16  Did he comment on what Mr. Teoli had said to you?
17  A.   No, he didn't.  My response was, "No.  I don't
18  feel that I am too old for the job."
19  Q.   Did Mr. Teoli say anything further on that
20  subject?
21  A.   No.
22  Q.   Then how did the conversation proceed?
23  A.   Mr. Street said to me that they had a list of
24  descriptions that they wanted me -- that they wanted

Page 47

1   me to go over and to sign, and I told him, No, I
2   wasn't signing anything.
3   Q.   And this was a list of job duties?
4   A.   I would imagine so, yes.
5   Q.   Okay.  Did you look over the list and say, I am
6   not signing or before you even looked at it you said
7   you weren't signing?
8   A.   I said, "I am not signing a job description."
9   Q.   So you did not look at that?
10  A.   No, I did not.
11  Q.   How did Mr. Teoli and Mr. Street respond to
12  that?
13  A.   Mr. Street, said, "Okay.  I'll get back with
14  you."
15  Q.   That was the end of the conversation?
16  A.   Yes.
17  Q.   When Mr. Teoli said, "Are you too old for the
18  job," is that pretty clearly what you recollect he
19  said?
20  A.   Yes.
21  Q.   Mr. Street simply sat idle while he made this
22  comment?
23  A.   He didn't comment, no.
24  Q.   Now, you said you responded, "No," to that

Page 48

1   question, no, you didn't feel you were too old for the
2   job?
3   A.   Correct.
4   Q.   Did you make any further response?
5   A.   No.
6   Q.   Did you tell Mr. Teoli or Mr. Street that you
7   found that question offensive?
8   A.   No.
9   Q.   Did you complain, as you had before, did you
10  complain to any other manager, to Ms. Congo or
11  Ms. Sexton or anyone in human resources about this
12  comment?
13  A.   No, I did not.
14  Q.   Now, Mr. Witcher, you indicated that you told
15  Mr. Teoli, Mr. Street that perhaps an explanation for
16  the time it took you to make these deliveries was that
17  you are a more cautious driver than you had been in
18  younger years and that, perhaps, you were, I think you
19  mentioned before the break -- that perhaps your
20  eyesight was not as good as it had once been.  Is that
21  correct?
22  A.   Correct.
23  Q.   And that it was in response to those comments
24  by you that Mr. Teoli asked you whether you felt you

Page 49

1   were too old to perform your job duties.  Is that how
2   it went?
3   A.   Yes.
4   Q.   Okay.  Did Mr. Teoli ever make any comments to
5   you that you felt were about your age before this
6   discussion in March of '04?
7   A.   No.
8   Q.   How about after that?
9   A.   No.
10  Q.   So this was an isolated comment from Mr. Teoli?
11  A.   Yes.
12  Q.   And at that time, you didn't feel it warranted
13  a complaint?
14  A.   No.
15  Q.   Did you ever speak with anyone at Sodexho,
16  perhaps after this incident, and human resources
17  personnel or a manager and reference back to this
18  incident?
19  A.   No.
20  Q.   Or it did not come up?
21  A.   No.
22  Q.   It did not.  And you were aware from your
23  previous experience, the Mr. Rogers incident, that you
24  could complain and that the company did have a process

A14

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Page 50

1  in place to receive such complaints. Is that right?
2  **A. Yes.**
3  Q. So at the end of this conversation with
4  Mr. Street, Mr. Teoli, you said you weren't signing
5  anything, they said that was fine, you left. What
6  happened next?
7  **A. I went back doing my job preparing food.**
8  Q. Did you feel that Mr. Teoli or Mr. Street took
9  any action against you, adverse action against you
10  after this comment based on your age?
11  **A. No.**
12  Q. No. And that was in March of '04. Did you
13  continue to have contact with Mr. Teoli, Mr. Street?
14  Did they continue in their management positions in the
15  kitchen?
16  **A. Yes, they did.**
17  Q. Okay. Mr. Witcher, going back to the Gary
18  Rogers comment, if I could for just a minute. I think
19  we came to the conclusion that during the course of
20  this 15 to 20-minute conversation Mr. Rogers made
21  between four and seven references to your age.
22  **A. Correct.**
23  Q. Is that how you recall it?
24      I would like to see if we couldn't be more

Page 51

1  specific about what those comments were. Can you
2  remember exactly what those comments were?
3  A. No, I cannot remember exactly what they were.
4  I know he just made reference to the fact of my age.
5  I know one of the comments about was I was the oldest
6  person on the job. And I made reference to the fact
7  that I was not the oldest person in the kitchen. Then
8  he said, "Well, you are older than anybody that works
9  back there." We were in the catering department.
10  "You are older than anybody back there in the catering
11  department." I asked him, "What does that have to do
12  with anything?"
13      Prior to that he had made a couple
14  comments where the conversation started off about my
15  age and I should be, I guess, you know, more -- at
16  least I took it I should be more influential in
17  reference to other parties.
18  Q. I think you mentioned before when you were
19  explaining how these age comments came up in your
20  conversation with Mr. Rogers that there had been a
21  previous incident --
22  A. Yes.
23  Q. -- that you thought had precipitated this
24  conversation?

Page 52

1  A. Exactly.
2  Q. Can you tell me about that?
3  A. Yes. There was a big catering job over at --
4  that was taking place over at Chestnut Run, I believe.
5  I am not certain. But Mr. Rogers came over to work in
6  the catering department to help out. There were some
7  comments that was made between John Lewis that I guess
8  Mr. Rogers felt offensive and -- felt offensive to. I
9  mean, it wasn't directed at him. But it was just
10  comments in general that had -- that were being made
11  by John Lewis, who is a younger black gentleman. And
12  Chad was there. Mark Teoli was there. But Mr. Rogers
13  is the one who made comment, you know, to John Lewis
14  in reference to the comments that he had made.
15      And there was some other things that had
16  happened in reference as far as John. John Lewis is a
17  young man that is just a happy, go-lucky, free, free
18  mouth, I guess, you would say, type of individual.
19  You know, you really have to know John to understand
20  and appreciate him. A lot of time John may say or do
21  things that some people may find offensive. And I
22  think that may have precipitated the fact that me
23  being there working, older gentleman as opposed to
24  John Lewis, that, perhaps, maybe he thought I should

Page 53

1  have took John Lewis under my arm and kind of counsel
2  him to the fact that, you know, in the workplace, he
3  should be more restrained. This is just my
4  impression.
5      I know that happened, that Mr. Rogers made
6  comments in reference to the action of John Lewis
7  where Chad and Mark Teoli knowing John did not say
8  anything because they know how John is. But
9  Mr. Rogers by not knowing John felt that the comments
10  and his actions was out of place.
11      This is just my impression of what
12  happened that particular day because Mr. Rogers made
13  comments to John Lewis. And I just felt that his
14  reference was due to the fact that, you know, again,
15  like I said, by me working in the place, in there with
16  John, that, perhaps, maybe I should have stepped up
17  and kind of talked to John in reference to his action
18  in the workplace.
19  Q. Okay. So would you say that Mr. Rogers'
20  comments to you were directed at, perhaps, your
21  maturity level; Mr. Witcher, you are more mature than
22  this Mr. Lewis, perhaps, you could help me out with
23  him or give him some guidance? Did you feel the
24  comments referencing your age was directed to that?

Witcher                                    v.                          Sodexho, Inc.
George M. Witcher                   C.A. # 05-2005 SSR          January 12, 2006

Page 54

1   A. But that wasn't the choice of words, you know.
2   See, I mean, Mr. Rogers is a very well educated man.
3   If he thought that I should talk to John in
4   reference to me being a more mature person, then that
5   is the way he should have made reference. That's the
6   way he should have talked to me, you know. But by
7   coming to me and talking about I'm an older gentleman.
8   People are offended by different things. You know
9   what may offend you may not offend the next person.
10  But when he came to me in reference to the older
11  comment, and he saw -- he clearly saw -- that I was
12  offended, that I was getting angry in reference to the
13  age comment, and he kept it up. That's the very
14  reason why -- the reason why I never complained about
15  Teoli's comment because it was a one-statement
16  comment. That was the end of it. That was the end of
17  it, period. But it was not -- it was a continuous
18  thing as far as Mr. Rogers concerned. That's why I
19  filed a complaint in reference to him.
20  Q. Okay. I am going to try and ask the question
21  again. Did you feel that Mr. Rogers' comments to you
22  regarding your age were directed at your maturity
23  level? Is that how you interpreted it?
24  A. Initially, yes.

Page 55

1   Q. And I believe you just mentioned the phrase
2   "older gentleman." Is that something that Mr. Rogers
3   said or is that your interpretation of what he said?
4   A. No, he didn't say, "Older gentleman." He just
5   said, "Older."
6   Q. He just said "older"?
7   A. Yeah, being an older person.
8   Q. Older person. I am just trying to see if we
9   can't -- talking about the incident more -- can't pin
10  down what exactly these comments were that you felt
11  were offensive. So he indicated you were an older
12  person. And then so that was at least one of the
13  comments. You said there was four to seven. At least
14  one was that you were an older person. Right?
15  A. Right.
16  Q. When Mr. Rogers made the first comment
17  regarding your age, did you immediately say, "Hey, you
18  know, what's that have to do with it?" Or "I find
19  that offensive." Or, you know, what was your initial
20  response the first time he said that?
21  A. I was waiting for him to continue with what it
22  was he was referring to, you know. And he never did
23  come out and pinpoint exactly what it was that he was
24  talking about.

Page 56

1   Q. Was it simply Mr. Rogers' use of the word "old"
2   or "older" a number of times or was this more? These
3   four to seven comments that we have identified. One
4   of them was that "You are an older person." One of
5   them was that "You are the oldest person in the
6   kitchen." Can you recall the others?
7   A. Well, the reference when I said, "I am not the
8   oldest person in the kitchen," then he came back,
9   "Well, you are older than any of us that's working
10  back in the catering department. You are older than
11  all of us as far as the library is concerned." I told
12  him that I am not older than anybody in the library.
13  Sharon is older -- Sharon who ended up
14  being the supervisor at the library on Foulk Road --
15  is older than I am. And, again, I made the comment,
16  "I don't understand what you are trying to get to as
17  far as the 'old' reference is concerned." That's when
18  I talked about my application. "Do you want to see my
19  license? I don't understand. It's not like I lied
20  about my age. What are you getting at?"
21  Q. Sure. So that was at the end of the
22  conversation, this back and forth you had with
23  Mr. Rogers --
24  A. Back and forth.

Page 57

1   Q. -- about who was the oldest person there?
2   A. Right.
3   Q. Was that accountable for -- I think, as you
4   just related to me, there might have been three back
5   and forths where he said "you are the oldest person in
6   this group," "you are the oldest person in this
7   group," is that responsible for maybe three of those
8   comments?
9   A. Yes.
10  Q. And another was that you were an older person.
11  So I think that's at least four comments that we have
12  identified. Prior to the whole exchange about you
13  being the oldest person in the kitchen, was there
14  something else? Can you recall with any more
15  specificity any other comments?
16  A. I can't recall.
17  Q. Now, although Mr. Rogers was, as you considered
18  him, your manager, did you perceive him being a
19  younger individual? I think we covered this.
20  A. We covered this. Yes.
21  Q. Did you perceive him to look up to you, or?
22  A. No.
23  Q. No. You did not. Okay. Did you perceive him
24  to be intimidated by you in any way?

A16

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Witcher                                        v.                        Sodexho, Inc.
George M. Witcher                        C.A. # 05-2005 SSR          January 12, 2006

Page 58

1  A. No.
2  Q. I think we covered the response to your
3  complaint and Ms. Congo's response to Mr. Rogers'
4  comments to you. Is it true that shortly after this
5  incident occurred with Mr. Rogers, Mr. Rogers left,
6  went on leave from Sodexho?
7  A. He got sick. I am not certain of the time
8  frame. But I know that he did get sick. And it could
9  have been maybe a week -- I would say, within 30 days
10  after the incident, he did take a leave.
11  Q. Did you have any further contact with
12  Mr. Rogers after that point?
13  A. Yes. I seen him prior to him getting sick,
14  after that incident. I think I seen him the next day.
15  Because he would be in the office, you know.
16  Sometimes he would be in the cafeteria.
17  Q. And that next day, did he say anything else to
18  you about your -- the previous day's conversation?
19  A. No. He spoke to me. I spoke to him. That's
20  all.
21  Q. Things were cordial?
22  A. We passed by one another. I am not the type of
23  person that is just going to walk by, for the most
24  part, you know, angry at somebody, especially you're

Page 59

1  my supervisor. I mean, that doesn't make sense.
2  Q. Right. Did you feel after that conversation in
3  the short time that Mr. Rogers remained in that
4  position that he took any action against you after
5  that conversation?
6  A. No.
7  Q. Then you said it was within 30 days probably
8  Mr. Rogers went on a medical leave?
9  A. I would say so, yes.
10  Q. After that occurred, did you have any further
11  contact -- after Mr. Rogers went on leave, did he come
12  back as your supervisor? Did you have any further
13  contact with him?
14  A. No, he didn't come back as my supervisor. But
15  I seen him on several occasions after that.
16  Q. But not as your manager or supervisor?
17  A. No.
18  Q. I think we can move on to the third event that
19  you identified in the beginning of your deposition as
20  supporting your claim of age discrimination. And that
21  was an incident in which you were disciplined for
22  cussing in the kitchen in around June of 2004. Is
23  that right?
24  A. Correct.

Page 60

1  Q. Can you be any more specific as to the date in
2  June of '04?
3  A. No, I can't.
4  Q. Why don't you recount for me what happened?
5  A. Well, a normal day's work, frustrated about --
6  I don't know exactly what it was that I was frustrated
7  about. But, you know, I cussed. And I was talking to
8  John Lewis. There was nothing specific.
9  I remember that there was a phone call
10  that came in from the library, and instead of them
11  giving me the phone, they just went on and took
12  whatever the message was, from a young lady by the
13  name of Michelle. And I cussed again on a couple of
14  other occasions. And Donna, who was the supervisor
15  there, asked me to stop cussing. And my comment to
16  Donna was, "Well, you know, everybody else cuss in the
17  kitchen. You don't say nothing to them. So why are
18  you singling me out?"
19  And to the best of my knowledge, her reply
20  was, you know, I said, "Stopped cussing." And then I
21  made the comment that she was prejudice. When I made
22  that comment, then she flew off the handle and started
23  hollering and screaming and ordered me to go into the
24  office.

Page 61

1  Q. So this incident occurred around what time of
2  day?
3  A. It was in the morning.
4  Q. While you were making the food that you were to
5  later deliver?
6  A. Correct.
7  Q. Do you know Donna's full name?
8  A. Her last name is hack-a-back (sic.) I don't
9  know. No, no, no.
10  Q. You said you thought she was a supervisor?
11  A. She was the supervisor.
12  Q. Of what?
13  A. Back in that department. Supervisor of
14  catering.
15  Q. Is this still at the Barley Mill kitchen?
16  A. Barley Mill kitchen, yeah.
17  Q. Did you consider Donna your supervisor at that
18  time?
19  A. Well, she was supervisor while I was in the
20  kitchen, yes.
21  Q. Would she have been responsible for giving your
22  performance reviews --
23  A. No.
24  Q. -- or setting your schedule? No.

A17

16 (Pages 58 to 61)

Page 62

1      Do you recall who else was working in the
2  kitchen at that time?
3      A.  Sure.  John Lewis and Erica Knight.
4      Q.  Just those two people?
5      A.  There is just four of us work back in the
6  catering department on a continuous basis, on a daily
7  basis.  If there is a large order, then they would
8  bring other people back in to help out.  But on a
9  daily basis, it's just four of us.
10     Q.  And that is John Lewis, Erica Knight, Donna and
11  yourself?
12     A.  And myself, correct.
13     Q.  You referenced the catering department.  Is
14  that set aside from the kitchen, or?
15     A.  Yes.  There's the catering.  You have your
16  office, which is right in the center.  And then the
17  kitchen where you have your refrigerators and stoves
18  and those sort of things.
19     Q.  Was there a cafeteria at Barley Mill?
20     A.  Yes.  The cafeteria was in, I guess you would
21  say, in front of the kitchen area.
22     Q.  So the individuals who were preparing food to
23  serve at the cafeteria would have been working in the
24  kitchen?

Page 63

1      A.  Yes.
2      Q.  So you, these four people, including yourself,
3  you've identified as working in catering, were
4  separate from those in the cafeteria kitchen?
5      A.  Yes.
6      Q.  So it's a relatively small area?
7      A.  I would say, yes.
8      Q.  And Mr. Lewis, do you know his age?
9      A.  John is in his 30s, I think.  He was 31, 32.
10  Something like that.
11     Q.  How about Erica Knight?
12     A.  Erica was in her 30s as well.
13     Q.  And the supervisor, Donna?
14     A.  I think she was in her late 30s.
15     Q.  How did you know their ages?  Is this just what
16  you perceived?
17     A.  John and myself -- well, John and Erica and
18  myself, we talked all the time anyway.  There was a
19  lot of comments in reference to age is concerned.
20     Q.  So they had told you how old they were?
21     A.  In the conversation, the ages came up, yes.
22     Q.  And is the same true for Donna?
23     A.  Yes.
24     Q.  Do you recall when any of these three

Page 64

1  individuals, John Lewis, Erica Knight or Donna, told
2  you how old they were?
3      A.  No, they didn't actually tell me:  I'm 32-years
4  old.  It was conversation.  We talked about different
5  movies.  We talked about different events that took
6  place at any given time.  You know, those things, in
7  general conversation, you are working together,
8  general conversation, those things come up.
9      Q.  So you simply recall that at different times --
10     A.  Yes.
11     Q.  -- these individuals' ages came up?
12     A.  Right.
13     Q.  And do you recall whether they specifically --
14  I think you just said they did not specifically say:
15  Hey, I am 32.
16     A.  Right.
17     Q.  But it was just more of a general --
18     A.  General conversation.  I know, for instance,
19  Erica was talking about her relationship with whoever
20  she was going with, and then, you know, when that
21  relationship kind of ended and she got involved with
22  someone else, and they were -- she was talking about
23  moving, you know, getting a new place and how long she
24  had been with another employer, how long she had been

Page 65

1  with Sodexho and, you know, talking about the
2  retirement.  Those kind of things where the age came
3  up:  Well, I am such and such years old.  That kind of
4  stuff there.
5      The same way with John, we had more of a
6  personal type of a conversation, you know, being
7  males.  He was talking about his relationship as far
8  as his brothers and sisters are concerned and that
9  kind of stuff there.
10     Q.  Is the same true for Donna?
11     A.  No.  Donna's age came up in reference to her
12  daughter.  Her daughter had graduated from high
13  school.  She was getting ready to go on to college,
14  university.  I think it was the University of
15  Delaware.  But it was just a general-type
16  conversation.
17     You know, you work in the kitchen.  Things
18  come up about people's birthdays and things of that
19  nature is concerned.  They had, amongst the women,
20  they had a birthday club.  Whenever the birthday came
21  up, they gave them gifts and balloons, and that kind
22  of stuff there is concerned.
23     Q.  So did John ever specifically tell you his age?
24     A.  John Lewis?

Witcher                                                                        Sodexho, Inc.
George M. Witcher                              v.                               January 12, 2006
                                      C.A. # 05-2005 SSR

Page 66

1    Q.  Yes.
2    A.  Yes.
3    Q.  He did.  How about Erica Knight?
4    A.  Specifically, yes, I believe Erica did, yes,
5    mm-hmm.
6    Q.  How about Donna?
7    A.  Donna did not specifically tell me:  I'm 38 or
8    39.  I know in general conversation it did come up.
9    Q.  Okay.  You said you were in the kitchen
10   preparing the food and you did use curse words?
11   A.  Yes.
12   Q.  What were those curse words?
13   A.  I believe it was:  "Damn," "shit," "bitch."  I
14   think at one time I made reference to the "F" word.
15   Q.  And all of these curse words, were they
16   directed at another employee?
17   A.  No, no, it was not.
18   Q.  When the phone call came from the library, from
19   Michelle, what was your response to that?
20   A.  I made -- I think I made reference to the fact
21   that:  I don't know why the bitch couldn't have called
22   me, or something of that nature there.
23   Q.  Would you have considered Michelle a co-worker?
24   A.  Yes, she was.

Page 67

1    Q.  So that comment at least was directed at a
2    co-worker?
3    A.  Well, it was not -- I mean, I didn't make it
4    directly to Michelle.  Michelle was on the phone.  We
5    did a lot of joking and kidding around.  Erica, a
6    young lady, cussed more than anybody in the kitchen.
7    So we did a lot of cussing as far as in the kitchen is
8    concerned.  And it was not said -- I did not say it in
9    a derogatory manner.  I was just saying it in
10   reference in a joking kind of way as far as Erica was
11   concerned.  I was not saying it in a derogatory
12   manner.  No, I did not.
13   Q.  At what point did Donna ask you to stop
14   cussing?
15   A.  I really can't say.  I can't say at what
16   particular point it was.
17   Q.  But you had used all of the words you indicated
18   to me before she reprimanded you?
19   A.  Yeah.  It was not in a group-typesetting.  It
20   was like maybe over a course of, perhaps, an hour.  I
21   wasn't like just rattling on and on and cussing,
22   cussing, cussing.  It was not a situation like that
23   there.  Nor was it a situation that I continued to
24   cuss after she told me to stop cussing.  That wasn't

Page 68

1    the situation as well.
2    Q.  So when Donna said "stop cussing," you did
3    stop?
4    A.  Yes.
5    Q.  Did you make a comment about people minding
6    their own business?
7    A.  No.
8    Q.  You did not?
9    A.  No, I did not.
10   Q.  I think you indicated, Mr. Witcher, that you
11   used the "F" word?
12   A.  Right.
13   Q.  What's the "F" word?
14   A.  Fuck.  Fuck it.
15   Q.  Is that how you used it on that day?
16   A.  Yes, mm-hmm.
17   Q.  Why when you were telling me what words you
18   used that day, you did not just say, "fuck."
19   A.  Well, we have ladies sitting around.  I just
20   didn't want to offend anybody.
21   Q.  But you thought it appropriate to use at work?
22   A.  Did I think it was appropriate to use at work?
23   You mean at the time in the kitchen?
24   Q.  Yes.

Page 69

1    A.  Everybody in the kitchen used that word.  Donna
2    used that word.  It's not like it was isolated, I was
3    the only one whoever used that word in the kitchen.
4    Q.  So you did think it was appropriate to use it
5    in the kitchen?
6    A.  I just -- I was just cursing at the particular
7    time.
8    Q.  So is that a yes, you thought it was
9    appropriate?
10   A.  No, I didn't say I thought it was appropriate.
11   Q.  So you did not think it was appropriate?
12   A.  I didn't give it any thought one way or the
13   other.
14   Q.  I see.  Okay.
15          MS. DiLUZIO:  Mr. Witcher, I am going to
16   hand you a document.  I think we're on Exhibit 3.  It
17   appears to be an excerpt from an employee handbook.
18   The first page is headed "Constructive Counseling."
19   The document is -- let me see how many pages -- nine
20   pages long.
21          (Witcher Deposition Exhibit No. 3 was
22   marked for identification )
23
24   BY MS DiLUZIO:

                                                                         18 (Pages 66 to 69)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Page 70

1   Q.  Are you familiar with this document?
2   A.  Yes, I am.
3   Q.  Is it in fact an excerpt from the Sodexho
4   employee handbook?
5   A.  To the best of my knowledge, yes.
6   Q.  Did you receive a copy of that handbook?
7   A.  Yes, I did.
8   Q.  In fact, you signed an acknowledgment form
9   acknowledging you had received the employee handbook.
10  Is that right?
11  A.  I imagine so. I am not sure.
12      MS. DiLUZIO:  Mark this Exhibit 4.
13      (Witcher Deposition Exhibit No. 4 was
14  marked for identification.)
15  BY MS. DiLUZIO:
16  Q.  The court reporter is handing you a document
17  entitled "Employee Handbook Acknowledgment." Does
18  this refresh your recollection as to whether you
19  signed an acknowledgment of having received the
20  handbook?
21  A.  Yes, it does.
22  Q.  And is that your signature on this document?
23  A.  Yes, it is.
24  Q.  And what is the date, sir?

Page 71

1   A.  9/27/03.
2   Q.  If you could turn in the excerpt I gave you of
3   the employee handbook to page 106, which I think is
4   the fifth page in the packet. I am sorry. The sixth
5   page. It says "106" at the top left. This, if you
6   look at the previous page, appears to be a list of
7   reasons that an employee may be terminated from
8   employment. Is that right?
9   A.  Yes.
10  Q.  Okay. And on that list on page 106 it says,
11  and I quote, "Any disorderly conduct, such as
12  profanity or yelling, including the use of vulgar,
13  abusive or obscene language while on company/client
14  premises or arising out of company business."
15  Do you see that?
16  A.  Yes, I do.
17  Q.  Would you agree with me that the words you
18  listed previously for me, the curse words you used,
19  are vulgar, abusive or obscene?
20  A.  Yes, I would.
21  Q.  So you agree with me then that your use of
22  those words while at work was in violation of Sodexho
23  company policy?
24  A.  Everybody in the kitchen that used those words

Page 72

1   were in violation of Sodexho's policy; not just me,
2   everyone.
3   Q.  Perhaps. But speaking of yourself, you admit
4   that your use of those terms was a violation of
5   company policy?
6   A.  I admit that everyone that used those words
7   were in violation of Sodexho's policy. And I was not
8   the only one that used those words that worked in the
9   kitchen.
10  Q.  I understand that. I just want a yes or no as
11  to whether or not you believe you were in violation of
12  company policy. Just you. Regardless of whether
13  other people may have been as well.
14  A.  Okay. So we're singling just me out; is that
15  correct?
16  Q.  For purposes of this question, yes.
17  A.  Yes.
18  Q.  Okay. Thank you.
19      In fact, the use of profanity is, as I
20  said, listed among the reasons why an employee can be
21  terminated immediately, according to the handbook. Is
22  that correct?
23  A.  Yes.
24  Q.  Okay. Were you in fact terminated for your use

Page 73

1   of this language?
2   A.  Was I terminated?
3   Q.  Yes.
4   A.  No, I was not.
5   Q.  Okay. Did you receive any discipline for your
6   use of the language?
7   A.  Are you talking about being reprimand?
8   Q.  Yes. For example.
9   A.  Yes. I was reprimand. I was illegally
10  detained. I was escorted out.
11  Q.  You said a number of times, Mr. Witcher, that
12  everyone in the kitchen used vulgar language. Can you
13  be more specific? Who?
14  A.  John Lewis. Erica Knight.
15  Q.  Anyone else?
16  A.  Donna. I don't know Donna's last name.
17  Q.  When?
18  A.  I can't give you specific times and dates.
19  Q.  How about general times and dates?
20  A.  I can't give you general times and dates. I
21  mean, it was especially, John Lewis. John Lewis and
22  Donna went at it all the time.
23  Q.  When you say "went at it," what do you mean?
24  A.  There for John Lewis being reprimand about food

Witcher                                              Sodexho, Inc.
                              v.
George M. Witcher              C.A. # 05-2005 SSR      January 12, 2006

Page 74

1   preparation or doing something.
2   Q.  So Donna would reprimand Mr. Lewis for various
3   things?
4   A.  Right. And the way he prepared food and things
5   of that nature, doing the salads.
6   Q.  Did she reprimand him about his language?
7   A.  Yes. She had him go to the office in reference
8   to that on a couple of occasions.
9   Q.  She had him go to the office. Did he receive
10  any further discipline like a warning or anything like
11  that that you know of?
12  A.  No. Mark Teoli talked to him a couple of
13  times. He never told me whether or not he got any
14  write-ups.
15  Q.  You said Erica Knight also used profanity at
16  work. Did you ever see her be reprimanded?
17  A.  No. Donna had a preference to women.
18  Q.  Did any other manager ever reprimand anyone in
19  your presence regarding their use of language?
20  A.  No.
21  Q.  Was Donna ever reprimanded by anyone?
22  A.  No.
23  Q.  When you say that everyone in the kitchen
24  used -- cussed, to use your word, did you ever hear

Page 75

1   Donna use, as you called it, the "F" word?
2   A.  No. But cussing is more than just the "F"
3   word.
4   Q.  Did you ever hear Erica use that word?
5   A.  Many times.
6   Q.  And John Lewis?
7   A.  Yes.
8   Q.  Was Mr. Lewis, any of the times he was
9   reprimanded for his language, was it for use of that
10  term?
11  A.  I really don't know.
12  Q.  How do you know that Ms. Knight was never
13  reprimanded for her language?
14  A.  Because I was in the kitchen. At the time that
15  I was in the kitchen and Donna -- Donna would say,
16  "Erica, stop cussing." If you call that a reprimand,
17  then that's reprimand.
18  Q.  Okay. What makes you think or what evidence do
19  you have that Donna telling you to stop cussing on
20  that day was motivated by your age?
21  A.  I never said it was motivated by my age.
22  Q.  Well, you listed this incident as an example
23  of --
24  A.  The total incident.

Page 76

1   Q.  I see.
2   A.  The total incident. The incident of me going
3   into the office. The incident of me being detained.
4   The incident of them calling in security. The
5   total -- I didn't say one isolated incident. It was
6   the total incident.
7   Q.  Okay.
8   A.  It was not about Donna reprimanding me. It
9   wasn't about that. That was a part of the entire
10  incident that took place.
11  Q.  Okay. So you do not believe then that when
12  Donna said, "stop cussing" --
13  A.  That it was age motivated?
14  Q.  Right.
15  A.  No.
16  Q.  Going back to the sequence of events. Donna
17  told you to stop cussing.
18  A.  Right.
19  Q.  You said, "Everybody else does it"?
20  A.  Right.
21  Q.  And she said, "just stop doing it," basically?
22  A.  Right.
23  Q.  Then what happened?
24  A.  Then I told Donna, I said, "You are just

Page 77

1   prejudice. That's all."
2   Q.  And what did you mean by that?
3   A.  Just what I said, that she was prejudice.
4   Q.  Prejudice in what way?
5   A.  Prejudice being prejudice. She did not like
6   men, especially black men.
7   Q.  So you felt that Donna was prejudice against
8   black men?
9   A.  Yes.
10  Q.  That's what you meant when you said "you're
11  prejudice"?
12  A.  Right.
13  Q.  How did Donna respond to that?
14  A.  She started hollering and screaming and told me
15  to go into the office.
16  Q.  Did you go into the office?
17  A.  Yes, I did.
18  Q.  What happened?
19  A.  I waited in the office, waited in the office.
20  Mark and another manager -- I think his -- I don't
21  know the other manager's name. They were out in
22  the -- in fact, they were out in the cafeteria area.
23  So after waiting for a long period of time, I just
24  left out of the office and went back to finish up what

Page 78

1  I had to do because I had a time frame in order to
2  make my deliveries.
3  Q.  How long would you say you waited in the
4  office?
5  A.  I don't know, 20 minutes, a half hour.
6  Q.  Donna did not come back and join you in the
7  office after having told you to go there?
8  A.  Yes, she did.
9  Q.  Is that after the 20 or 30 minutes had elapsed?
10  A.  Right.
11  Q.  So after 20 or 30 minutes you are sitting in
12  the office by yourself?
13  A.  Right.
14  Q.  No one comes in and says anything to you?
15  A.  No.
16  Q.  Then you decide, I am just going to go finish
17  my work?
18  A.  Yes.
19  Q.  So you go back into the food preparation area.
20  And is Donna there?
21  A.  No.  Donna went -- she had went to, I guess,
22  find Mark Teoli and the other one.  The guy, his name
23  was Mark somebody.  I don't know what Mark, the other
24  manager's name was.

Page 79

1  Q.  So you go back in the room.  Who is in the
2  room?
3  A.  John Lewis and Erica Knight.
4  Q.  And you just began preparing the food?
5  A.  Started to finish up what I was doing.
6  Q.  Then what happened?
7  A.  Then, to my knowledge, Donna walked over to her
8  station.  She saw one of the managers come in, and she
9  went in the office.
10  Q.  Okay.
11  A.  And they had whatever conversation they had.
12  And then they called me in the office.
13  Q.  Who specifically called you in the office?
14  A.  Mark Teoli and the other manager.
15  Q.  And how much time had passed between when you
16  came out of the office and went to finish your work
17  and then Donna came back with Mark, these two
18  gentlemen named Mark and asked you to come into the
19  office?
20  A.  Would you repeat that question again?
21  Q.  Sure.  How much time was it that you were back
22  preparing food before you were asked to come back to
23  the office again?
24  A.  Well, maybe 15, 20 minutes.

Page 80

1  Q.  And then Mark Teoli and the other manager named
2  Mark whose last name you can't remember asked you to
3  come into the office?
4  A.  Exactly.
5  Q.  Who all was in the office at that point?
6  A.  Just the two Marks and myself.
7  Q.  Was Donna in the office?
8  A.  No.
9  Q.  She was not.  So you indicated that you saw
10  Donna return with these two Marks.
11  A.  No.  I said Donna had came back to the kitchen
12  and went to her station, her work station.
13  Q.  Okay.
14  A.  Shortly after she came back in the catering
15  area, then one of the Marks came in, and then the
16  other Mark came in.  When Donna saw one of the Marks
17  come in, then she went into the kitch -- or she went
18  into the office.
19  Q.  Okay.
20  A.  And then the other Mark joined her.
21  Q.  Did she then leave the office before you were
22  asked to come in?
23  A.  Yes.
24  Q.  So once you are in the office with Mark Teoli

Page 81

1  and the other Mark, what happened?
2  A.  They asked me about if I was cussing.  I told
3  them, yes, I was.
4  Q.  What happened next?
5  A.  Well, it was about the cussing.  I said, "Mark,
6  everybody cusses.  What's the big deal?  I apologize.
7  I was wrong.  I shouldn't have cussed.  I was wrong."
8  Okay?
9  Q.  Okay.
10  A.  I said, "But then everybody else cusses."  He
11  said, "Did you tell Donna she was prejudice?"  I said,
12  "Yes, I did."  I said, "Mark, this is a free country.
13  I have a right to my opinion."
14  Q.  What was his response?
15  A.  And he didn't respond beyond that.  Then he
16  told me, he said, "You are suspended."  I said,
17  "Suspended.  For what?"  He said, "Until the
18  investigation is over with."  I said, "What
19  investigation?  I was cussing, right.  I was
20  reprimanded for cussing.  I admitted that I cussed.  I
21  apologize."
22  Q.  What was his response to that?
23  A.  And his response was, you know, "You are
24  suspended until the investigation is over with."  He

A22

Witcher                                          v.                          Sodexho, Inc.
George M. Witcher                    C.A. # 05-2005 SSR                      January 12, 2006

Page 82

1  ordered me to sit over in the corner because security
2  was coming.
3     Q.  When you say "he," are you referring to Mark
4  Teoli?
5     A.  Mark, yes.
6     Q.  The other individual named Mark, did he say
7  anything at this time?
8     A.  Yes, he did.
9     Q.  What did he say?
10    A.  He made reference to the fact that "Donna is
11  the supervisor and you shouldn't have disrespected
12  her." I said, "I did not." As far as I was
13  concerned, I did not disrespect her, you know. And,
14  again, I apologize as far as the cussing was
15  concerned, but I was not cussing directly at any
16  individual. I was just cussing."
17         And, again, that happened. It happened on
18  several times as far as people back there cussing. I
19  was never reprimanded before for cussing, you know.
20  It was just one of those -- it was just one of those
21  incidents.
22    Q.  Donna had never before that day told you to
23  stop cussing?
24    A.  No, no.

Page 83

1     Q.  No manager before that day had ever told you to
2  stop cussing?
3     A.  No.
4     Q.  So you said that Mr. Teoli advised you that you
5  were being suspended. Is that right?
6     A.  Right.
7     Q.  Did you ask why?
8     A.  Yes. I commented on that. I asked him why.
9  And he told me until the investigation was over. I
10  asked him, I said, "What investigation?" They said I
11  was cussing. I admitted that I was cussing. I
12  apologized for cussing."
13         And he just ordered me to sit in the
14  corner until security come.
15    Q.  Did you do that?
16    A.  Yes, I did.
17    Q.  How long was it until security came?
18    A.  I don't know. Maybe five, 10 minutes, 15
19  minutes.
20    Q.  Can we be a little bit more specific?
21    A.  That's as specific as I can get. I am not
22  certain. I would say, between five to 15 minutes. I
23  can't pinpoint an exact time frame. As far as I was
24  concerned, it was a lifetime.

Page 84

1     Q.  Why do you say that?
2     A.  Because you got, if I may say so, two white
3  guys. One is blocking the door, standing at the door.
4  Mark Teoli is at the door. I don't know what they
5  have in their minds.
6     Q.  Did either of them tell you you couldn't leave?
7     A.  If a supervisor advised you to sit over in the
8  corner, that's telling me I can't leave. And he's
9  standing at the door. Yes, that's telling me I can't
10  leave. No. Did they verbally say "you can't leave"?
11  No, they didn't. But I was ordered to sit over there
12  in the corner.
13    Q.  Was the door closed?
14    A.  Yes, it was closed.
15    Q.  Was it locked?
16    A.  I don't know if it was locked or not.
17  Normally, it is locked because you can't -- normally,
18  you cannot get in the office. Now, it's locked from
19  the outside in. I was on the inside.
20    Q.  Right.
21    A.  But in order to go through the door, I would
22  have had to go through Mark Teoli because he was
23  standing there blocking the door. The office is a
24  pretty small office. It's not a big office. You have

Page 85

1  two desks in that office. So it's not a big office at
2  all.
3     Q.  Did you try to leave?
4     A.  Why would I try leave when I am told to sit in
5  there? That's a violation. That's a total violation.
6  I am advised by a manager to sit over there in the
7  corner. No, I did not try to leave.
8     Q.  Did you say, "I'm uncomfortable' I would like
9  to leave"?
10    A.  No, I did not.
11    Q.  Did you ask: Can I leave?
12    A.  I was given an order. At that point, I felt
13  threatened. I just kept my mouth shut until I knew
14  what I had to do later on. No, I did not. Because I
15  felt threatened at the time. I felt the best thing
16  for me to do was to do as I was told, to sit in the
17  corner and keep my mouth shut.
18    Q.  Did anybody tell you to keep your mouth shut?
19    A.  No, they didn't have to tell me to keep my
20  mouth shut. At that point, all conversation was over
21  with.
22    Q.  Why did you feel threatened? Did you feel
23  physically threatened?
24    A.  Yes, I did.

A23

22 (Pages 82 to 85)

Witcher                                   v.                        Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR            January 12, 2006

Page 86

1   Q.  What made you feel that way? What gave you the
2   impression that you were in physical danger?
3   A.  Because of the tone of the conversation when
4   they were talking to me.
5   Q.  The way you relayed the conversation to me just
6   now was: They asked you if you were cussing; you
7   admitted that you were and apologized; they said you
8   were being suspended pending investigation; you said
9   what investigation; they said, you know, have a seat;
10  we're calling security; you're being suspended. What
11  about -- am I missing something? What about that
12  conversation made you feel threatened?
13  A.  I said the tone, the tone.
14  Q.  Okay.
15  A.  We never discussed the tone and manner, the
16  manner in which I was told to sit over in the corner,
17  the expression that was on the face. The fact that he
18  was standing near the door, blocking the door.
19  Q.  Did you feel that Mr. Teoli was physically
20  imposing?
21  A.  Yes, I did.
22  Q.  Was he bigger than you, taller?
23  A.  No, he wasn't taller than I am, but he is a
24  stocky, a stocky fellow.

Page 87

1   Q.  How tall are you, Mr. Witcher?
2   A.  About 5-7, 5-8.
3   Q.  And how tall would you estimate Mr. Teoli is?
4   A.  Probably about 5-6, 5-7.
5   Q.  At that time, Mr. Witcher, how much did you
6   weigh, roughly?
7   A.  Two -- maybe 220.
8   Q.  What would you estimate Mr. Teoli weighed?
9   A.  About 180, 190.
10  Q.  So it sounds like you thought Mr. Teoli was
11  smaller than you in size?
12  A.  Yes.
13  Q.  Yet you found his presence in the room to be
14  physically intimidating?
15  A.  That's right. Because Mr. Teoli is about 20
16  years younger than I am. And there was two Marks in
17  there.
18  Q.  While you were waiting for security, there were
19  two of them in the room?
20  A.  Exactly. Neither one of them never left from
21  the time I entered into the room.
22  Q.  I thought you indicated one of them had gone to
23  get security.
24  A.  No, no. I said that they told me to sit, to

Page 88

1   wait for security to come. And Mark stood at the
2   door.
3   Q.  Mark Teoli?
4   A.  Mark Teoli stood at the door waiting for
5   security.
6   Q.  The other Mark, where did --
7   A.  The other Mark was sitting at the desk behind
8   where I was at. Well, kind of cater-corner to where I
9   was at. Because I was sitting in the corner and he
10  was sitting to the left of me.
11  Q.  Give me a picture of this room. About how big
12  of a room are we talking about, Mr. Witcher?
13  A.  Oh, I would say if you look at this particular
14  room, maybe about one-third of this room. The width
15  probably being, basically -- no, it's a little smaller
16  as far as width-wise is concerned. You had two desks
17  in there. You had a cabinet.
18  Q.  How many chairs?
19  A.  Three.
20  Q.  Three. Would you be able, Mr. Witcher, to do a
21  rough diagram?
22  A.  No, I cannot. I can't use this hand. I'm
23  left-handed. As a matter of fact, I can't use either
24  one of my hands.

Page 89

1   Q.  Okay. I am going to try and, with your
2   direction, draw the room.
3   A.  Okay.
4   Q.  Does that sound like it could work? Okay.
5   We're talking about a rectangle?
6   A.  Yes.
7   Q.  The shape of the room, roughly?
8   A.  Yes.
9   Q.  Where about is the door? Is it sort of on the
10  long end of the room?
11  A.  It was on --
12  Q.  Let me come around to you.
13  A.  Yeah.
14  Q.  So here's the room. Where would the door be?
15  A.  The door would be. Let's say, you would enter
16  in here. This would be the door.
17  Q.  This would be the door. Okay. Door.
18       All right. Any windows?
19  A.  Yes. There is windows on both sides so that
20  they can see.
21  Q.  On here windows?
22  A.  Big bay windows on both sides.
23  Q.  On both sides. But not against the back wall?
24  A.  No.

A24

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Witcher                                    v.                              Sodexho, Inc.
George M. Witcher                   C.A. # 05-2005 SSR                  January 12, 2006

Page 90

1   Q. Okay. Is the whole wall windows --
2   A. Yes.
3   Q. -- or half of them?
4   A. Yes. The whole wall windows on both sides.
5   Q. On both sides. Okay.
6       What kind of door are we talking about?
7   Is it an interior door like we have in this conference
8   room?
9   A. Yes.
10  Q. Or is it an exterior door of a house with a
11  heavy duty lock?
12  A. No. It's a door similar to what you have in
13  the conference room.
14  Q. It's an office door?
15  A. Yes.
16  Q. But it does have a lock?
17  A. Yes.
18  Q. Okay. You said there were two desks.
19  A. Right. There's one right here.
20  Q. Where would it be facing?
21  A. It would be facing --
22  Q. If I am sitting behind the desk, am I looking
23  at the back wall or am I looking towards the door?
24  A. You are looking this way.

Page 91

1   Q. Towards the door?
2   A. Mm-hmm.
3   Q. So here's the desk. One desk. Where is the
4   other desk?
5   A. Over here.
6   Q. In the back wall facing towards the door?
7   A. Right.
8   Q. So far so good.
9   A. Mm-hmm.
10  Q. Where are chairs?
11  A. One here and one behind the desks, each desk.
12  Q. Behind the desk, there is a chair, a chair.
13  The third chair?
14  A. Over in the corner.
15  Q. In this corner here?
16  A. Mm-hmm.
17  Q. Okay. Now, where were you asked to sit?
18  A. Over here.
19  Q. In this corner chair, which would be as soon as
20  you walk in the office door to your left?
21  A. To your left, right.
22  Q. I am just going to put an X and your name right
23  there on top of that chair.
24      Then the Mark, whose last name you don't

Page 92

1   know, where was he sitting?
2   A. Behind that door.
3   Q. Behind the desk?
4   A. Desk. I'm sorry.
5   Q. On the back wall?
6   A. Right.
7   Q. We'll put an X and Mark there you said
8   Mr. Teoli was standing right here in front of the
9   office door?
10  A. By the door.
11  Q. Was he leaning against the door or how was he
12  standing?
13  A. Just standing by the door.
14  Q. Was he standing directly in front of the door?
15  A. Kind of cater-corner towards the door where he
16  could see whatchamacallem coming.
17  Q. I am going to put an X in front of the office
18  door with Teoli.
19      Is this diagram I have drawn accurate?
20  A. Pretty much so.
21  Q. Okay. Are you able to initial it or is that
22  something you are not able to do?
23  A. No, I can't do that.
24      MS. DiLUZIO: We're going to mark this as

Page 93

1   Exhibit 5 for the record.
2       (Witcher Deposition Exhibit No. 5 was
3   marked for identification.)
4   BY MS. DiLUZIO:
5   Q. So you said Mr. Teoli was standing a little bit
6   cater-corner to the door?
7   A. Right.
8   Q. Were his arms across his chest? Were they at
9   his side?
10  A. No. I think they were pretty much to his side.
11  Q. To his side. Okay. So if you had got up to
12  walk out the door, you would have had to push him out
13  of the way?
14  A. Yes.
15  Q. Okay.
16  A. There is no way he had that much space like
17  that. Do you see all this space right here, there is
18  no way you had that much space between the two desks
19  and the door.
20  Q. So the diagram is not to scale?
21  A. No.
22  Q. It was more confined than what the diagram
23  would have you believe?
24  A. A lot more confined.

A25

24 (Pages 90 to 93)

Page 94

1    Q.   Okay. About how much space would you say
2  between this front desk here and the door?
3    A.   Feet-wise, maybe three, four feet.
4    Q.   We'll just put on here three to four feet.
5         How about between this front wall and the
6  back wall?
7    A.   I would say -- you are talking about how much
8  space from this wall to that wall there?
9    Q.   Yes. The front to the back.
10   A.   Between 12 to 15 feet. My estimates is not
11 that great.
12   Q.   Sure. I am not good at that either,
13 Mr. Witcher, estimating distance.
14        Okay. So I think we have a picture. So
15 the other Mark, whose last name we don't know, was
16 along the back wall?
17   A.   Yes.
18   Q.   So he was not in your path to the door?
19   A.   No.
20   Q.   And you said that you were waiting for security
21 anywhere between -- I am going to return to my seat
22 now and just leave this here with you -- anywhere from
23 five to 15 minutes. Is that right?
24   A.   Yes.

Page 95

1    Q.   During this wait time, was there any
2  conversation?
3    A.   No.
4    Q.   None at all?
5    A.   No.
6    Q.   Not between the Marks and not between you and
7  the Marks?
8    A.   No.
9    Q.   And you made absolutely no attempt to leave
10 during this time frame?
11   A.   No, I did not.
12   Q.   No, you did not. So did security arrive?
13   A.   Yes, they did.
14   Q.   When you say that, what are you talking about?
15 How many people?
16   A.   One.
17   Q.   One. Was it a male or female?
18   A.   Female.
19   Q.   Was she a Sodexho employee or employed by
20 someone else?
21   A.   She was an outside contractor for DuPont.
22   Q.   Outside contractor for DuPont.
23        So she arrives. Then what happens?
24   A.   I got up and walked out or escorted out.

Page 96

1    Q.   Well, which is it? Did she say, "Mr. Witcher,
2  come with me?" Or when she arrived, you just got up
3  and left?
4    A.   I got up and left. Well, when she arrived,
5  Mark said, "Here's security." I got up and walked out
6  with her. She told me: "Don't say nothing to
7  nobody."
8    Q.   Did she say anything else to you?
9    A.   No.
10   Q.   Where did the two of you walk together?
11   A.   We walked out the back loading dock door, to
12 the parking lot, to my car.
13   Q.   Did she walk you all the way to your car?
14   A.   No.
15   Q.   Just out the door?
16   A.   Yes.
17   Q.   Did she then return to the building?
18   A.   No. There was another security officer in the
19 car outside waiting for her.
20   Q.   So she got in that car and then left?
21   A.   I assume. I don't know. I just walked to my
22 car, got in and left.
23   Q.   On your way out of the office with the security
24 guard, did you say anything to either Mark? Did

Page 97

1  either Mark say anything to you?
2    A.   Mark Teoli asked me if I had any personal
3  effects in my drawer. I told him, "No."
4    Q.   Did anyone say, "We'll talk about this
5  tomorrow, we'll see you tomorrow?" Anything like
6  that?
7    A.   No.
8    Q.   Did they tell you how long the suspension was
9  to last?
10   A.   Until the investigation was over.
11   Q.   Were you paid for the suspension during the
12 time of the suspension?
13   A.   Yes, I was.
14   Q.   How long did the suspension end up lasting?
15   A.   About a week.
16   Q.   Did anyone from Sodexho contact you during that
17 time?
18   A.   Yes, they did.
19   Q.   Who was that?
20   A.   Mark Teoli.
21   Q.   And what did Mark -- did he call you?
22   A.   Yes, he did.
23   Q.   What did he say?
24   A.   He told me the investigation was ongoing, that

Witcher                                v.                         Sodexho, Inc.
George M. Witcher                C.A. # 05-2005 SSR              January 12, 2006

Page 98

1    somebody should call me in to have a meeting or
2    something.
3        Q.  When was that?  Was it the next day?  Was it
4    two days later?
5        A.  It was maybe two or three days after the
6    suspension.
7        Q.  So after you got home that day, the next day
8    you didn't call and say, "Hey, what's going on; should
9    I come into work"?
10       A.  No.  They told me that until the suspension was
11   over -- until the investigation was over.
12       Q.  So you were waiting to hear from someone?
13       A.  Waiting to hear from someone, yes.
14       Q.  You heard from Mr. Teoli within two to three
15   days, and he said they were still investigating?
16       A.  Right.  That somebody would call me within the
17   next day or two.
18       Q.  Did you hear from anyone?
19       A.  Yes.  I am not sure who called me to come in
20   for a meeting.
21       Q.  Was it a HR representative?
22       A.  I am not certain.
23       Q.  Could it have been Carol Sexton?
24       A.  Like I said, I am not sure who called me.

Page 99

1        Q.  When was that that you received the call saying
2    "Come on in"?
3        A.  A day or two from Mark Teoli's call.
4        Q.  Did you go in?
5        A.  Yes.
6        Q.  That same day?
7        A.  Well, the day they told me that they was going
8    to have the meeting, yes.
9        Q.  Right.  Who was present at the meeting?
10       A.  Carol Sexton, Joanne, and I can't think of the
11   regional general manager was there.  And John Lewis.
12       Q.  Was there a representative from human resources
13   there?
14       A.  I am not sure.  I am not sure if she was at
15   that meeting or we had another meeting.  I am not
16   sure.  So I can't say.
17       Q.  Okay.  Now, who is Joanne?
18       A.  Joanne was the manager for Chestnut Run.  The
19   meeting was at Chestnut Run.
20       Q.  Was Joanne your manager?
21       A.  No.  She was the manager of Chestnut Run.
22       Q.  Did you know her prior to this meeting?
23       A.  No.  I knew of her.  I had seen her coming in
24   and out Barley Mills, but I didn't know nothing about

Page 100

1    her.
2        Q.  Carol Sexton was your manager at that time?
3        A.  And general manager, yes.
4        Q.  And there was a regional general manager.  Does
5    the name Lew Delfierro ring a bell?
6        A.  Yeah.
7        Q.  When you say regional general manager, was he
8    then superior to both Carol and Joanne?
9        A.  Yes.
10       Q.  And John Lewis who you indicated was a
11   co-worker?
12       A.  Right.
13       Q.  This meeting took place at Chestnut Run.  How
14   long did it last?
15       A.  Maybe a half hour, 45 minutes.  I am not sure.
16       Q.  What was discussed?
17       A.  About the incident.
18       Q.  What was said?  How was the meeting opened?
19       A.  I can't recall.
20       Q.  Did one of the managers sort of run the
21   meeting?  Did one of them say --
22       A.  Carol Sexton.
23       Q.  Carol Sexton ran the meeting?
24       A.  Mm-hmm.

Page 101

1            (Witcher Deposition Exhibit No. 6 was
2    marked for identification.)
3    BY MS. DiLUZIO:
4        Q.  I am going to show you a document marked
5    Exhibit 6.  It appears to be meeting notes dated
6    June 17, 2004.  Have you seen this document before?
7        A.  No, I haven't.
8        Q.  June 17th, 2004, could that have been the date
9    of the meeting that you were just discussing?
10       A.  Yes.
11       Q.  In fact, these notes indicate that at the
12   meeting you, Carol Sexton, Lew Delfierro, Joanne Dunn
13   and John Lewis were present.
14       A.  Correct.
15       Q.  So does it appear that these meeting notes
16   refer to the meeting that you and I were just
17   discussing?
18       A.  Yes, it is.
19       Q.  And these notes indicate that the confrontation
20   regarding your cursing and when you were suspended
21   occurred on June 10th, 2004.  Does that refresh your
22   recollection as to the exact date of that incident?
23       A.  It could.  I am not sure.
24       Q.  So it could have been June 10th, but not

A27

Page 102

1  necessarily?
2  **A. It could have been, yes.**
3  Q. Okay. So Carol ran the meeting. And what did
4  she say had happened?
5  **A. She said what did --**
6  Q. Did she say there had been an investigation?
7  **A. No, she did not.**
8  Q. What did she say?
9  **A. She, basically, asked me so what happened over**
10  **again. We repeated it. She wasn't at the original**
11  **meeting. She didn't say anything to me -- I can't**
12  **recall her saying anything about the investigation, if**
13  **there ever was an investigation. As a matter of fact,**
14  **I didn't even know that I was being paid for the**
15  **suspension until at that meeting. No one had ever**
16  **said that prior to me leaving.**
17  Q. Did you ask when you could return to work?
18  **A. No, I didn't. They told me.**
19  Q. What did they tell you?
20  **A. They told me I could return to work the next**
21  **day.**
22  Q. Did you ask on this day as you had asked
23  Mr. Teoli what the investigation entailed?
24  **A. No. Because they never said anything about an**

Page 103

1  **investigation at that point there. Just a discussion**
2  **about what happened.**
3  Q. Was there any resolution offered at the
4  meeting, like, you know --
5  **A. Yeah. The resolution that was offered, that,**
6  **you know, they changed my location. They wanted me to**
7  **work over at Chestnut Run. I opposed that.**
8  Q. Who wanted you to work at Chestnut Run?
9  **A. Carol Sexton.**
10  Q. She said that she thought you should be
11  transferred to the Chestnut Run site?
12  **A. Right.**
13  Q. Your response to that was that you did not want
14  to be transferred?
15  **A. I did not want to go.**
16  Q. How did Carol respond?
17  **A. She say, "Well, we'll see what we can do about**
18  **it."**
19  Q. Did Carol say why she thought you should
20  transfer to Chestnut Run?
21  **A. No, she didn't. I asked her, "Why?"**
22  Q. What did she say?
23  **A. She didn't reply. To my knowledge, she didn't**
24  **reply.**

Page 104

1  Q. Did she say it was as a result of your using,
2  you know, bad language?
3  **A. To my knowledge, no.**
4  Q. Did you later agree to the transfer to Chestnut
5  Run?
6  **A. Yes, I did.**
7  Q. How did that come about?
8  **A. How it came about agreeing?**
9  Q. Yes.
10  **A. I just felt that if I wanted to keep my job, I**
11  **had no other choice.**
12  Q. Is that what you told Carol --
13  **A. No.**
14  Q. -- Sexton?
15  **A. No.**
16  Q. When did you let Carol Sexton know that you
17  would agree to the transfer?
18  **A. Later on that day when I thought about it.**
19  Q. Did you go and see her? Did you call her?
20  **A. I called her.**
21  Q. What did you say?
22  **A. I left word on the answering machine that after**
23  **giving thought that I thought for all things**
24  **concerned, it would be to my best interest, you know,**

Page 105

1  **to accept the job transfer.**
2  Q. When you say "job transfer," did your job
3  duties change?
4  **A. No.**
5  Q. Did you continue to prepare food and then
6  deliver it to the two libraries?
7  **A. Yes.**
8  Q. You just prepared the foot at Chestnut Run
9  instead of Barley Mill. Is that right?
10  **A. At a different location, yes.**
11  Q. Did your -- was your salary in any way affected
12  by this transfer?
13  **A. No.**
14  Q. Did anyone at the meeting suggest that the
15  transfer was, perhaps, a way to separate you from
16  Donna?
17  **A. No.**
18  Q. Did that come up?
19  **A. The suggestion was, but -- the suggestion**
20  **was -- yes. I just assumed that that was the reason.**
21  **No one said it.**
22  Q. Okay. These notes of this June 17th meeting
23  referred to someone named Vanessa. Who was that?
24  **A. She worked in the area. Not directly in**

Witcher                                    v.                    Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR              January 12, 2006

Page 106

1  catering area. She worked for the catering
2  department. She would prepare and set up facilities
3  for catering.
4      Q.  Did she also report to Donna as far as you
5  know?
6      A.  Well, yeah, Donna is her supervisor, yes.
7      Q.  Was she present on the day that you were
8  suspended?
9      A.  Yes.
10     Q.  She was?
11     A.  Yes, she was.
12     Q.  Did you have any exchange with her that day?
13     A.  Yes, I did.
14     Q.  Tell me about that.
15     A.  She came in the catering area in a very
16  aggressive manner, asking what's going on. I told
17  her, none of her business. Her and Donna are
18  extremely, extremely close friends.
19     Q.  So Vanessa came into the catering area and
20  asked what was going on?
21     A.  Yes.
22     Q.  Was this after Donna had asked you to stop
23  cursing and you had told her --
24     A.  This was after Donna had left, right. Donna

Page 107

1  had left the area, the catering area, went to find
2  Mark Teoli.
3      Q.  So this is after that you had said to Donna
4  that you thought she was prejudice?
5      A.  Right.
6      Q.  And she said "go to the office," then she went
7  to find Mark Teoli?
8      A.  Yes. After Donna, yes, started having a little
9  fit.
10     Q.  Then Vanessa came in and said "What's going
11  on?"
12     A.  Yes.
13     Q.  What did you say?
14     A.  I said, "It's not of your business." She came
15  to me in a confrontational manner, in my face.
16     Q.  Did you get back in her face?
17     A.  She was in my face. How am I gong to get back
18  in her face? I didn't back off and then get back in
19  her face, no.
20     Q.  What do you mean by "confrontational"?
21     A.  Just her tone of voice.
22     Q.  How close did she come to you?
23     A.  Pretty close. I would say, almost nose to
24  nose.

Page 108

1      Q.  Almost nose to nose. When you say the tone of
2  her voice was confrontational, was she yelling?
3      A.  Yes.
4      Q.  Did you step away from her?
5      A.  Yes, I did.
6      Q.  Did you yell back at her?
7      A.  No, I didn't.
8      Q.  When she -- when Vanessa first came to you, did
9  she, you know, touch you in any way?
10     A.  No.
11     Q.  Did she point her finger at you?
12     A.  No.
13     Q.  When you responded and told her it was none of
14  her business, did you point your finger at her or make
15  any gesture --
16     A.  Gesture?
17     Q.  -- with your hands?
18     A.  No, I did not.
19     Q.  Mr. Witcher, it is noon. Would now be a good
20  time for a lunch break?
21     A.  All I am going to do is sit here anyway. So I
22  think it would be pretty unfair for me. I have been
23  in this wheelchair now since about 6:00 o'clock this
24  morning. I don't know if you are going to take an

Page 109

1  hour at noon break or whatever it is. It would be
2  pretty unfair for me sitting around waiting and
3  waiting. What's the lunch break going to be? An
4  hour. I would like to finish this here if we can.
5      Q.  Okay. We'll go a little further. Then we'll
6  take a 30-minute break. How does that sound?
7      A.  All right.
8      Q.  Now, Mr. Witcher, you said that you told Mark
9  Teoli and the other Mark that you did feel that Donna
10  was prejudice. Is that right?
11     A.  Right. I told Mark Teoli and the other Mark
12  that -- they asked me if I made the comment. I told
13  them that I did. I told them -- I think I did tell
14  them that's my opinion; I have a right to my opinion.
15     Q.  Right. Was there any follow-up as to that?
16  Was there any investigation about Donna's actions and
17  whether she did act in a prejudicial manner?
18     A.  Yes, there was.
19     Q.  When did that occur? Did someone contact you?
20     A.  I believe it was in July or August. I believe
21  it was in July, if I am not mistaken.
22     Q.  Was it long after the incident or shortly after
23  the incident?
24     A.  I would say, probably within 30 days after the

A29                                    28 (Pages 106 to 109)

Page 110

1  incident.
2    Q.  Who contacted you?
3    A.  I think Patty Weick because Carol Sexton
4  refused to take the complaint.
5    Q.  You -- I'm sorry.  Could you explain that?
6    A.  I initially made the complaint or wanted to
7  make the complaint to Carol Sexton, and she refused to
8  take the complaint.
9    Q.  When did that happen?
10   A.  Shortly after the incident.
11   Q.  When you say refused, did you have something in
12  writing and she said, "No, I am not taking that"?
13   A.  No.
14   Q.  I'm sorry.  What happened?
15   A.  I told her that I felt Donna was prejudice and
16  that I wanted to make a complaint.  And she refused to
17  take it.  She said, I am not going to put your
18  words -- or something I wasn't going to write your
19  words down for you or something of that nature.
20   Q.  So she wasn't telling you that you should put
21  your complaint in writing?
22   A.  I can't recall it.  She just told me that she
23  wasn't going to do it.
24   Q.  Then what did you do?

Page 111

1    A.  What could I do?
2    Q.  Did you contact someone else?
3    A.  No.  I think Patty Weick -- she had mentioned
4  it to Patty, and Patty approached me.
5    Q.  When you say "she," do you mean Carol Sexton?
6    A.  Yes.
7    Q.  Told Patty about your complaint about Donna?
8    A.  Right.
9    Q.  And then Patty contacted you?
10   A.  Yes.
11   Q.  So it seems that Carol did pass along your
12  complaint about Donna?
13   A.  But she refused to take the complaint.
14   Q.  What do you mean by that?
15   A.  I mean she didn't write down the complaint.
16   Q.  She didn't write down what you said?
17   A.  Right.  Exactly.
18   Q.  Nor did you write down your complaint?
19   A.  I didn't write it down for Patty Weick either,
20  but Patty wrote it down.
21   Q.  So Carol didn't write it down, but she did
22  contact Patty who was the HR representative?
23   A.  Right.
24   Q.  Then Patty contacted you?

Page 112

1    A.  Yes.
2    Q.  What did Patty say?
3    A.  She took the complaint, and she said that she
4  was going to launch an investigation.
5    Q.  When you say took complaint, you mean she wrote
6  down what you said?
7    A.  Right.  Exactly.
8    Q.  Did you hear any more about the investigation?
9    A.  Yes, I did.
10   Q.  What was that?
11   A.  What did I hear?
12   Q.  Yes.
13   A.  She came down and kind of paraphrased the
14  investigative report and gave me a copy of the
15  investigation.
16   Q.  Okay.  Did she tell you that she had spoken
17  with other employees?
18   A.  Yes.
19   Q.  Did she tell you who she spoke with?
20   A.  No.  She just said managers, employees, and
21  coworkers.
22   Q.  What did Ms. Weick tell you the investigation
23  found?
24   A.  That there was no basis of the complaint.  But

Page 113

1  she did think the -- that counseling or something as
2  far as Donna is concerned of her -- I am not sure
3  exactly, but there was counseling as far as Donna and
4  her sensitivity.  Something of that nature.  I am not
5  quite sure.
6         MS. DiLUZIO:  Okay.  I think this might be
7  a good time to go ahead and take our lunch break,
8  Mr. Witcher.  I should have asked the court reporter
9  earlier if it's okay.  We'll limit the lunch break to
10  30 minutes and then we'll resume.
11        THE WITNESS:  Right.
12        MS. DiLUZIO:  Okay.
13        (Luncheon recess taken at 12:07 p.m.)
14  BY MS. DiLUZIO:
15   Q.  Good afternoon, Mr. Witcher.
16   A.  Good afternoon.
17   Q.  You had indicated before we broke for lunch
18  that you had special dietary considerations, and, you
19  know, you didn't want to take a long break for lunch.
20  Would you rather suspend the deposition today and
21  continue it on another day?  Are you comfortable
22  proceeding today?
23   A.  I am comfortable with proceeding because, you
24  know, I have to go through a procedure in order to

Witcher                                    v.                              Sodexho, Inc.
George M. Witcher                   C.A. # 05-2005 SSR                January 12, 2006

Page 114

1  leave the facility. It's costly for me to get an
2  ambulance service to take me back and forth. So I
3  would rather go ahead and finish while I'm here.
4  Q.  If there is, you know, anywhere, a facility
5  where we could come and finish it there, we would be
6  able to do that as well. I was not aware before today
7  you were still hospitalized --
8  A.  Right.
9  Q.  -- and under medical care.
10  A.  Yeah. I wouldn't know that until I got back to
11  the facility.
12  Q.  Okay.
13  A.  Do you expect it to be real lengthy?
14  Q.  Well, we could go up to seven hours is the
15  maximum length of the deposition. And we have spent a
16  little over three now.
17  A.  So seven hours would take us up to about 5:00.
18  Q.  Yes. We would be done by 5:00.
19  A.  Okay. Let's go.
20  Q.  Okay. All right then.
21      When we left off, we were talking about
22  this incident in June 2004 when you were disciplined
23  for cursing and ultimately suspended. I just want to
24  back up a little bit. You told me about some of the

Page 115

1  words, specific curse words you were using. And I
2  just want to see in what context you were using those
3  words. Who were you speaking with? Who were you
4  referring to? So let's just start.
5      Mr. Witcher, you said you used the word
6  "damn."
7  A.  I used the word -- I'm sorry. I used the word
8  what?
9  Q.  "Damn."
10  A.  Okay.
11  Q.  In what context would you have used that, do
12  you recall?
13  A.  I can't -- the only word that I can say -- that
14  I can definitely say that -- I'll put it in context --
15  is when I used the word "bitch," and that was in
16  reference to the phone call that came in from
17  Michelle. Other than that there, it was just cussing,
18  you know, in general. It was not directed at any
19  individual or situation. Obviously, there was
20  something that had me pretty upset. And, you know, I
21  was just cussing. That's all. Like I said, it was
22  not a bunch of outbursts of cussing in a short period
23  of time. It was like, I would say, scattered over at
24  least a two-hour time frame.

Page 116

1  Q.  How long are you in the kitchen in the morning
2  before you leave to make your deliveries?
3  A.  It varies. Normally, I get in at 6:00 o'clock.
4  Most of the time, we try to be out -- I try to be out
5  of the kitchen by 4:00 o'clock. I mean -- I'm sorry.
6  I was watching them get some potato chips. It kind of
7  distracted me knowing I can't have none.
8      MS WEICK: Sorry.
9  A.  I'm sorry. Normally, I am out by 10:00
10  o'clock. I was looking at a four- hour span when I
11  said 4:00 o'clock. Normally, I am in at 6:00 in the
12  morning, and then I am loaded up by 10:00 o'clock.
13  Q.  So four hours every morning?
14  A.  Right.
15  Q.  When Donna told you to stop cursing, do you
16  have any idea: Was it 10:00 o'clock? Was it 9:00
17  o'clock?
18  A.  I would say that it was probably around 9:00,
19  9:15, something like that.
20  Q.  So you had been there awhile that morning?
21  A.  Right. Exactly.
22  Q.  When Donna said, you know, "stop cursing" and
23  you responded, you know, hey, everybody does it, how
24  did that make you feel when she told you to stop

Page 117

1  cursing?
2  A.  Well, I think I was already aggravated.
3  Obviously, I was already aggravated. So probably felt
4  being singled out, most definitely for me to respond
5  the way I did.
6  Q.  Did you feel angry at Donna?
7  A.  No, not necessarily angry at Donna. I mean,
8  Donna has a personality like everybody does. I know
9  Donna does not like men. I think she doesn't like
10  black men in particular. I mean she has expressed
11  that in conversation, so. That's Donna's -- that's
12  her personality.
13  Q.  You said Donna actually said in conversation
14  that she didn't like black men. Is that right?
15  A.  No, I didn't say that she said that in
16  conversation. I said that my personal belief that
17  Donna does not like black men.
18      I mean, there was conversation in regards
19  to her only child, which is a young lady. And the
20  young lady was at the age that, you know, she liked
21  rap music. And Donna was surprised because most of
22  your top rap artists are black. She said that she
23  went in, Donna, her daughter's room and saw these half
24  naked black men, that she was pretty upset about it.

Wilcox & Fetzer, Ltd.           Professional Court Reporters              (302)655-0477

Page 118

1  Then she had saw her daughter come in late one night
2  and she had a black guy that she was kissing on her
3  back porch, or what have you, and she expressed the
4  fact that she really, you know, was not pleased with
5  that at all.
6      Q.  When did that conversation take place?
7      A.  I can't pinpoint a particular date in time.
8  You know, when you work together, conversations come
9  up. Some things stick with you. I told her that, you
10  know, my son, you know, he loves white women. I am
11  don't particularly care for it. But it's his choice.
12  You know what I mean? They have to live their own
13  lives. That's how the conversation -- the
14  conversation came up about the rap artists and John
15  citing some of the cuss words as far as the rap
16  artists are concerned. I told him I didn't
17  particularly care about it simply because they degrade
18  a lot of women. They also cite a lot of violence. I
19  just couldn't see where it fit in.
20          That's, basically, how that conversation
21  came up. You have to understand, before I left there,
22  I had been working there at that site for over a year,
23  so there was a lot of conversation that came up.
24      Q.  So Donna didn't say I don't like black men;

Page 119

1  Donna was relating she was unhappy with her
2  daughter's --
3      A.  Right.
4      Q.  -- choice of boyfriend or dates?
5      A.  No, she didn't come out and say she didn't like
6  black men. I am just saying her conversation. You
7  can tell if a person like or don't like somebody just
8  by the way they converse. That is easy enough.
9      Q.  Did you ever complain to anyone that you
10  thought, you know, that Donna didn't like black men?
11      A.  That's Donna's choice. It wasn't anything, as
12  far as I was concerned, being racial; because if she
13  don't like black men, she don't like black men. I
14  mean, you know, I didn't feel threatened by that, but
15  I felt that, you know, Donna has a right to choose who
16  she like and who she don't like. When I felt it
17  involved me directly, then I made comment in reference
18  to that.
19      Q.  What do you mean by that?
20      A.  What do you mean what do I mean by --
21      Q.  What do you mean that when you felt -- you felt
22  it directly, you made comment about it? Did you
23  complain at some time about a certain comment, or?
24      A.  No. I just said that in hearing her

Page 120

1  conversation -- and Donna was more anti-men than she
2  was black men. You know, the black men situation came
3  up in reference to her daughter. But she always
4  talked negative as far as men was concerned. You
5  know, I don't know the situation as far as her and her
6  husband was concerned, but she was always making
7  negative comments when it came to men.
8      Q.  Okay  Did you complain to anyone about that?
9      A.  No, I didn't.
10      Q.  And what kind of things would she say about men
11  that you felt were negative?
12      A.  Well, how men are chauvinistic, you know,
13  doggish. Those kind of comments there about the
14  sporting events and the -- just general conversation.
15  I said, it's kind of hard to pinpoint any one
16  particular thing. Things kind of stand out,
17  especially the comment about her daughter is
18  concerned. But just her general treatment. Now, she
19  never had Erica in the office. And Erica cussed more
20  than John and myself combined. And Erica used the "F"
21  word and a lot of other words, any words you can think
22  of, very harshly in our conversation. But she never
23  took her into the office.
24          Conversation. I mean, the things like the

Page 121

1  breads, and where she would get on me about it and
2  John about it, but the women could get away with it.
3  So it was clearly that Donna was in favor of women
4  over men. No question about that.
5          There was conversation, anybody around
6  Donna, even Michelle when she went over there to work
7  during the time I was suspended, so she clearly noted
8  that Donna was anti-men.
9      Q.  You mentioned some comments that Donna made
10  that you felt were anti-men, to use your word. Let's
11  get specific. What did she say specifically?
12      A.  I am saying I can't say -- I can't just
13  pinpoint anything specific in terms of talking about
14  men, men's activities, how doggish men were. But to
15  say, give you a specific time and conversation what it
16  was all about, you know, I can't say that because
17  there was so many different conversations and things
18  that went on that Donna would just interrupt. John
19  and myself when we were talking or Erica and myself,
20  Erica and John would be talking, and Donna would just
21  interrupt, you know.
22      Q.  Can you tell me who was present for these
23  conversations?
24      A.  John Lewis, Erica Knight.

Page 122

1  Q.  And yourself?
2  A.  Yeah.  The people that, basically, worked in
3  the kitchen there or worked back there in the catering
4  area.
5  Q.  You can't recall any specific comments?  You
6  sort of just keep referring to these generalities.
7  You can't recall anything specific?
8  A.  Nothing specific, no, that I can pinpoint.
9  Q.  You can't recall any specific dates?
10 A.  No, by no means.
11 Q.  When she made the comment that men, were, to
12 use your word, doggish, who was she talking about?
13 A.  I have no idea.  It was just a comment talking
14 about --
15 Q.  Do you know when she made that comment?
16 A.  No, I don't.  Uh-uh.  It was something in
17 reference to -- you know, the next day you come in,
18 you talk about whatever was on the news the night
19 before or whatever particular TV show that was on.
20 Q.  She was not referring to you or Mr. Lewis?
21 A.  No.  I know she wasn't referring to me because
22 she didn't know anything about my personal life.
23 Q.  How about the chauvinist comment, do you recall
24 who she was referring to when she made that comment?

Page 123

1  A.  I think it was just in general.
2  Q.  You don't recall when she made that comment?
3  A.  No, I don't.
4  Q.  Was anyone else present for that comment?
5  A.  The same people that I told you before.
6  Q.  And for all these comments you are saying
7  everyone was in the kitchen, you, Erica --
8  A.  Mm-hmm.
9  Q.  -- John?
10 A.  Just about.  Just about.
11 Q.  How many times did you hear Donna refer to men
12 as chauvinists?
13 A.  I can't pinpoint that.  I don't know the
14 numbers.  I am not even going to attempt to give you a
15 number because I can't recall that.
16 Q.  You can't ballpark?  Less than ten, more than
17 ten?
18 A.  I don't know.
19 Q.  Did it happen every day?
20 A.  No.
21 Q.  Every other day?
22 A.  I don't know.
23 Q.  Once a week?
24 A.  I don't know.  Could have.

Page 124

1  Q.  Is the same true about the doggish comment?  Do
2  you know how many times she talked about men being
3  dogs?
4  A.  No, I can't say that.
5  Q.  More than ten, less than ten?
6  A.  No, I can't say that.
7  Q.  Again, was it a daily type conversation?
8  A.  I don't think so, no.
9  Q.  Was it weekly?
10 A.  I don't know.  It could have been.  I am not
11 certain.  There is no sense in me -- you trying to
12 pinpoint me on the time, a number, because I just
13 cannot recall.  I know that the words have come out of
14 her mouth on several occasions.  But to pinpoint the
15 number, a time, a date, a statement, I can't do that.
16 Q.  Because you just don't recall?
17 A.  I just can't recall the number of times.
18 Q.  Do you know if anyone ever complained about
19 Donna's comments regarding men?
20 A.  If -- I know that -- now, again, I can't say
21 that I know.  This is hearsay -- that John complained
22 to Mark in regards to Donna didn't like men.  Now,
23 again, this is hearsay.  This is what John told me he
24 complained to Mark.  And Mark said, "Well, she get

Page 125

1  along with me.  I am a man."  Then John replied, he
2  said, "But you are not a black man."
3       Now, again, this is hearsay.  Don't, don't
4  hold me to this is what happened.  This is what John
5  had told me.
6  Q.  But you, yourself never complained?
7  A.  About Donna?
8  Q.  About Donna's comments regarding men.
9  A.  No.
10 Q.  Going back to that day in June when you had
11 this argument with Donna  You said you had been
12 agitated.  Why was that?
13 A.  I don't know.
14 Q.  You just recall that that day you had been
15 agitated?
16 A.  Again, normally, I am not a cusser.  Very
17 seldom do I cuss.  I don't just go around cussing.
18 And if I do, it's because I am aggravated about
19 something.  It could or maybe it had nothing to do
20 with working, you know, on the job, you know.  Whether
21 it was something because -- at that time I was
22 involved in other activities outside of the job, and
23 something could have been pressing on my mind that,
24 you know, did or did not happen.

A33

32 (Pages 122 to 125)

Page 126

1  Q.  When Donna told you to stop cussing and you
2  accused her of being prejudice, you said that you felt
3  Donna began to yell at that point.  Did you yell back
4  at her?
5  A.  No, I did not.
6  Q.  You did not raise your voice at all?
7  A.  No, I did not.
8  Q.  How close were you to Donna?
9  A.  Maybe six feet.
10  Q.  Did you raise your hands in any way, make any
11  hand gesture to Donna?
12  A.  No.  I just went on in the -- I went on in the
13  office.
14  Q.  What were you doing when she said, "Go to the
15  office"?
16  A.  I was over at the table.  I believe I was
17  preparing salads.
18  Q.  Were you using a knife?
19  A.  I could have been.  I am not certain.  I don't
20  think I was, though.
21  Q.  Do you recall throwing a knife down on the
22  table when she told you to go to the office?
23  A.  I never throw a knife down, never.
24  Q.  Were you angry that she told you to go to the

Page 127

1  office?
2  A.  No, not really.
3  Q.  So you had been agitated that day.  And you
4  testified previously that you were agitated that she,
5  in your mind, singled you out for the cussing?
6  A.  I never said I was agitated that she singled me
7  out.
8  Q.  So you were not agitated she singled you out?
9  A.  No.  I said, I felt she singled me out.  I
10  never said I was angry or agitated because she singled
11  me out.
12  Q.  So you were perfectly calm during this entire
13  incident?
14  A.  Yeah, for the most part.
15  Q.  One thing I want to clarify.  You referred to
16  an Erica Knight.  I have seen the name Ursula
17  identified.
18  A.  I am sorry.  I meant Ursula, but we called her
19  "Erica."  But it's Ursula.  You are right.
20  Q.  So that's the same person?
21  A.  Ursula, yes.
22  Q.  Now, you admitted, Mr. Witcher, that the curse
23  word when you used the word "bitch" you were referring
24  to Michelle from the library, when she called and

Page 128

1  spoke to someone other than you on the phone.  Is that
2  right?
3  A.  Right.
4  Q.  And who specifically did you direct that
5  comment to?  Who told you, "Hey, Michelle just
6  called"?
7  A.  Erica.
8  Q.  And who was Michelle?
9  A.  Michelle.  A cashier over at the Foulk Road
10  Library.
11  Q.  Is she a Sodexho employee?
12  A.  Yes.
13  Q.  She is.
14      Is she someone who would use the food that
15  you delivered to the library or take part in that?
16  A.  Yes.  Are you talking about putting it up in
17  the cabinet and that kind of stuff, some of the food?
18  Q.  Right  would she eat the food that you were
19  delivering to the library?  Would she be someone that
20  that food was delivered for or no?
21  A.  No.  She was a worker in the cafeteria that
22  placed the food on the shelf and sold the food over
23  the counter.
24  Q.  Okay.  You said that you -- when Erica said,

Page 129

1  "Hey, that was Michelle on the phone," you referred to
2  Michelle as "a bitch."  How many times did you use
3  that word?
4  A.  I used that word one time.  And I was kidding
5  with Erica.
6  Q.  Are you certain Erica knew that you were
7  kidding?
8  A.  I am sure Erica knew I was kidding.
9  Q.  You only used that term once that morning?
10  A.  To my knowledge, yes.  It was in reference to
11  the phone call.
12  Q.  Had there been other instances where you had
13  used that term while at work?
14  A.  Not to my knowledge, no.
15  Q.  So you never ever referred to any other woman
16  that you worked with as "a bitch"?
17  A.  No.
18  Q.  I think you testified before you didn't tell
19  anyone to mind their own F-ing business?
20  A.  No, I didn't.
21  Q.  Nothing even remotely like that happened that
22  day?
23  A.  No, no.
24  Q.  If I told you Donna Haughney had reported that

Witcher                                  v.                        Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR            January 12, 2006

Page 130

1   in fact you had told her that, that would not be
2   correct?
3      A. That would not be correct.
4      Q. I think we talked before about the fact that
5   Patty Weick conducted an investigation regarding your
6   complaint that Donna was prejudice. Is that right?
7      A. Correct.
8      Q. And that she ultimately informed you of the
9   results of that investigation?
10     A. Correct.
11     Q. I am going to show you what's going to be
12  marked as Exhibit 7.
13          (Witcher Deposition Exhibit No. 7 was
14  marked for identification.)
15  BY MS. DiLUZIO:
16     Q. Is this a letter that Ms. Weick wrote to you
17  explaining the results of the investigation?
18     A. It appears to be, yes.
19     Q. You can feel free to take your time to look
20  through that.
21     A. Mm-hmm.
22     Q. Okay. In this letter, it is relayed to you
23  that both Donna and Vanessa, one of your co-workers,
24  felt threatened that day because of the language you

Page 131

1   had been using and because of your general demeanor.
2   Do you recall that being explained to you, that both
3   Donna and Vanessa had felt threatened?
4      A. Mark Teoli had said not in reference to
5   Donna -- I mean, he said nothing about Donna feeling
6   threatened because of language or demeanor. He
7   mentioned the fact of Vanessa. I told him that
8   Vanessa approached me in a confrontational manner. He
9   said nothing about Donna felt threatened because of my
10  demeanor with my language.
11     Q. But this letter from Ms. Weick clearly
12  explains to you that both Donna and Vanessa felt
13  threatened that day?
14     A. That's what they said, yes, in this letter,
15  correct.
16     Q. Correct
17     A. But you asked me did anybody say anything to me
18  in reference to that and I told you, "No."
19     Q. Right.
20     A. Or at least that's what I understood you to
21  say.
22     Q. Okay. Wasn't it explained to you in fact,
23  Mr. Witcher, that the reason you were suspended that
24  day was not necessarily your use of language but was

Page 132

1   because Donna and Vanessa had felt threatened?
2      A. No, it was not.
3      Q. That was not explained to you?
4      A. It was not. They told me I was suspended
5   because of the cussing pending an investigation.
6   That's why I asked the question: "What investigation?
7   That I am accused of cussing. I admitted that I was
8   cussing. And that I apologize for cussing."
9          There was nothing about no threatening
10  other than Vanessa. And I explained the fact that
11  Vanessa came up into my face. She came from her work
12  station over to the kitchen area -- I mean to the
13  catering area where I was at. And she got up in my
14  face. I did not get up into Vanessa's face.
15     Q. So Mr. Teoli did bring up a confrontation with
16  Vanessa during this conversation, though. Right?
17     A. He brought up the fact that Vanessa had made
18  claims that there was a confrontation. I told him
19  that there was no confrontation other than the fact
20  that Vanessa approached me.
21     Q. So it's true then that when you were suspended,
22  Mr. Teoli advised you that one of the reasons for your
23  suspension was that Vanessa had felt threatened.
24  Whether in fact you threatened her, I am not concerned

Page 133

1   with
2      A. No.
3      Q. I am concerned with whether you were aware that
4   Vanessa felt threatened.
5      A. No. It was not explained to me that the reason
6   I was being suspended because Vanessa or Donna felt
7   threatened. That was never brought up. I told you
8   the reason they told me I was being suspended was
9   pending investigation. When I asked them an
10  investigation of what, they did not tell me what the
11  investigation was. That's why I asked the question:
12  "Well, why? Cussing. Admitted cussing. Apologized.
13  What's the investigation?"
14     Q. But you also said that Mark said to you that
15  Donna felt that you your confrontation with Vanessa
16  had made her feel threatened?
17     A. No, I didn't say that. That's what you said.
18  I said that Mark said that there was a conversation --
19  confrontation between Vanessa and myself. Nothing
20  about Vanessa felt threatened at all.
21     Q. Did he relay that Vanessa felt that you had
22  been confrontational with her?
23     A. He said that Vanessa -- I believe he did tell
24  me that Vanessa felt that there was a confrontation

Page 134

1  between us. Then I, you know -- Vanessa had her
2  version, and I had my version. But there was nothing
3  about suspension based on the fact that it was because
4  of Vanessa or Donna being threatened.
5  Q  So that's the conversation that occurred that
6  day. Later, after Ms. Weick's investigation, did
7  Ms. Weick indicate to you -- as this letter I showed
8  you, Exhibit 7, indicates -- that the confrontation
9  with Vanessa and perhaps your demeanor with Donna were
10  reasons that you were suspended?
11  A. No. She just gave me the report. And this is
12  when the threatening and the demeanor came up. But
13  there was never mention -- I never got the answer to
14  the reason why there was an investigation.
15      And the report that Ms. Weick wrote was
16  based on my allegation of harassment. I never did get
17  a report on the investigation that they were supposed
18  to be doing.
19  Q. Putting aside the word "threat" because,
20  perhaps, no one used that word  When you were in the
21  office with Mark Teoli and he says to you, "Vanessa
22  says there was a confrontation between the two of
23  you," that didn't indicate to you that that was part
24  of the reason that you were being disciplined?

Page 135

1  A. No, because there wasn't -- the only
2  confrontation was when I told him that Vanessa came up
3  into my face. She said nothing else about it. That
4  was the end of it.
5  Q. But she did bring it up?
6  A. She brought it up. But she said -- I explained
7  my version of it, and that was it. There was no
8  indication -- I had no kind of thoughts whatsoever
9  about I am being suspended because Vanessa and Donna
10  felt that I was threatening. That was never an
11  indication.
12  Q. And even later, that was never explained to
13  you?
14  A. No.
15  Q. When you were sitting in the office waiting for
16  security to arrive, and you say you felt that you
17  couldn't leave, you didn't try and leave  Right?
18  A. No.
19  Q. You weren't physically restrained in any
20  manner; you weren't handcuffed to the chair?
21  A. No.
22  Q. Did anyone walk by the windows? You said there
23  were windows on either side of the office  While you
24  were sitting there, did anyone walk by?

Page 136

1  A. They didn't have to walk by. You can see in
2  the office, especially in the catering area. Just
3  about any position in the catering office, you can see
4  right in the office. People didn't have to walk by.
5  But there were people that were walking by to the
6  cooler. Because in order to go to either the
7  bathroom, or the loading dock area, you know, or to
8  the dish room, you had to go by the office. But even
9  if you walked out to go to the cafeteria, you had to
10  go by the office. There were big windows that you
11  could clearly see into the office.
12  Q. Did you motion to anyone on the other side of
13  the window that you wanted to leave and you couldn't
14  leave?
15  A. I asked Mark Teoli and the other Mark could
16  John Lewis come in the office with me at the time they
17  called me in as a witness that everything was on the
18  up and up. And they denied me having John Lewis.
19  That's why I asked for John Lewis to be at the meeting
20  that they had over at Chestnut Run.
21  Q. But you didn't indicate to anyone on the other
22  side of the windows that you wanted to leave and you
23  couldn't leave? You didn't ask for help through the
24  window?

Page 137

1  A. I was given an order by a supervisor. And I
2  followed that order.
3  Q. And the order was sit in the chair till
4  security comes?
5  A. Sit in the chair in the corner and wait for
6  security to come.
7  Q. Based solely on that, you felt you couldn't
8  leave the room?
9  A. Yes.
10  Q. Was there a phone in the room?
11  A. I assume there were.
12  Q. Did you ask to use the phone?
13  A. No.
14  Q. Did you call the police and say you were
15  falsely imprisoned?
16  A. No. I could have done that at a later state.
17  Q. Did you?
18  A. I didn't feel like it was necessary at that
19  time. I followed the procedures that I thought I
20  needed to follow.
21  Q. Why didn't you think it was necessary at that
22  time?
23  A. Because I just didn't want -- I didn't want to
24  go that particular route. Besides, there was still

A36

Witcher                                    v.                         Sodexho, Inc.
George M. Witcher                   C.A. # 05-2005 SSR           January 12, 2006

Page 138

1   time to do that if I wanted to do that.
2   Q. But you didn't do that. Did you?
3   A. No, I didn't.
4   Q. Why not?
5   A. Because I didn't feel like I wanted to take
6   that route. I took the route that I wanted to take.
7   Q. So you felt that you were imprisoned in the
8   office. Is that correct?
9   A. False, yes.
10  Q. Falsely imprisoned?
11  A. That's right.
12  Q. But you did not contact the police regarding
13  that?
14  A. No, I didn't.
15  Q. Did you have a cell phone on you by any chance
16  that day?
17  A. No, I didn't.
18  Q. Did you ask to use the phone in the office?
19  A. No.
20  Q. Do you know whether as a result of Ms. Weick's
21  investigation Donna received any disciplinary action
22  or counseling?
23  A. I was told that she received disciplinary
24  action or counseling. I think it was counseling.

Page 139

1          MS. DiLUZIO: We'll mark this Exhibit 8.
2          (Witcher Deposition Exhibit No. 8 was
3   marked for identification.)
4   BY MS. DiLUZIO:
5   Q. The court reporter has handed you what's been
6   marked Exhibit 8. It says, "Constructive Counseling
7   Notice" given to Donna Haughney, and it's dated
8   July 8th, 2004. Have you ever seen this document
9   before?
10  A. I saw this again along with the documents that
11  I received from EEOC.
12  Q. Okay. Does this appear to be a counseling
13  notice for Donna based on the incident that occurred
14  with you that we have been discussing?
15  A. Yes.
16  Q. Now, Mr. Witcher, we have now been through the
17  three incidents you identified first thing this
18  morning as supportive of your age discrimination
19  claim. And those were the Gary Rogers comment, the
20  Mark Teoli comment, and then this situation we have
21  just been discussing where you were disciplined for
22  cursing and so forth. Are there any other incidents
23  or events that you can point to that support your age
24  discrimination claim?

Page 140

1   A. No. None that I can think of offhand.
2   Q. On the charge that you filed with the EEOC or
3   the Department of Labor, you indicate that on
4   March 15th, 2004, it says here, "During a performance
5   review Mark Teoli asked me if I was too old to
6   accomplish my tasks." Is that reference to the same
7   conversation that we have discussed here today?
8   A. About the job, yes. What I was told to do the
9   job, yes.
10  Q. When you and I were speaking today, you did not
11  indicate it was during a performance review.
12  A. Well, it wasn't during a performance review.
13  When they called me in talking about laying out my job
14  description.
15  Q. So there was only one comment that Mark Teoli
16  made?
17  A. Correct.
18  Q. And Mark Teoli never gave you a performance
19  review?
20  A. No.
21  Q. In addition to what we've talked about so far
22  this morning, in your complaint you mention a couple
23  other events. Specifically, the day before the day
24  that you were suspended, there was an incident or an

Page 141

1   exchange between Donna and you regarding the use of
2   focaccia bread?
3   A. Correct.
4   Q. Can you tell me a little bit about that
5   situation?
6   A. Just the fact that Donna got on me about using
7   the old focaccia bread, which was very thin, very
8   brittle that made terrible sandwiches. And I was
9   telling her that "Well, the other people use the fresh
10  focaccia bread that comes in, and you never say
11  anything about it." That was basically it.
12  Q. So, again, you felt singled out?
13  A. Correct.
14  Q. Was it not standard operating procedure to use
15  older product before open newer product?
16  A. Right. For everybody.
17  Q. Right. For everybody.
18  A. Okay. But as I just previously stated, other
19  employees used the new stuff and there was nothing
20  said. I was singled out when I went to use the new
21  stuff, the new products.
22  Q. So you never heard any other employee told to
23  use older product before they were to use newer
24  product?

A37

36 (Pages 138 to 141)

Witcher                                v.                         Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR              January 12, 2006

Page 142

1   A.  No.
2   Q.  Did you ever ask your co-workers had they been
3   told to use older product before newer product?
4   A.  No, I did not.
5   Q.  How do you know they weren't told to use older
6   product before newer product?
7   A.  You asked me had I ever heard.
8   Q.  Right.
9   A.  I didn't tell you that nobody was ever told to
10  use that.  You asked me had I ever heard, and I told
11  you, "No."
12  Q.  I asked you was it standard operating
13  procedure.  You said, "Yes, but everybody else did
14  it."  I am asking:  Was anybody else ever reprimanded
15  for that?
16  A.  I told you I don't know if anybody was ever
17  reprimanded for that.
18  Q.  So they may well have been?
19  A.  They could have been.
20  Q.  Did you ever hear Donna tell anyone hey go
21  ahead, use the new stuff, throw the old stuff away?
22  A.  No.  But I noticed Donna didn't say nothing
23  when people did use the new stuff and not the old
24  stuff.

Page 143

1   Q.  Who are we talking about?
2   A.  I can't think of her name.  She did the dell
3   trays.  I just can't think of her name right now.
4   Q.  When was that?
5   A.  I can't pinpoint a specific time.  But it had
6   to have been, roughly, around the same time that this
7   discussion had came up.
8   Q.  What about Donna's telling you to follow
9   standard operating procedure and use older product
10  first makes you think that that was motivated by your
11  age?
12  A.  I didn't say it was motivated by my age.  I
13  said I was just being treated differently.  That's
14  all.
15  Q.  In your complaint, you allege that it was
16  motivated by your age?
17  A.  Well, I feel like I was being treated
18  differently.
19  Q.  Why do you think you were being treated
20  differently?
21  A.  Because I was the older gentleman.  And what
22  she applied or some of the things, that she showed
23  favoritism as far as younger, especially female
24  employees, you know, was totally different than the

Page 144

1   way she treated me.
2   Q.  So I am going to ask my question again.  What
3   about her telling you to follow procedure and use old
4   product before new product makes you think that was
5   motivated by your age?
6   A.  Because she wasn't telling other employees.
7   Because other employees was not following procedure.
8   So if you are not telling other people to follow
9   procedure, younger people to follow procedure, then
10  why are you telling me?  And I can't even recall her
11  telling me to follow procedure.  I can recall her
12  telling me to use the older products first.
13  Q.  Which was procedure, to use the older products
14  first?
15  A.  But, again, it may have been procedure.  But
16  the fact of it is, is that if one person is allowed to
17  break the rules, then why do you reprimand someone
18  else?  That's showing favoritism.  The younger person
19  can do it.  They cannot follow the rules, but the
20  older person can't.
21  Q.  What younger person, Mr. Witcher?
22  A.  I'll have to get her name.  I can't recall her
23  name.  But Vanessa -- not Vanessa.  Erica did it all
24  the time.  When she had to prepare sandwiches for the

Page 145

1   dell, she did it all the time.  Everybody wanted to
2   use the fresh, thicker focaccia bread because it made
3   a nice, attractive sandwich.
4   Q.  So you witnessed Erica using new product when
5   there was old product sitting on the shelf?
6   A.  Yes, many times.
7   Q.  When Donna was in the room and Donna said
8   nothing?
9   A.  Donna said absolutely nothing whatsoever.
10  Q.  When did that happen?
11  A.  I can't pinpoint exact dates and time.
12  Q.  Is there another employee that you can point to
13  that did the same thing?
14  A.  I'll be able to verify it at the proper time.
15  I cannot do it right now, right, because I can't
16  pinpoint a date and time.
17  Q.  Your testimony is you never heard Donna tell
18  any other employee in your presence to use the older
19  product before the newer product?
20  A.  That's correct.
21  Q.  She may have when you weren't around.  Is that
22  right?
23  A.  Yes.
24  Q.  You also indicate, Mr. Witcher, in your

A38

37 (Pages 142 to 145)

Page 146

1    complaint that one of the bases for your complaint is
2    that your delivery truck had had some mechanical
3    problems  Is that right?
4    **A. Correct.**
5    Q. Can you tell me about that allegation?
6    **A. It was that the "stop engine" light had came**
7    **on.**
8    Q. Okay.
9    **A. Or "check engine" light had came on. And when**
10   **I made the delivery to the Foulk Road Library, I made**
11   **mention to Michelle. By that time, Michelle had made**
12   **supervisor. And Sharon, who was the main supervisor**
13   **over at the library. Because Gary had left and there**
14   **was no manager there, so Sharon was in charge of both**
15   **of the libraries. So Michelle was the acting**
16   **supervisor. And I made a complaint to her that the**
17   **"check engine" light had came on. And that was on,**
18   **roughly, around February the 9th.**
19   Q. What year?
20   **A. Of 2005.**
21   Q. And what happened? You complained that the
22   "check engine" light came on. And then what happened?
23   **A. Nothing happened. I made --**
24   Q. Someone --

Page 147

1    **A. She didn't do anything --**
2    Q. Did someone check the truck out?
3    **A. No, the truck wasn't checked out. To the best**
4    **of my knowledge, I complained again about the light coming on and coming off on 273**
5    **again about the light coming on and coming off on 273**
6    **that the van cut off on me, and I almost got**
7    **rear-ended.**
8          **So she called Mark Teoli over at Barley**
9    **Mills to complain to him about the problem that I was**
10   **still having as far as the van was concerned. And**
11   **Mark Teoli, according to Michelle, relayed the fact**
12   **that they were working on getting another van. But,**
13   **again, nothing ever happened.**
14   Q. This van was provided to you by Sodexho to make
15   your deliveries?
16   **A. I imagine -- yes.**
17   Q. Did you take it home with you at night?
18   **A. No.**
19   Q. Or did you pick it up at the kitchen area?
20   **A. No. I parked -- because by that time, I was**
21   **working at New Castle County Government Center.**
22   Q. Okay.
23   **A. And that's where I would park the van at night**
24   **when I finished making my deliveries.**

Page 148

1    Q. So you would park it at the facility you were
2    working at in the morning -- I'm sorry in the
3    afternoon when you were through and pick it up again
4    in the morning when you came to work?
5    **A. Correct.**
6    Q. That was in February of '05?
7    **A. Correct.**
8    Q How long after that did you continue to work
9    for Sodexho?
10   **A. I continued to work for Sodexho until July 7th.**
11   Q. July the 7th. Of '05?
12   **A. Of '05.**
13   Q. Did that engine light stay on from February to
14   July 2005?
15   **A. It stayed on from February until the end of**
16   **March where I almost had an automobile accident with a**
17   **school bus.**
18   Q. Then what happened? Did someone check out the
19   truck?
20   **A. No. They finally -- only because I was very**
21   **emotional, distraught and both Michelle and Sharon**
22   **called. They called Carol Sexton as far as the van**
23   **was concerned. And Carol then made arrangements to**
24   **replace the van, I think that Monday or Tuesday of the**

Page 149

1    **following week.**
2    Q. So the van was ultimately replaced?
3    **A. After seven weeks and almost three accidents.**
4    Q. What about that situation, the fact that you
5    had a truck that had some mechanical problems, makes
6    you think that your age had anything to do with the
7    way that situation was handled?
8    **A. That wasn't an age factor. As far as I was**
9    **concerned, that was part of the harassment claims that**
10   **I made.**
11   Q. What makes you think that harassment motivated
12   anyone with regard to the upkeep of the truck that you
13   were using?
14   **A. Because I was the only person that drove that**
15   **van. In the past, when there were -- prior to these**
16   **charges -- when there was a problem with the vehicle,**
17   **they immediately pulled it off and had it serviced.**
18   Q. When was that?
19   **A. This was back in 2003.**
20   Q. So in 2003, you complained of a problem with
21   your van?
22   **A. Yes. And I complained about either there was**
23   **a -- I think there was a bad brake problem. There was**
24   **a light problem.**

Page 150

1  Q.  Was it both a bad brake and a light problem at
2  the same time?
3  A.  No, not at the same time.
4  Q.  So these were separate incidents?
5  A.  At different times, correct.
6  Q.  And each time you were given a new van?
7  A.  No.  They took the van and had it serviced.
8  Q.  Can you be any more specific than 2003?  When
9  were the bad brakes?
10  A.  I can't pinpoint dates in time.
11  Q.  Who did you complain to?
12  A.  Mark Teoli.  At that time, I was working out of
13  Barley Mills.
14  Q.  How long after you made the complaint was the
15  truck taken in for service?
16  A.  It was taken care of immediately.
17  Q.  You said there was a second incident where
18  something was wrong with the lights?
19  A.  Yes.
20  Q  What lights?
21  A.  I think it was the parking lights or the brake
22  lights.  Someone had stopped me and told me that the
23  brake lights weren't on.
24  Q.  Again, who did you complain to about that?

Page 151

1  A.  Mark Teoli.
2  Q.  That was around what time frame?
3  A.  I don't know.  Sometime in 2003.  I can't
4  pinpoint the date and time.
5  Q.  How long after you made your complaint until
6  that was serviced?
7  A.  It was taken care of immediately.
8  Q.  Do you know where the truck was taken to
9  service?  Was there a specific garage or specific
10  individuals whose job it was to upkeep the vans?
11  A.  I believe -- I am not sure of the name of the
12  company, but it was located on Route 7 and Kirkwood
13  Highway.  I am not certain of the mechanical shop.
14  Q.  Was it your responsibility, Mr. Witcher, to
15  keep up routine maintenance of the vehicle that you
16  drove?
17  A.  No, it was not.
18  Q.  Do you know whose responsibility that was?
19  A.  I have no idea.  It was my responsibility to
20  check the equipment on the van, you know, before I
21  drove it and afterwards, to check to make sure that
22  everything was working properly.  But I -- you know, I
23  had no equipment or knowledge of taking care of no
24  van.

Page 152

1  Q.  Would you put gas in it?
2  A.  Oh, yeah, I would put gas in it.
3  Q.  What about oil changes?
4  A.  No.  They did that.
5  Q.  You don't know who, but somebody took care of
6  that?
7  A.  Well, all I did was call Mark Teoli or report
8  it to the supervisor in charge.
9  Q.  Were there any other previous incidents where
10  you complained of problems with the -- was it a van
11  that you drove?
12  A.  Yes.
13  Q.  It was a van?
14  A.  All together, there was three -- problems as
15  far as the van, with that situation began March the
16  9th -- I mean began February the 9th, and I think it
17  was around the 2nd or 3rd of April before we finally
18  got it resolved.
19  Q.  Right.  But prior to that, you indicated at
20  least two other incidents, one with brakes, one with
21  the lights.  Were there any others?
22  A.  No.
23  Q.  Those were both in '03 --
24  A.  Yes.

Page 153

1  Q.  -- the brakes and the light incidents?
2  A.  Also, I would note that during that time frame
3  there were other people using the vehicle.  Mark Teoli
4  would use it.  The other driver would use it.  Donna
5  would use it.
6  Q.  What time frame is that?
7  A.  That was from the time that I started.  Well,
8  at one point we had a big, old truck.  But I can't
9  recall when I started using the van outside of Barley
10  Mills.  I think that was after -- I believe that was
11  in -- I am not sure when I started using that
12  particular van.  The main van.
13  Q.  Okay  So, again, in February '05 when you
14  complained that the check engine light had come on in
15  the van and no one did anything about it, why do you
16  think that that is related to your age claim?
17  A.  I did not say that was related to my age claim.
18  I said that was related to the harassment charges that
19  I had filed, after the retaliation and harassment
20  charges that I had filed in September.
21  Q.  Right.  That was my question.  What about that
22  situation makes you think it was in retaliation for
23  the fact that you made a claim of discrimination?
24  A.  Because of the fact they did absolutely nothing

Page 154

1 whatsoever to correct the problem. They didn't call.
2 They didn't pull that vehicle out of service to have
3 it corrected. They did absolutely nothing about it
4 whatsoever.
5 Q. How do you know that?
6 A. Because I was driving the vehicle, and the
7 engine light stayed on continuously from February the
8 9th until they finally replaced that van, which was in
9 the first part of April.
10 Q. But you don't know whether they had taken it to
11 a mechanic and a mechanic had looked it over. Do you?
12 A. I know based on what was told to me. The fact
13 that they kept telling me -- the excuse was that they
14 were going to replace the van. I am certain that if a
15 mechanic had pulled that van in that I would have been
16 told about it because I kept complaining about the
17 engine light kept coming on. And it was on
18 continuously.
19 Q. Do you know, yes or no, whether or not anyone
20 inspected the van during this time frame?
21 A. No.
22 Q. Now, you mentioned that you believed this
23 incident, at least, was in retaliation for the fact
24 that you had filed this charge of discrimination. Is

Page 155

1 that right?
2 A. Correct.
3 Q. And in your complaint in this suit you allege
4 retaliation. What other incidents can you point to
5 that support your claim that Sodexho retaliated
6 against you after you filed your charge of
7 discrimination?
8 A. Well, there was an incident in -- I believe it
9 was the first part of March where I was written up for
10 not going in one day when it was supposedly Sodexho
11 policy that a non-supervised person can work alone in
12 the kitchen. Now, I was written up because I didn't
13 go to work that particular day. No one had told me to
14 come to work. I was given a key card. But no one had
15 told me to come to work in a facility where there is
16 absolutely nobody in the facility whatsoever.
17 Now, I was told -- I was told by the
18 supervisor prior to that that I was not supposed --
19 because I had went to work one other holiday at the
20 building, and there was nobody in that building but
21 me. And I was told that that was against the policy
22 because if something had happened, there was
23 absolutely no way they could have gotten in contact
24 with me. This particular time when I didn't go to

Page 156

1 work, I was written up for not going to work.
2 Now, Carol had never came over to the New
3 Castle County Government Center to see me about
4 anything. When she wrote me up, she came over, as far
5 as I was concerned, to embarrass me, to write me up
6 right across the hall from the employees where I was
7 working at over an incident that I was told that was
8 against the policy.
9 Q. When did that occur, Mr. Witcher?
10 A. I believe it was the first part of March.
11 Q. Of what year, sir?
12 A. I'm sorry. Of 2005. And I sent you a copy,
13 with the interrogatories, I sent you a copy of the
14 write-up that I received on that.
15 Q. Yes, sir. When did you file your charge of
16 discrimination with the Department of Labor?
17 A. I believe I filed it in June -- I believe it
18 was in June of '07.
19 Q. I am sorry. Of what year?
20 A. June of -- not '07 -- I'm sorry, June of '05.
21 Q. June of?
22 A. '04.
23 Q. '04.
24 A. I believe it was June the 7th or July the 7th

Page 157

1 of '04. One of those two dates. I am not quite
2 certain.
3 Q. I have a copy of your charge right here. We'll
4 make this Exhibit 9.
5 (Witcher Deposition Exhibit No. 9 was
6 marked for identification.)
7 BY MS. DiLUZIO:
8 Q. The court reporter is handing you what is
9 marked as Exhibit 9. It appears to be your charge of
10 discrimination that you filed. Does that refresh your
11 recollection as to when you filed that charge?
12 A. The 8th of -- you gave me two papers. Did you
13 want both of these, for me to have --
14 Q. Yes. I am sorry. What date was that, sir?
15 A. July the 8th.
16 Q. Of 2004?
17 A. 2004.
18 Q. Okay. So far you have alleged that in
19 retaliation for having filed that charge there was an
20 incident with your truck in February of '05 and there
21 was this write-up, that we'll come back to, in March
22 of '05. Were there any other incidents of
23 retaliation?
24 A. Yes. I was supposed to have received a raise.

**A41**

Witcher                                    v.                              Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR                      January 12, 2006

Page 158

1   I was told that if I didn't file with the Department
2   of Labor that I would have gotten the raise that I was
3   supposed to have gotten in April for my first
4   anniversary. And I did not receive --
5   Q.  Who told you that, sir?
6   A.  I believe it was Patty Weick.
7   Q.  She told you if you had not filed a charge of
8   discrimination, you would have received a raise?
9   A.  That she would make sure that I got the raise
10  that I was supposed to have gotten anyway on my first
11  anniversary date.
12  Q.  When was that? When was that conversation?
13  A.  It was a part of the investigation. I mean
14  when we did --
15  Q.  The July 2004 investigation?
16  A.  When we did the initial complaint, the initial
17  write-up of the complaint.
18  Q.  What complaint are you referring to?
19  A.  The discrimination complaint.
20  Q.  So you filed your charge of discrimination
21  July 8th of '04. The investigation that Patty Weick
22  conducted, you received the final letter from her on
23  July 7th of '04. Is that right?
24  A.  I am not certain when it was.

Page 159

1   Q.  We can look back. I believe it is an exhibit.
2   I don't know what the number is. You have it here in
3   front of you. It's a letter from Patty dated July 7th
4   of '04.
5   A.  Okay. So it was prior to that. When she first
6   took the complaint. The first complaint of
7   discrimination.
8   Q.  But, sir, if Patty conducted her -- gave you
9   the results of her investigation on July 7th and you
10  did not file a charge of discrimination until
11  July 8th, how could she have told you as part of the
12  investigation that the DOL charge had any effect on
13  whether or not you were getting a raise?
14  A.  The DOL charge?
15  Q.  The EEOC complaint that you filed.
16  A.  I didn't file that complaint -- the complaint
17  of harassment until August or September. I did not
18  file it at that particular time.
19  Q.  But your charge of discrimination that I have
20  just shown you that is Exhibit 9 is dated July 8th of
21  2004.
22  A.  Exactly, exactly.
23  Q.  So my -- you then stated that Patty Weick told
24  you that if you had not filed your charge of

Page 160

1   discrimination with the Department of Labor, you would
2   have received a raise sooner.
3   A.  No, no. She said that if I did not file -- if
4   I did not make the complaint of discrimination, right,
5   with EEOC, give her the opportunity to do the
6   investigation, that she would make certain that I
7   would get the raise that I was supposed to have gotten
8   automatically on my anniversary date, where I was
9   supposed to have been evaluated and I was supposed to
10  have gotten that raise. Okay.
11        But I did file the complaint. And as a
12  result of me filing the complaint, then she did not
13  make sure that I got that raise like she had promised.
14  And our allegations were the reason why I did not get
15  the raise as promised was because I did file, not
16  because I didn't file, because I did file was her
17  reasoning for not giving me the raise. And that
18  constituted, as far as I was concerned, harassment.
19  Q.  Okay. So are you testifying that you never
20  received a raise?
21  A.  No, I am not saying that. I am saying when I
22  filed the complaint, which was a month or two months
23  and a half later. I received the raise almost ten
24  months later. And that's after EEOC, the investigator

Page 161

1   requested a report on how raises, you know, were given
2   out.
3   Q.  Did you in fact receive a raise for the period
4   of April 2003 until April 2004 for that performance
5   period?
6   A.  Ten months later, yes.
7   Q.  Yes. Was the raise not retroactive to that
8   time?
9   A.  Yes.
10  Q.  Was it explained to you at that time that the
11  change in your -- the change in managers that you had
12  experienced during that first year contributed to the
13  delay in your getting a raise?
14  A.  Yeah. But management had nothing to do with it
15  because other people that was working in the same
16  capacity for the library received raises during that
17  time frame.
18  Q.  But my question is, Mr. Witcher, was it not
19  explained to you that that was the reason why your
20  review was delayed? Was that the reason that was
21  given to you because there had been changes in
22  management?
23  A.  That's the reason that I was given.
24  Q.  And you've said, I think previously, that your

A42

41 (Pages 158 to 161)

Witcher                                v.                        Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR            January 12, 2006

Page 162

1  employment situation was a little unique in that there
2  was no one else who did the same job that you did.
3  Isn't that right?
4     A.  In terms of delivery?
5     Q.  In terms of their job was to come in in the
6  morning, make sandwiches and then deliver them.
7     A.  Right.
8     Q.  Right.  Okay.  Then for the period from
9  April 2004 until April 2005, you were given a raise.
10 Correct?
11    A.  Correct.
12    Q.  Who gave you that raise?
13    A.  Sharon, for the most part, as far as I know.
14 Because Sharon did the evaluation.
15    Q.  That raise was in connection with the
16 performance evaluation?
17    A.  Exactly.  And Sharon had been there from the
18 time that I first started.  She was there all along.
19         (Witcher Deposition Exhibit No. 10 was
20 marked for identification.)
21 BY MS. DiLUZIO:
22    Q.  The court reporter has handed you what's been
23 marked Exhibit 10.  It appears to be a performance
24 review for you, dated April 21st, 2005.  Have you seen

Page 163

1  this document before?
2     A.  Yes.
3     Q.  And the supervisor's signature, do you
4  recognize it?
5     A.  Yes.  Carol Sexton.
6     Q.  Carol Sexton.  So she conducted this
7  performance review?
8     A.  No.  Sharon did.  The unit accountant manager's
9  signature.
10    Q.  Sharon who?  What is her last name?
11    A.  I don't know what Sharon's last name is.
12    Q.  And Sharon was -- was your supervisor?
13    A.  Yes, she was.
14    Q.  For how long?
15    A.  Basically, when Gary Rogers left, Juanita kind
16 of took over back and forth.  And then they made
17 Sharon the supervisor that handled both accounts --
18 that handled Foulk Road and -- she handled Foulk Road
19 and the Newark Library.  So if I needed time off, I
20 would consult Sharon.  If there were changes made, I
21 would consult Sharon.
22    Q.  About when did she take over for Ms. Congo?
23    A.  I am really not sure.  It's hard for me to say.
24 But she -- I would say, at least six, seven months.

Page 164

1     Q.  Six, seven months from what?
2     A.  I mean, she was manager at least six, seven,
3  eight months prior to me getting the raise.
4     Q.  So this was in April of 2005, this performance
5  evaluation.  So at least going back to -- was she your
6  manager in June of 2004 when the confrontation with
7  Donna occurred?
8     A.  No.
9     Q.  So it was after that?
10    A.  It was after that.
11    Q.  But before April --
12    A.  She was still the supervisor.  But I don't
13 think she was my manager at the time.  Or she could
14 be.  I really can't say.  I don't know exactly when
15 Sharon was given the official title.  She could have
16 been.
17    Q.  Did you consider this a good performance
18 review?
19    A.  Pardon me?
20    Q.  Did you consider this a good performance
21 review?
22    A.  I considered it an average performance.  I
23 thought it should have been better, but.
24    Q.  Did you have any input in this review or is the

Page 165

1  review process one where your manager makes all the
2  decisions and let's you know the results?
3     A.  Oh, yeah, sure I had input.
4     Q.  What was your general rating in this review?
5     A.  My general rating.  I don't know.  I guess it
6  was like average.  Wasn't it?  I am not certain.
7     Q.  It looks to me like there is a scale of 1 to 5.
8     A.  That's what I am saying, I would say, average.
9  It seemed to be down the middle, a 3 for the most
10 part.  3, 3, 3-1/2.  That's why I said 3 being
11 average.
12    Q.  Okay.  You received a 3 percent increase in
13 connection with this performance review?
14    A.  Correct.
15    Q.  The prior increase was 2.5 percent.  Is that
16 correct?
17    A.  Right.
18    Q.  So your claim is that the -- although you
19 ultimately received an increase for that first year of
20 your employment, the delay in receiving that increase
21 was in retaliation for your having filed a charge of
22 discrimination.  Is that your claim?
23    A.  Yes, it is.
24    Q.  Do you have any evidence to support that claim?

Page 166

1   A.  Other than the fact that we didn't receive the
2   raise until after the investigator for EEOC wrote the
3   letter.  And we were planning on entering that as far
4   as our document claim.
5   Q.  Mr. Witcher, you keep using the word "we."  To
6   whom are you referring in addition to yourself?
7   A.  I apologize.  I just have a bad habit of doing
8   that.
9   Q.  Okay.  You are, in fact, the sole plaintiff in
10  this lawsuit?
11  A.  You are absolutely right.  That was my mistake.
12  And I apologize for that.
13  Q.  Okay.  I just want to be clear.  And you are
14  not currently represented by counsel?
15  A.  No, I am not.
16  Q.  Okay, sir.  I believe we were going through all
17  the events or incidents that you believe support your
18  claim of retaliation.  We talked about the truck.  We
19  talked about your March write-up and your delay in
20  getting a raise.  Is there anything else?
21  A.  Yes.  That I was forced September --
22  September 23rd and 24th to work in the Chestnut Run
23  facility that was shut down for renovation.  It was
24  clearly marked outside of the kitchen area, the

Page 167

1   loading dock area, "danger asbestos."  And I was
2   forced to go in and to work under hazardous conditions
3   to prepare food that was served to the public.  And
4   the public -- took to the public libraries.  As a
5   result, I did suffer some eye irritation and which I
6   had to go to the doctor for.
7   Q.  We'll explore that in a little more detail in a
8   minute.  Are there any other incidents that you want
9   to -- that you think support your retaliation claim?
10  A.  No.  I can't -- off the top of my head, no, I
11  can't recall.
12  Q.  I am going to start with this one you just
13  mentioned because that was September 23rd and 24th --
14  of what year?
15  A.  Of 2004.
16  Q.  2004.  Okay.  Now, what exactly happened those
17  two days?
18  A.  The cafeteria was closed down for major
19  renovation.  I was forced to go in.  And I objected to
20  Carol about going in, you know, working in the area
21  where they're doing major renovation.  I asked if in
22  fact that asbestos was in the building because there
23  was five panels outside the loading dock area that was
24  clearly marked "danger asbestos."  Carol never gave me

Page 168

1   an answer one way or the other.
2        Worst case scenario.  There was all kinds
3   of equipment that was brought from the cafeteria into
4   the kitchen area.  There was construction equipment.
5   There was dust, dirt and debris flying around.  I
6   still had to -- even though I was in a room adjacent
7   directly to the kitchen area -- it was an open room,
8   but I still had to go into the kitchen to get items
9   out of the refrigerator, out of the freezer.  I had to
10  prepare them because there is a certain sink that you
11  use to wash down raw meats.  I still had to use the
12  ovens which are in the kitchen.  There was all kind of
13  dirt and debris.
14       I still don't know whether asbestos was in
15  the building or not.  I asked the question.  And that
16  question was never answered.  I got dirt and debris
17  and irritated eye.  I had had irritated eyes as a
18  result of working in that condition.
19       I could not use, on the 24th, I could not
20  use the loading dock to load up my truck because they
21  had all kinds of equipment out there where they were
22  sawing and using that loading dock for what they
23  needed to do and had to take, I guess, equipment into
24  the cafeteria area.  So I had to load on a very small

Page 169

1   landing, step landing, which was extremely dangerous.
2   Q.  Who else was assigned to Chestnut Run at this
3   time?
4   A.  There were three or four other people that was
5   working at Chestnut Run.
6   Q.  Who are those people?
7   A.  Beulah was one of them.  Betty, I think is
8   another one.  Joanne was the manager.  And there is a
9   couple other people that was working there that I
10  can't recall their names.
11  Q.  Was the set-up at Chestnut Run like that at
12  Barley Mill where the sort of catering area was
13  separate from the main kitchen?
14  A.  No.  Well, they had no catering area.  What
15  they had, a bake shop area that was like behind the
16  office adjacent to the kitchen area, but it was all a
17  big, open area.
18  Q.  But the -- was the baking shop then where you
19  prepared your sandwiches that you were to deliver?
20  A.  Yes.
21  Q.  And that part of the building was not under
22  renovation?
23  A.  No, it wasn't.
24  Q.  Was there anyone else who was assigned to work

A44

Page 170

1   in that bake shop area other than yourself?
2   A.  No.
3   Q.  No.  Okay.  You said you were the only person
4   who had to work those two days.  How do you know that?
5   A.  Because there was nobody else working in the
6   kitchen but me.
7   Q.  The kitchen was under renovation?
8   A.  No.  The cafeteria was under renovation.
9   Q.  The cafeteria was under renovation.
10       You were the only one there?
11  A.  No.  You had your construction people there.
12  Joanne came in and just went through the area.
13  Q.  So Joanne was there, who was the manager.
14  Right?
15  A.  Yes.
16  Q.  What were your hours those days?  Were you
17  still on the 6:00 am to 2:00 p.m. schedule?
18  A.  Yes.
19  Q.  How much time was spent in the kitchen?
20  A.  In the kitchen area, approximately about the
21  same time, four hours.
22  Q.  About four hours?
23  A.  Yeah.
24  Q.  So for four hours, were you the only one in the

Page 171

1   kitchen except for the construction crew nearby?
2   A.  Joanne would come through, yeah.
3   Q.  Was she there the entire four hours?
4   A.  No.
5   Q.  How long was she there?
6   A.  I don't know.
7   Q.  Was she there when you got there?
8   A.  Yes, I think she was because she opened up the
9   kitchen.
10  Q.  Was she there when you left?
11  A.  I didn't see her, no.
12  Q.  Was she there for one hour, two, three?
13  A.  I didn't see her during the entire time that I
14  was in there.
15  Q.  So you don't know how long she was there?
16  A.  No, I don't.
17  Q.  Could she still have been there when you left
18  and you just didn't see her?
19  A.  No.  Because if she was in the kitchen area, I
20  would have seen her.  Because her office, right, again
21  there is a big glass.  And before I left, I had to go
22  inside the kitchen area to get the carts because I
23  load things in the carts and bring them in the back.
24  And the foods that I prepare, in order to keep them

Page 172

1   cold -- once I prepare the salads and sandwiches -- I
2   had to take them to the refrigerator, the walk-in
3   refrigerator.  That's where I store them until I am
4   ready to make my delivery.  So if she was in there, I
5   would have saw her.
6   Q.  You said the other employees, I think you said
7   Beulah and Betty, neither of them were there that day?
8   A.  No.  Neither one of the days.
9   Q.  Do you know if they -- if any employees came in
10  either the 23rd or the 24th of September '04 after you
11  left to make your deliveries, after, let's say, 10:00
12  when you left to make your deliveries?
13  A.  No, I don't.
14  Q.  Did you come back to the kitchen after you were
15  done making your deliveries on those two days?
16  A.  Yes, I did.
17  Q.  You did.  Was anyone there?
18  A.  No.  Other than the construction crew.
19  Q.  Both days you came back and both days no one
20  was there?
21  A.  No one but the construction crew.  At least I
22  didn't see no one.  If someone was in the kitchen, I
23  definitely would have saw them.
24  Q.  Do you know if they were working at other sites

Page 173

1   those two days, any other employees?
2   A.  I believe some of the employees did work at
3   other sites.  I think they had the option of working
4   the other sites or taking the day off, according to
5   what I was told.  Again, this is hearsay.
6   Q.  Who told you that?
7   A.  Beulah.
8   Q.  She said all the other employees were allowed
9   to either take off or work somewhere else?
10  A.  Yes, uh-uh.
11  Q.  Were the other employees' duties to support the
12  cafeteria, to work in the kitchen to support the
13  cafeteria?
14  A.  Yes.
15  Q.  So it makes sense then if the cafeteria was
16  closed that day, they didn't have anything to do that
17  day.  Right?
18  A.  Not necessarily.  They could have cleaned
19  silverware.  There are a lot of other things that you
20  can do.  The grease trap needed to be cleaned and
21  changed.
22  Q.  Other than, perhaps, some cleaning that could
23  have been done --
24  A.  Right.

A45

Page 174

1    Q    -- the cafeteria was closed; there was no need
2  for there to be kitchen staff preparing food when the
3  cafeteria was closed   Correct?
4    A.  Exactly.
5    Q.  And, again, your job was unique because you
6  prepared food that was taken elsewhere   Right?
7    A.  Not in a contaminated area.
8    Q.  How do you know it was contaminated?
9    A.  Any time -- whether there was asbestos or
10 not -- any time you have flying objects flying around,
11 debris -- there was sawdust, there was all kind of
12 debris all over -- that's foreign objects that should
13 not be prepared -- that food should not be prepared
14 around.
15   Q    What makes you think, Mr. Witcher, that your
16 being required to work those two days was in
17 retaliation for having asserted a charge of
18 discrimination?
19   A.  Because I would think that no one would want --
20 if they had have gotten around it, that they
21 would have employees to come in and to work in an area
22 where they know, worst case scenario, they know that
23 you got dirt and dust and debris flying around in that
24 area.  They know or they knew that I definitely had to

Page 175

1  work out of the kitchen, that I had to use the stove,
2  that I had to use the sink.  I cleaned it to the best
3  that I could.  But I had to use it.  I had to prepare
4  chicken.  And these are airborne objects flying
5  around.  They're laying around.  Everywhere you
6  looked, there was dirt, dust and debris.  There is no
7  way I could have gotten around it.  There is no way in
8  the world that some of that contamination did not get
9  on the food.  It had to get on the food.
10   Q    Well, Mr. Witcher, you said that the cafeteria,
11 not the kitchen, was what was being renovated.  Is
12 that right?
13   A.  Exactly.
14   Q.  How do you know that -- Carol Sexton was your
15 manager at this time   Is that right?
16   A.  Exactly.
17   Q.  How do you know that Carol knew that renovation
18 on the cafeteria would affect conditions in the area
19 where you had to work in the bake shop?
20   A.  Well, being a manager -- you don't have to be a
21 manager.  Common sense.  If you are working in
22 a very large area that is open -- it was not
23 completely clear, sealed off -- that dirt and debris
24 is going to fly.  Ventilation, airborne stuff, it's

Page 176

1  going to fly around.
2        And Carol came through the kitchen that
3  Thursday.  She saw the dirt and the dust and debris.
4  She saw all of the equipment that was laying around in
5  the kitchen area.
6    Q.  I am sorry.  You said that you were the only
7  one there for two days   Carol was there one day.
8    A.  Carol came through.  Because the main office as
9  far as the DuPont management staff is upstairs.  So
10 Carol came through.  Joanne came through.
11   Q.  Did anyone else come through?
12   A.  I am sure.  Well, the construction people came
13 through.
14   Q.  Aside from the construction people.  I am
15 talking about kitchen employees.
16   A.  No.  Not that I can recall.
17   Q.  What day did Carol come through, the first day
18 or the second day?
19   A.  The first day to run the -- I believe it was
20 the first day.
21   Q.  How about Joanne?  Was that the first day or
22 the second day that you saw her?
23   A.  Both.
24   Q.  Both days?

Page 177

1    A.  Yes.
2    Q.  Joanne was there the second day as well?
3    A.  Exactly.
4    Q   How long was she there that day?
5    A.  I have no idea.
6    Q.  Did you see her when you got there?
7    A.  I saw her when she came through, yes.  I
8  believe she opened up the kitchen.
9    Q   Did you see her when you left?
10   A.  No, I did not.
11   Q.  Did you complain to anyone that you thought the
12 conditions were --
13   A.  Yes, I did.  I complained to Carol.  When they
14 told me I had to work those two days, I complained to
15 Carol the day of as far as the debris and all of the
16 construction equipment and equipment that they had
17 taken out of the cafeteria behind the counter.  And
18 they kind of just cluttered it all up in the kitchen
19 area because I needed to get to the stove.  I needed
20 to get to the refrigerator.  We had to move things out
21 of the way.
22        I complained to her about the loading
23 dock, how they were putting things on the loading dock
24 and it would be hard for me to get my truck back up to

A46