Witcher                                        v.                        Sodexho, Inc.
George M. Witcher                    C.A. # 05-2005 SSR                  January 12, 2006

Page 178

1  the loading dock and to load the stuff up properly and
2  load it in an unsafe manner.
3          And I also complained about the fact
4  whether or not there was asbestos in the building. I
5  felt likely a right to know. I felt like I needed to
6  let my family know. I didn't know, still don't know
7  what I took home to my family.
8      Q. What did Carol say when you made this
9  complaint?
10     A. Carol would not reply. She would not answer
11  the particular question. Even when I filed an
12  incident report. And ten days after I filed the
13  incident report, then I got called in. I was told
14  that DuPont was kicking me off the site.
15     Q. How did you complain to Carol? Did you call
16  her? Did you go see her?
17     A. I complained to Carol face-to-face about the
18  working conditions.
19     Q. And she said nothing?
20     A. No, she did not reply when I asked her in
21  regards to whether or not there was asbestos in the
22  building. For the most part, Carol was barely
23  speaking to me even when she walked through.
24     Q. Aside from the question of whether or not there

Page 180

1      A. Yeah. She just kept on walking.
2      Q. And you heard nothing else about it?
3      A. No.
4      Q. This was on the first day?
5      A. This was on the first day.
6      Q. Did you complain to anyone else?
7      A. No, I didn't. I just went on and worked the
8  two days. When I started having problems as far as my
9  eyes were concerned, some irritation problems, then I
10  went ahead -- it was all made part of my complaint.
11     Q. Were you aware that DuPont has excessive safety
12  procedures?
13     A. I was not aware of any DuPont procedures at
14  all.
15     Q. You were not aware of any of DuPont's safety
16  precautions or personnel that you could contact if you
17  felt things were unsafe?
18     A. No, I was not.
19     Q. Were you aware of any Sodexho persons that you
20  could contact if you felt your work area was unsafe?
21     A. You know, at that point, I felt that all this
22  was a big conspiracy. The last person I was going to
23  contact was Sodexho.
24     Q. But were you aware of whether or not there was

Page 179

1  was asbestos in the building, did Carol have any
2  response to your complaint that the work area was --
3      A. Unsafe and unsanitary?
4      Q. Yes.
5      A. No, she did not.
6      Q. She said nothing?
7      A. She said nothing.
8      Q. You said, Carol, these are all the things I
9  think is wrong and she said nothing.
10     A. I said, "Look, Carol, look. There is dirt and
11  debris. I have to go in the freezer to pull the
12  chicken out. I have to thaw it out in the sink. The
13  sink is dirty. There is dirt and debris." Carol just
14  kept on walking.
15     Q. She said nothing to you?
16     A. Carol and myself had absolutely -- we didn't
17  have a good relationship, period. Carol gave the
18  impression that I was totally ignorant.
19     Q. Where were you when you had this conversation?
20     A. We were back there in the kitchen area, back in
21  the bake shop area.
22     Q. She was in your work area. You made this
23  complaint to her. And she said nothing. Did she walk
24  away?

Page 181

1  someone you could contact at Sodexho to complain about
2  safety concerns?
3      A. At the time, I wasn't thinking. I am sure I
4  was aware of it, but I wasn't thinking of it under
5  those terms. Because by the time I didn't feel like I
6  could because I felt there was conspiracy and it was
7  all about retaliation.
8      Q. Because that's what you believed, you didn't
9  give Sodexho a chance to make things better. Is that
10  right?
11     A. You are correct.
12     Q. You just went back to work the second day and
13  did your job and made no further complaint?
14     A. Yes, I did make a complaint. When I complained
15  about the incident report about my eyes and I was
16  having chest irritation.
17     Q. Did you complain that you believed working
18  under those conditions was in retaliation for having
19  filed a charge of discrimination?
20     A. I did that in my complaint, too, when I filed
21  the retaliation charges. It was all a part of the
22  retaliation charges.
23     Q. Right. But you didn't complain to anyone in
24  human resources, for example, at Sodexho?

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Witcher
George M. Witcher

v.

C.A. # 05-2005 SSR

Sodexho, Inc.
January 12, 2006

Page 182

1   A.  No, I didn't.

2   Q.  This incident report that you are referring to,

3   was that in connection with the worker's compensation

4   claim?

5   A.  The worker's compensation claim?

6   Q.  Did you assert a worker's compensation claim

7   for the alleged injury that you suffered while working

8   in the kitchen on September 23rd and September 24th?

9   A.  All I did was I filed the incident report.

10  Joanne filed it with whoever she filed it with.  And I

11  went and had my eyes checked.  I didn't do a workman's

12  compensation claim.

13  Q.  Did you miss any time from having irritated

14  eyes or chest?

15  A.  No.

16  Q.  You didn't assert a worker's compensation

17  claim?

18  A.  No.

19  Q.  The incident report, is that an incident of

20  injury report that you are referring to?

21  A.  Yes.

22  Q.  Did you try and contact Sodexho's business

23  abuse hotline to file a report about the conditions on

24  September 23rd and 24th?

Page 183

1   A.  I think I previously told you at that point I

2   felt there was a conspiracy going on as far as Sodexho

3   was concerned.  No, I did not try to contact Sodexho

4   because I felt like Sodexho wasn't going to do

5   anything about it.  I had already talked to Sodexho

6   management.  I felt that they were part of the

7   conspiracy.

8   Q.  So you knew there was such a number that you

9   could call, a business abuse hotline number.  Right?

10  A.  No.

11  Q.  You didn't know that.  It wasn't in your

12  handbook?

13  A.  It could have been.  I didn't go through the

14  handbook and read it page by page.

15  Q.  Did you explore at all what your options were

16  as far as who you could call if you felt Carol was not

17  giving you a satisfactory response?

18  A.  Again, I felt that there was a conspiracy

19  throughout Sodexho in reference to me because of the

20  charges that I had filed.  And, no, I did not.  I had

21  absolutely no confidence in Sodexho higher management

22  whatsoever, none.  So I did not contact them.

23  Q.  What made you think there was a conspiracy that

24  went throughout the company regarding you?

Page 184

1   A.  Because the senior manager of human resources

2   who I felt at the time had retaliated against me by

3   not giving me the raise or making sure that I got the

4   raise that I was supposed to have gotten four, five

5   months prior to that.  I felt that that was all a part

6   of a conspiracy.  So that's why, no, I did not go

7   through Sodexho management at that time.

8   Q.  If the conditions were so bad in the kitchen

9   these two days, September 23rd and 24th, why did you

10  come back on the second day?

11  A.  Because I needed my job.  That's why.

12  Q.  Did you again try and make a complaint on the

13  second day to Carol or anyone else that the conditions

14  hadn't improved from the day before?

15  A.  No, I did not.

16  Q.  I think we need to go back to your write-up in,

17  I think you said March of '05 that you received for

18  not showing up to work.  You think that is -- that was

19  in fact motivated by the fact that you had filed a

20  charge of discrimination.  Is that right?

21  A.  Yes.

22  Q.  Let's see if we can find that charge.

23  A.  I did not list that as one of the complaints,

24  but that's what you are looking for.

Page 185

1   Q.  No, sir.  I am looking for the write-up that

2   you referenced.

3   A.  I'm sorry.

4       MS. DILUZIO:  We're going to mark that as

5   Exhibit 11.

6       (Witcher Deposition Exhibit No. 11 was

7   marked for identification.)

8   BY MS. DILUZIO:

9   Q.  Mr. Witcher, you said that you expressed to

10  Carol Sexton your concerns about the cleanliness of

11  the work environment on September 23rd and 24th.  Did

12  you say anything to Joanne, who was your direct

13  supervisor?

14  A.  No.  Joanne was not my direct supervisor.

15  Carol Sexton was my supervisor.  Joanne was just there

16  as far as she was manager -- she was manager of the

17  Chestnut Run facility.  So when I was there as far as

18  working was concerned.  But Joanne could not overrule

19  what Carol Sexton had to say.

20  Q.  But you said that Joanne let you in that first

21  morning on September 23rd.  Right?

22  A.  Exactly.

23  Q.  When you went in and saw the conditions, you

24  didn't say, "Hey, Joanne, this isn't acceptable"?

A48

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Witcher                              v.                        Sodexho, Inc.
George M. Witcher            C.A. # 05-2005 SSR              January 12, 2006

Page 186

1    A. I had already complained to Carol in reference
2  to my concern as far as whether or not asbestos was in
3  the building. I had already made that complaint to
4  her.
5    Q. So you didn't feel that a complaint to Joanne
6  was necessary?
7    A. No. Because I knew that there was nothing that
8  Joanne could have done about it.
9    Q. How did you know that?
10   A. Because Joanne was under Carol Sexton. How is
11 Joanne going to overrule what Carol Sexton say?
12   Q. But did you give her a chance?
13   A. I knew she couldn't. Why even bother to
14 discuss it with Joanne?
15   Q. So you saw Joanne there on both the 23rd and
16 the 24th, but you never made a complaint to her.
17 Right?
18   A. No. Why should I when I already made a
19 complaint to Carol Sexton?
20   Q. Could you take a look at what's been marked as
21 Exhibit 11, Mr. Witcher. It's a constructive
22 counseling notice directed to you, dated
23 February 25th, 2005. It's two pages.
24   A. Okay. Sure.

Page 187

1    Q. Okay. Now, you indicated that the write-up for
2  not coming into work was in March of '05. This is
3  dated February 25th, but seems to be in response to
4  your not coming to work. Is this the same incident?
5    A. Yes.
6    Q. So you just had the date a little off?
7    A. I had the date off. The month.
8    Q. As I said, this is dated February 25th. And it
9  describes -- it says that it's a written coaching
10 memorandum for your failure to show up for work on
11 February 21st, 2005. Is that right?
12   A. Correct.
13   Q. Now, can you describe to me the circumstances
14 surrounding this counseling notice?
15   A. Yeah. They wrote me up because I didn't come
16 to work on that Monday, which was a holiday. The
17 entire New Castle County was completely shut down.
18 Now, I was told when I went to work another holiday
19 that I wasn't supposed to go into work, right, without
20 a supervisor being present. Because I am on-the-clock
21 personnel because, you know, for safety reasons --
22 which it makes a lot of sense -- if I got cut, if I
23 got hurt, there would have been absolutely no way to
24 contact nobody, you know. And I got written up when I

Page 188

1  was told that I wasn't supposed to go to work under
2  those particular conditions.
3    Q. What holiday was it?
4    A. I believe it was Presidents Day.
5    Q. Did you upon your employment with Sodexho or at
6  any time during your employment with Sodexho get a
7  list of company holidays, company paid holidays?
8    A. No, I didn't. But the difference was -- we
9  were a little different as far as the library was
10 concerned because a lot of times, as far as the
11 county, what was county holidays, and county was shut
12 down. Well, county holidays as far as Sodexho's
13 holidays were were all together different because the
14 County give off more holidays than what Sodexho was
15 paying their particular employees, so.
16   Q. Right. But did Sodexho offer you holidays,
17 paid holidays? Were there certain holidays during the
18 year that you were not required to work?
19   A. Yes.
20   Q. But for which you were paid?
21   A. Right. Exactly.
22   Q. Were you given a list of what those holidays
23 were?
24   A. No. I can't recall. Maybe it was in the book.

Page 189

1  I can't recall. I didn't get -- receive a list.
2    Q. There was some communication you from
3  Sodexho as to which holidays you were expected to work
4  and which you were not. Correct?
5    A. No.
6    Q. There was not?
7    A. No.
8    Q. Did you have to work on Thanksgiving?
9    A. No.
10   Q. How did you know you weren't supposed to work
11 on Thanksgiving?
12   A. Because I am not dumb. It was posted that "All
13 county facilities are closed." That's how I knew I
14 wasn't supposed to work Thanksgiving Day.
15   Q. That's what I am asking you: How did you know
16 what holidays Sodexho expected you to work and what
17 holidays they did not?
18   A. Well, I am just saying, "It was posted 'All
19 county facilities are closed.'" I worked out of the
20 county facilities. If they're closed, how am I going
21 to work? If the libraries are closed, the county
22 buildings are closed, how am I going to work?
23   Q. Who was your employer, Mr. Witcher?
24   A. Sodexho was my employer.

Witcher
George M. Witcher

v.

C.A. # 05-2005 SSR

Sodexho, Inc.
January 12, 2006

Page 190

1   Q.  So Sodexho paid holidays is what I am concerned
2   about   What holidays -- how was it communicated to
3   you what holidays Sodexho recognized as holidays that
4   you were not expected to work?
5   A.  If I didn't work -- if they weren't -- if I
6   wasn't working, whether it was Sodexho's holiday or
7   not, I couldn't go to work.  I never got paid for -- I
8   got paid for -- there was some county holidays that
9   Sodexho employees had to work we didn't work, we still
10  got paid because we got paid through the contract from
11  the county.  The county decided on what holidays that
12  they were going to pay us for and what holidays that
13  they weren't going to pay us for.  That was dictated
14  by the county, not Sodexho.
15  Q.  So Sodexho did not set forth for you what
16  holidays it expected you to work?
17  A.  Maybe they did, but I am saying, our holidays
18  were basically dictated as far as the county, whether
19  or not the county was going to pay for us to be off a
20  day that they recognized.
21  Q.  At this point in February of 2005, where were
22  you located?
23  A.  I was working out of the county building.
24  Q.  The county building where?

Page 191

1   A.  New Castle County.
2   Q.  Where is that located?
3   A.  New Castle County Government Center located out
4   on, I believe it was 141.
5   Q.  Is that in New Castle, Delaware?
6   A.  New Castle, yes.  I believe it's Commons
7   Boulevard.
8   Q.  So at that time were your duties the same, you
9   would go in the morning and prepare food and deliver
10  to the two libraries or were they different?
11  A.  The exact same thing.
12  Q.  The kitchen you went to to prepare the food was
13  at the Government Center   Is that correct?
14  A.  Correct.
15  Q.  What you are telling me is because you were at
16  this time working in a government building, when the
17  county had a holiday, you had a holiday.  Is that
18  right?
19  A.  A lot of times the county would recognize them
20  and they would pay us for the holiday if the libraries
21  were closed.
22  Q.  If the libraries were closed, what, you were
23  not required to work?
24  A.  Sometimes if the libraries were closed, right,

Page 192

1   we were not required to work.  Now, the libraries did
2   not take off every county holiday.  So it depended on
3   whether or not the libraries were closed.
4   Q.  Who at Sodexho told you that when the libraries
5   are closed, you didn't have to work?
6   A.  Sharon told me.  Sharon was the immediate
7   adviser, and she gave us a list of the holidays that
8   the library would be closed.
9   Q.  And she said these days you don't have to work?
10  A.  Right.  Because the library is closed, you
11  couldn't work.  And the county building was closed.
12  Q.  Well, you seemed to think people could work in
13  the kitchen when the cafeteria was closed, so I just
14  wanted to clarify that.
15  A.  Not if the building is closed.
16  Q.  On February 21st, 2005, the county building was
17  closed for a holiday.  Is that right?
18  A.  Correct.
19  Q.  So you didn't report to work?
20  A.  No.
21  Q.  Had anyone at Sodexho told you, hey, the 21st
22  is a holiday, you don't have to come to work?
23  A.  No.  And no one at Sodexho told me the 21st, to
24  come to work.

Page 193

1   Q.  What day of the week was the 21st   Do you
2   recall?
3   A.  It was on a Monday.
4   Q.  It was on a Monday.  Does someone need to tell
5   you every Monday to come to work?
6   A.  Not if the building is closed.
7   Q.  But, again, no one told you you didn't have to
8   come to work that Monday.  Right?
9   A.  Right.
10  Q.  Generally speaking, you knew Monday through
11  Friday you had to get up and go to work.  Is that
12  right?
13  A.  Right.  Unless it's a holiday.
14  Q.  Unless it's a holiday.  Again, February 21st
15  was not a holiday that Sodexho recognized.  Is that
16  right?
17  A.  This is not based on Sodexho.  I keep telling
18  you that.  It's based on the county and what the
19  county paid and what the county didn't pay.  It had
20  nothing to do with Sodexho.
21  Q.  But Sodexho was your employer.  Was it not?
22  A.  Correct.
23  Q.  And management were Sodexho employees.  Were
24  they not?

Witcher
George M. Witcher

v.
C.A. # 05-2005 SSR

Sodexho, Inc.
January 12, 2006

Page 194

1   A.  Right.
2   Q.  So the expectations for your work were set by
3   Sodexho  Is that right?
4   A.  If I could go get in and go to work.
5   Q.  So you could not get into the building on
6   February 21st?
7   A.  Yes, I could get into the building.
8   Q.  So you could have reported to work on the 21st?
9   A.  Yeah, I could have reported to work.
10  Q.  But you did not?
11  A.  Right.  Because I was told that I was not
12  supposed to go to work when there was no supervisor in
13  the kitchen.  That's what I was told by Sodexho
14  employees.
15  Q.  How did you know there was no supervisor in the
16  kitchen if you did not show up to work on the 21st?
17  A.  Because Jim Harbrook's, who is the manager and
18  who was going to be off that day, said that he wasn't
19  coming to work.  There was no Sodexho employees there.
20  Q.  Did you know if any other manager was going to
21  come to work in Mr. Harbrook's place?
22  A.  No, no one told me that a manager was going to
23  be there.
24  Q.  So there well could have been; isn't that

Page 195

1   right?
2   A.  There well could have been.
3   Q.  And you didn't know that when you decided not
4   to come into work on the 21st  Right?
5   A.  I decided not to come to work on the 21st
6   because no one from Sodexho told me to come to work on
7   the 21st.
8   Q.  But you have already testified that you didn't
9   expect someone to tell you every day you needed to
10  come to work.  Right?
11  A.  Every day the kitchen at New Castle County is
12  not closed down.
13  Q.  Right.  Okay.  So this performance review that
14  we have labeled Exhibit 11 -- I'm sorry, not
15  performance review, constructive counseling notice was
16  given to you for not showing up to work on the day
17  that Sodexho had scheduled you to work.  Right?
18  A.  No, Sodexho had not scheduled me to work.
19  Q.  It was a Monday.  Was it not?
20  A.  It was a holiday.
21  Q.  Was it a Monday?
22  A.  It was a holiday.  Yes.
23  Q.  Was it a Monday, yes or no?
24  A.  It was a Monday.  But it was a holiday.

Page 196

1   Q.  Were you regularly scheduled to work Monday
2   through Friday?
3   A.  Not when it's a holiday, no.
4   Q.  Were you regularly scheduled to work Monday
5   through Friday?
6   A.  Not when it's a holiday.
7   Q.  Sir, if you could answer the question I am
8   asking, it will go quicker.  Were you regularly
9   scheduled to work from Monday through Friday?
10  A.  Yeah.  But it was a holiday.  So, no, I was not
11  scheduled.
12  Q.  Was it a Sodexho recognized holiday?
13  A.  I don't know if it was a Sodexho.  It was a
14  county recognized holiday.  And the county was the one
15  that dictated whether or not you came to work.
16  Q.  Who signed your paycheck?
17  A.  Sodexho signed the paycheck.
18  Q.  Sodexho was your employer.  Correct?
19  A.  Correct.
20  Q.  And February 21st, 2005 was not a Sodexho
21  recognized holiday.  Correct?
22  A.  Correct.
23  Q.  Thank you.  So, again, this constructive
24  counseling notice was given to you for not showing up

Page 197

1   on February 21st, 2005 to work.  Correct?
2   A.  Correct.
3   Q.  What about this counseling notice makes you
4   believe that it was in retaliation for your having
5   filed a charge of discrimination?
6   A.  Because of the fact that I was told by Sodexho
7   management that I was not supposed to go to work when
8   there was no manager on duty in the kitchen, that I
9   was not supposed to go to work.
10  Q.  When were you told that?
11  A.  I was -- I can't give you the precise date and
12  time.  But that's what Sharon, my immediate
13  supervisor, had told me.
14  Q.  Again, though, you didn't know if there was
15  going to be a manager there on February 21st of 2005?
16  A.  No.
17  Q.  Okay.  You received this constructive counseling
18  notice on February 25th, 2005 for your having failed
19  to show up on the 21st.  In fact, you didn't show up
20  on the 21st.  Right?  That's correct?
21  A.  Correct.
22  Q.  Why do you think for having been written up for
23  that is in response to your having filed a Department
24  of Labor EEOC charge of discrimination?

Witcher                                    v.                          Sodexho, Inc.
George M. Witcher                   C.A. # 05-2005 SSR              January 12, 2006

Page 198

1    A.  Because there was, as far as I was concerned,
2  there was no basis to this complaint, especially after
3  management telling me that I was not supposed to come
4  to work without a manager.  I did know that Sharon,
5  the supervisor, wasn't going to be there.  I knew that
6  Jim Harbrook who managed the kitchen wasn't going to
7  be there.  So the only thing that I could determine,
8  that it was just a direct retaliation.
9         Plus the write-up took place over at the
10  Government Center as opposed to the library where
11  Carol, any time she had to speak to me about
12  something, we always had our conversation at the
13  library on Foulk Road or at the Chestnut Run Center.
14  But Carol made it a point to come over to the
15  Government Center, have me to wait for her at the
16  Government Center and came over there in front of the
17  employees, took me out, over into a room adjacent and
18  did the write-up.
19  Q.  Were you not working in the Government Center
20  at this time?
21  A.  Yes.  But I always went to the kitchen, to the
22  library.
23  Q.  But you were working at the Government Center,
24  so Carol just came to where you were.  Right?

Page 199

1    A.  No.  Carol had me to wait at the library.  I
2  mean, where I was, Carol was there because she was at
3  the kitchen.  I mean, she was at the library.  She was
4  always at the library at Chestnut Run.
5  Q.  You were at the Government Center, so she came
6  to you?
7  A.  No.  Carol left word.  And she called from
8  Chestnut Run.  She left word.  According to what I was
9  told, she called from Chestnut Run.
10  Q.  I am not concerned about where Carol was coming
11  from.  I am saying, you were at this time assigned to
12  work in the Government Center.  That's where you
13  prepared the meals.  Right?
14  A.  Correct.
15  Q.  That's where she came and had this discussion
16  with you.  Right?
17  A.  Yeah.
18  Q.  So she came to where you were.  Right?
19  A.  She didn't come to where I was at when she
20  did -- when she performed the performance.
21  Q.  But she did on this day.  Right?
22  A.  Yes.
23  Q.  So based on your, what, own suspicions you
24  believed that this constructive counseling notice was

Page 200

1  in retaliation for your having filed a charge of
2  discrimination?
3    A.  Correct.
4    Q.  No one ever said anything that would make you
5  think that was true; you never saw any documents that
6  would make you think that that was true?
7    A.  No.
8    Q.  Do you have any other facts or evidence other
9  than your own suspicions that would lead one to
10  believe that this constructive counseling notice for
11  not showing up to work was in retaliation for your
12  having filed the Department of Labor charge?
13    A.  Yes.  Because I missed one day out of seven in
14  seven months -- because I am getting written up for
15  missing one day in seven months when there were other
16  holidays that fell -- as a matter of fact, I believe
17  February 4, Lincoln's Birthday, Washington's Birthday
18  where the county was closed and the county building
19  was closed and New Castle -- the libraries were opened
20  and I didn't work and I got paid for.
21    Q.  Do you know if that was a Sodexho approved
22  holiday?
23    A.  No.  Because Sodexho employees were working.
24    Q.  What does that have to do with this

Page 201

1  constructive counseling notice was in retaliation?
2    A.  Well, you asked me a question.  I am telling
3  you what I felt.
4    Q.  Okay.  So to ask the question again.  Do you
5  have any other facts to support your claim that this
6  constructive counseling notice was in retailing for
7  your having filed a charge of discrimination?
8    A.  No.  It's just my personal belief.
9    Q.  I think we have gone over everything you
10  identified as events that support your claim for
11  retaliation.  But let me just make sure.  You
12  identified the problems with your truck in February of
13  '05.  Right?
14    A.  Correct.
15    Q.  The write-up that we just discussed that was in
16  February, also in February of '05.  Right?
17    A.  Correct.
18    Q.  The delay in your getting a raise, which you
19  ultimately did receive in March of '05.  Is that
20  right?
21    A.  Correct.
22    Q.  And then the two days, September 23rd and
23  September 24th, '04 when you were working in the
24  Chestnut Run facility while the cafeteria was under

A52

Witcher                                    v.                    Sodexho, Inc.
George M. Witcher                 C.A. # 05-2005 SSR          January 12, 2006

Page 202

1  renovation. Is that correct?
2  **A. Correct.**
3  Q. Are there any other incidents that support your
4  retaliation claim?
5  **A. No.**
6  Q. And just to be clear, your charge was, charge
7  of discrimination was filed on July 8th, 2004.
8  Correct?
9  **A. I believe so.**
10  Q. So from July 8th, 2004 when you filed your
11  charge of discrimination until September 23rd of '04,
12  which is the first of these incidents that you have
13  complained of, did anything else happen that you think
14  was in retaliation for your having filed a charge of
15  discrimination?
16  **A. No.**
17  Q. How about from September of '04 until February
18  of '05 when you had the truck problems and the
19  write-up, did anything happen then that you felt was
20  in retaliation for your having filed a charge of
21  discrimination?
22  **A. No.**
23  Q. And then from then February of '05 until your
24  resignation in, I think you said July 2005 -- is that

Page 203

1  correct?
2  **A. Correct.**
3  Q. -- did anything happen between February and
4  July of '05 you feel was in retaliation?
5  **A. The truck incident.**
6  Q. After the truck incident. After the truck and
7  the write-up, between that time and your resignation
8  in July of '05 --
9  **A. You mean from March?**
10  Q. From March. I am sorry.
11  **A. No.**
12  Q. Let's take a look at your resignation letter.
13       Can we mark this as Exhibit 12?
14       (Witcher Deposition Exhibit No. 12 was
15  marked for identification.)
16  BY MS. DiLUZIO:
17  Q. Mr. Witcher, the court reporter has handed you
18  what's been marked as Witcher Deposition Exhibit 12.
19  It appears to be a letter from you to Carol Sexton.
20  Is that correct?
21  **A. Correct.**
22  Q. The re: line is "Two week notice"?
23  **A. Mm-hmm.**
24  Q. Is this your resignation letter from Sodexho?

Page 204

1  **A. Yes, it is.**
2  Q. So you voluntarily resigned from the company,
3  it says here "effective July 8th." Is that right?
4  **A. Correct.**
5  Q. How long were you employed by Sodexho,
6  Mr. Witcher?
7  **A. Roughly, two years, three months.**
8  Q. So that was April of 2003 until July of 2005.
9  Is that correct?
10  **A. Correct.**
11  Q. During that time were you ever demoted?
12  **A. I don't see how I could have been demoted.**
13  **But, no.**
14  Q. Was your pay ever decreased, your salary ever
15  decreased?
16  **A. No.**
17  Q. Were your hours ever cut?
18  **A. No.**
19  Q. Were your -- did you receive benefits as part
20  of your salary?
21  **A. Yes.**
22  Q. Were your benefits ever decreased during the
23  time of your working for Sodexho?
24  **A. No.**

Page 205

1  Q. In fact, I think you said during that week that
2  you were suspended back in June of '04 you were paid
3  for that week. Right?
4  **A. Correct.**
5  Q. And also, you received two raises in that
6  two-year time frame. Right?
7  **A. Yes.**
8  Q. After your resignation from Sodexho,
9  Mr. Witcher, were you employed elsewhere?
10  **A. No.**
11  Q. Did you try and find employment elsewhere?
12  **A. Yes.**
13  Q. What were your efforts?
14  **A. Phone book inquiries, newspaper clippings.**
15  Q. And what did you do to inquire?
16  **A. Phone calls.**
17  Q. You made phone calls?
18  **A. Yes.**
19  Q. To whom?
20  **A. I can't recall the various places. Pathmark.**
21  **Rent Way.**
22  Q. And your telephone inquiries were simply what,
23  asking if they needed employees?
24  **A. If they were hiring.**

Wilcox & Fetzer, Ltd.         Professional Court Reporters         (302)655-0477

Witcher                                v.                        Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR              January 12, 2006

Page 206

1    Q.  Did anyone say, yes, they were hiring?
2    A.  No.
3    Q.  About how many people did you call?
4    A.  Well, I would say, all together up until my
5    accident, I would say, I probably 20 to 30 employers.  I am not
6    sure.
7    Q.  Twenty to 30.  All of those people said they
8    were not hiring?
9    A.  Correct.
10   Q.  Did you apply for unemployment compensation?
11   A.  Yes, I did.
12   Q.  Did you receive unemployment compensation?
13   A.  Yes, I did.
14   Q.  How much?
15   A.  Before or after taxes?  Because I had them take
16   taxes out.  Do you want the before taxes amount?
17   Q.  Yes.
18   A.  265.
19   Q.  $265.  Is that a week?
20   A.  Yes.
21   Q.  For how many weeks?
22   A.  Twenty-six would have been the total.
23   Q.  Are you still receiving worker's
24   compensation -- or, I'm sorry, unemployment

Page 207

1    compensation?
2    A.  Yes, I am.
3    Q.  We've made reference to the fact that you were
4    involved in an accident in September of 2005.  Is that
5    correct?
6    A.  Correct.
7    Q.  Unrelated to your employment with Sodexho.
8    Right?
9    A.  Correct.
10   Q.  Since that time you have been unable to work.
11   Is that correct?
12   A.  Correct.
13   Q.  Prior to your accident, Mr. Witcher, I guess in
14   the two months from July of '05 until your accident in
15   September of '05, did you speak with any career
16   counselors or seek any other employment counseling to
17   help you find another position?
18   A.  No, I didn't.
19   Q.  Did you seek employment with a temporary
20   employment agency during that time period?
21   A.  No, I didn't.
22   Q.  Now, Mr. Witcher, in your complaint that you
23   filed in this action you allege that you have suffered
24   "mental anguish."  Can you tell me what evidence you

Page 208

1    have to support that allegation?
2    A.  Of being --
3    Q.  Of having suffered mental anguish.
4    A.  Yeah.  Being detained, felt that I was
5    threatened.  The embarrassment of being escorted out
6    of the building.
7    Q.  That was all from the June of 2004 incident.
8    Correct?
9    A.  Correct, correct.
10   Q.  But you continued to work for Sodexho until
11   July of 2005.  Correct?
12   A.  Yes, I did.
13   Q.  You also allege, sir, that you suffered damage
14   to your reputation.  With who?
15   A.  The fact that -- I have been on local TV in
16   this area for almost 30 years.  A lot of the employees
17   that worked in the kitchen know me, know me from a
18   personal standpoint, being an outstanding, religious
19   person.  To see me being escorted, being detained in
20   the office and escorted under security, now, greatly
21   damaged my reputation as being an outstanding person
22   within the community.
23   Q.  Could you describe for me a little bit more
24   when you say you were on local TV for 30 years?  What

Page 209

1    exactly is that?
2    A.  I have -- I ran a local TV program called
3    Gospel Expression.  It's a local cable program that
4    comes on or it came on at that time on every Sunday
5    from the hours of 7:00 to 8:00 p.m.  Plus I did a
6    tremendous amount of work in the community, feeding
7    the hungry, register -- voter registration.  Just
8    being involved in the community at-large.
9    Q.  And a lot of your coworkers at Sodexho had seen
10   you on this program or were aware of your activities.
11   Is that right?
12   A.  Yes.
13   Q.  You felt that being escorted from the building
14   in June of '04 damaged your reputation in the eyes of
15   these folks?
16   A.  Exactly.
17   Q.  You didn't feel that your use of profanity
18   damaged your reputation in their eyes?
19   A.  No.  Because they weren't in the kitchen.  They
20   were not in the kitchen.  I am sure that, you know,
21   rumors, rumors will fly.  And, you know, people are
22   human-beings.  You know, me cursing in the kitchen
23   were of my own doing.  You know, preachers preach, are
24   constantly being ridiculed and being prosecuted

A54

53 (Pages 206 to 209)

Witcher                                                    v.                    Sodexho, Inc.
George M. Witcher                               C.A. # 05-2005 SSR              January 12, 2006

Page 210

1  because of things that they did. That's things that
2  they did of their own choosing, you know. It was not
3  my choice for the action that was taken against me.
4  That was not taken against other employees that
5  committed the same crime or the same incident.
6    Q.  So you don't feel that you're referring to a
7  woman as a "bitch" would damage your reputation as a
8  clergy man, but walking out the door next to a
9  security guard would?
10   A.  First of all, I am not a clergy man. I never
11  said that I was a clergy man. I said I worked -- I
12  had a gospel TV program where I promoted gospel music
13  and I played gospel videos. I mean, things happen.
14  People are human-beings. You know, people make
15  mistakes, you know. And I did what I was supposed to
16  do in terms of apologizing. That's all I could do,
17  was apologize.
18   Q.  So your use of the profanity is not an example
19  that you would hope to set for people; it was in your
20  mind something that you would be embarrassed of should
21  people who watched your program know about; is that
22  right?
23   A.  Sure, sure, I would have been embarrassed, you
24  know, people that watched the program. But people

Page 211

1  also know that, again, you are human-beings. People
2  get frustrated. There is a human side of you.
3    Q.  Mr. Witcher, have you spoken with any mental
4  health professional or other medical professional
5  regarding your claim that you suffered emotional
6  distress?
7    A.  Yes, I did.
8    Q.  Who did you speak with, have you spoken with?
9    A.  Dr. Elwood, who is a psychologist at the V.A.
10  Hospital.
11   Q.  Anyone else?
12   A.  Dr. Castillo.
13   Q.  And Dr. Castillo, is he also a psychologist?
14   A.  No. A psychiatrist.
15   Q.  A psychiatrist?
16   A.  Also at the V.A. Hospital.
17   Q.  When did you speak with Dr. Elwood?
18   A.  I believe it was in either April or May of
19  2005.
20   Q.  April or May of 2005 is when you first spoke
21  with Dr. Elwood?
22   A.  I believe. I am not certain about that.
23   Q.  How often did you see Dr. Elwood after that
24  initial discussion?

Page 212

1    A.  I saw him once after that, and I was scheduled
2  once -- I was to be set up to see Dr. Castillo, right.
3  For him to prescribe medication, I was scheduled to
4  see him on like a monthly basis.
5    Q.  So you saw Dr. Elwood twice. Is that right?
6    A.  I saw him twice, right.
7    Q.  What kind of time period was there between
8  those two visits? You first saw him in April or May
9  of '05?
10   A.  Right.
11   Q.  When did you see him again?
12   A.  I believe it must have been, must have been
13  maybe like 30 days. I am not sure. Probably a 30-day
14  time frame.
15   Q.  Then when did you first speak with
16  Dr. Castillo?
17   A.  I believe it was in June.
18   Q.  June of 2005?
19   A.  Correct.
20   Q.  Then how many times did you see him thereafter?
21   A.  I only saw him once. I was scheduled to see
22  both of them in October. But because of the accident,
23  I did not see them.
24   Q.  Have you seen them since?

Page 213

1    A.  No; because of the accident.
2    Q.  So you saw Dr. Elwood twice and Dr. Castillo
3  once. Is that correct?
4    A.  Right.
5    Q.  Did Dr. Castillo prescribe any medication?
6    A.  Yes, he did.
7    Q.  What did he prescribe?
8    A.  I am not certain. It's part of the information
9  that we sent you. But I am not certain.
10   Q.  Okay. Was it an antidepressant medication that
11  you are aware of?
12   A.  Yes, it was.
13   Q.  Why did you seek out Dr. Elwood and
14  Dr. Castillo?
15   A.  Because I had suicidal tendencies.
16   Q.  When did those begin?
17   A.  During the time of the van incident and
18  especially with the incident with the school bus.
19   Q.  Which was in about March 2005, is that right,
20  between February and March 2005?
21   A.  It was in March. I believe it was in March,
22  last part of March, the 1st of April.
23       MS. DiLUZIO: Mark this 13, please.
24       (Witcher Deposition Exhibit No. 13 was

Witcher
George M. Witcher

v.

C.A. # 05-2005 SSR

Sodexho, Inc.
January 12, 2006

Page 214

1   marked for identification.)
2        THE WITNESS:   There is one other.
3   Yesterday, we hired the services of Dr. Garcia.
4   BY MS. DiLUZIO:
5   Q.   Garcia?
6   A.   Yes.
7   Q.   Is Dr. Garcia a mental health professional?
8   A.   Yes, he is.
9   Q.   Why have you sought out Dr. Garcia?
10  A.   Because we wanted to have his professional
11  input.  His evaluations were totally different than
12  Dr. Elwood.  And he came highly recommended.
13  Q.   Where is Dr. Garcia located?
14  A.   Can I go in my pocket and get my card?
15  Q.   Or you could just tell me, you know.  Is he at
16  the V.A. Hospital?  Is he at another hospital?
17  A.   No, no.  He has his own private practice.
18  Q.   He has a private practice?
19  A.   On Foulk Road.
20  Q.   Okay.  Is that because you are still
21  experiencing suicidal tendencies?
22  A.   Depression.
23  Q.   Depression.  You didn't feel that Dr. Elwood or
24  Castillo's treatment was adequate?

Page 215

1   A.   The fact that Dr. Elwood, Dr. Castillo, I can't
2   get to the V.A.  Dr. Garcia came to the Riverside
3   Rehabilitation Center to see me.
4   Q.   Okay.  Now, you said that you sought out
5   Dr. Elwood in around April or May of 2005 because you
6   were having suicidal tendencies.  What in your mind
7   caused those suicidal tendencies?
8   A.   The situation, basically, that I was going
9   through, especially the van incident.
10  Q.   Okay.  Is that what you relayed to Dr. Elwood?
11  Let's start with Dr. Elwood.
12  A.   Yes, it is.
13  Q.   Did you relate to Dr. Elwood or Dr. Castillo
14  that you felt you were being discriminated against on
15  the basis of your age at work?
16  A.   Yes, I did.
17  Q.   You did.  Could you take a look at what's been
18  marked as Exhibit 13?  This is the medical records
19  that you have provided Sodexho.  This top page appears
20  to be from Dr. Castillo, and it's dated September 2nd,
21  2005.  Does it say in Dr. Castillo's synopsis that you
22  felt that you were being discriminated against based
23  on your age?
24  A.   No, I don't see where it says that.

Page 216

1   Q.   Okay.  It says here in this synopsis by
2   Dr. Castillo that you felt that you were depressed.
3   Is that right?
4   A.   Correct.
5   Q.   And what symptoms were you experiencing that
6   made you feel that you were depressed?
7   A.   Withdrawn, emotional.  Every time I thought of
8   the incident and thought of what took place the past
9   year, I became very emotional.
10  Q.   Were you eating regularly?
11  A.   No.
12  Q.   No?
13  A.   Not regularly.  Not really being a diet -- I
14  mean, being a diabetic.  I was withdrawn from the
15  little boy who's 11-years old who we have legal
16  custody of.  I did a lot of unnecessary arguing and
17  fussing with my wife.  I had a lot of very strong,
18  strong thoughts of committing suicide.
19  Q.   When did these symptoms begin?
20  A.   They began just before the bus -- almost bus
21  accident.
22  Q.   So you filed your charge of discrimination in
23  July of 2004.  Following -- so at that time,
24  obviously, you felt there was, in your mind,

Page 217

1   discrimination taking place at work.  Is that right?
2   A.   Right.
3   Q.   Did you experience any symptoms at that point,
4   any symptoms related to depression?
5   A.   No.
6   Q.   So you did not begin to experience these
7   symptoms until early 2005 after this near accident.
8   Is that correct?
9   A.   The symptoms that I would identify -- whether
10  or not I was in denial; could have been -- but, you
11  know, when I had strong thoughts of committing
12  suicide, like going down to the river and just
13  constantly would look and look into the river, had
14  thoughts of jumping in it, had thoughts of taking an
15  overdose of medication.  And the thoughts became, you
16  know, more permanent.  That's why I decided to seek
17  out help and to -- sometimes I get stubborn.  That's
18  the reason I wouldn't give in to what I thought and
19  what I feel was discrimination and retaliation.  But
20  it just became overwhelming to me.  It became so
21  overwhelming to me that I knew I had to do something.
22  It just was not working for me anymore.
23  Q.   Mr. Witcher, were there other stressors during
24  your life during that time period that could have

Witcher                                  v.                          Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR               January 12, 2006

Page 218

1  contributed to your feelings of depression?
2  **A. No.**
3  **Q.** It's mentioned in your medical records, sir,
4  that your wife had suffered and thankfully survived a
5  bought with breast cancer. When was that?
6  **A. That was in 2002.**
7  **Q.** It's also mentioned, sir, in your records that
8  you and your wife are raising, I think, is it your
9  sister-in-law's child. Is that correct?
10 **A. Yes.**
11 **Q.** When did that child come into your life?
12 **A. He came into our life 11 years ago when he was**
13 **seven-months old.**
14 **Q.** You have been raising him since that time?
15 **A. Exactly.**
16 **Q.** Were there other things in your life during
17 that time that could have contributed to your feelings
18 of depression other than this accident you almost had
19 at work?
20 **A. No.**
21 **Q.** So you think that this near accident was the
22 sole reason for your feelings of depression?
23 **A. I think when I started thinking back on the**
24 **things that took place, and I just kind of equated it**

Page 219

1  **with my early childhood and my upbringing, and that**
2  **terrible feeling came back on me again.**
3  **Q.** Did you have an unhappy or difficult childhood?
4  **A. Very, very unhappy. We were state children.**
5  **We were --**
6         MS. DiLUZIO: Mr. Witcher, I think now
7  might be a good time for a short break. We're
8  probably not going to go much longer.
9         THE WITNESS: All right.
10        (Recess taken.)
11 BY MS. DiLUZIO:
12 **Q.** Mr. Witcher, referring back again to
13 Exhibit 13, the medical records that you provided us,
14 the notes here from Dr. Elwood. It's the last page of
15 the exhibit. It looks like this is from a
16 consultation you had with him on August 15th, 2005.
17 There is a reference in Dr. Elwood's notes to your
18 complaining that co-workers at your job had referred
19 to you as "Pops" or "Old Man." That's in quotes in
20 these notes. Do you recall telling Dr. Elwood about
21 that?
22 **A. Yes.**
23 **Q.** Now, when I asked you several times today:
24 Tell me everything, all the evidence in fact you have

Page 220

1  that support your claims in this litigation, you did
2  not mention to me that coworkers had called you "Pops"
3  or "Old Man." Why is that?
4  **A. Because I didn't remember that. I, basically,**
5  **was more focused on the incident that took place on**
6  **the 4th and things that happened thereafter.**
7  **Q.** Who referred to you in this way?
8  **A. Well, John, Ursula.**
9  **Q.** Is that John Lewis?
10 **A. Yes.**
11 **Q.** And Ursula who you previously referred to as
12 "Erica"?
13 **A. Erica. I am sorry.**
14 **Q.** I want to make sure it's the same person we
15 were talking about.
16 **A. Yeah.**
17 **Q.** Anyone else?
18 **A. There were just conversations where Donna**
19 **didn't exactly call me "Pops," but it was just a part**
20 **of the conversation. I mean, that's when the "Old**
21 **Man" started.**
22        **As a matter of fact, I did go to -- I went**
23 **to Chad Lewis in reference to it because they were**
24 **making -- Donna's reference now to that I was I**

Page 221

1  **complained about being diabetic and taking my insulin**
2  **early. I am on 37 delayed insulin. So 30 units work**
3  **immediately. Then the 7 units is time based. And it**
4  **reaches its peak like three hours after you have taken**
5  **that medication. If I don't get something to eat,**
6  **then my sugar drops a lot. Donna made reference to:**
7  **"Yeah, well, that's the way old people are, you know.**
8  **They have diabetes and they have to eat, you know,**
9  **something at a precise time."**
10 **Q.** When was that comment made by Donna?
11 **A. That was in the early stages. This was, I**
12 **believe, if I am not mistaken, this was like three**
13 **days after I had started the job, and I went in and I**
14 **complained to --**
15 **Q.** So this was in April of 2003?
16 **A. Right. I complained to Mark Teoli.**
17 **Q.** You did complain to Mark Teoli?
18 **A. Mark Teoli and Chad Street. And I believe**
19 **Mark, if I am not mistaken, called Donna in and talked**
20 **to her in reference to that. At least he told me he**
21 **did.**
22 **Q.** Did you complain to Mark about the comments of
23 your co-workers, John Lewis and Erica, or simply of
24 the comment from Donna or both?

A57

56 (Pages 218 to 221)

Witcher                                  v.                          Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR              January 12, 2006

Page 222

1    A. About everybody. I was making a comment about
2    Donna, John and Erica.
3    Q. Did Mark speak with or did anyone speak with
4    John and Erica about their use of these comments?
5    A. I am not certain if he did or not. But I am
6    sure he told me that he spoke to Donna by Donna being
7    the supervisor and that -- because he asked me like a
8    couple months later if it was continuing.
9    Q. And had it continued?
10   A. No.
11   Q. So it was just the first couple days of your
12   employment?
13   A. Right. And there were times when there were
14   like old songs and that kind of stuff came up there
15   was reference made about "Pops, that's the old folks
16   stuff," and that kind of stuff there.
17   Q. About how many times was this? You said this
18   was two or three days when you started working and
19   complained to Mark Teoli. Was it every one of those
20   two or three days somebody made a comment? Was it
21   just one or are we talking about?
22   A. No. It was the first day that I took a break
23   to go in and to eat something. And when I came back,
24   the comments were made. And it was after the third

Page 223

1    day that, again, people started making fun of me. I
2    am highly offended about it, you know. I have a
3    complex. And I am highly offended when that happens.
4    Q. So was it, okay, the first day you took a break
5    to attend to your diabetes; you came back; and Donna
6    said something about your age?
7    A. No. She didn't say something about my age the
8    first day. The first day John, you know, made fun.
9    He made reference to my age.
10   Q. Okay.
11   A. You know. And what I should -- I remember I
12   shouldn't have done it, but I immediately tried to
13   defend myself being a diabetic. Then that's when
14   Donna made reference to, you know, that's what old
15   people do.
16   Q. Okay.
17   A. Somebody she knew experienced the same kind of
18   situation.
19   Q. So that was that first day of your working.
20   Right?
21   A. Yes.
22   Q. Then what about the next day? Did anybody say
23   anything that day?
24   A. Yeah. John and Erica just kind of like made it

Page 224

1    a joke in terms of, you know, old music and old
2    school, and "Pops" this and "Pops" that. And then the
3    third day when it was done, and I was just in one of
4    them moods that I got tired of it. I got sick and
5    tired of it and I went in and complained to Mark and
6    Chad. Both were in the office.
7    Q. Did Donna make any comment other than that one
8    comment that "that's what old people do" referring to
9    your diabetes?
10   A. Not to my knowledge, no.
11   Q. So after you complained to Mark Teoli after
12   that third day on the job, did Donna make any further
13   comments?
14   A. No. Not to my knowledge.
15   Q. How about John or Erica?
16   A. Yeah.
17   Q. They did continue to make comments?
18   A. Yeah, yeah.
19   Q. What kind of comments?
20   A. Again, it was in reference to old music, what
21   old people did back in the day, you know. That kind
22   of stuff there.
23   Q. Did you ever complain, make another complaint
24   regarding your co-workers?

Page 225

1    A. No, I didn't.
2    Q. Why not?
3    A. Well, I got to know both John and Erica a
4    little better. Right. And I just didn't want to
5    every time turn, run and make a complaint, make a
6    complaint, make a complaint. I got to know that John
7    was just one of those fun-loving guys and not take,
8    really take their comments personal after that point.
9    Q. So comments that John or Erica would make about
10   old songs or old movies were not directed at your age?
11   A. Yes, it was.
12   Q. They were directed at your age, you felt?
13   A. Mm-hmm. Yes, it was. At least I felt that
14   way.
15   Q. But you didn't feel it warranted a complaint?
16   A. No, I didn't. Because since I really got to
17   know John and Erica both, and I didn't take it really
18   personal. The first couple of days, I took it
19   personal. The incident -- about the incident, that
20   was never brought up any more. As a matter of fact, I
21   had told Chad that I would stop taking my insulin in
22   the morning. And I got off a half hour earlier, so I
23   didn't -- so I just wouldn't eat, and then I would
24   just ...

A58

57 (Pages 222 to 225)

Witcher
George M. Witcher

v.
C.A. # 05-2005 SSR

Sodexho, Inc.
January 12, 2006

Page 226

1  Q.  You said Mark Teoli checked up on you a little
2  while after you made your initial complaint to make
3  sure nobody was still using these terms with you.  Is
4  that right?
5  A.  Right.  Well, basically, the comments was about
6  the old and the insulin part of the -- the insulin
7  part of it and the old people thing.  I told him,
8  "No."  But I did tell him that "John and Ursula still
9  made comments as far as old people are concerned."  I
10  said, "But, you know, I am really not offended by it.
11  Now I know John and I know how John is.  And I just
12  thought, you know, it's just John happy-go-lucky way."
13  Q.  Okay.  So about when was this that Mark sort of
14  checked in on you?  Was it a month later, two months
15  later?
16  A.  We were -- he rode with me to the Foulk Road
17  Library.  And the comment came up.  So I would say
18  maybe two months later.
19  Q.  Although you told him that John and Erica
20  continued to make comments to old movies or old
21  songs --
22  A.  Or old people.
23  Q.  -- or old people, you did not want him to
24  investigate that further?

Page 227

1  A.  No, I didn't tell him I didn't want him to --
2  he didn't ask me if I wanted him to investigate it.
3  When I told him that they did, but I also told him
4  that, you know, knowing how John Lewis is and Erica,
5  right, that I did not take offense to it.
6  Q.  Why did you feel that the comments of your
7  co-workers regarding old movies or old songs were
8  directed at your age?
9  A.  Because I was only old person back there.
10  Q.  Well, what kinds of things would they say?
11  A.  Questions about, like, how old people dance.
12  Player-player, was the player-player back in your day?
13  I said, "No.  It wasn't called player-player.  It was
14  called 'Pimp Daddy's' or something of that nature," I
15  would tell him.  And comments about old songs and old
16  songs that would come up.  And they would say, "Ask
17  George.  He knows.  He was around back in that day.
18  He knows all about that old stuff."  That kind of
19  stuff there, you know.  Or like maybe an old movie
20  would come up or somebody would come up with something
21  about an old movie, you know, and then the reference
22  would come up like that.
23  Q.  How often would these kinds of comments be
24  made?

Page 228

1  A.  Oh, I don't know.  Maybe at least once a week.
2  Q.  At least once a week?
3  A.  Yeah.
4  Q.  And, again, this is by both John Lewis and
5  Erica Knight?
6  A.  For the most -- well, more John than Erica.
7  John would be the instigator or the person that would
8  come up with about the old stuff.  Sometimes maybe
9  somebody that would come through the catering area,
10  older employee, and, you know, would ask me something
11  in reference to something that took place, you know,
12  back in the day, and those comments came.  It just
13  wasn't a daily dose of it.
14  Q.  And how long did this go on?
15  A.  Oh, I imagine, it went on eight, nine months.
16  Something of that nature there.  Maybe longer.  Maybe
17  less.  I am not sure.
18  Q.  Was there ever a time that you felt these
19  comments by John or Erica kept you from performing
20  your job duties?
21  A.  No.
22  Q.  Did you always feel like you could perform your
23  job duties?
24  A.  Sure.

Page 229

1  Q.  Was there any adverse action that you suffered
2  as a result of the comments of John or Erica?
3  A.  No.
4  Q.  Was there ever a time when their comments upset
5  you to the point that you had to leave work?
6  A.  No.
7  Q.  Again, they didn't upset you enough that you
8  felt you needed to complain.  Is that right?
9  A.  No, not after the initial complaint that I
10  made.
11  Q.  Right.  Going back quickly to the February 25th
12  write-up you received for failing to report to work on
13  February 21st, 2005.  On that day, February 21st, were
14  the libraries that you delivered to, were they open?
15  A.  Yes, they were.
16  Q.  So is that why you received the counseling
17  notice, because the libraries were open and no one
18  delivered food to them?
19  A.  Yes.
20  Q.  Who went over that counseling notice with you?
21  A.  Carol.
22  Q.  She explained to you that the libraries were
23  expecting a food delivery and they didn't get them and
24  that's why you were getting written up?

A59

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Witcher                                v.                      Sodexho, Inc.
George M. Witcher            C.A. # 05-2005 SSR            January 12, 2006

Page 230

1   A. Yeah. But, I mean, it happened before days
2   that I didn't come in I didn't get written up. I
3   missed days before. Normally, when I missed days,
4   they just have somebody make up a few orders. A lot
5   of times, they had enough food to last them.
6   Q. But Carol did explain to you that that's why
7   you were receiving that counseling notice?
8   A. Yes.
9   Q. What was your response to receiving the
10  counseling notice?
11  A. I was upset. I was very upset.
12  Q. I noticed that you refused to sign the
13  counseling notice. Is that right?
14  A. That's correct.
15  Q. Was there any further discussion with you about
16  that counseling notice?
17  A. No.
18  Q. And that was February 25th, '05. Your
19  performance appraisal for the year 2004 to 2005 was
20  given to you on April 21st. Is there any indication
21  in that performance review that that prior counseling
22  notice had any effect on your increase?
23  A. No.
24  Q. And regarding your raise for the first year of

Page 231

1   your employment, the 2003 to 2004 year that you didn't
2   get until early '05, and that was made retroactive,
3   you indicated that when you spoke with Patty Weick
4   back in July of '04 during her investigation of your
5   claim that Donna was prejudice that you told her about
6   the fact that you hadn't gotten a raise yet.
7   A. Correct.
8   Q. Is that right?
9       Was Patty Weick responsible for conducting
10  performance evaluations for you?
11  A. No. Patty Weick was in charge of human
12  resources, I think senior manager of human resources.
13  But I never got a job performance. As a matter of
14  fact nobody that I know of that worked at the library
15  got a job performance, but they still got raises.
16  Q. Okay. Would Patty Weick as an HR
17  representative have been the individual who would have
18  given you the raise?
19  A. No. But Patty Weick would have been in a
20  position to find out the reason why, if it was
21  something that I was supposed to have gotten. At
22  least she gave me that impression. Let me put it that
23  way there.
24  Q. Did you follow up with Ms. Weick about the fact

Page 232

1   that you hadn't gotten a raise?
2   A. No, I did not.
3   Q. Did you complain to anyone else, Carol Sexton,
4   for example, that you hadn't gotten a raise
5   performance review?
6   A. Yes, I did.
7   Q. When was that?
8   A. That was in, if I am not mistaken, late August.
9   Q. Of 2004?
10  A. Yes.
11  Q. What was Carol's response?
12  A. She told me she would check into it.
13  Q. And then you didn't hear back?
14  A. No, I didn't.
15  Q. Did you follow up with Carol on that?
16  A. No, I didn't. I just felt that because I, you
17  know, I did file the discrimination charge that this
18  was the reason why. And I felt that I wasn't going to
19  get one.
20  Q. Now, you mentioned other employees who had
21  gotten raises. Who are you referring to?
22  A. Chinara Jackson.
23  Q. Who was that?
24  A. She was an employee that worked at the library.

Page 233

1   A cashier at the cafe.
2   Q. How do you know she got a raise and when?
3   A. Because she told me.
4   Q. Anyone else?
5   A. There was another young lady that worked at the
6   Newark Library. At the top of my head, I can't recall
7   her name.
8   Q. What, she told you she had received a raise?
9   A. Yes.
10  Q. So because these two individuals you had spoken
11  with indicated they had received raises, that's what
12  made you think you should have received one as well?
13  A. That's right. As a matter of fact, there was a
14  third person who left -- who had left the company, and
15  we both had started, roughly, about the same time. I
16  think I started maybe a day or two before her because
17  we were brought in when they got the library account.
18  And, you know, she got -- she told me she got two
19  raises.
20  Q. Prior to mentioning it, mentioning to Patty
21  Weick during her discrimination investigation that you
22  still hadn't received a raise in July of 2004, had you
23  complained to anyone else?
24  A. To Sharon, who was the supervisor.

Wilcox & Fetzer, Ltd.        Professional Court Reporters            (302)655-0477

Witcher                                          v.                    Sodexho, Inc.
George M. Witcher                       C.A. # 05-2005 SSR          January 12, 2006

Page 234

1   Q.  What did Sharon say?
2   A.  She told me she would check into it.
3   Q.  Did you follow up with her?
4   A.  No, I didn't.
5   Q.  Do you recall the name of the third employee
6   who said that she received a raise?
7   A.  No, I can't.  No, I can't.
8   Q.  Okay, Mr. Witcher.  You provided certain
9   discovery responses to Sodexho in this matter.
10  Correct?
11  A.  Correct.
12  Q.  In those responses, you indicated that there
13  may be some witnesses that you would want to call if
14  this case were to go to trial.  Is that correct?
15  A.  Correct.
16  Q.  Have you interviewed or taken statements from
17  any potential witnesses?
18  A.  No, I have not.
19  Q.  Do you intend to call any expert witnesses?
20  A.  Yes, I do.
21  Q.  Who is that?
22  A.  Dr. Garcia.
23  Q.  Have you seen Dr. Garcia yet?
24  A.  I saw him yesterday.

Page 235

1   Q.  For the first time?
2   A.  Yes.
3   Q.  Why do you intend to call Dr. Garcia?
4   A.  From the psychological standpoint.
5   Q.  To discuss your psychological condition?
6   A.  Yes.
7   Q.  You also provided something called a diary in
8   response to our discovery request.  Do you know what I
9   am referring to?
10  A.  Yes, I do.
11  Q.  Did you write that?
12  A.  Yes, I did.  Well, my wife wrote it down, but I
13  gave her the information, yes.
14  Q.  Did you dictate it to her or did you just sort
15  of tell her the information and she copied it in her
16  own words?
17  A.  I told her the -- well, dictated.  She wrote
18  down what I told her.
19  Q.  When did you do that?  When did you take that
20  down, have your wife take that down?
21  A.  We went over -- because I started marking the
22  calendar of different events that was taking place,
23  and then we went over it one day at the hospital.  She
24  started writing down the information.

Page 236

1   Q.  So is that recently then?
2   A.  It was, I would say, within the last two months
3   anyway.
4   Q.  You also provided an exhibit about punitive
5   damages.  Do you know what I am referring to?
6   A.  Yes, I do.
7   Q.  Is that a document that you typed?
8   A.  It's a document that I had given -- because I
9   can't do any typing.  All this here was done after I
10  had the accident.  But it was information that I had
11  given to my wife.
12  Q.  And she typed it up for you?
13  A.  Yes.
14  Q.  Is the same true of your emotional distress
15  exhibit?
16  A.  Everything that was submitted was, basically,
17  done by my wife.
18  Q.  They were both prepared in the last two months?
19  A.  Yes, two to three months.  I am not sure when
20  you were requesting that.
21  Q.  In response to our discovery request?
22  A.  Yes.
23  Q.  Do you have any other documents, Mr. Witcher,
24  in your possession that you have not previously

Page 237

1   identified or given to Sodexho that would support your
2   claims in this litigation?
3   A.  No, I don't.
4   Q.  I just want to go back and do a little
5   background clean-up if I can.  Before Sodexho, where
6   did you work?
7   A.  I had my own business, a medical transportation
8   company.
9   Q.  For how long?
10  A.  Two and a half years.
11  Q.  Two and a half?
12  A.  Two and a half years.
13  Q.  And when you say medical transportation, you
14  took individuals to medical appointments?
15  A.  Yes.
16  Q.  What was that time period that you did that
17  work?
18  A.  I believe it was 2000 to 2003.
19  Q.  What was that company called, sir?
20  A.  On-time Medical Transport Service.
21  Q.  What did you do before that?
22  A.  It's hard to try to retrace.  Because I did, in
23  between, I did production.  I told you I was -- I had
24  not only did -- I produced my own TV program, but I

A61                                    60 (Pages 234 to 237)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Witcher                          v.                        Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR            January 12, 2006

Page 238

1  produced programs for other hosts that was on TV.
2  Plus I was road manager for a group called the Gospel
3  Ambassadors. They called them the Gospel Ambassadors.
4        You are saying prior to -- let me
5  backtrack. You wanted the last job before Sodexho?
6  Q.  Yes. I am trying to get your employment
7  history.
8  A.  Yeah, the last job before Sodexho. As a matter
9  of fact, I worked both jobs for one year together, and
10  that was Bennet Security Services.
11  Q.  What did you do for them?
12  A.  I was a security guard at New Castle County
13  Courthouse.
14  Q.  How long did you have that job?
15  A.  For two years.
16  Q.  Is that --
17  A.  Two years, one year. One year.
18  Q.  So 2002 to 2003?
19  A.  Correct. No. 2003 to 2004.
20  Q.  So you had two jobs, the job with Sodexho and
21  this job at the same time?
22  A.  Right.
23  Q.  Then prior to that is when you had your medical
24  transportation company?

Page 239

1  A.  Yes.
2  Q.  Then prior to that? So prior to 2000.
3  A.  Prior to 2000, I don't know because I did a lot
4  of promotional work. You know --
5  Q.  Did you work for yourself or did you work for a
6  company?
7  A.  No, no. I worked for myself. Well, I worked,
8  basically, like a freelance, like a freelance
9  producer. I did videotapes. I did the promotion,
10  like I said, of the particular group. I also was the
11  booking manager for the group. But I am trying to
12  think what did I do prior to that. It's really hard
13  for me to remember.
14  Q.  Is it fair to say that you worked for yourself
15  for the great bulk of your career?
16  A.  I would say for the most part.
17  Q.  About how many years would you say that you
18  were basically working for yourself?
19  A.  All together, off and on, 10, 15 years.
20  Q.  Why did you leave the job at Bennet Security?
21  A.  Because it was too much. I was working two
22  full-time jobs. It was just too much for me.
23  Q.  So you voluntarily quit?
24  A.  Yes.

Page 240

1  Q.  Why did you quit there instead of Sodexho?
2  A.  Because Bennet didn't have benefits; Sodexho
3  did.
4  Q.  Mr. Witcher, have you ever initiated a
5  discrimination claim against any previous employer
6  before Sodexho?
7  A.  No, not to my knowledge, no.
8  Q.  Have you been involved in any lawsuits prior to
9  this one, civil actions?
10  A.  Yes, I have.
11  Q.  Can you tell me about that?
12  A.  I believe in -- I don't know the case number.
13  That's why we didn't write them down. There was two
14  charges -- well, let me explain to you what happened.
15  I was a freelance driver for a company. There was an
16  accident that had occurred, and the insurance company
17  sued both them and myself as being the driver. They
18  in turn sued me. We went to arbitration. The
19  insurance company did not show up, so they ended up
20  dismissing the case.
21  Q.  Okay. So you were involved in an action
22  arising out of a car accident?
23  A.  Yeah.
24  Q.  Any other actions?

Page 241

1  A.  Yeah. There was an action involving a
2  production that I had along with a church, and the
3  outcome of that, it was arbitrated and we had to pay
4  $150 for production time. That was split between the
5  church and myself.
6  Q.  Anything else?
7  A.  Could be. I just -- well, I was involved in a
8  motorcycle accident, I think, back in '90, '91.
9  Something I mentioned there.
10  Q.  What's your educational history, Mr. Witcher?
11  A.  Well, I went to the -- I completed the 10th
12  grade. I completed G.E.D. in the military. And I
13  took a course or two of business at Goldey Beacom
14  college.
15  Q.  Did you receive a degree from Goldey Beacom?
16  A.  No, I did not. I only took a course or two.
17  Q.  When were you in the military, sir?
18  A.  Way back when. 1962 to '65. The Army.
19        MS. DiLUZIO:  Just give me one moment.
20  We'll just take a couple-minute break.
21        (Recess taken.)
22  BY MS. DiLUZIO:
23  Q.  Okay, Mr. Witcher. You indicated you had just
24  seen a Dr. Garcia for the first time yesterday.

A62

61 (Pages 238 to 241)

Witcher
George M. Witcher

v.
C.A. # 05-2005 SSR

Sodexho, Inc.
January 12, 2006

Page 242

1  A. Correct.
2  Q. Did anyone tell you that you needed a medical
3  expert for this litigation?
4  A. No. I felt that I needed a medical expert.
5  And also, it's our intention that once we've finished
6  with my rehabilitation, I still feel that the need is
7  still there, that I do need to get over this
8  situation. And the V.A. Hospital, they're good, but
9  as you can imagine, with the Vietnam era, there are a
10  lot of patients, a tremendous amount of patients that
11  is going through psychological evaluations. And it's
12  hard to get appointments and get appointments, you
13  know, in kind of a timely manner. And I felt the best
14  possible thing is to be able to have someone that I
15  can see on a more regular-type basis.
16  Q. Did you ever speak with an attorney about this
17  case?
18  A. Yes, I did.
19  Q. Is there a reason why you didn't retain an
20  attorney or you chose not to retain an attorney?
21  A. Yeah. It's hard to find attorneys that handle
22  these kind of litigations. The one that was a
23  regular -- two of them we talked to just felt from a
24  monetary standpoint it wouldn't be worth their while.

Page 243

1  They were kind of high profile attorneys. And my
2  personal attorney, who had been giving me legal
3  advice, does not handle these kind of cases.
4  Q. And who was that?
5  A. Robinson, Grayson & Dryden. Mr. Eric Grayson
6  is my personal attorney.
7  Q. Did Mr. Grayson give you any legal advice
8  regarding this litigation?
9  A. He's talked to me in regards to questions I
10  would ask.
11  Q. So he has?
12  A. Yeah, he has given me information.
13  Q. How often have you spoken with Mr. Grayson
14  about the litigation?
15  A. Not that often. Maybe, over a period of
16  time -- especially when I got hurt, there are a lot of
17  things that I just couldn't do; I just couldn't get
18  out and do the research -- maybe I talked to him two
19  or three times.
20  Q. When was the first time you spoke with him
21  about this situation?
22  A. Oh, I can't recall now.
23  Q. Did you speak with him before you filed the
24  lawsuit?

Page 244

1  A. I think, yes. I know I did.
2  Q. Following up on your claims of emotional
3  distress, Mr. Witcher. You indicated that you began
4  experiencing these suicidal tendencies in early '05.
5  It's noted in your medical records that you lost your
6  mother at a young age. Is that correct?
7  A. Correct.
8  Q. Do you feel that that loss could have
9  contributed to your recent depression?
10  A. No.
11  Q. It's also noted, sir, in your medical records
12  that after your mother's death -- and I believe you
13  alluded to it earlier -- you were placed in foster
14  care for a good part of your childhood. Do you feel
15  that that contributed in any way to your recent
16  depression?
17  A. It could have had an effect. But when I think
18  about the events as far as my childhood is concerned,
19  you know, and being picked on, things I went through
20  from child abuse, that point is concerned, I was a
21  pretty isolated child. I received discrimination on
22  both sides of the track. You know, not only whites
23  discriminated against me, but blacks as well. Being
24  very dark skin during my time, you know, it was

Page 245

1  something for other brown skin and light skin people
2  to make fun of. So it was a laughing post. And those
3  are the kind of things that I tried to stay away from
4  as much as I could.
5  Q. So it's fair to say that those experiences
6  you've had in your lifetime, particularly in your
7  childhood, could certainly have contributed to your
8  recent feelings of depression?
9  A. Yes.
10  Q. Circling back to the comments made by your
11  co-workers, John Lewis and Erica or Ursula Knight. Is
12  it fair to say that you became friends with
13  Mr. Lewis --
14  A. Yes.
15  Q. -- during the course of your employment?
16      Is the same true of Erica, would you have
17  called her a friend?
18  A. Yes.
19  Q. Did these comments they made to you, did you
20  have a typical response to them? Was there a friendly
21  banter that developed between you and John and Erica?
22  A. Well, the comments became less offensive. As I
23  said, relating to my childhood and how I would become,
24  you know, very angry and taking comments personal, I

Witcher                                    v.                    Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR              January 12, 2006

Page 246

1  built up an isolation wall so that I could keep those
2  things from affecting me for the most part. Once I
3  got to know someone, to be able to distinguish when
4  somebody was, you know, being sincere and I took it
5  personal or it was just a friendly gesture, but even
6  that at a friendly gesture, you know, a steady dose of
7  it, I would become offended by it, you know.
8        So I did have and I still do have a
9  complex, you know, in regards to when I think that
10 people are personally attacking me, whether it's
11 because of my education, whether it's because of my
12 skin color, you know, regardless, when I think it's
13 becoming personal, then I become very defensive.
14   Q.  When John or Erica would call you, you know,
15 "Pops" or "Old Man," were there similar things that
16 you would say to them because you were friends that
17 you took the liberty of saying to them, you know,
18 similar names that they were inappropriate, but you
19 took certain liberties because you were friends?
20   A.  No. I made -- I am sure I made comments, but I
21 didn't make no comments that I thought would be
22 offensive to them.
23   Q.  Did you make comments about their youth?
24   A.  No, no.

Page 247

1  Q.  Did -- I think you said that perhaps once a
2  week a comment regarding your age would be made by
3  other John or Erica. Is that correct?
4  A.  Yes.
5  Q.  Was there ever a time when you were afraid or
6  apprehensive about going to work because you were
7  afraid of what Erica or John would say?
8  A.  Afraid, no.
9  Q.  Or just sort of anxious? How about anxious
10 about going to work because you were afraid that
11 perhaps they'd make a comment that related to your
12 age?
13 A.  No.
14 Q.  Was there ever a time where you told John or
15 Erica: "Knock it off, I don't appreciate those
16 comments," or anything similar?
17 A.  No. Because, you know, the comments, for the
18 most part, was not directed at me, where, perhaps, if
19 I was in a conversation with someone else and they
20 made comments about old people, where I would take it
21 personally, where a lot of times that the comments
22 that they made me about music, about maybe the kind of
23 clothing that older people wore or just the lifestyle
24 of old people or something in regards to, you know,

Page 248

1  they're bringing back the old shows, that kind of
2  stuff there, no, no, I didn't take it personally, you
3  know.
4  Q.  So you did not find those comments offensive?
5  A.  No.
6  Q.  So is it fair to say then that their comments
7  were directed to old TV shows, old movies, old music,
8  maybe even old clothes, maybe even old dance routines,
9  but not necessarily old people?
10 A.  Well, what old people did. You know, what I
11 mean?
12 Q.  Mm-hmm.
13 A.  When it was related in that sense of the word,
14 then I really didn't find that offensive to me.
15 Q.  Did you have any nicknames for John or Erica?
16 A.  No.
17 Q.  You just called them "John" and "Erica"?
18 A.  Or "Ursula."
19 Q.  "Ursula." Ursula/Erica.
20     MS. DiLUZIO: We can mark this as 14,
21 please.
22     (Witcher Deposition Exhibit No. 14 was
23 marked for identification.)
24 BY MS. DiLUZIO:

Page 249

1  Q.  So John and Erica's comments, were they ever
2  directed at capabilities of older people or was it
3  more observations about past events?
4  A.  I am sorry. I was reading. Would you repeat
5  that?
6  Q.  Sure. John and Erica's comments, were they
7  ever in the nature of capabilities of older people,
8  like, I don't think old people could, you know,
9  perform that task, or was it more in the nature of,
10 gee, what songs were popular in the 50s?
11 A.  Well, it depended on the conversation that came
12 up. Yeah, surely, there were times as far as
13 capabilities were concerned, and there was, you know,
14 about old songs, old movies. So it was a mixture.
15 Q.  So there were times when they made comments
16 about capabilities of older persons?
17 A.  Right.
18 Q.  About how many of those kinds of comments were
19 there?
20 A.  It's hard to say. It was just a mixture. It
21 was general conversation, you know, in the workplace.
22 Things go by, time goes by faster when you are talking
23 and carrying on. So it was just general conversation.
24 We -- I know John and myself, we constantly talked

Witcher                                v.                          Sodexho, Inc.
George M. Witcher              C.A. # 05-2005 SSR              January 12, 2006

Page 250

1  about sports and, you know, how old are basketball
2  players. That kind of stuff there related to athletes
3  and entertainers and things of that nature there. So
4  it's hard to say how many times it really took place.
5     Q. Were any of the comments directed at you
6  personally?
7     A. Yeah, there was conversation about playing
8  basketball, you know, and John would say, "Old Man,
9  I'll drive you in the ground." I said, "Well, don't
10  let the age fool you. I can't keep up with you full
11  court, but I'll hold my own half court."
12    Q. But did John's comment include a reference to
13  your age or was it, you know, he made the remark that
14  he thought he could beat you in basketball when you
15  said, "Hey, don't let my age fool you"?
16    A. No. He said, "Old man." So he made reference
17  to my age, sure.
18    Q. Was that just one conversation?
19    A. Well, there was different conversations
20  about, whether it was dancing, you know, the ability,
21  because of the age factor. We would talk about boxers
22  when, you know, boxers were leaving, they're at the
23  end of their career and they were fighting, competing
24  against younger players, you know, the old factor was

Page 251

1  a reference. And the same way with other athletes
2  that were trying to keep up with the younger, more
3  faster young people.
4     Q. But was that conversation you had with John
5  Lewis about playing basketball the only conversation
6  you can recall where a comment was made about your
7  age, specifically about you, George Witcher, and your
8  abilities?
9     A. Oh, no, no. Other conversations in reference,
10  you know, to the age factor.
11    Q. Can you recall any others?
12    A. Well, they're kind of personal, so I -- you
13  know, I would like to stay away from them, if I could.
14    Q. Were these comments made by Mr. Lewis?
15    A. Yes.
16    Q. Were these comments that you found offensive?
17    A. No, not really.
18    Q. Did you make any complaints regarding any of
19  these comments?
20    A. No.
21    Q. Did you ever ask Mr. Lewis not to make those
22  comments in the future?
23    A. No. No, I didn't. Again, I just didn't --
24  knowing, as I said before, once I got to know John,

Page 252

1  right, and I knew where John was basically coming
2  from, then I just was not offended.
3        I think John knew me well enough to know
4  that when he made comments that was off-base because,
5  you know, my actions kind of showed it, right, so he
6  just -- he stayed away from it. He never crossed that
7  particular barrier.
8     Q. Okay. Mr. Witcher, the court reporter has
9  handed you a document marked Exhibit 14. And it
10  appears to be a letter on Sodexho letterhead, dated
11  July 6th, 2005, addressed to you and signed by a
12  Mr. Gordon Ellis, who was the human resources director
13  of Sodexho. Have you seen this letter before?
14    A. Yes, I have.
15    Q. Did you receive it on or shortly after
16  July 6th, 2005?
17    A. I believe -- you said after July 6th?
18    Q. Well, it's dated July 6th. So did you receive
19  it that day or shortly thereafter?
20    A. No. I received it the day after.
21    Q. The day after. Okay. And this letter is in
22  response to your resignation that you had turned in on
23  June 23rd. Is that right?
24    A. Correct.

Page 253

1     Q. And what does Mr. -- what does this letter say?
2  If you could summarize.
3     A. If I could summarize. I believe it was in
4  reference to the allegations of my reason for
5  quitting, that the company did -- I think he said that
6  the company did not tolerate it or he didn't know
7  anything about it, and he asked me if I would
8  reconsider and stay with the company, to just
9  basically summarize it.
10    Q. In fact, Mr. Ellis in this letter invites you
11  to tell him of any allegations of discrimination that
12  hadn't previously been investigated by Sodexho so that
13  he could investigate. Is that right?
14    A. Yes. I believe so. That's true.
15    Q. As you said, the letter does invite you to
16  reconsider your resignation and remain in Sodexho's
17  employ. Right?
18    A. Correct.
19    Q. Did you respond to Mr. Ellis' invitation?
20    A. No, I didn't.
21    Q. Did you respond to this letter in any way?
22    A. No, I didn't.
23    Q. Why not?
24    A. Because, first of all, in March, I received

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Witcher                                          v.                                   Sodexho, Inc.
George M. Witcher                        C.A. # 05-2005 SSR                      January 12, 2006

Page 254

1   three phone calls, three different phone calls
2   about -- from the investigator, Mr. Theo Robinson, in
3   reference to Sodexho had made three different
4   settlement offers. Besides the monetary offer that
5   was made, there was a request all three times that I
6   had to resign from the company. They wanted me to
7   resign from the company.
8        Secondly, I had put this notice -- I had
9   put my notice in two weeks prior to receiving this
10  letter. I received this letter, and it came by
11  special delivery the last day of employment. I had
12  already left the company when I officially saw and
13  read that letter.
14  Q.  But this letter is offering you reinstatement.
15  In fact, it says, "This letter serves as an
16  unconditional reinstatement of your position with the
17  same terms and conditions of employment." So you
18  didn't feel you couldn't remain at your employment
19  despite the terms of this letter?
20  A.  No, I didn't. Because four months prior, there
21  was three requests for me to resign from the company.
22  So there was nothing in this letter that made me feel
23  that the company was serious. Plus, I was going
24  through a highly depressed stage. I felt that in

Page 255

1   order for me to get back to the road of recovery --
2   because I have fought this here, as far as I was
3   concerned, trying to stay on with the company, as long
4   as I chose to fight it. Because I felt if I kept on,
5   you know, I might have committed suicide. And I
6   didn't want to take that chance that that would
7   happen. And I just had no confidence. As far as this
8   letter was concerned, I did not believe the letter.
9   So that's why I didn't respond to the letter. I
10  didn't believe that there was any sincerity attached
11  to it.
12  Q.  Just a clean-up so we can make sure all your
13  discovery responses are clear. Can you list for me
14  all the people you have spoken with about this
15  lawsuit?
16  A.  All of the people?
17  Q.  Yes.
18  A.  I spoke to --
19  Q.  Specifically about the lawsuit.
20  A.  I spoke to quite a few people in regards to the
21  lawsuit. Family members. Do you need individual's
22  names?
23  Q.  Yes.
24  A.  Carolyn Witcher. Renee Witcher. Kizzy

Page 256

1   Witcher. Joanne Stanley. Tony Stanley.
2   Q.  Are these people all family members that you
3   have listed thus far?
4   A.  Yes.
5   Q.  Okay.
6   A.  Reverend Arcessa Townsend.
7   Q.  Okay.
8   A.  Reverend Bullock. Dr. James Thomas. Thomas
9   Neuberger. Jeff Martin. Another attorney I can't
10  name. I can't think of his name. Eric Grayson. Glen
11  Ward. Dr. James -- I don't know if I said Dr. James
12  Thomas. Did I give you that name?
13  Q.  You did.
14  A.  Okay. Dr. Garcia. Dr. Elwood. Dr. Castillo.
15  And I can't recall the name of the other people.
16  Q.  Have you spoken to anyone currently or formerly
17  employed by Sodexho about the lawsuit or the claims in
18  the lawsuit?
19  A.  Yeah. During -- while I was employed, I talked
20  to Beulah. I don't know what Beulah's last name is.
21  Betty. John Lewis. Erica Knight. Michelle. I am
22  not sure of Michelle's last name. Sharon. Chinara.
23  And I can't recall anyone else.
24  Q.  Is that everyone you can recall?

Page 257

1   A.  That I can recall. I am sure there is a lot
2   more, but I can't recall employees, past employees and
3   non-employees, but -- I just can't recall off the top
4   of my head.
5   Q.  Do you have last names for any these Sodexho
6   employees? I think you said Erica Knight and John
7   Lewis. For the other individuals.
8   A.  No. But a part of the discovery that we sent,
9   I think, I know that I believe Sharon's name -- Sharon
10  is a part of the unit manager. Michelle works over
11  there. And Chinara.
12  Q.  Is it -- I believe in your discovery you have a
13  Sharon Hoffecker?
14  A.  Yes.
15  Q.  Is that her?
16  A.  Yes.
17  Q.  Michelle Fermier?
18  A.  Yes.
19  Q.  Is it Chinara Jackson?
20  A.  Mm-hmm.
21  Q.  And you provided addresses in your discovery
22  for Dr. Elwood, Dr. Castillo, Dr. Thomas. These other
23  individuals that you have just identified for me are
24  not identified in your discovery responses. Do you

**A66**

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Witcher
George M. Witcher

v.
C.A. # 05-2005 SSR

Sodexho, Inc.
January 12, 2006

Page 258

1  have addresses for any of them or can you follow up
2  with me for that?
3      A.  No, I don't have addresses.  I just have the
4  work phone numbers.  I don't have the addresses.
5      Q.  What are those phone numbers, do you know?
6      A.  I don't have them with me.
7      Q.  You don't know the addresses or phone numbers
8  of any of these folks that you have listed for me?
9      A.  For Sodexho employees?
10     Q.  No.  The individuals before that, all the
11  people you listed that you have spoken to about the
12  lawsuit.
13     A.  Most of them are my address.  Kizzy Richard, I
14  think is 2318 Tulip Street, in Wilmington.  Renee
15  Witcher is 2601 Tatnall Street, in Wilmington.  I am
16  not sure -- I know Reverend Townsend is, I believe,
17  Compton Tower, 5th & Walnut Street, in Wilmington.
18     Q.  Is there an apartment number or a unit number?
19     A.  It is, but I don't know.
20     Q.  How about the Stanleys, Joanne and Tony
21  Stanley, do they live at the same address?
22     A.  Joanne lives with me.  Tony is moving Saturday.
23  They're all sons and daughters.  They're moving
24  Saturday.  He's moving Saturday.  So I don't know what

Page 259

1  his present address is going to be.
2      Q.  How about Reverend Bullock?
3      A.  Reverend Bullock I can give you -- he's my
4  pastor -- I can give you the administrative office,
5  and he will get any correspondence.
6      Q.  What church is that?
7      A.  That's Canaan Baptist Church Administrative
8  Office.  It's East 35th Street.  I think it's 212 East
9  35th Street.
10     Q.  James Thomas.  You did give us an address for
11  James Thomas.  I am familiar with Messrs. Neuberger
12  and Martin.  How about Mr. Grayson?
13     A.  He's 910 Foulk Road, in Wilmington.
14     Q.  And Glen Ward?
15     A.  He's in the same office.
16     Q.  And Dr. Garcia, you said he was in private
17  practice?
18     A.  Yes.
19     Q.  And did you --
20     A.  Yeah.  I have his business -- do you want his
21  business card.
22     Q.  If it's easy for you to get to.
23     A.  It may not be that easy to get to.
24     Q.  That's okay, Mr. Witcher.  We can follow up on

Page 260

1  that?
2      A.  Well, my wife has the information.
3      Q.  You also have in your discovery identified a
4  captain bearing, James Bering?
5      A.  James Bering.  We chose not to use him.  Did
6  you get the last bit of information that I submitted?
7      Q.  We did.
8      A.  We excluded all of our professional witnesses.
9  I will be doing another supplement because we're going
10  to add Dr. Garcia as our professional witness.
11     Q.  Okay.  I appreciate that.
12         MS. DiLUZIO:  Okay, Mr. Witcher, I have no
13  further questions.  Thank you for your time today.
14         THE WITNESS:  Thank you.
15         (Deposition concluded at 4:44 p.m.
16             -  -  -  -

Page 261

1           I N D E X
2  WITNESS:  GEORGE M. WITCHER          PAGE
3      Examination by Ms. DiLuzio         2
4      WITCHER DEPOSITION EXHIBITS
5  NO.                              MARKED
6   1   Letter by Mr. Rogers              29
7   2   Constructive counseling notice    33
        for Mr. Gary Rogers
8
9   3   Excerpt from Sodexho employee handbook  69
10  4   Document entitled "Employee Handbook    70
        Acknowledgment"
11  5   Drawing                          93
12  6   Document headed "Meeting with    101
        George Witcher: June 17, 2004
13      10:15 a.m."
14  7   Letter, dated 7/7/04 to  G. Witcher  130
        from Ms. Welck
15
    8   A document titled "Constructive     139
16      Counseling Notice"
17  9   Charge of discrimination        157
18  10  Performance review              162
19  11  A document titled "Constructive  185
        Counseling Notice"
20
21  12  Letter, dated 6/23/05, to C. Saxon   203
        from G. Witcher
22  13  Three-page document re: medical record 213
23  14  Letter, dated 7/6/05, to G. Witcher  248
        from G. Ellis
24

66 (Pages 258 to 261)

A67

Witcher                                    v.                          Sodexho, Inc.
George M. Witcher                   C.A. # 05-2005 SSR              January 12, 2006

Page 262

1
2
3          REPLACE THIS PAGE
4          WITH THE ERRATA SHEET
5          AFTER IT HAS BEEN
6          COMPLETED AND SIGNED
7          BY THE DEPONENT.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 263

1  State of Delaware   )
                       )
2  New Castle County   )
3
4          CERTIFICATE OF REPORTER
5
       I, Lucinda M. Reeder, Registered Diplomate
6  Reporter and Notary Public, do hereby certify that
   there came before me on the 12th day of January 2006,
7  the witness herein, GEORGE M. WITCHER, who was duly
   sworn by me and thereafter examined by counsel for the
8  respective parties; that the questions asked of said
   witness and the answers given were taken down by me in
9  Stenotype notes and thereafter transcribed by use of
   computer-aided transcription and computer printer
10 under my direction.
11     I further certify that the foregoing is a true
   and correct transcript of the testimony given at said
12 examination of said witness
13     I further certify that I am not counsel,
   attorney, or relative of either party, or otherwise
14 interested in the event of this suit.
15
16
17          Lucinda M. Reeder, RDR, CRR
            Certification No. 132-RPR
18          (Expires January 31, 2008)
19
20
   DATED:      1-23-06
21
22
23
24

A68

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

ATTACH TO DEPOSITION OF: *George M. Witcher*

DATE TAKEN: *January 12, 2006*

IN THE MATTER OF: *Witcher v Sodexho, Inc.*

## ERRATA SHEET

<u>INSTRUCTIONS</u>:  After reading the transcript of your deposition, please note any change or correction and the reason therefor on this sheet.  **Do not make any marks or notations on the transcript itself.**  Rule 30(e) governing this procedure is enclosed.  Please sign and date this errata sheet and return it to our office at the address indicated below.  Thank you.

| PAGE | LINE | CHANGE OR CORRECTION AND REASON |
|------|------|--------------------------------|
| 8 | 17 | "Juanita" Not "Anita" |
| 8 | 22 | "to" Not "top" |
| *GW* |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

I have read the foregoing transcript of my deposition and, except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

DATED: *2-21-06*

_____
(Signature of Deponent)

RETURN TO:  WILCOX AND FETZER, LTD.
            1330 King Street
            Wilmington, DE  19801

**A69**



DEPOSITION EXHIBIT
Witcher 1
1-12-06 LR
FENGAD 800-631-6989

# Attention Carol

I Gary Rogers apologized to George Witcher at the library located at 1300 Foulk Rd the day I offended him. He brought it to my attention I offended him by referring to his age and he didn't understand it, I quickly told him I was sorry and I didn't mean any harm by the statement and I was wrong. He accepted and left the office at which time I thought this was the end. The apology was given by myself in my office at the library 5 minutes after I offended George. Before he left the building he came back to my office and said he understood everything I said with the exception of me making mention of his age and the fact he's one of the oldest employees at Darley Mills and he didn't understand what this had to do with his job, and job duties. Again I said your right and I'm sorry to have implied he couldn't do the job because of him being older. In conclusion I don't remember the exact time or date of the incident I only know I apologized 5 minutes later when George made me realize I offended him.

Sincerely
Gary Rogers

# CONSTRUCTIVE COUNSELING NOTICE

Employee's Name _Gary Rogers_____ Social Security # _____

Business Unit: _New Castle Library_____ Business Segment: _Corporate Services_

Type of Constructive Counseling (check one): _✓_ Coaching ____ Written Warning ____ Termination

Describe the nature and dates of the unsatisfactory performance or conduct (be specific):

_See Attachment_

Describe in specific detail the level of performance or conduct that you consider satisfactory:


State the timeframe in which you expect the employee to achieve satisfactory performance or conduct:


Identify the specific action or actions which may occur next if they employee does not demonstrate and maintain satisfactory performance or conduct:




_Juanita Congo_____        _10/3/04_____
Manager's Signature                      Date


**EMPLOYEE ACKNOWLEDGEMENT**

Employee Comments:

PENGAD 800-631-6989

DEPOSITION
EXHIBIT
_Witchel_
_1-12-06_  _LR_



_____        _____
Employee's Signature                             Date


The employee's signature does not necessarily indicate agreement with the content of this Constructive Counseling Notice but does at least acknowledge receipt of the form and the content (or lack) of Employee Comments.

An employee's decision not to sign this form should be noted on the Employee's Signature line, preferably with a witness present. The witness should initial the notation of refusal to sign as well.

Distribution:  Original to Human Resources in Allentown Office for Personnel File (becomes part of permanent file)
         Copy to employee's Personnel File at Unit
         Copy to employee

A71

## Notes from meeting with Gary Rogers GM at New Castle Library

I (Juanita Congo) went to the Brandywine Library Friday, October 3, 2003 at approximately 3:00 pm to speak with Gary about what had transpired between he and George.

When I walked in Gary seemed a little out of sorts but when I asked if he was okay Gary replied yes, so I asked if we could talk. When we set down, I explained to Gary that George Withcher the prep/driver for the library and I had spoken earlier that day and George felt that Gary had made statements that were of a discriminating nature. George felt that Gary's referencing his age was discriminatory and that he was not happy with Gary's comments. I asked Gary to tell me what he said to George and why.

Gary had been at the unit to observe Georges performance to get a handle on what George did on a daily basis to help build a job description and help to streamline some daily practices. Gary said that when he was observing George, George had dropped a knife on the floor and another associate picked the knife up for George, Gary felt that George's age played a part in his not picking up the knife and that's what lead to the comment about his age. Gary said that he remembered saying to George "your the oldest person at Barley Mill, your older than the manager, chef and all the rest of the staff". Gary said that he felt because George was the eldest that he should be the smartest/wisest as well. I asked Gary if George had tried to talk to him about the comment made to him referencing his age and, he said yes George had mentioned this to him while making a deliver to the library. Gary went onto say that he really didn't understand why George was upset and they did have a discussion about it but he was trying to finish his weekly paperwork at the unit and he really didn't give it the attention it apparently needed and couldn't remember what was said. I (Juanita Congo) asked Gary if he had attended EEO/AA he replied no I (Juanita) asked if he was aware that he could not make statements or assumptions referencing age, race, gender or religion when speaking to associates. Gary said that he was, signed up to attend the next EEO/AA training being held at DuPont later in the month. I told Gary that he would have to apologize to George in person the next time George was at the location. We also spoke about how unfair it was for Gary to assume that George's age was affecting his performance and that he really did not have any performance issues to note except that he (Gary) felt George worked slower than other's which is not an issue unless he's not getting the work done on time. I went on to explain that if it was and issue and causing the business to suffer than that was a coaching issue that Gary should address with George and the management team at DuPont.

I (Juanita Congo) left Gary with the expectation that the next time George and Gary met at the library that Gary would apologize to George for his inappropriate comment.

<u>Notes from phone conversation with Gary Rogers 10/7/04</u>

I called the Library at approximately 4:30 pm on October 7th, and I was speaking with
Gary to see how things were at the unit and to see if he had seen George to apologize.
Gary went on to say that he had been working evenings this week and had not been in the
unit when George made his delivery to the Library.

Gary went on to talk about how he was felling, he felt he had no direction and he needed
to set down and talk to me (Juanita) about some things. I "Juanita" asked if he could write
down what his concerns were and we could get together later in the week to hash it out.
He said he would do that. I "Juanita" then said you seem to not be yourself is everything
okay. He said that he had been feeling a little under the weather and that he would be
fine. After that I asked about his sending the week ending numbers to Marc and told him
to make sure that he did that on a weekly basis and submitted them to Marc before
Monday's at noon. That's when he started unloading on me that he felt he had no
direction, he did not understand the financial reports he was having problems with
entering information into the financial system and that he feels he's been set up to fail.
He "Gary" said that I "Juanita" said that he had to start working a shift at the Library
without a second person on staff to save on labor cost and he could not do all he needed
to do and work a shift too. He said it was no way possible he could be at both locations
every day and that it was all too much and that he was totally overwhelmed. I "Juanita"
reminded Gary that I stopped in at least once a week and called almost every day and
would ask those times if there are any issues we need to take care of or is there anything
he needed my help with and the answer was always everything is just fine. I said that if
he was having problems with the financial system we had been using Charlotte at
Wilmington Trust to help with that training because I was not familiar with the operations
of the UFS financial system either. Charlotte was our resource for training and he could
go/gone to her location to work on the areas he needed help with so she could spend more
time with him. Gary asked; when could he do that, I "Juanita" said you could have done
it all along, before I told you to start working a shift to save on labor cost you were at the
Library everyday with Sharon in the unit, you could have gone to Wilmington Trust then
to train with Charlotte. I also explained that the reason I had him to start working a shift
was because financially it made no sense for both he and Sharon to work the same shift
averaging a total of maybe $225 in the 6-8 hours they worked together. Moving forward I
"Juanita" told Gary that if he needed to be trained to start scheduling someone to be at the
unit the days he worked he would be training at Wilmington Trust. I also explained that if he needed
help with understanding the financial reports that I was free to help him whenever he
wanted if I had obligations during the day I would make time in the evening to set with
him.

The phone conversation ended with plans of meeting later in the week to address Gary's
issues.

## Notes from meeting with George Withcher

On October 3, 2003 while at DuPont Barley Mill, Mark Teoli the chef said that I (Juanita Congo) needed to speak with George the driver for the Libraries because George said that he felt Gary the GM of the library had made discriminating comments to him referencing his age.

I "Juanita" set down with George and asked him what had happened. George said that Gary had observed him working at Barley Mill earlier in the week and after that when he went to the Library for the daily delivery Gary spoke with him. Gary started the conversation with "George you're the oldest person at Barley Mill" George asked, what did that have to do with anything; Gary repeated to George "you are the oldest person there. George said he asked if there was a problem with his work. Gary went on to say that when he was observing that day at Barley Mill, George knocked a knife off the counter and instead of George picking it up John the other associate working at the station with George picked up the knife. George said that he explained that John said he would get it and, since they work as a team every day he let John pick up the knife. George went on to say to Gary that he did not hide his age from the company when he applied he had disclosed all information prior to being hired, so if his age was going to be a problem he needed to know because he felt he was doing what he needed to perform his daily duties. I (Juanita Congo) told George that I would speak with Gary and Get Back with him.

On Monday October 6, 2003 I (Juanita Congo) stopped into DuPont Barley Mill and spoke with George explaining that I had spoken with Gary and when Gary was on duty the next time George delivered to the library that Gary would speak with George and apologize for the statements he made.



performance) and the needs of the business, which may change over time.

## Constructive Counseling

Sodexho promotes and preserves a safe, productive, and pleasant work environment, which enables employees to achieve their highest level of productivity and self-fulfillment. We require all employees to meet the standards of performance and conduct which have been established for their jobs. If your performance is unsatisfactory, we will provide you with an opportunity to improve, if possible. Through our constructive counseling process, your manager will decide what action is appropriate by considering such factors as your work history, your frequency of policy violations and the seriousness of your offense. Counseling actions may include coaching, written warning, and/or termination of employment. The action taken will be appropriate to the problem behavior.

☆ SODEXHO | JANUARY 2002



DEPOSITION
EXHIBIT
Mitchell 3
1-12-06 lp
PENGAD 800-631-6989

SODEXHO EMPLOYEE HANDBOOK

## Constructive Counseling Actions

To assist in the opportunity for improvement, the following options can be used to correct an employee's unsatisfactory performance or behavior. There is no guarantee that particular constructive counseling options will be taken in all cases, nor is there any sort of contractual commitment to employees of the order in which counseling will occur. Every situation is unique, and so the options below may not occur, or may occur in different orders, in any given case. The use of any or all of these options is up to the business judgment of the manager in light of the severity of the offense and all circumstances surrounding the unsatisfactory performance or inappropriate behavior. Some types of performance or behavioral problems are so serious that they result in immediate terminations.

102 | What We Offer You



A76



## Coaching

If any employee's unsatisfactory performance or conduct persists after discussion or is sufficiently serious, the employee may be told of:

1) The unsatisfactory performance/conduct;

2) The level of performance or conduct that is expected and a reasonable deadline by which that must be achieved; and

3) What actions may be taken if the violation or unsatisfactory performance occurs again.

## Written Warning

A written warning may be issued when an employee's conduct is serious enough or an employee does not correct unsatisfactory performance or conduct discussed in coaching.



SODEXHO EMPLOYEE HANDBOOK

*Investigatory Suspension*

Employees may be placed on investigatory suspension to allow the Company time to investigate facts surrounding a serious performance or conduct problem.

*Termination of Employment*

Termination of employment may occur when an employee's performance does not improve after constructive counseling or when an employee's conduct is sufficiently serious.

While the Company hopes to correct most types of unsatisfactory performance or conduct through constructive counseling measures, some types of performance and misconduct are so severe that they may warrant termination without any prior constructive counseling options. Examples of these types of violations include, but are not limited to, the following:

104 | What We Offer You





SODEXHO  |  JANUARY 2002

- Any violation of the Company's *Ethical Conduct Policy;*
- Insubordination or failure to carry out reasonable requests made by the manager or supervisor;
- Theft, attempted theft, or removal from the premises the property of Company, client, or co-worker without proper authorization;
- Willful misuse or destruction of Company, client, or a co-worker's property;
- Sleeping during work time or leaving the job without authorization;
- Any violation of the Company's *Drug and Alcohol Use* policy, including the possession or consumption of illegal drugs or alcoholic beverages, or being under the influence of illegal drugs or alcoholic beverages on Company time or on Company/client premises;
- Gambling on Company time or on Company/client premises;
- Sexual harassment, other harassment, or discrimination of any kind;



A79

SODEXHO EMPLOYEE HANDBOOK

- Any violation of the Company's *Workplace Violence Policy*, including threatening, intimidating, or violent behavior;

- Possession of a dangerous weapon on Company/client premises;

- Any disorderly conduct, such as profanity or yelling, including the use of vulgar, abusive, or obscene language, while on Company/client premises or arising out of Company business;

- Falsification of Company-related documents, including, but not limited to records of time worked, payroll records, expense reports, employment applications, or any application for leave of absence;

- Conviction of a felony or off-duty conduct which relates to the employee's fitness for employment or the Company's integrity or reputation;

- Failure to obey Company rules regarding confidentiality, proprietary information, and conflict of interest;

- Other serious misconduct.

106 | What We Offer You



A80

SODEXHO EMPLOYEE HANDBOOK

## Policy Against Workplace Violence

We are committed to creating a safe and positive work environment for all of our employees. The Company takes a "zero-tolerance" approach to acts of workplace violence. Any act or threat of violence will be taken seriously and investigated immediately by the Company.

While it is not possible to list all circumstances that constitute threatening and violent behavior, the following are some examples of behavior that violate this policy:

◆ Use of threatening, intimidating, or abusive language and/or gestures;

◆ Use or possession of firearms, explosives, stun guns, ammunition, or any other type of weapon on Company or client property;

◆ Stalking of employees or customers;

62 | Safety in the Workplace





Safety in the Workplace    63

℣. SODEXHO  |  JANUARY 2002

◆ Workplace sabotage;

◆ Physical attack of any employee or customer;

◆ Throwing objects; and/or

◆ Verbal threats to harm another individual or destroy property.

If you observe, know or learn about any acts or potential acts of violence, you should immediately contact one or more of the following:

◆ Your immediate supervisor;

◆ Security personnel on premises;

◆ Your Human Resources representative.

In all cases, the complaint and the investigation will be handled as confidentially as possible. The only people informed about the situation will be those directly involved or those with a need to know. The Company will not retaliate against anyone who in good faith reports or cooperates in an investigation of possible workplace violence.

SODEXHO EMPLOYEE HANDBOOK

If an investigation confirms that threatening or violent behavior has occurred, the manager and Human Resources representative will determine what action is appropriate. Significant threats or acts of violence will ordinarily result in immediate termination of employment. In certain situations, individuals who violate this policy may be required to obtain counseling or other available assistance to remain employed.

Significant *Threats or acts of Violence* will ordinarily result in immediate *Termination* of employment.



64 | Safety in the Workplace

A83



✿ SODEXHO  |  JANUARY 2002

## Promise of Respect & Fair Treatment

The Promise of Respect and Fair Treatment allows you to express your concerns and obtain guidance from your manager or Human Resources representative if you feel that you have been treated unfairly in some way. It is our hope that the use of this policy will encourage respectful and fair treatment of all employees. If you feel that you have been treated unfairly, you have the right to complain through the steps listed below without fear of retaliation.

It is the policy of our Company that there will be no discrimination or retaliation against anyone because he or she has presented, in a proper way, a complaint or problem. As a Sodexho employee, you have rights that are assured by our Company's *Promise of Respect and Fair Treatment Policy.*

© SODEXHO | JANUARY 2002

## Employee Handbook Acknowledgment

I acknowledge that I have received a copy of the Sodexho *Employee Handbook* effective January 2002. I also agree that I have/will read, and will follow the policies in this *Handbook*. I will ask questions of my manager if I do not understand any of the information contained in this *Handbook*.

I understand that any previous policies or procedures on the subjects in this *Employee Handbook*, if different, are replaced by the terms of this *Employee Handbook*. Further, I acknowledge that this *Employee Handbook* is not a contract of employment, does not create any contractual commitment by the Company, and that the Company reserves the right in its discretion to modify or discontinue any of the provisions in this *Employee Handbook* or to decide that they do not apply to a given case.

Print full name: _George M. Witcher_

Social Security or Social Insurance Number: _____

Signature: _____    Date: _9-27-03_

**OR**    **IAL TO EMPLOYEE'S PERSONNEL FILE**

EFFECTIVE JANUARY 2002

A84



DEPOSITION
EXHIBIT
Witcher 4
1-10-06
PENGAD 800-631-6989

Meeting with George Witcher:   June 17, 2004  10:15 a.m.

Attended:  George Witcher, Carol Sexton, Lew Delfierro, Joanne Dunn-Vanaman, and John Lewis.

George and Donna had a confrontation on Thursday June 10, 2004.  The argument lead to bad language. Donna asked him not to say those things and George said he was cussing as well as everyone else cussing.  (Mark, Donna, Ursula, John)

George stated he feels Donna has a problem with him, she is correcting him for his language but no one else, he feels that she is prejudice, and has a bad habit of disrespecting him and treating him like a child told her that she is prejudice in their argument.  That is when Donna got upset and asked him to go to the office.

According to George, no one came to the office so George walked away to go calm down said a prayer and was fine.  He went back to work, cleaned up his area, got out the food he needed and proceeded to get the key from the office for the van.

At this point there was Mark on the phone, Donna in the office as well as Vanessa. George was told to wait a minute.  George asked if he could bring John in because Vanessa was there and he was told no.  He also stated that he was not asked his version of the incident, and that he did apologize to Mark for his abusive language.

George feels that he was judged without giving his side of the events, he was escorted by security, and that Vanessa was chuckling in his face, when taken away.

Carol read the information that was given to her by the other parties, explained to George that he has written statements.  Carol read John's, Donna's and Vanessa's statements.

John agreed with George that Donna disrespects employees and he feels that she treats the Black men different from the Black women.

Carol addressed that abusive language is not appropriate for anyone to be using and it will be stopping.  George was told that he will be contacted and this was a meeting to discuss his version of the events and that everyone should be treated fair and just within the company.

George requested copies of all reports and he was told that should not be a problem.



Patty informed
Carol + George
that he would
not receive our
investigation docume

JDV

DEPOSITION
EXHIBIT
Witcher 6
1-12-06
PENGAD 800-631-6989

A85

Personal and Confidential

July 7, 2004

Mr. George Witcher
2621 Jessup Street
Wilmington, DE 19802

Dear George:

This is a follow-up to the meeting we had on June 25, 2004. The meeting was the result of an incident that occurred on June 10, 2004 between yourself and a supervisor Donna Haughney. On June 10, 2004 Donna made a comment regarding your use of profanity in the workplace. Specifically, Donna attempted to counsel you after she heard you use the words, "bitch", "shit" "goddamitt" and "fucking". In response you told her that she was "prejudiced". Also, you and Vanessa had a heated exchanger. Because of your inappropriate language and demeanor Donna and Vanessa felt threatened. Accordingly you were place on investigatory leave, with pay, pending the outcome of the investigations. Prior to you leaving on June 10, 2004, Mark Pisano and Mark Teoli met with you to hear your version of what occurred. In addition, Carol Sexton, General Manager, began to conduct an investigation on June 14, 2004. You and I met on June 25, 2004 in order for me to also conduct an investigation of the events. In the following paragraphs, I will outline the allegations that you have made and I will provide details regarding our findings.

During discussions that you had with our managers at Dupont and with me on June 25, 2004, you alleged that you were treated differently by supervisor Donna Haughney because of your gender and your age. Our investigation found no support for your claim. I personally interviewed 7 frontline employees and 4 managers. Although some employees indicated that Donna's tone may be more assertive when providing direction to one of your co-workers, none of these individuals could provide support for your claim. Our findings regarding discriminatory behavior due to gender and age were inconclusive. Nonetheless, Donna will be coached and reminded of our company policies of fair and consistent treatment for all employees regardless of age, gender, race, etc.

When asked to identify the basis of your belief that you had been treated differently by Donna, you shared with me two incidence of alleged disparate treatment. First, on June 9, 2004, she asked you to use "old" foccacio bread when you started to make a sandwich with a new loaf of bread. You indicated that she does not say the same things to other employees.

Second, on June 10, 2004, you indicated that Donna asked you to watch your language and again that other employees are not corrected when they use foul language.

A86



Through the course of my investigation and my interviews with other employees, it was almost unanimous that all employees are asked to use "old" product before "new" products. In fact, many employees told me that it is a standard operating procedure.

Regarding the use of foul language, employees indicated that they are corrected when they use inappropriate language but that mostly words are not directed at each other or as bad as the "f" word. On June 10, you admitted that you referred to fellow co-worker by calling her a "bitch" although you claimed to have only been kidding. You did not recall using the "f" word when you and I talked but you did admit to Mark Pisano and Mark Teoli that you did use the "f" word on June 10, 2004.

You also indicated that you were "illegally imprisoned" on June 10, 2004 when Mark Teoli and Mark Pisano asked you to remain in the office until they got someone from security to escort you from the building. It is a requirement by our client that a member of their security escort an employee that was being suspended or terminated. Both Mark's indicated that it was only a matter of approximately 2 minutes that you remained in the office, that you did not ask to leave the office, and if you did they would have certainly allowed you to leave. Further, the door was not locked, no one blocked the door or your path to it, and you were never restrained in any manner.

You also indicated that in October 2003, a former manager, Gary Rodgers made comments to you regarding your age. You indicated that you were not sure what caused him to make the comments but that he said something like "you know you're old". You indicated that nothing was ever done regarding Gary's comments. I looked into this situation and found that Gary's boss at the time, Juniata Congo, addressed the situation immediately and coached Gary on the inappropriateness of his comments. Gary was instructed to formally apologize to you but unfortunately he went on a leave of absence before doing so. He was out of work for several months and is no longer working in the capacity as your manager or at your unit.

When asked if there was any other specific example of someone commenting about your age you said yes but that "I'm not going to get into that". At that point you indicated that you had everything documented because you were planning on filing something with the state. I requested that you share any documentation with me so that I can be sure to investigate each aspect of your claim and obtain all relevant facts. You did not respond to my request for the additional document. At this point, no additional documentation has been shared with me.

In addition, we discussed the decision to transfer you from Barley Mill Plaza to the Chestnut Run facility; you informed both me and Carol Sexton, your current General Manager, of your acceptance of this transfer.

In conclusion, I appreciate your cooperation in this matter and for bringing your concerns to my attention. Sodexho is committed to providing employees with a work place that is free of any form of discrimination as outlined in our policy of respect and fair treatment. After a thorough investigation in which I interviewed 11 individuals and reviewed our company policies regarding discrimination I found insufficient information

to substantiate your claim. However, Donna will receive a coaching and a reminder of the importance of fair and consistent management.  Thank you for your cooperation and candor during this investigation.  Please do not hesitate to contact me if you have any questions or if you have any other concerns.

Sincerely,

Patty Weick
Sr. Human Resource Manager

A88

# CONSTRUCTIVE COUNSELING NOTICE

Employee's Name __Donna Haughney_____    Social Security # _____

Business Unit: Dupont_____    Business Segment: Corporate Services Date: July 8, 2004

Type of Constructive Counseling (check one):  x Coaching    .__ Written Warning  ____ Termination

Describe the nature and dates of the unsatisfactory performance or conduct (be specific):
**On June 10th, 2004 employee George Witcher accused Donna of being "prejudiced". He felt that she treated him differently because of his gender. An investigation was conducted and George's allegations were unsubstantiated. However, the purpose of this document is to reinforce and remind Donna of our policy of fair and consistent treatment for all employees.**

Describe in specific detail the level of performance or conduct that you consider satisfactory:
**All managers and supervisors are expected to treat all employees with respect and dignity regardless of race, gender, age, etc.**

State the timeframe in which you expect the employee to achieve satisfactory performance or conduct:
**Immediate and on-going**

Identify the specific action or actions which may occur next if they employee does not demonstrate and maintain satisfactory performance or conduct:
**Any failure to consistently manage employees or failure to treat employees with respect and fairness could result in discipline up to and including termination.**

_Mall Ph_____            _7-12-04_____
Manager's Signature                                      Date

## EMPLOYEE ACKNOWLEDGEMENT

Employee Comments:

_Donnat Loreighney_____            _7-12-04_____
Employee's Signature                                      Date

The employee's signature does not necessarily indicate agreement with the content of this Constructive Counseling Notice but does at least acknowledge receipt of the form and the content (or lack) of Employee Comments.

An employee's decision not to sign this form should be noted on the Employee's Signature line, preferably with a witness present. The witness should initial the notation of refusal to sign as well.

Distribution:  Original to  Employee's file
              Copy to employee

A89


DEPOSITION
EXHIBIT
Witcher 8
7-12-06  CR

| CHARGE OF DISCRIMINATION | ENTER CHARGE NUMBER |
|---|---|
| This form is affected by the Privacy Act of 1974 | ☐ FEPA<br>☐ EEOC |

| Delaware Department of Labor | and EEOC |
|---|---|
| (State, or local Agency, if any) | |

| NAME (Indicate Mr., Mrs., Ms)<br>Geoge M. Withcer | HOME TELEPHONE NO. (Include Area Code)<br>302-762-3249 | |
|---|---|---|
| STREET ADDRESS<br>2621 Jessup St.   Wilmington DE 19802   NC | CITY, STATE AND ZIP CODE | COUNTY |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

| NAME<br>Sodexho | NO. OF EMPLOYEES OR<br>MEMBERS +100 | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| STREET ADDRESS<br>6081 Hamilton Blvd. Allentown, PA 19106 | CITY, STATE AND ZIP CODE | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| STREET ADDRESS | CITY, STATE AND ZIP CODE |

| ☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☒ AGE<br><br>☐ RETALIATION  ☐ DISABILITY  ☐ OTHER (Specify) | DATE DISCRIMINATION TOOK PLACE<br>EARLIEST  4/9/2003<br>LATEST  6/10/2004<br>☒ CONTINUING ACTION | **DEPOSITION EXHIBIT** _Witcher 9_ _1-12-06_ |
|---|---|---|

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

am in individual approximately 60 years of age who began working for the Respondent in their Barley Mills facility under ...tract with the DuPont Co. on April 6, 2003. On June 10, 2004 I was working in the kitchen speaking to some of my other coworkers. In this environment the use of certain amounts of profanity is commonplace. At this time my supervisor Donna Haughney, reprimanded me for the language I was using. I asked her why this was a problem with me since everyone in the kitchen was using the same sort of language. I then voiced some concern that I was being singled out because of some prejudice she may have had. She then instructed me to go to the office and wait for members of management to arrive. Shortly thereafter Mark Teoli, Executive Chef and Mark Piasano, Manager told me that I had been suspended. I assume it was because of my use of profanity. I noticed on several instances that the Respondent has tolerated the same behavior and did not suspended younger employees. Specifically, John Lewis, food service worker, under 40 years of age. Mr. Lewis frequently uses profanity in the same or very similar circumstances and is not disciplined. Also Gary Rodgers, Manager, said that I was the oldest worker in the company and several comments about my age without any purpose. On 3/15/2004 during a performance review Mark Teoli asked me if I was too old to accomplish my assigned tasks.

II: The Respondent never gave me an actual reason for my suspension. However, I believe it was a result of my using profanity in the kitchen.

III: I believe I have been discriminated against in violation of The Age Discrimination in Employment Act and the Delaware Discrimination in Employment Act, as amended inasmuch as: 1. I was suspended for using profanity in an area where such use was commonplace. 2. The Respondent tolerates the use of such language by its younger employees. 3. Management personnel of the Respondent have made comments to me in the past that gave me the impression that they felt I was too old to perform my job . 4. I have never had any problem in the past performing my assigned tasks because of my age.

| ☒ | I also want this charge filed with the EEOC. I will advise the agencies<br>if I change my address or telephone number and I will cooperate fully<br>with them in the processing of my charge in accordance with their<br>procedures. | SIGNATURE OF COMPLAINANT<br><br>I swear or affirm that I have read the above charge and that it is true to the best of<br>my knowledge, information and belief. |
|---|---|---|
| clare under penalty of perjury that the foregoing is true and correct.<br><br>_____    _____<br>Date              Charging Party (Signature) | NOTARY - (When necessary to meet State and Local Requirements)<br><br>_____<br>Subscribed and sworn to before me this date      (Day, month, and year) |

EEOC FORM 5
REV 6-92          PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

## CONTINUATION OF AFFIDAVIT

**COVERAGE/RESPONDENT'S BUSINESS:**
Food Services

2.  **RELEVANT WORK HISTORY:**
I: I am in individual approximately 60 years of age who began working for the Respondent in their Barley Mills facility under contract with the DuPont Co. on April 6, 2003. On June 10, 2004 I was working in the kitchen speaking to some of my other coworkers. In this environment the use of certain amounts of profanity commonplace. At this time my supervisor Donna Haughney, reprimanded me for the language I was using. I asked her why this was a problem with me since everyone in the kitchen since everyone in the kitchen was using the same language. I then voiced some concern that I was being singled out because of some prejudice she may have had. She then instructed me to go to the office and wait for members of management to arrive. Shortly thereafter Mark Teoli, Executive Chef and Mark Piasano, Manager told me that I had been suspended. I assume it was because of my use of profanity. I noticed on several instances that the Respondent has tolerated the same behavior and not suspended younger employees. Specifically, John Lewis, food service worker, under 40 years of age. Mr. Lewis frequently uses profanity in the same or very similar circumstances and is not disciplined. Also on several occasions Gary Rodgers, Manager, said that I was the oldest worker in the company without any purpose. On 3/15/2004 during a performance review Mark Teoli asked me if I was too old to accomplish my assigned tasks.

3.  **PERSONAL HARM:**
III: I believe I have been discriminated against in violation of The Age Discrimination in Employment Act and the Delaware Discrimination in Employment Act, as amended inasmuch as: 1. I was suspended for using profanity in an area where such use was commonplace. 2. The Respondent tolerates the use of such language by it younger employees. 3. Management personnel of the Respondent have made comments to me in the past that gave me the impression that they felt I was too old to perform my job.

4.  **RESPONDENT'S EXPLANATION FOR THE ALLEGED HARM AND ITS POLICIES AND PRACTICES:**
II: The Respondent never gave me an actual reason for my suspension. However, I believe it was a result of my using profanity in the kitchen.

5.  **DIRECT EVIDENCE:**
See Attached

6.  **WITNESSES:**
See Attached

7.  **COMPARATIVE DATA:**
A yonger employee of the Respondent, John Lewis also used profanity in the facility to a greater degree than the Charging Party but has not been disciplined or suspended.

8.  **CLASS HARM:**
NA

9.  **REMEDY/RELIEF SOUGHT:**
Other Damages

---

DATE AND INITIAL

PAGE #

**Sodexho**

**CONFIDENTIAL**
**HOURLY EMPLOYEE PERFORMANCE & DEVELOPMENT APPRAISAL**

EMPLOYEE'S NAME: _George M. Witcher_    DATE: _April 21, 2005_
POSITION: _Driver + Prep of Grab & Go for 2 Locations_ UNIT: _45423-001_
DATE OF LAST REVIEW: _Apr. 2004_
APPRAISAL PERIOD:    FROM _Apr 2004_    TO _Apr 2005_

### PERFORMANCE RATING

Review and rate the employee's performance for the appraisal period indicated. At the appropriate places on this form, indicate the level which best describes the individual's current performance.

**Level 1:**
Performance far exceeds standards established in the job description and/or by management even on some of the most complex parts of the job. Extremely accurate worker, and corrects any errors made. Seizes the initiative in the implementation of daily duties and does not require direction or supervision. This category is reserved for a small percentage of employees whose performance level is well above expectations.

**Level 2:**
Consistently exceeds standards established in the job description and/or by management. Work is accurate, errors are few and seldom repeated. Dependable in accomplishing job duties on time, and handles them with a minimal amount of supervision and follow up.

**Level 3:**
Consistently meets standards established in the job description and/or by management. Work is consistent, errors are infrequent. Completes work on schedule, however, may require help with non-routine tasks. Requires normal supervision and follow up.

**Level 4:**
Job performance is inconsistent. Work is usually acceptable, but occasionally below standards. May require assistance with routine procedures. Requires frequent supervisory direction and follow up. Counseling, training, and experience are necessary to meet standards in select areas.

**Level 5:**
Does not meet job standards. Fails to produce the quantity and quality of work required by the position. Constant supervision and follow up is required. Requires extensive counseling, training, and experience to meet standards. Immediate improvement necessary.

**Customer Satisfaction:**                                1    2    3    4    5
Employee understands the importance of customer and client satisfaction and consistently strives to achieve this standard. Employee is constantly cheerful and interested in helping the customer at all times.

Comments/Action Plan and Date _____ _N/A_ _____

**Job Skills:**                                            1    2    3 +    4    5
Employee consistently uses company procedures to complete tasks. Skills and abilities meet the job requirements at the current performance level. Little supervision is required to complete tasks to meet company standards.

Comments/Action Plan and Date _basically works on his own. Sometimes needs to be reminded of portion controls - uses less product then specified_

265 (03/99)
Page 1 of 2

A92

PERIGO 800-631-6989
DEPOSITION
EXHIBIT
_Witcher 10_
_12-06 CN_

**Productivity:**                    1    2    ③    4    5
Employee consistently maintains pre-determined quantity and quality standards. Employee seeks to improve operating procedures to increase efficiency/productivity of the unit.

Comment/Action Plan and Date _Always has ideas for improving products_
_especially the packaging_

                                    3.5
                              1    2    3 ⊂ ④    5
**Teamwork:**
Employee regularly contributes to the efficient operation of the department/unit. Employee has a positive attitude and cooperates with coworkers and management. Easily adapts to and accepts new situations, and independantly takes initiative to help in all areas.

Comment/Action Plan and Date _Volunteers to assist with all aspects_
_of the operation._

**Appearance:**                    1    2    ③    4    5
Employee is clean, neat and well groomed. Uniform is well maintained, and a name tag is worn consistently.

Comment/Action Plan and Date _Always neat & clean_

**Attendance:**                    1    2    ③    4    5
Employee reports to work on time and as scheduled. Follows established procedures if delayed or unable to report.

Comment/Action Plan and Date _Usually very dependable. Missed 1 holiday_
_when arrangements had been made to give him access_
_to the building and he didn't show-up._

**Safety:**                    1    2    ③    4    5
Employee follows corporate safety policy and unit programs and practices safe working habits on a consistent basis. Reports potential safety hazards, and follows established procedures in the event of an accident.

Comment/Action Plan and Date _____

**Overall Rating**                    1    2    ③    4    5

Supervisor Comments: _Appreciate George's willingness to help_
_his co-workers anytime he is ask._

**Employee Comments:** _____

Employee's Signature _____  Date ____

Unit/Account Manager's Signature ____  Date _4/21/05_

Supervisor's Signature _Carol Sexton_    Date _4/21/05_

District Manager's Signature    Date
(Out-of-Policy Increases)

Next Review Date: _Apr. 2006_
Current Rate: _9.22_

Proposed Rate: ____
Percentage Increase: _3%_

265 (03/99)
Page 2 of 2

A93

# CONSTRUCTIVE COUNSELING NOTICE

**Employee's Name:** *George Witcher*    **Social Security #**

**Date:** *2/25/05*

**Business Unit:** *Wcc Library*    **Business Segment:** *Corporate Services*

**Type of Constructive Counseling (check one):** ✓ **Written Coaching**
_ **Written Warning** _ **Termination**

**1. Describe the nature and dates of the unsatisfactory performance or conduct:**

*George did not show for work on Monday, Feb. 21, 2005*

**2. Describe in specific detail the level of performance or conduct that you consider satisfactory:**

*George must come to work when expected and produce good for the libraries on the time schedule expected.*

**3. State the timeframe in which you expect the employee to achieve satisfactory performance or conduct:**

*Immediately*

**4. Identify the specific action or actions which may occur next if they employee does not demonstrate and maintain satisfactory performance or conduct:**

*Further occurrences will lead to further discipline up to an including termination.*

*Carol Sutton    Area BM*    _____ *2/25/05*

Manager's Signature    Date

## EMPLOYEE ACKNOWLEDGEMENT

Employee
Comments:_____
_____
_____

~~The~~ **Employee refused to sign** *2/25/05*
Employee's Signature    Date

The employee's signature does not necessarily indicate agreement with the content of this Constructive Counseling Notice but does at least acknowledge receipt of the form and the content (or lack) of Employee Comments.

An employee's decision not to sign this form should be noted on the Employee's Signature line, preferably with a witness present. The witness should initial the notation of refusal to sign as well.

*Carol Sutton, BM 2/25*

Witness: *Ron Hill*    A94

DEPOSITION
EXHIBIT
*Witcher 11*
*1-12-06*
PENGAD 800-631-6989

Distribution:   Original to employee's Personnel File (becomes permanent part of file)
Copy to employee
Copy to Human Resources (all salaried employees; hourly optional at HR discretion)

*George M. Witcher*
*2621 Jessup Street*
*Wilmington, Delaware 19802*

Carol Saxon
General Manager
Sodexho Inc.                                         June 23, 2005

**RE: Two week notice**

Dear Carol,

    During the past year I've been discriminated and retaliated against
I have also been continously harassed, all because I filed a complaint
against the company for age discrimination. Because of this on going
problem that I'm having with the company I'm giving you my two week
notice that I 'm leaving the company effective July 8, 2005.
I can no longer work for a company that supports and encourages
Discrimination, retalition and harassment of their employees.

                     Sincerly



         George M. Witcher

A96





# Sodexho
— CORPORATE SERVICES —

July 6, 2005

Mr. George Witcher
2621 N. Jessup Street
Wilmington, DE 19802

Dear Mr. Witcher:

I am in receipt of your resignation letter of June 23, 2005 addressed to Carol Sexton. Your letter asserts unspecified claims of discrimination and retaliation. Your letter further contends that Sodexho "supports and encourages discrimination retaliation and harassment of employees." Sodexho does not tolerate workplace discrimination. It is one of the Company's highest priorities to ensure equal opportunities for each and every employee. Indeed, the workplace success of each of its employees is critical to the Company's overall success.

Sodexho takes complaints of workplace discrimination very seriously. The company has implemented multiple policies and procedures to prohibit all forms of discrimination. Pursuant to these policies and procedures, Sodexho must conduct a prompt and comprehensive investigation of all discrimination claims. To the extent that your resignation letter raises new allegations of discrimination not previously asserted in your EEOC charge or pending lawsuit (Sodexho has already conducted comprehensive investigations of those claims), please contact me immediately so that I may investigate any new claims of which we are not aware.

Finally, we were surprised to learn of your resignation. Although we respect your decision, we hope that you will reconsider and remain within our employ. To that end, this letter serves as an unconditional offer of reinstatement to your current position with the same terms and conditions of employment, including the same duties, assignment and rate of compensation.

Should you have any questions regarding this letter, or any other matter, please do not hesitate to contact me at 301-987-4020.

Sincerely,                                                    A97

Gordon Ellis
Human Resources Director
Sodexho Corporate Services



Sodexho Corporate Services • 200 Continental Drive, Suite 400, Newark, DE 19713
Telephone: 302-738-9500 • Internet: www.sodexhoUSA.com

Member of Sodexho Alliance

## CERTIFICATE OF SERVICE

I, Sarah E. DiLuzio, hereby certify this 14th day of March, 2006, I caused the foregoing **APPENDIX TO OPENING BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the U.S. District Court District of Delaware via CM/ECF (Official Court Electronic Document Filing System) and served two (2) true and correct copies upon *pro se* Plaintiff via overnight mail, to the following address:

> George Witcher, *Pro Se*
> 2621 Jessup Street
> Wilmington, Delaware 19802

> **/s/ Sarah E. DiLuzio**
> Sarah E. DiLuzio (I.D. #4085))
> POTTER ANDERSON & CORROON LLP
> 1313 North Market Street—6[th] Floor
> Post Office Box 951
> Wilmington, Delaware 19899-0951
> (302) 984-6044 - Telephone
> (302) 658-1192 - Facsimile
> sdiluzio@potteranderson.com - Email

723452