## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GEORGE WITCHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-205 (SLR) |
| | ) | |
| SODEXHO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT SODEXHO, INC.'S ANSWERING BRIEF
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

POTTER ANDERSON & CORROON LLP
Jennifer Gimler Brady (I.D.# 2874)
Sarah E. DiLuzio (I.D. #4085)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000 - Telephone
jbrady@potteranderson.com
sdiluzio@potteranderson.com

*Attorneys for Defendant Sodexho, Inc.*

Dated: March 21, 2006
724540

# TABLE OF CONTENTS

**PAGES**

TABLE OF CONTENTS................................................................................................ i

TABLE OF AUTHORITIES .......................................................................................... ii

NATURE AND STAGE OF PROCEEDINGS ...............................................................1

SUMMARY OF ARGUMENTS ....................................................................................2

INTRODUCTION ..........................................................................................................3

ARGUMENT ..................................................................................................................3

I.    THE ALLEGATIONS CONTAINED IN PLAINTIFF'S MOTION
      DO NOT SATISFY PLAINTIFF'S THRESHOLD BURDEN TO
      PRODUCE EVIDENCE FROM WHICH A REASONABLE FACT
      FINDER COULD FIND IN HIS FAVOR...........................................................3

      A.    Discrimination Exhibit Does Not Evidence Any Adverse
            Employment Action.................................................................................5

      B.    Punitive Damages/Emotional Distress Exhibit Is Completely
            Irrelevant.................................................................................................7

      C.    Retaliation Exhibit Does Not Evidence Any Adverse
            Employment Action.................................................................................9

      D.    Resignation Exhibit Confirms That Plaintiff Suffered No
            Adverse Employment Action.................................................................10

CONCLUSION ............................................................................................................12

i

# TABLE OF AUTHORITIES

*Abbondanzo v. Health Mgmt. Sys.*
  2001 U.S. Dist. LEXIS 17567 (S.D.N.Y. 2001) ...........................................................................11

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)..................................................................................................................3

*Baker v. Summitt Unlimited, Inc.,*
  855 F. Supp.375 (N.D. Ga. 1994) .............................................................................................11

*Blumensaadt v. Standard Products Co.,*
  744 F. Supp. 160 (N.D. Ohio. 1989).........................................................................................11

*Commissioner of Internal Revenue v. Schleier,*
  515 U.S. 323 (1995).....................................................................................................................8

*Gaddis v. Russell Corp.,*
  242 F. Supp. 2d 1123 (M.D. Ala. 2003) ...................................................................................11

*Klyuch v. Freightmasters, Inc.,*
  2005 U.S. Dist. LEXIS 1843 (D. Minn. 2005) .........................................................................11

*Mattern v. Hudson,*
  532 A.2d 85, 86 (Del. Super. Ct. 1987) .....................................................................................8

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973)....................................................................................................................4

*Pastore v. Bell Tel. Co.,*
  24 F.3d 508 (3d Cir. 1994)..........................................................................................................7

*Powell v. Consolidated Edison Co. of N.Y.,*
  2001 WL 262583 (S.D.N.Y. 2001)............................................................................................4

*Pritchett v. Delmarva Builders, Inc.,*
  1998 WL 283376 (Del. Super.)...................................................................................................8

## OTHER AUTHORITIES

Age Discrimination in Employment Act, 29 U.S.C. Section 621....................................................3, 7

Fair Labor Standards Act..................................................................................................................7

ii

## NATURE AND STAGE OF PROCEEDINGS

On March 7, 2006, Plaintiff filed a document titled "Plaintiff's Response[1] to The Summary Judgment." (D.I. 41)  In this document, Plaintiff sets forth reasons why he believes this matter should proceed to trial.  Accordingly, Sodexho will treat this document as Plaintiff's Motion for Summary Judgment.  This is Sodexho's Answering Brief in Opposition to Plaintiff's Motion.

---

[1] Plaintiff was not, in fact, "responding" to anything.  Defendant Sodexho did not file its Motion for Summary Judgment and supporting Brief until March 14, 2006.

## SUMMARY OF ARGUMENT

I.    The Allegations Contained in Plaintiff's Motion Do Not Satisfy Plaintiff's Threshold Burden To Produce Evidence From Which A Reasonable Fact Finder Could Find In His Favor.

## INTRODUCTION

In his Motion for Summary Judgment, Plaintiff identifies four incidents in purported support of his claim that he was subject to unlawful discrimination on the basis of his age. Plaintiff does not, however, offer <u>any</u> evidence that he suffered any adverse employment action whatsoever. Instead, Plaintiff continues to rely on his own subjective and distorted belief that he was treated unfairly by Sodexho. Plaintiff's weak attempt to link this alleged unfair treatment with his age is likewise unsupported by any evidence. Even affording Plaintiff the benefit of all reasonable inferences, he has not established a *prima facie* case of discrimination in violation of the Age Discrimination in Employment Act and his Motion for Summary Judgment must therefore be denied. For the reasons set forth in its Brief in Support of its Motion for Summary Judgment, and supporting documents, Sodexho is entitled to judgment as a matter of law. (D.I. 42-45.)

## ARGUMENT

I.    The Allegations Contained in Plaintiff's Motion Do Not Satisfy Plaintiff's Threshold Burden To Produce Evidence From Which A Reasonable Fact Finder Could Find In His Favor.

This case is ripe for summary judgment. None of the allegations, or supporting documents, contained within Plaintiff's Motion for Summary Judgment raise a genuine dispute of a material fact. *See Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248 (1986) (stating a dispute regarding a material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Assuming Plaintiff's allegations as true for purposes of summary judgment, Plaintiff has not adduced evidence

3

sufficient to carry his burden of establishing a *prima facie* case of age discrimination in violation of the ADEA.

In order to establish a prima facie case, Plaintiff must prove: (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances supporting an inference of discrimination, such as evidence that he was treated differently than other similarly situated employees who are younger. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-802 (1973). Plaintiff has failed to identify <u>any</u> evidence in support of elements three and four.

The incidents raised by Plaintiff's Motion for Summary Judgment, *i.e.*, the Gary Rodgers comment, the Mark Teoli comment, the discipline received on June 10, 2004, and the delay in receiving a salary increase, are thoroughly addressed in Sodexho's Brief in Support of Its Motion for Summary Judgment. In short, not one of these incidents resulted in Plaintiff suffering any adverse employment action. Moreover, as to the June 10 incident and the delay in receiving a salary increase, there is no link between Sodexho's actions in connection with these events and Plaintiff's age. Nor has Plaintiff identified any similarly situated younger employees who were treated differently under the circumstances. *See, e.g, Powell v. Consolidated Edison Co. of N.Y.*, 2001 U.S. Dist. LEXIS 2706, *41 (S.D.N.Y. 2001) ("generalizations about the allegedly tolerated misbehavior of others are insufficient to allow a jury to make a finding of improper motivation, where the record contains no evidence . . . that specific incidents leading to disciplinary action were sufficiently comparable to episodes involving others.") (attached as Ex. A).

4

Plaintiff also attaches several documents to his Motion, which do not carry his burden at this stage of the proceedings.

### A.    Discrimination Exhibit Does Not Evidence Any Adverse Employment Action.

None of the exhibits Plaintiff attaches to his motion support his claims. The three documents contained within Plaintiff's "Discrimination" Exhibit A are all included, in their entirety, in Defendant's Appendix, filed in support of its motion for summary judgment. The first document, titled Juanita Congo's Notes Regarding a Meeting with Gary Rogers, was offered by Sodexho as evidence that when Plaintiff complained about Mr. Rogers inappropriate comment regarding Plaintiff's age, Sodexho took prompt and remedial action. As Sodexho has indicated, Mr. Roger's comment to Plaintiff that he was "the oldest" employee in the kitchen area was inappropriate and inconsistent with Sodexho's employment policies. Mr. Rogers received a Constructive Counseling Notice as punishment for the comment and was instructed to apologize to Plaintiff. As Plaintiff himself admitted, no adverse action befell Plaintiff as a result of the comment. (*See* Defendant's Appendix at A17, Tr. 59.)

The second document is a copy of Meeting Notes documenting a June 17, 2004 meeting in which Plaintiff was permitted to explain his version of the events that transpired on June 10, 2004. On June 10, Plaintiff was reprimanded for using vulgar profanity in the kitchen area, which was at times directed at other employees, and for engaging in a verbal altercation with a co-worker. These events ultimately resulted in Plaintiff's suspension from work, with pay, for one week. (A26, Tr. 97.) As indicated in these meeting notes, all of other employees who were present that day submitted

statements that contradicted Plaintiff's version of events. (*See* Weick Certification, Exhibits A-C.) As also indicated in these meeting notes, all employees present during the events of June 10, including Ms. Haughney, the supervisor, were reminded that it is inappropriate to use vulgar language in the workplace. (A85.) Indeed, Ms. Haughney received a Constructive Counseling Notice following these events to reinforce the importance of treating all employees fairly when enforcing Sodexho company policy. (*See* Haughney Counseling Notice, A89.) Again, however, Plaintiff has offered no evidence that he suffered any adverse employment action as a result of the events of June 10, 2004.

The last document in Plaintiff's Exhibit A is the first page of a letter addressed to Plaintiff from Patty Weick, the Senior Human Resources Manager, dated July 7, 2004, detailing the results of Sodexho's investigation into Plaintiff's claim that Ms. Haughney was prejudiced, or treated employees unfairly. As set forth in this letter, Sodexho interviewed seven other employees and four managers – none of whom corroborated Plaintiff's claims. (*See* 7/7/04 Letter, in its entirety, A86-88.)

Plaintiff's attempt to support his claims with these exhibits must fail. Not only do they fail to support Plaintiff's claims, but they also show that his claims should be dismissed as a matter of law. The exhibits unequivocally demonstrate that: (1) when Plaintiff complained, Sodexho took prompt remedial action; and (2) Sodexho's decision to discipline Plaintiff was not motivated by his age, but rather, his own misconduct and vulgar language, including admittedly referring to a co-worker as a "bitch."

B.     Punitive Damages/Emotional Distress Exhibit Is
Completely Irrelevant.

Because Plaintiff has failed to show that he suffered any adverse employment

action, he cannot establish a prima facie case of age discrimination. Thus, any damages

Plaintiff alleges to have suffered are irrelevant at this stage of the proceedings.

Nonetheless, Plaintiff submits two documents, titled "Emotional Distress" and "Punitive

Damages" in support of his claim that he has suffered damages as a result of the

discrimination he allegedly endured during his employment with Sodexho. As a

preliminary matter, Sodexho objects to the inclusion of either of these documents as

evidence in this case. Both were prepared by Plaintiff, with the help of his wife (how do

we know that?), in the last few months in connection with this litigation. (Tr. 235-236,

A61.) These "exhibits" are a clear example of the type of self-serving, post hoc

statements that Courts have repeatedly rejected as valid evidence of discrimination. *See,*

*e.g., Pastore v. Bell Tel. Co.*, 24 F.3d 508, 511 (3d Cir. 1994) (holding that non-moving

party may not rely "upon conclusory allegations . . . to establish a genuine issue of

material fact.").

The additional documents in this exhibit appear to relate to an eye injury Plaintiff

suffered while working for Sodexho and the notes of mental health professionals Plaintiff

has consulted. As a preliminary matter, Plaintiff makes no attempt to explain what

connection or relevance this document, or the alleged eye injury described therein, has to

his age discrimination claim. For this reason alone, the exhibit should be disregarded as

irrelevant.

Moreover, because Plaintiff has not -- and indeed cannot – establish a prima facie

case of age discrimination, damages are not relevant at this stage in the proceedings.

Even if damages were relevant now, none of these documents is valid proof of damages.
The ADEA does not permit a separate recovery of compensatory damages for pain and
suffering or emotional distress. *See Commissioner of Internal Revenue v. Schleier*, 515
U.S. 323, 326 (1995) (citations omitted). The ADEA incorporates the enforcement
powers, remedies, and procedures of the Fair Labor Standards Act ("FLSA"), which
provides that "any employer who violates [the FLSA] shall be liable to the employee or
employees affected in the amount of their unpaid minimum wages, or their unpaid
overtime compensation, as the case may be, and in an additional equal amount as
liquidated damages." 29 U.S.C. § 216(b); *see also Potence v. Hazleton Area Sch. Dist* ,
357 F.3d 366, 372 (3d. Cir. 2004). Plaintiff here has not alleged that he suffered any
economic damages that Sodexho could potentially be liable for.

Finally, to the extent that Plaintiff is now attempting, for the first time, to make
out a separate, state law claim for intentional infliction of emotional distress, he fails to
satisfy that pleading burden as well. In Delaware, a claim of intentional infliction of
emotional distress requires that Plaintiff show that the conduct complained of (1) is
extreme and outrageous; (2) was performed intentionally or recklessly; and (3) causes
him severe emotional distress. *See Pritchett v. Delmarva Builders, Inc* , 1998 Del. Super.
LEXIS 102, *13 (Del. Super.) (attached as Ex. B). Plaintiff has not alleged, nor could he,
that any of the conduct alleged to have been committed by Sodexho management was
"extreme and outrageous." *See, e.g., Mattern v. Hudson*, 532 A.2d 85, 86 (Del. Super. Ct.
1987) (conduct must be "so outrageous in character, and so extreme in degree, as to go
beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community") (citing Restatement (Second) of Torts § 46, comment d).

### C.    Retaliation Exhibit Does Not Evidence Any Adverse Employment Action.

The documents Plaintiff attaches at Exhibit 3 are a conglomeration of material that Plaintiff submits as evidence of his retaliation claim. Once again, these documents do not satisfy Plaintiff's burden. The first page is a letter seeking additional information that was sent to Sodexho during the course of the Delaware Department of Labors' investigation of Plaintiff's charge of discrimination. It is interesting that Plaintiff would attach this document when the Department of Labor ultimately failed to substantiate Plaintiff's charge. Nonetheless, this letter cannot contradict the fact that, as Plaintiff admitted during his deposition, Plaintiff did, in fact, receive a salary increase following the first year of employment with Sodexho of 2.5%. (Tr. 160-161, 165, A42-43.) Although there was a delay in the payment of this increase due to the repeated changes in Plaintiff's direct supervisor during that time, when Sodexho paid Plaintiff the increase, it was made retroactive to April 2004. (*Id.*) The page of notes Plaintiff includes in this Exhibit demonstrates that, when Ms. Weick investigated Plaintiff's allegations of discrimination in June 2004, Plaintiff raised the fact that he had not received a pay increase. Ms. Weick stated that she would discuss it with his management team and ask them to follow-up. (*See also* Weick Certification, ¶6.) However, Ms. Weick herself had no responsibility for reviewing Plaintiff's performance or authority to award him a raise.

Furthermore, Plaintiff received another 3% salary increase in connection with his 2005 performance review in April 2005, which Plaintiff also attaches as part of Exhibit C. (A92-93.)

Plaintiff also attaches what appears to be a letter he wrote to the United States Department of Transportation regarding alleged mechanical problems with his delivery van. There is no evidence that Sodexho received this letter or even knew of its existence so it cannot possibly serve as evidence that Sodexho retaliated against Plaintiff. Moreover, there is absolutely no evidence tying Plaintiff's allegations that his delivery van needed repair with his age or the Charge of Discrimination he filed with the EEOC.

In sum, there is nothing contained in these documents that evidences that Plaintiff suffered any adverse employment action as a result of any of his complaints of harassment.

>   D.   Resignation Exhibit Confirms That Plaintiff
>        Suffered No Adverse Employment Action.

Plaintiff's separation from employment does not constitute adverse action. Sodexho did not terminate Plaintiff. (A96.) He resigned. (*Id.*) The first document in Plaintiff's Exhibit D is his resignation letter. Plaintiff testified repeatedly at his deposition that his resignation was completely voluntary. (Tr. 204-205, A53.) Upon receipt of his resignation, Sodexho urged Plaintiff to reconsider. (A97.) Sodexho offered Plaintiff immediate and unconditional reinstatement to the same position, upon the same terms and conditions of his employment. (*Id.*) None of the terms or conditions of Plaintiff's employment suggest that he suffered any adverse action. Throughout the 2 years of Plaintiff's employment, his job duties never changed, his salary and benefits were never

decreased (in fact, he received 2 salary increases), and his schedule and hours of work remained the same. (Tr. 204-205, A53.)

Finally, Sodexho's response, or lack of response, to Plaintiff's request for unemployment benefits is completely irrelevant to his discrimination claim. *See Klyuch v. Freightmasters, Inc.*, 2005 U.S. Dist. LEXIS 1843, *8-9 (D. Minn. 2005) (noting the standard for unemployment benefits is distinct from the standard for employment discrimination, and excluding evidence from the unemployment insurance benefits hearing from introduction in the discrimination trial) (attached as Ex. C); *Abbondanzo v. Health Mgmt. Sys.*, 2001 U.S. Dist. LEXIS 17567 (S.D.N.Y. 2001) (unemployment benefits administrator's decisions based on "state statutes totally unrelated to the issues" presented by discrimination claim) (attached as Ex. D). Courts have repeatedly held that determinations by state agencies regarding unemployment benefits are not probative of a claim of employment discrimination. *See Goldsmith v. E.I. DuPont de Nemours & Co.*, 1983 U.S. Dist. LEXIS 17086 (D. Del. 1983) (attached as Ex. E); *Blumensaadt v. Standard Products Co.*, 744 F. Supp. 160, 163 (N.D. Ohio 1989). Furthermore, an employer's opposition to an employee's request for unemployment benefits does not constitute adverse employment action. *See, e.g., Gaddis v. Russell Corp.*, 242 F. Supp. 2d 1123, 1145 (M.D. Ala. 2003) ("In addition to the absence of any cognizable harm to the Plaintiff, the Defendant's opposition [to her request for unemployment benefits] was not retaliation, but an exercise of its legal rights under [state] law."); *citing Baker v. Summitt Unlimited, Inc.*, 855 F. Supp. 375, 376 (N.D. Ga. 1994) (holding that the "Defendants' opposition to Plaintiff's claim for unemployment benefits ... is not retaliatory in nature and therefore not a basis for a claim under Title VII").

## CONCLUSION

For the foregoing reasons, Sodexho respectfully requests that the Court DENY

Plaintiff's Motion for Summary Judgment.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By: _____
Jennifer Gimler Brady (I.D. # 2874)
Sarah E. DiLuzio (I.D. #4085)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000 - Telephone
jbrady@potteranderson.com
sdiluzio@potteranderson.com

Dated:  March 21, 2006
724540

*Attorneys for Defendant Sodexho, Inc.*

11

# EXHIBIT A

Service: **Get by LEXSEE®**
Citation: **2001 us dist lexis 2706**

*2001 U.S. Dist. LEXIS 2706, \**

DWIGHT F. POWELL, Plaintiff, -v- CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., DENNIS O'DONNELL, PAT SHEEHAN, DONALD THOMPSON, and BRUCE SMITH, Defendants.

97 Civ. 2439 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2001 U.S. Dist. LEXIS 2706

March 12, 2001, Decided
March 13, 2001, Filed

**DISPOSITION: [\*1]** Defendants' motion for summary judgment granted in part and denied in part.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff sued defendants, employer, two supervisors, and two co-workers, alleging breach of contract, discrimination under Title VII of the Civil Rights Act of 1964, and Americans with Disabilities Act, and violations of 42 U.S.C.S. §§ 1981, 1983 and 1985(3). Plaintiff's claims for breach of contract and violation of § 1983 were dismissed. Defendants, employer and supervisors, moved for summary judgment on other causes of action.

**OVERVIEW:** As to plaintiff's Title VII claim, the court held that the record presented no affirmative evidence that defendant employer's decision not to promote plaintiff was motivated by racial animus. First, defendants' asserted reasons for denying the promotion were solidly supported. Defendant supervisor, who made the promotion decision, testified that he did so because plaintiff, unlike the successful candidates, had both a poor attendance record and a demonstrated unduly aggressive attitude toward other people, as reflected in his disciplinary record. Plaintiff offered no evidence that the disciplinary actions relied on to deny him promotion were undeserved. Thus, summary judgment was appropriate. As to plaintiff's hostile work environment claim, the court held that while defendant employer had a non-discrimination policy in place, and produced evidence that plaintiff's complaints were reasonably investigated, there was also evidence of other incidents in response to which defendant employer took no action. As there was a genuine issue of material fat, summary judgment was denied. Summary judgment was granted on plaintiff's remaining claims.

**OUTCOME:** Defendants' motion for summary judgment was granted with respect to plaintiff's claims of discrimination based on disability, violation of 42 U.S.C.S. §§ 1981, 1985(3), and racially-discriminatory adverse employment actions, as well as with respect to all claims against defendant supervisors. Defendants' motion was denied as to plaintiff's Title VII claims alleging hostile work environment.

**CORE TERMS:** promotion, summary judgment, co-worker, supervisor, disciplinary, hostile work environment, discriminatory, subjected, disability, candidate, disciplinary record, conspiracy, termination, hostile, harassment, mechanic, insubordination, discriminated, racially, abusive, arrest, promoted, cream, prima facie case, non-discriminatory, confrontational, threatening, arbitrator, hostility, abandoned

## LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN1* Summary judgment may only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(b). More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof

*HN2* The party opposing summary judgment may not rest upon mere allegations or denials, rather it must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). To defeat a motion for summary judgment, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Similarly, the non-moving party cannot defeat summary judgment by offering purely conclusory allegations of discrimination, or by offering evidence in opposition that is merely speculative. Accordingly, to defeat summary judgment, it must set forth "concrete particulars" showing that a trial is needed. More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Title VII Amendments

*HN3* Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., permits actions only against an "employer." 42 U.S.C.S. 2000e(2)(a). More Like This Headnote

Labor & Employment Law > Discrimination > Title VII Amendments

*HN4* United States Court of Appeals for the Second Circuit precedent bars Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., actions against individual defendants with supervisory control over a plaintiff, still less will Title VII support claims against mere co-workers. More Like This Headnote | *Shepardize:* Restrict By Headnote

Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally

Constitutional Law > Civil Rights Enforcement

*HN5* The limitations period applicable to 42 U.S.C.S. § 1981 actions in New York is three years. More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN6* The framework for analyzing summary judgment motions in employment discrimination claims begins by asking whether the plaintiff has established the "minimal" McDonnell Douglas Corp prima facie case. This requires no evidence of discrimination. It is satisfied by a showing of membership in a protected class, qualification for the position, an adverse employment action, and preference for a person not of the protected class. Meeting this test creates a presumption that the employer unlawfully discriminated. This presumption places the burden of production on the employer to proffer a nondiscriminatory reason for its action. If the employer fails to present such a reason, plaintiff prevails. More Like This Headnote |

*Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN7* In employment discrimination claims, once the employer articulates a non-discriminatory reason for its actions, the presumption completely drops out of the picture. At that point, the employer will be entitled to summary judgment unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination. Evidence casting doubt on the employer's proffered justification may - or may not - be sufficient to provide this support.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN8* In employment discrimination claims, when the employer has proffered an explanation and the plaintiff has attempted to refute it, the court's responsibility is to examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN9* Even if a plaintiff succeeded in persuading a jury that his employer's explanations were false, that would not necessarily constitute affirmative evidence that the real reason was prohibited discrimination: The requirements of the McDonnell Douglas prima facie case are so minimal that they do not necessarily support any inference of discrimination; and there are so many reasons why employers give false reasons for an adverse employment action that evidence contradicting the employer's given reason - without more - does not necessarily give logical support to an inference of discrimination.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN10* In analyzing summary judgment motions in employment discrimination claims, there must be evidence that reasonably supports an inference of the discrimination plaintiff must prove.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment 

Labor & Employment Law > Employer Liability > Tort Liability > Direct & Vicarious Liability 

*HN11* Employers may be held liable for the conduct of employees that is so abusive as to alter the conditions of employment.  More Like This Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment 

*HN12* To prevail on a hostile work environment claim, an employee must prove three elements. First, the conduct must be severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive. Second, the plaintiff must have subjectively perceived the environment to be abusive. Third, when harassment is allegedly perpetrated by co-workers, rather than a supervisor, the standard for imputing liability to the employer is one of negligence.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment 

*HN13* To prevail on a hostile work environment claim, the employer will be liable only if the plaintiff demonstrates that it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.  More Like This Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment

*HN14* In a hostile work environment claim, whether the employer is aware of employee harassment by co-workers and whether the employer has taken reasonable steps to eliminate such offensive conduct present questions of fact to be determined in each case.  More Like This Headnote

Labor & Employment Law > Discrimination > Sexual Harassment > Hostile Work Environment

*HN15* To establish a hostile work atmosphere, however, plaintiffs must prove more than a few isolated incidents of racial enmity.  More Like This Headnote

Torts > Multiple Defendants > Conspiracy

Constitutional Law > Civil Rights Enforcement

*HN16* To establish a violation of 42 U.S.C.S. § 1985, a plaintiff must prove a conspiracy between two or more persons intended to deprive any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the law and an act by one of the conspirators in furtherance of the conspiracy which injured another person or deprived him of exercising any right or privilege of a citizen of the United States.  More Like This Headnote

Labor & Employment Law > Discrimination > Disability Discrimination > Other Laws

Administrative Law > Judicial Review > Reviewability > Exhaustion of Remedies

*HN17* Under the Americans with Disabilities Act, as under other discrimination statutes, a court only has jurisdiction if a plaintiff has filed an administrative charge with the Equal Employment Opportunity Commission and exhausted the administrative remedies available by this route. Thus, the court may only adjudicate those allegations contained in a timely charge of discrimination, or acts that are reasonably related to such allegations.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

**COUNSEL:** Stephen C. Jackson, Esq., New York, NY, for Dwight F. Powell, Plaintiff.

Barbara Jane Carey, Esq., Of Counsel, Mary Schuette, Esq., New York, NY, for Consolidated Edison Company of New York, Denis O'Donnell and Donald Thompson, Defendants.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINIONBY:** GERARD E. LYNCH

**OPINION:** OPINION AND ORDER

GERARD E. LYNCH, District Judge:

Plaintiff Dwight F. Powell brings this employment discrimination action against his former employer, Consolidated Edison Company of New York ("Con Ed"), two of his supervisors

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 2706                    Page 5 of 24

Case 1:05-cv-00205-SLR     Document 46     Filed 03/21/2006     Page 21 of 40

there, Denis O'Donnell n1 and Donald Thompson, and two co-workers, Patrick Sheehan and Bruce Smith. n2 The action is predicated on a charge of discrimination filed with the EEOC and the New York State Division of Human Rights on October 28, 1993, alleging disparate treatment and a failure to promote. On January 17, 1997, Powell received a "Right to Sue" letter from the EEOC and shortly thereafter filed the original Complaint in this action. n3 After several rounds of repleading, he filed the Second Amended Complaint ("Complaint") alleging breach of contract, **[*2]** employment discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act (the "ADA"), and violations of 42 U.S.C. §§ 1981, 1983 and 1985(3). Powell's claims for breach of contract and violation of § 1983 were dismissed by order of this Court (Denny Chin, J.), dated April 20, 2000. The remaining causes of action are before the Court on Defendants' motion for summary judgment. After careful consideration of the parties' submissions, the motion is granted in part and denied in part.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 According to Defendants, O'Donnell's first name is spelled incorrectly in the caption

n2 The Complaint names two of Powell's co-workers, Patrick Sheehan and Bruce Smith, as individual defendants in this action. The record indicates that although Sheehan and Smith have been served, they have never appeared in this action. They are not parties to the motion before the Court, and thus general references to "Defendants" in the opinion are to Con Ed and the two supervisors

n3 Plaintiff filed a charge of discrimination on the basis of race and national origin with the EEOC on October 23, 1993. The EEOC referred the charge to the New York State Division of Human Rights for investigation. On October 21, 1996, that agency entered a "Determination and Order after Investigation," finding no probable cause to believe that Con Ed engaged in prohibited discrimination. On January 17, 1997, the EEOC, apparently without objection, adopted the state agency's findings and advised Plaintiff of his right to sue.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*3]**

FACTS

The following paragraphs summarize the facts asserted by Plaintiff, indicating some of the issues on which disputes exist.

Powell, an African-American man, was originally hired by Con Ed in April 1981 as an Attendant in its Facilities Management Department (the "Department"). Ten years later, in the Spring of 1991, he was assigned to the Department's Electrical Shop under the supervision of defendant O'Donnell and the Section Manager, defendant Thompson. In December 1991, Powell was promoted to the position of "Mechanic B" in a group known as the "cable gang," and worked in that capacity throughout the period relevant to this lawsuit.

The available evidence indicates that the working environment in the Electrical Shop was beset with incidents of both racial and personal animosity. (See, e.g., Jackson Aff. Ex. I at CE1427 (Con Ed memorandum dated September 27, 1996, documenting a discussion on work place harmony and referring to "the hostility that pervades the night electrical shop mechanic's [sic]")) Powell has testified that his white co-workers often uttered "unspeakable things, vulgarities to Denis O'Donnell. They would ignore his orders, curse him out, go out **[*4]** drinking with him, have lunch with him, none of which I ever did, and nothing was

done. He called them good lads who was [sic] just blowing off steam." (Carey Aff. Ex. C at 136) n4 Additionally, Powell has testified to a general atmosphere of racial insensitivity, and indeed hostility, on the part of his co-workers. In particular, Powell has testified that since his assignment to the Electrical Shop, he has been "subjected to an almost daily barrage of racially-derogatory slurs, epithets and comments such as 'nigger', 'jig', 'Zulu', [and] 'Mau Mau'." n5 (Powell Aff. P 11.) Powell has also testified to several specific instances (of unspecified date) in which two co-workers, Sheehan and Smith, made overtly racist comments to him. Specifically, Sheehan told Powell at one point "You people don't know your place. The shop was better before you people got here." (Carey Aff. Ex. C at 143.) In addition, Smith "frequently" told him that "blacks should behave more like the 'slaves down south on the plantation' and that he was the 'slave master.'" (Powell Aff. P 11.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 The following abbreviations are used throughout this opinion. "Carey Aff." refers to the Affirmation of Barbara Jane Carey, dated June 23, 2000, submitted in support of defendants' motion for summary judgment. "Carey Supp. Aff." refers to the Supplemental Affirmation of Barbara Jane Carey, dated September 22, 2000, submitted in support of defendants' motion for summary judgment. "Def. Mem." refers to the Defendants' Memorandum of Law in Support of its Motion for Summary Judgment, dated June 23, 2000. "Jackson Aff." refers to the Affirmation of Stephen Jackson, dated August 14, 2000, submitted in support of plaintiff's opposition to defendants' motion for summary judgment. "O'Donnell Dep." refers to the transcript of Denis O'Donnell's deposition attached as Exhibit Z to the Jackson Affidavit. "Pl. Mem." refers to the Plaintiff's Corrected Memorandum of Law in Opposition to Defendant's [sic] Motion for Summary Judgment, dated August 25, 2000. "Powell Aff." refers to the Affidavit of Dwight Powell, dated August 14, 2000, submitted in support of plaintiff's opposition to defendants' motion for summary judgment. **[\*5]**

n5 Powell also claims to have been the target of derogatory remarks, pictures and drawings associated with his being HIV-positive, although there is no evidence that Powell's condition was known to anyone in his department until Powell's condition became public through the filing of this lawsuit in 1997. Powell was apparently diagnosed as HIV-positive in 1992, and informed Con Ed's Occupational Health Department of his condition on February 16, 1993. (See Carey Aff. Ex. E P 2.) Defendants contend that despite this disclosure to the Occupational Health staff, they had no knowledge of Powell's condition. (See Carey Aff. Ex. D at 41; id. Ex. F P 2.) They have provided uncontradicted written testimony from the Director and former Administrator of Con Ed's Occupational Health Department indicating that the department's policy and practice was not to divulge any medical information to an employee's department, and that no information concerning Powell's condition was divulged in this case. (See id. Ex. E P 3.) There is no evidence in the record that Powell's condition hindered his job performance, and at any rate he never requested any accommodations. (See Carey Aff. Ex. C at 96-97.) In short, the record indicates that Powell's condition was not known to members of the his condition became public with the filing of this lawsuit in 1997. The derogatory drawings that have been provided as Exhibit U to the Jackson Affidavit do not contradict this testimony, since neither the exhibit nor Powell's testimony provides any indication of when these drawings were found, and since they have no clear reference to HIV or AIDS. See p. 35 below

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*6]**

Con Ed maintains a non-discrimination policy which is publicized to employees and administered by an EEO director and officers. That policy states that aggrieved employees

may complain either to the EEO staff or to any management level employee. It is undisputed that Powell knew about Con Ed's policy, and he has testified generally that "in accordance with company policy [he] reported to management on many occasions that [he] was subjected to harassment, verbal abuse, intimidation and racial slurs and innuendo," but that Con Ed management "did not respond." (Powell Aff P 12.) The record contains evidence that Powell was the target of several specific actions of which he did complain to his supervisors. For example, there is evidence that Powell received a note in his locker, stating, "Those who think they know everything are annoying to those of us who do." While the reproduction of this note in the record is unclear, it appears to be a commercially produced greeting card bearing the quoted text and a picture of a gorilla, which apparently forms the basis of plaintiff's characterization of the note as a racial slur. (Jackson Aff. Ex. D.) Powell also testified that he received **[*7]** another note, delivered in the same manner, that read, "Some people are alive simply because it's against the law to kill them." (Id., see also Powell Aff. P 9.) That note, which he characterizes as a death threat, has no racial reference at all. Powell alleges that he told O'Donnell of the note, that O'Donnell did not investigate the incident, and that he complained to the EEO officer of this failure to investigate. (See Powell Aff. P 9; Carey Aff. Ex. C at 454-56.) Powell has claimed that a similar incident involving the phrase "you're no good" written on the locker of a white co-worker occasioned an investigation by O'Donnell, during which photographs were taken and employees interviewed. (See Powell Aff. P 9; Carey Aff. Ex. C at 452-54.)

Powell's work history following his reassignment to the Electrical Shop and his promotion to the position of Mechanic B was marked by a number of confrontations with supervisors and employees in both his own and other departments, resulting in repeated complaints and disciplinary warnings for abusive and threatening behavior. The first such incident in evidence involves an altercation in August 1992 with a co-worker in the cable gang, **[*8]** John Diver. John Setaro, Powell's supervisor, reported that Powell told him that the incident was "without intention" and that "he liked Mr. Diver" (See Carey Supp. Aff. Ex G at CE944.) Based on his conversation with Powell, Setaro believed that this was an "isolated incident," and although no formal disciplinary action was taken, the two employees were separated. (See id.)

Shortly thereafter, Powell was involved in two separate incidents with employees in other departments. In October 1992, according to Con Ed records, Powell verbally abused a Treasury Department Supervisor who had attempted to stop him from soliciting a date with a female employee, repeatedly referring to the Supervisor as "punk." (See id. Ex. G at CE1080-81.) He was given a written warning for insubordination and being AWOL from his department. (See id. Ex. C at CE1077-78.) In November 1992, the Security Department complained of his threatening and abusive behavior towards a parking attendant who had stopped him from parking his car in an unauthorized area. (See id. Ex. G at CE1111.) Although resulting in no formal disciplinary action, the incident prompted Thompson to observe that "Powell is **[*9]** developing into an obstinate individual," and to seek advice about how to handle what he regarded as a developing disciplinary problem. (Id.)

On December 8, 1992, Powell was suspended for a day, and docked a day's pay, for taking an unauthorized day-off to deal with Medicare-related problems for his mother. (See Carey Aff. Ex. J at CE623-24.) This last action prompted Powell to complain that the disciplinary actions taken against him "malicious," and he accused Thompson of being "intent on accumulating documentation in an effort to terminate [him] after 13 years with [Con Ed]." (Jackson Aff. Ex. E at CE1127.) Subsequently, Setaro informed Thomson of several additional incidents, of Powell's allegedly "unprofessional and insubordinate" behavior, including causing damage to Con Ed property, and stated that he was not sure he was able to handle Powell's increasingly erratic and aggressive behavior (Carey Aff. Ex. P.) After these reports, Thompson requested that Powell submit to a job fitness evaluation. (See id.)

These disciplinary incidents bear none of the hallmarks of racial animus. The record is silent as to the race of most of the individuals involved, and the evidence **[*10]** often casts Powell

in the position of the aggressor. Apart from conclusory allegations that he was subjected to excessive and discriminatory discipline, Powell offers no alternative account of any of the episodes.

At some point in early 1993, following these incidents, Powell sought, but ultimately failed to secure, a promotion to the position of "Mechanic A." Although Powell claims that he was qualified for the promotion, performance evaluations by his supervisor are equivocal, questioning his grasp of basic technical skills although praising him for his diligence. (See Jackson Aff. Exs. F, H.) They also express concern about Powell's belligerent and confrontational behavior. (See Carey Supp. Aff. Ex. F.) In advising Powell that he had failed to secure the promotion, Thompson informed Powell that he had not been promoted because he was "too controversial." (Powell Aff. P 5.) Powell alleges that Con Ed's failure to promote him to the position of Mechanic A was motivated by racial bigotry as well as by retaliation for his vociferous complaints of alleged disparate treatment of African-Americans. However, the evidence shows that of the six employees (including Powell) who sought **[*11]** promotion to Mechanic A at that time, the two who were promoted were an African-American and a Latina; Powell, another African-American, and two Caucasian employees were passed over. (See Carey Aff. Ex. L; Carey Supp. Aff. Ex. E.) Powell then sought to transfer to Con Ed's Learning Center to improve his skills, but his transfer was denied, as were later requests to change shifts. Thompson testified that he refused to approve Powell's transfer to the Learning Center because if he did so, he would lose a budgetary slot for a Mechanic B. (See Carey Aff. Ex. F P 6.) There appears to be no dispute that under Con Ed's procedures, that would indeed have been the consequence of granting the transfer. In addition, Thompson indicated his reluctance to transfer an employee with Powell's disciplinary record. (See id.)

Powell's belief that he was being treated unfairly appears to have strengthened following his unsuccessful bid for promotion. Whether warranted or not, Powell's pervasive belief in the discriminatory animus of colleagues and supervisors often led to disputes and disciplinary action, which in turn fostered Powell's sense of being singled out. In March 1993, Con Ed Security **[*12]** complained that Powell had responded abusively to a security guard who had asked for his I.D. card. (See Carey Supp. Aff. Ex. G. at CE1198.) In May 1993, Powell was asked to calm down after complaining "It's O.K. for this boy to do all the nigger work, and still will [sic] not get his 'A' title," and after he continued to carry on in a loud and disruptive manner, he was given a written warning for insubordination. (Carey Supp. Aff. Ex. H at CE 1200.) In July 1993, Powell was hit on the head by a roll of tape, and complained that the incident had been motivated by racial animus. The person who threw the tape claimed that it was an accident, and apologized; an investigation conducted at Powell's request accepted this story. (See Jackson Aff. Ex. O.)

Powell has also testified that on or about October 7, 1993, Sheehan threatened Powell's life during an argument. (See Powell Aff. P 9; Carey Aff. Ex. C at 129.) Powell has testified that his supervisors failed to take this threat seriously. (See Powell Aff. P 10.) Although Powell believes that O'Donnell's failure to respond was racially motivated, he has testified that similar incidents between white co-workers, and one **[*13]** even more serious incident involving the brandishing of knives, were routine in the electrical shop (See Carey Aff. Ex C. at 457-59.) Later that month, Powell incurred a five-day suspension for insubordination. That incident involved Powell's refusal to remove a white cream from his face and making threatening remarks to his supervisor O'Donnell after being told to leave the premises. n6 It was following his suspension for that incident that Powell Filed with the EEOC the charge of discrimination that forms the predicate for this action.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 Plaintiff's and Defendants' accounts of the incident differ. Powell claims that the cream was "medically prescribed" to protect his skin from soot that accumulated on his face while

laying cable in the ceiling. (See Carey Aff. Ex. I.) Defendants assert that the cream was painted on Powell's face in stripes rather than rubbed into the skin or uniformly applied, and O'Donnell testified that when he asked Powell what the substance on his face was he told him it was "war paint." (See Carey Aff. Ex D at 29; Carey Supp. Aff. Ex. L; (O'Donnell Dep. at 25.) Powell has claimed that Smith told him that the white cream on his face made him look like a "Mau-Mau" or "Zulu." (See Carey Aff. Ex. C at 141-42.) O'Donnell has stated that he never made such comments (O'Donnell Dep. at 26), and Powell's testimony does not implicate him or any other supervisor (see Carey Aff. Ex. C at 142). When Powell refused to remove the cream, he was suspended. This suspension was upheld by the arbitrator in the same union grievance procedure that resulted in Powell's reinstatement following his firing after the fight with Smith in March 1994. (See Jackson Aff. Ex. V.)

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*14]**

The working environment in the shop appears to have become desperate enough for Powell that he thrice requested to be transferred from his shift, first in December 1993, and twice again in January of 1994, but he was refused each time. (See Jackson Aff. Ex. R.) In his second request, Powell described his work environment as "inequitable and hostile" and indicated his "'dire' wish" to be transferred at any cost, including demotion to his former position. (Id. Ex R at CE615.) Thompson stated at the time that there were no openings available on the shifts that Powell had requested. (See id. Ex. S.) He subsequently testified that there were no slots available in the midnight shift to which Powell requested a transfer, and that a white co-worker was similarly denied a transfer of shifts. (See Carey Aff. Ex. F PP 5, 8.) After his second rejection, Powell submitted a written complaint to the Con Ed EEO administrator reiterating his former belief that he "suspected that this denial is a continuation of the conspiracy by Donald Thompson and Dennis [sic] O'Donnell to 'corner' me, continue to harass me, hoping that I will go berserk so that they can terminate my employment. **[\*15]**" (See Jackson Aff. Ex. R.)

Powell's most severe difficulties in the Electric Shop involved his relationship with Smith, one of the individual defendants in this action. In addition to the racially offensive comments which Powell attributes to Smith and others, a series of specific incidents resulted in disciplinary actions against both Powell and Smith. The most serious of these was a fight on March 30, 1994, which apparently resulted in an injury to Smith, after which Smith filed criminal charges. (See Jackson Aff. Ex. T.) Powell was called to the offices of Con Ed Security, where he was arrested by New York City police officers. Although Powell claims that Defendants "caused or acquiesced in" what he asserts was a false arrest (Complaint P 71), Con Ed officials have testified that when the police wished to arrest a Con Ed employee, it was standard policy to summon the employee to the security office, to be taken into police custody out of view of other employees, in order to minimize workplace disruption and embarrassment to the employee. (See Carey Aff. Exs. G & H.) Powell points to no evidence supporting the claim that Con Ed or the individual defendants other than **[\*16]** Smith played any role in his arrest. A subsequent internal investigation recommended Powell's termination, although that decision was reversed after arbitration. (See id. Exs. T & V.) The criminal charges were eventually dismissed.

Powell was not the only person to have difficulties with Smith. In November 1995, Con Ed's EEO committee held a disciplinary hearing based on complaints against Smith by Powell and at least two other African-American employees. (See Jackson Aff. Ex I.) At the hearing, Smith was reminded of Con Ed's EEO policy, and warned that future infractions could result in more severe punishment, including termination (See id.) In September 1996, Powell accused Smith of spitting at him, and Setaro assigned them to different floors for the remainder of the shift. (See Carey Supp. Aff. Ex. C. a CE1432-33.) Following an interview with Thompson, Smith was suspended pending further investigation. (See Jackson Aff. Ex. I at CE1447.) Smith and Powell were later permanently assigned to different shifts. (See id. at

CE1427.)

DISCUSSION

I. Standards for Summary Judgment

$^{HN1}$Summary judgment may only be granted when "the pleadings, depositions, **[*17]** answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law" FED. R. CIV. P. 56(b). $^{HN2}$The party opposing summary judgment "may not rest upon mere allegations or denials," rather it must "set forth specific facts showing that there is a genuine issue for trial." Id. 56(e). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Similarly, the non-moving party cannot defeat summary judgment by "offering purely conclusory allegations of discrimination." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985), or by offering evidence in opposition that is merely speculative. **[*18]** See Dister v. Continental Group, Inc., 859 F.2d 1108, 1116-1117 (2d Cir. 1988). Accordingly, to defeat summary judgment, it must set forth "concrete particulars" showing that a trial is needed. R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984).

II. Powell's Claims

Analysis of the record against this standard is complicated by confusion concerning Powell's legal theories, and the facts he relies on to support them. The Complaint sets forth a two claims for relief. One, based on breach of contract, has already been dismissed by the Court. (See Complaint 79-81.) The other charges in a very general way that the all the defendants "unlawfully discriminated against the plaintiff on the basis of his race and disability, denied plaintiff equal opportunity to [sic] employment, . . . and engaged in a pervasive and intentional [course] of corporate conduct and established corporate policy which discriminated against plaintiff on the basis of his race and disability." (Complaint P 74.) Interspersed with these general and conclusory allegations are more specific charges that the defendants "denied plaintiff[] promotions **[*19]** and advancements in [his] employment . . . [and] created a hostile and oppressive work environment [and] made unwelcome, vile and offensive racial and AIDS[-]related epithets." (Id.). This would seem to charge both that Defendants took specific adverse employment actions against Plaintiff (by denying him promotions), and that they created a "hostile work environment." Elsewhere in the Complaint, however, Plaintiff sets forth a slightly different set of grievances, charging that Defendants subjected him to

> adverse disparate treatment, including, but not limited to, [1] closely scrutinizing plaintiff's work performance, citing plaintiff for unsubstantiated work deficiencies, [2] failing to conduct a full investigation of charges of misconduct against plaintiff, [3] failing to promote plaintiff, [4] wrongfully causing the false arrest and incarceration of plaintiff, and [5] wrongfully terminating plaintiff because of race and disability.

(Id. P 20.) This list seems to add to the basic claim [3] of failure to promote three additional charges of adverse employment actions that plaintiff was [1] wrongfully scrutinized and disciplined, [5] fired, **[*20]** and even [4] arrested. In addition, it charges that Defendants

[2] failed to investigate wrongful conduct against Powell by others, a charge closely related to the hostile work environment claim.

Finally, the Complaint details five specific incidents of mistreatment: suspension for failure to remove the facial cream (id. PP 25-32), denial of promotion to Mechanic A (id. PP 33-38), failure to investigate alleged death threats (id. PP 39-47), refusal of transfers to the Learning Center and "and other temporary assignments" (id., PP 56-61), and the alleged false arrest (id. PP 62-72). In addition, a sixth, parallel but less specific section of the Complaint alleges that Powell was subjected to "excessive disciplinary actions and write ups," including compulsory psychological and urine testing. (Id. PP 48-55.) Throughout the Complaint, all of these incidents are attributed to bias against Powell on the grounds both of race and disability.

In his summary judgment response, Plaintiff seems to narrow his claims. In a twelve-page "Statement of Facts," he sets forth a number of factual allegations, referring to failure to investigate his complaints of mistreatment, **[*21]** dangerous and undesirable work assignments, racist comments by co-workers, refusal of time off for family emergencies, denial of promotions and transfers, discipline for insubordination, the tape-throwing incident, and his 1994 arrest, termination and reinstatement. (See Pl. Mem. at 3-15.) n7 In the legal analysis section of his response, however, Plaintiff puts forward only two legal theories, arguing that "Plaintiff has established a prima facie case of discrimination regarding defendants' denial of promotion to Mechanic A" (id. at 19-21), and that "Defendant[]s subjected Plaintiff to a hostile work environment" (id. at 21-23). Moreover, where the Complaint consistently attributes the alleged discrimination against Powell to his medical condition as well as to his race, and cites the Americans with Disabilities Act as frequently as Title VII, the summary judgment response makes only stray references to Powell's having AIDS, fails to cite the ADA in its summary of the legal bases of his claims (Pl. Mem. at 1), and appears to rely exclusively on Title VII and on 42 U.S.C. §§ 1981 and 1985. n8

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 This recitation, however, is conspicuously devoid of specific citations to testimony in the record. Repeatedly, where one would expect a citation to some evidence of discriminatory intent, it is simply asserted that "Plaintiff believed" that particular actions were racially motivated, that he was singled out because of his complaints, that a white co-worker had thrown the tape at him, or that decisions were arbitrary. (Pl. Mem. at 6, 9, 9, 11, 12, 12, 13, 15). **[*22]**

n8 In contrast, the summary judgment response recites that the case is also based on the "New York State Human Rights Law." (Pl. Mem. at 1.) The New York statute is not, however, cited anywhere in the complaint, and Plaintiff makes no attempt in the memorandum to analyze any of the facts in light of New York law. Accordingly, no issue under the New York statute is properly before the Court.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

These shifts in position raise questions not merely of neatness or nicety of pleading. As will be seen more fully below, the standards of proof for claims of hostile work environment are different from those applicable to claims of discriminatory adverse employment action, and it is difficult to apply a summary judgment standard to shifting targets and nebulous claims. Moreover, the Court must be careful to separate smoke from fire. Powell was clearly, in the words he attributes to his supervisor, a "controversial" employee, in the sense that he was

frequently involved in disputes and was sometimes disciplined, and Defendants concede that he appears sincerely to believe that his troubles stem from discrimination. **[*23]** (See Def. Mem. at 11.) But frequent altercations and subjective beliefs are not the same as evidence of discrimination. See Meiri, 759 F.2d at 998. The Court must determine whether there are genuine questions of fact that are material to the legal claims raised by Powell. Doing so requires some clear understanding of what those claims are and what facts bear on them. With that in mind, we turn to an analysis of the particular claims.

III Title VII

It is helpful, in addressing Powell's contentions, to analyze them according to the different statutes on which he relies. As discussed above, Powell's Complaint does not clearly distinguish among different legal theories of discrimination, and his characterization of his claims seems to have shifted between the Complaint and his response to Defendants' summary judgment motion. Originally, Plaintiff alleged as aspects of a single cause of action that he was discriminated against in a number of different ways, on the basis of both race and disability, in violation of several distinct statutes. Certain of his factual claims and legal theories have apparently been abandoned, and will be addressed below. This Part **[*24]** of the opinion will address Powell's principal remaining charge, of racial discrimination in violation of Title VII. Powell's claim of a § 1985 conspiracy to violate his rights by creating false testimony leading to his arrest and firing will be discussed in Part IV, and his claims of discrimination on the basis of disability will be discussed in Part V.

Plaintiff appears to have reduced his claims of racial discrimination to two: that Defendants unlawfully denied him a promotion to Mechanic A (see Pl. Mem. at 19-21), and that they subjected him to a hostile work environment, because of his race, in violation of Title VII (see id. at 21-23.) Plaintiff no longer appears to challenge his firing in May 1994 as an independent instance of a racially-motivated adverse employment action, relegating this incident to analysis under § 1985. n9 To the extent that Powell continues to claim that he was discriminated against in disciplinary proceedings, he now seems to regard this as part of his claim for wrongful denial of promotion. n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 A Title VII claim based on this incident would be extremely dubious in any event. Powell was fired following his arrest for assaulting Smith. There seems to be no question that the firing was based on a finding that he was guilty of assault, and not on Powell's race. In any event, in a subsequent union grievance proceeding, an arbitrator found insufficient evidence to support this finding, and the termination was reversed. (See Jackson Aff. Ex. V.) Since the firing was reversed, and Powell was reinstated, there would appear to be no adverse employment action to challenge. **[*25]**

n10 The Complaint alleges other conduct, such as the requirement that he submit to a Job Fitness Evaluation because of his disciplinary record, for which Con Ed has provided ample non-discriminatory reasons. (See Def. Mem. at 16, 19.) Because Powell has failed to respond with any evidence of pretext, to the extent that any claims are predicated on these allegations, they must be considered abandoned and are thus dismissed. The allegation that Powell was given inferior and more dangerous assignments than his white counterparts is simply unsupported by any evidence. Powell's affidavit in response to the summary judgment motion makes no reference to this allegation. Asked at his deposition to give examples of such discriminatory assignments, Powell cited only one allegedly dangerous assignment, and presented nothing to suggest that the assignment was discriminatorily made, other than the fact that he, the only black present at the time, was assigned the task. (Carey Aff. Ex. C at

156, 162.) Powell testified that some of his co-workers referred to certain work as "nigger work." (Carey Supp. Aff. Ex. J at 72.) Powell provides no evidence that such a comment was made by any supervisor or person responsible for assigning work, and the Thompson Affidavit categorically denies that preferential assignments were given. (See Carey Supp. Aff. Ex A PP 2, 8.) Moreover, the record is completely devoid of any circumstantial or statistical evidence suggesting preferential treatment. On this record, no reasonable juror could conclude that Powell was assigned a disproportionate share of dangerous or undesirable work, still less that if he was, the reason was his race.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*26]**

Two final preliminary matters need to be addressed before turning to the merits of Powell's claims of discrimination. First, Powell has sued four individuals in addition to Con Ed. Two of the individual defendants were his supervisors during the period at issue, n11 and the other two were co-workers in the "cable gang." As Defendants correctly point out, $^{HN3}$Title VII permits actions only against an "employer." 42 U.S.C. 2000e(2)(a); see Tomka v. The Seiler Corp., 66 F.3d 1295 (2d Cir. 1995) (construing Title VII not to encompass a cause of action against individual agents of employer despite statutory definition of employer including "agents"). $^{HN4}$Second Circuit precedent bars Title VII actions against individual defendants with supervisory control over a plaintiff, still less will Title VII support claims against mere co-workers. See id. (granting summary judgment on Title VII claim as to individual liability against low-level supervisor and co-workers). Therefore the Title VII portion of this action should be dismissed as to each of them.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 O'Donnell was Powell's direct supervisor, and O'Donnell was in turn supervised by Thompson.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*27]**

Second, Powell appears to bring this action under § 1981 as well as under Title VII. As concerns the merits of the claims, there is no need to separate these theories in the discussion that follows, since the same rules applied below to Plaintiff's Title VII claims govern § 1981 as well. See Hudson v. IBM Corp., 620 F.2d 351, 354 (2d Cir. 1980) (discriminatory adverse employment action), Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62 (2d Cir. 2000) (hostile work environment). However, the claims under § 1981 must be dismissed as barred by the applicable statute of limitations. Powell does not dispute that $^{HN5}$the limitations period applicable to § 1981 actions in New York is three years. Tadros v. Coleman, 898 F.2d 10, 12 (2d Cir. 1990). Thus, since the initial complaint in this action was filed on April 4, 1997, Powell may not base a claim under this statute on conduct occurring before April 4, 1994. Both the challenged failure to promote to Mechanic A and essentially all of the incidents allegedly contributing to the hostile work environment occurred before that date. n12 Neither claim may thus be brought under § 1981, **[\*28]** and Plaintiff's claims must be sustained, if at all, under Title VII. n13

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n12 The only significant episode addressed in the Complaint that took place after April 4, 1994, was Powell's termination for fighting with Smith. As discussed in note 9 above, the claim that this action was discriminatory has been abandoned and is without merit in any

event.

n13 Defendants argue that many of the incidents cited by Powell in support of his claims are time-barred under Title VII as well, because the charge was not filed with the EEOC within 300 days of their occurrence (i.e. they occurred before January 1, 1993). But whether or not that is so -- and there is some question given the "continuing violation" exception to the 300 day rule, see, e.g., Fleurcius v. Short Line Hudson Transit Bus Co., 2000 U.S. Dist. LEXIS 18261, No. 99 Civ. 2754 (DC), 2000 WL 1863536, at *3-4 (S.D.N.Y. December 20, 2000) -- such time-barred incidents are few and are not essential to the resolution of this motion. Con Ed's alleged failure to promote Powell to Mechanic "A" and most of the predicate acts for Powell's hostile work environment claims occurred after January 1, 1993.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*29]**

With these preliminary matters out of the way, we turn to the merits of those claims.

A. Discriminatory Failure to Promote

The framework for analyzing summary judgment motions in employment discrimination claims was recently revisited by the Second Circuit in James v. New York Racing Assoc., 233 F.3d 149 (2d Cir. 2000). In James, the Court of Appeals considered the effect of the latest ruling of the Supreme Court, ( Reeves v Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), on prior circuit case law, as announced in Fisher v. Vassar College, 114 F.3d 1332 (2d Cir. 1997) (en banc). The Court's conclusion was that Reeves was entirely consistent with Fisher, and left prior circuit law unchanged, since "both opinions essentially stand for the same propositions." James, 233 F.3d at 156.

Under the analysis applied in Fisher and reaffirmed in James, **HN6**⚓we begin by asking whether the plaintiff has established the "minimal" prima facie case defined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). **[*30]**  As the Second Circuit put it in James,

> This requires no evidence of discrimination. It is satisfied by a showing of "membership in a protected class, qualification for the position, an adverse employment action," and preference for a person not of the protected class.

James, 233 F.3d at 153-54. Meeting this test "creates a presumption that the employer unlawfully discriminated." Fisher, 114 F.3d at 1335. This presumption "places the burden of production on the employer to proffer a nondiscriminatory reason for its action." 233 F.3d at 154. If the employer fails to present such a reason, plaintiff prevails.

"**HN7**⚓On the other hand, once the employer 'articulates a non-discriminatory reason' for its actions, Fisher, 114 F.3d at 1336, the presumption completely 'drops out of the picture.' St. Mary's [Honor Ctr. v. Hicks], 509 U.S. [502,] 510-11, [113 S. Ct. 2742, 125 L. Ed. 2d 40 (1993)]." Id. At that point, "the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." Id. Evidence casting doubt on the employer's proffered **[*31]** justification "may -- or may not -- be sufficient" to provide this support. Fisher, 114 F.3d at 1333. Thus,

_HN8_⟰when the employer has proffered an explanation and the plaintiff has attempted to refute it, the Court's responsibility is to "examine the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (citing Reeves, 120 S. Ct. at 2106).

Although the Complaint initially predicated employment discrimination upon a long list of frictions and grievances, Powell has abandoned most of those claims, relying primarily on one specific purported adverse employment action: Con Ed's refusal to promote him to Mechanic A in 1993. n14 Powell has met his burden of establishing his prima facie case on this claim. Powell, an African-American, is certainly a member of a protected class, and looking at his qualifications in light most favorable to him, at the time of the promotion decision he had many of the requisite credentials for the position sought, including 12 **[*32]** years of experience as a Mechanic B, training at Con Ed's electrical school, and working the night shift in the electrical shop. n15

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n14 This is the only adverse action specifically argued in Plaintiff's brief opposing summary judgment as a reason to deny the motion. However, in the fact statement of that brief, and in Plaintiff's affidavit, reference is also made to a refusal to transfer Powell temporarily to another Con Ed unit, the Learning Center. (See Pl. Mem. at 9; Powell Aff P 6.) While it is unclear whether Powell continues to rely on this incident, in an excess of caution it will also be addressed below


n15 There is no dispute that Powell was qualified for the Learning Center position, since he appears to have been offered that job by someone in that unit, subject to approval of his department.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Con Ed, however, has more than met its burden of articulating non-discriminatory reasons for its decisions not to promote or transfer Powell. Powell's performance evaluations, while adequate, questioned **[*33]** his grasp of technical skills, and voiced a persistent concern about his aggressive and confrontational behavior towards co-workers. (See Carey Supp. Aff. Ex. F; Jackson Aff. F.) Moreover, there is significant evidence that the evaluations of the employees actually promoted were superior to Powell's. (See Carey Supp Aff. Exs. A P 7, F, H.) Affidavit testimony by Thompson also supports Defendants' assertion that Powell was denied promotion because of his poor disciplinary record, which included write-ups for insubordination and otherwise confrontational behavior with co-workers. (See Carey Supp. Aff. Ex. A P 12.) Powell's disciplinary record, set forth in some detail above, provides more than reasonable justification for refusing him a promotion. Finally, the two employees eventually promoted to Mechanic A were Hispanic and African-American, further supporting Con Ed's claim that its reasons for refusing to promote Powell were non-discriminatory. (See id. Ex. E.) n16

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n16 Defendants have also presented evidence that the decision not to transfer Powell to the Learning Center was non-discriminatory and based on legitimate business concerns. Written testimony from Thompson, Powell's supervisor, indicates that he refused to transfer Powell because had he approved the transfer, the department would have lost a budgetary slot for a

Mechanic B, resulting in staffing difficulties. (See Carey Aff. Ex. F P 6.) He also testified that he was reluctant to transfer an employee with a problematic disciplinary record. (See id.) Powell offers no evidence whatever that casts doubt on the accuracy of these reasons, or on the sincerity of Thompson's reliance on them. Powell's subjective belief that "had I been white I would have been afforded such an opportunity to . . . gain additional experience elsewhere" (Powell Aff. P 6) is not evidence of discrimination.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*34]**

Powell, of course, disputes the accuracy of Defendants' assertions, especially their characterization of his performance evaluations, and charges that the reasons provided are merely pretexts for discrimination. In support, Powell points to his own testimony that his supervisor, Thompson, had indicated that Powell's failure to receive a promotion was because he was "too controversial." (Powell Aff. P 5.) Powell argues that this was a reference to his complaints that he was discriminated against on account of his race. Defendants argue that this alleged comment provides no evidence of a racial bias on the part of Con Ed. Thompson testified that he merely tried to convey that Powell was too confrontational and that his poor disciplinary record worked against his promotion. (See Carey Supp. Aff. Ex. A P 12.) Defendants argue that Thompson's comment is not racial on its face, and cannot, therefore, prove a discriminatory motivation.

Powell's evidence is sufficient to create an issue of fact as to whether his qualifications were in fact inferior to those of the candidates actually promoted. His evaluations, like those of the successful candidates, include both positive and negative **[\*35]** elements, and reasonable people could conceivably disagree about their relative weight. Moreover, there is at least some factual dispute about the meaning of Thompson's "too controversial" comment (assuming, as we must for purposes of this motion, that those were in fact the words used).

Under James and Fisher, however, this is not necessarily enough to survive a motion for summary judgment. Title VII does not forbid Con Ed to make mistakes in comparing rival candidates for promotion; it only prohibits discrimination on the basis of race. As the Court of Appeals pointed out in James, [HN9] even if a plaintiff succeeded in persuading a jury that his employer's explanations were false, that would not necessarily constitute affirmative evidence that the real reason was prohibited discrimination:

> The requirements of the McDonnell Douglas prima facie case are so minimal that they do not necessarily support any inference of discrimination; and there are so many reasons why employers give false reasons for an adverse employment action that evidence contradicting the employer's given reason -- without more -- does not necessarily give logical support to an inference of discrimination.
> **[\*36]**

James, 233 F.3d at 154. Thus, the combination of the prima facie case and some evidence of pretext may or may not be enough to survive a motion for summary judgment. The Court's task is to "analyze the particular evidence to determine whether it reasonably supports an inference of the [discrimination] plaintiff must prove." Id. at 157.

Here, the record presents no affirmative evidence that Con Ed's decision not to promote Powell was motivated by racial animus. First, Defendants' asserted reasons for denying the

promotion are solidly supported Thompson, who made the promotion decision, has testified that he did so because Powell, unlike the successful candidates, "had both a poor attendance record and a demonstrated unduly aggressive attitude toward other people, as reflected in his disciplinary record." (Carey Aff. Ex. F P 10.) Powell cannot claim that these reasons are fabricated: the record is replete with instances of Powell's confrontational behavior. His disciplinary record in the period prior to his consideration for promotion contains evidence of (at least) five complaints against him for threatening and abusive behavior, one of which **[*37]** resulted in a written warning for insubordination, and which cumulatively formed the basis for his being required to submit to a job fitness evaluation. n17 Nor is there any doubt that Thompson was aware of Powell's record. He was personally involved in all of the disciplinary proceedings, and the disciplinary record was referred to in the references sought in connection with the promotion. Nor is this a case in which Powell's other qualifications were so strong as to render the failure to promote him suspicious. Powell argues that throughout his employment, he received satisfactory evaluations, and thus was qualified for the promotion. (See Pl. Mem. at 19.) But the performance evaluations sought in connection with the promotion decision are equivocal at best. While Powell is praised for his diligence and effort, the evaluations question his retention of the skills taught and several criticize his confrontational attitude with co-workers. (See Carey Supp. Aff. Ex F; Jackson Aff. Exs. F, H.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n17 The very fact that only one of these incidents apparently resulted in formal disciplinary action for insubordination, and that by a supervisor outside of Powell's department, belies the claim that his supervisors subjected him to an excessive number of disciplinary actions.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*38]**

Nor do the circumstances surrounding the promotion decision create an inference of discrimination. Of the six employees who sought promotion to Mechanic A, two were non-Latino whites, three (including Powell) were African-American, and one was Hispanic. The two successful candidates were both minorities, one of them African-American. (See Carey Supp. Aff. Ex. E.) n18, n19. The record contains no further statistics about those who occupy Mechanic A positions at Con Ed that could dilute the force of this evidence. Moreover, whatever Thompson may have meant by referring to Powell as "controversial," nothing about that comment (particularly in a context in which other minority candidates are being promoted, and no non-Hispanic white candidate was successful) suggests that it is a code word for "black."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n18 Powell's brief asserts that promotions to Mechanic A were given to "three caucasian employees and one African American from another site." (Pl. Mem. at 7.) The uncontradicted record evidence flatly refutes him. Thompson's testimony, and the documentary evidence submitted by Con Ed establishes the facts in the text. The document cited in Plaintiff's brief in support of its assertion lists the applicants for promotion, not those who received it. (Jackson Aff. Ex. G.) **[*39]**

n19 Promotion of a Latina candidate, of course, does not refute discrimination against African-Americans, and in other circumstances might be given little weight. Powell's specific claims, however, rest heavily on the assertion not only that he was discriminated against as

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 2706
Page 18 of 24
Case 1:05-cv-00205-SLR    Document 46    Filed 03/21/2006    Page 34 of 40

an African-American, but also that whites, and in particular Irish-Americans, were favored. In this context, the promotion of two non-Irish minority candidates has significance. Even if this promotion were disregarded, however, the fact would remain that black candidates achieved promotion in this small sample at a higher rate (one of three) than non-minority candidates (zero of three), or non-African-American candidates (one of four).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Finally, Powell ultimately relies on the claim that the disciplinary record itself bespeaks discrimination, because it reflects "specious and unwarranted charges of insubordination by caucasian[] supervisor[s] who demonstrated a racial animus against plaintiff." (Pl. Mem. at 20.) This contention comes closest to creating a genuine issue of fact. Powell's accounts of his confrontations with **[*40]** co-workers reveal occasions on which he responded angrily after being provoked by explicitly racial taunting by fellow workers (discussed in more detail below), or by inconsiderate treatment that he concluded (perhaps correctly) would not have been extended to a white co-worker (See, e.g., Carey Aff. Ex. C at 142-149 (confrontation with Sheehan over the latter's taking of a cart that had been used by Powell).) Thus, at least some of Powell's troubling history, and the resulting sense that Powell was "unduly aggressive" (Carey Aff. Ex. F P 10) has tangled racial roots, in which Powell's (not necessarily "undue") sensitivity to injustice or to (subtle or blatant) racial slights in the workplace played a significant part.

But to say this is not to say that there is a genuine issue of fact as to whether the disciplinary actions themselves were discriminatory. Powell asserts in conclusory terms that he has been "given excessive write-ups, and subjected to excessive disciplinary actions." (Powell Aff. P 7.) But this is not enough to establish a factual dispute. Powell does not even offer testimony about most of the disciplinary actions in his record, which involve a number of confrontations **[*41]** with different co-workers and supervisors. Moreover, those disciplinary actions that precede the promotion decision have no apparent racial overtones. See pp. 5-7, above. Powell does not offer any evidence that he did not commit the acts charged, that the punishment imposed was inappropriately severe, or that the punishment was imposed for discriminatory reasons. Instead, he merely states that he "believes that [his] race was the motivating factor" for certain actions (Powell Aff. P 4), or charges in general terms that "similarly situated persons" were not treated similarly (id.), or that white workers got away with things that he did not. (Carey Aff. Ex. C at 136.) But Powell's subjective belief that a supervisor had an improper motive is not evidence at all, and generalizations about the allegedly tolerated misbehavior of others are insufficient to allow a jury to make a finding of improper motivation, where the record contains no evidence that Powell was ever punished for something he did not do, or punished excessively or unreasonably, or that specific incidents leading to disciplinary action were sufficiently comparable to episodes involving others to permit a meaningful **[*42]** comparison of Powell's treatment to that of others who can genuinely be regarded as "similarly situated." See Meiri, 759 F.2d at 998 (granting summary judgment in Title VII case where the only evidence supporting defendant's discriminatory motive was plaintiff's belief that she was treated differently). This is especially so where Powell no longer even attempts to argue that any particular disciplinary incident in itself constituted an actionable discriminatory adverse employment action, but is merely using a generalized attack on the good faith of the disciplinary record as a way of attacking Defendants' otherwise entirely legitimate and fully-supported basis for declining to promote Powell.

The parties certainly disagree about the real reasons for Con Ed's refusal to promote Powell. Powell has stated under oath his belief (and there is no reason to doubt that his belief is honestly held) that racial prejudice lay behind this decision, as well as behind at least some of the disciplinary actions that led to it; Defendants, for their part, stoutly deny that either Con Ed or the individual supervisors responsible entertained any discriminatory motive. But

that is not **[*43]** the same as a "genuine issue of material fact" that would preclude summary judgment. To raise such an issue. James teaches, *HN10* there must be "evidence . . . [that] reasonably supports an inference of the [discrimination] plaintiff must prove." 233 F.3d at 157. On this record, there is no affirmative evidence of bias on the part of Defendants, there is no evidence contradicting the legitimate reasons offered by Defendants to rebut Plaintiff's prima facie case, and Plaintiff offers no evidence that the disciplinary actions relied on to deny him promotion were undeserved. On this record, summary judgment is appropriate.

## B. Hostile Environment

In addition to his claim that he was denied promotion for discriminatory reasons, Powell has also alleged that he was subjected to a racially hostile working environment. The hostile work environment claim is based on three sets of allegations, one general and two specific. The Complaint generally alleges that "in accordance with company policy" Powell had "reported to defendant Con Ed that he was being harassed, verbally abused, intimidated and threatened" by his co-workers, but that Con Ed "refused to respond to or acknowledge" **[*44]** his complaints. (Complaint P 63.) The complaint also alleges that Con Ed did not respond to his complaint of a verbal death threat by Sheehan in September 1993 made in the presence of O'Donnell and that Con Ed did not respond to threatening notes left in his locker in October 1993, despite investigating a similar incident involving a white co-worker. (See id. PP 39-47.)

*HN11* Employers may be held liable for the conduct of employees that is so abusive as to alter the conditions of employment. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986). *HN12* To prevail on a hostile work environment claim, Powell must prove three elements. First, the conduct must be "severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-2, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993) (emphasis added). Second, the plaintiff must have "subjectively perceived the environment to be abusive." Id. (emphasis added). Third, when harassment is allegedly perpetrated by co-workers, **[*45]** rather than a supervisor, the standard for imputing liability to the employer is one of negligence. See Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 441 (2d Cir. 1999). *HN13* The employer will be liable only if the plaintiff demonstrates that it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. See Murray v. New York Univ. Coll. of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995); Kotcher v. Rosa and Sullivan Appliance Ctr., 957 F.2d 59, 63 (2d Cir. 1992); Snell v. Suffolk County, 782 F.2d 1094, 1104 (2d Cir. 1986) ("Once an employer has knowledge of a racially combative atmosphere in the workplace, he has a duty to take reasonable steps to eliminate it."). *HN14* "Whether the employer is aware of employee harassment by co-workers and whether the employer has taken reasonable steps to eliminate such offensive conduct present questions of fact to be determined in each case." Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (2d Cir. 1987). On the present record, Powell has sufficiently established the existence of material issues of fact on the hostile **[*46]** work environment claim to defeat summary judgment.

As an initial matter, there can be no dispute that the subjective requirement has been met, since Powell has clearly stated in sworn testimony that he perceived his working environment to be racially hostile. (See Powell Aff. PP 9-12.) Similarly, Powell has sufficiently established the existence of a factual dispute regarding the objectively hostile or abusive nature of his work environment. Looking at the evidence in the light most favorable to Plaintiff, it is clear that the atmosphere between Powell and his colleagues was, to put it mildly, racially charged. Powell has testified that since his assignment to the Electrical Shop, he has been "subjected to an almost daily barrage racially derogatory slurs, epithets and comments such as 'nigger', 'jig', 'Zulu' [and] 'Mau Mau'." (Id. P 11.) Powell also testified that Smith, a co-worker and individual defendant in this action "frequently" told him and another African-

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 2706
Page 20 of 24
Case 1:05-cv-00205-SLR    Document 46    Filed 03/21/2006    Page 36 of 40

American woman employee that "blacks should be have more like the 'slaves down south on the plantation' and that he was the 'slave master.'" (Id.) In addition, the record is peppered with evidence of both physical **[*47]** and verbal altercations, at least some of which were apparently motivated by racial hostility.

Con Ed has raised a credible argument that the hostility between Powell and several members of the "cable gang" was sporadic rather than pervasive, and thus does not establish an objectively hostile work environment. See e.g., Snell, 782 F.2d at 1103 ("*HN15*To establish a hostile work atmosphere, however, plaintiffs must prove more than a few isolated incidents of racial enmity."). It is true that, in his deposition testimony, Powell was unable to recall very many specific instances of such verbal harassment by co-workers, and that some of the episodes of alleged threats or harassment may not, viewed objectively, have been particularly serious or explicitly racial. Yet Powell has alleged, and testified to, more than a few examples of overtly racist comments directed at him, and there is no real dispute that tensions between him and Smith and Sheehan reached the point of threats and at least one episode of violence. Determining the extent and seriousness of these incidents, and the truth of what occurred in each, involve issues of credibility and balancing that must be resolved **[*48]** by a jury. See American Int'l Group v. London American Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) ("The responsibility of the district judge on a motion for summary judgment is merely to determine whether there are issues to be tried, rather than to try the issues himself via affidavits") (internal quotation marks omitted). This dispute alone would be sufficient to defeat summary judgment

There are also factual issues concerning whether Con Ed is liable for the purportedly hostile work environment in the Electrical Shop. Every instance of overt racial hostility that Powell alleges appears to have been committed by co-workers in the cable gang, rather than supervisors, and therefore, in order to hold Con Ed liable, Powell must show that Con Ed either provided no viable avenue of complaint or it knowingly failed to take reasonable steps to address their misconduct. See Kotcher, 957 F.2d at 63. The central issue is thus whether the steps taken by Con Ed were reasonable in light of the conduct.

It is undisputed that Con Ed, like most large companies, subscribes to a non-discrimination policy and has specific mechanisms in place to field complaints. **[*49]** (See Carey Aff. Ex. K.) Con Ed's non-discrimination policy prohibits co-workers from engaging in "racial, religious, ethnic, or age-based harassment including jokes, slurs or any other verbal or physical conduct which unreasonably interferes with employee work performance or creates an offensive, intimidating or hostile work environment." (Id. § 2.2(b).) Con Ed's EEO director and officers are vested with the authority to investigate complaints and enforce the policy through disciplinary sanctions. (See id. § 3.3). Employees may lodge complaints either with these EEO officials or with any management level employee. (See id. § 5.0) Powell was aware of Con Ed's non-discrimination policy and the procedures required to avail himself of its protection. In language nearly identical to allegations in the Complaint, Powell has provided affidavit testimony that "in accordance with company policy, [he] reported to management on many occasions that [he] was subjected to harassment, verbal abuse, intimidation and racial slurs and innuendo," but that Con Ed management "did not respond." (Powell Aff. P 12.) Additionally, it is undisputed that Con Ed failed to respond to both **[*50]** the anonymous threatening notes directed at Powell and the verbal threat made by Sheehan to Powell in the presence of O'Donnell.

Con Ed, however, points to evidence that Powell's complaints to his immediate supervisors were reasonably investigated, and significant evidence supports its claim. (See Carey Supp. Aff. Ex. C. at CE1077-78.) For example, in October 1992, after his confrontation with the supervisor from the Treasury Department, Powell complained to O'Donnell, who accompanied him to see the supervisor and air his complaint. In July 1992, Powell claimed that a co-worker had thrown a roll of tape at him. Thompson investigated the incident by interviewing employee witnesses, and determined that it was an accident, for which the employee

throwing the tape had apologized. (See Carey Supp. Aff. Ex. C. at CE1212, 1222, 1224-25.) Powell has testified that in 1994 his shift was changed at his request after he complained that Smith's harassing behavior was having adverse effects on him. (See Carey Aff. Ex. C at 95.) An altercation between Powell and Smith in 1994 produced another investigation, however this time resulting in the termination of Powell (a result ultimately **[\*51]** reversed in arbitration). In 1995, Con Ed held a disciplinary hearing for Smith because of his involvement in several incidents involving minority co-workers, including Powell. (See Carey Supp. Aff. Ex. C at CE1442.) Smith was warned about the possibility of further action, including termination if his behavior continued. In September 1996, Powell complained that Smith spit at him. Setaro, the supervisor on duty, conducted a preliminary investigation but could find no corroborating evidence and assigned each employee to different floors for the remainder of the shift. (See id. at CE1432-33.) Smith was subsequently suspended pending an investigation into the matter. Thus, there is substantial evidence that there were effective investigatory and disciplinary mechanisms to resolve complaints about racist behavior, and that these were invoked by Powell on various occasions.

This evidence, however, does not suffice to grant summary judgment. While these incidents give considerable force to Con Ed's claim that it responded reasonably to Powell's complaints, "reasonable jurors could disagree," since "there were other incidents in response to which [Con Ed] took no action, and harassment **[\*52]** continued after [Powell] made [his] complaints." Richardson, 180 F.3d at 442. A jury might find that instances in which Con Ed responded to Powell's complaints rebut Powell's testimony that Con Ed failed to respond to his complaints, but ultimately this issue is for a jury to resolve. Accordingly, defendants' motion for summary judgment is denied with respect to Powell's hostile work environment claim under Title VII.

IV. 42 U.S.C. § 1985(3)

The Complaint also alleges that Defendants engaged in a conspiracy to violate Powell's civil rights, in violation of 42 U.S.C. § 1985(3), by having him arrested on a charge of assaulting Smith. This claim has apparently been abandoned by Powell, whose opposition to summary judgment contains no discussion of this theory of liability. In any case, it is without merit.

*HN16* To establish a violation of § 1985, Powell must prove "a conspiracy between two or more persons intended to deprive any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the law and an act by one of the conspirators in furtherance of the conspiracy **[\*53]** which injured another person or deprived him of exercising any right or privilege of a citizen of the United States." Girard v 94th Street and Fifth Avenue, 530 F.2d 66, 70 (2d Cir. 1976). See Griffin v. Breckenridge, 403 U.S. 88, 102-3, 29 L. Ed. 2d 338, 91 S. Ct. 1790 (1971).

Powell has failed to provide any evidence suggesting the existence of a conspiracy. Powell's conspiracy theory centers on Con Ed's disciplinary investigation of the fight between Powell and Smith in March 1994. The investigation resulted in a recommendation of Powell's termination, but his termination was ultimately reversed by an arbitrator. Powell has alleged that the actions of Con Ed employees, including Thompson, charged with the task of investigating the incident amounted to an unlawful "coaxing" of witnesses to concoct false testimony against Powell.

None of the evidence provided by Powell supports an inference that witnesses were coaxed to inculpate him. His "evidence" of a conspiracy consists of nothing more than requests by the investigator for eyewitness statements, employee statements concerning the incident, and the chief investigator's eventual recommendation **[\*54]** that Powell be terminated. (See Jackson Aff. Ex. T.) Nothing in the investigative record indicates that the witness statements were solicited other than in the normal course of carrying out an investigation, nor that any "coaxing" took place. Nor does the arbitrator's report recommending Powell's reinstatement

conclude, as Powell suggests, that those investigating the incident unlawfully coached witnesses to frame Powell. (See id. Ex. V.) The arbitrator merely concluded that in the absence of neutral eyewitness corroboration, the testimony of Bruce Smith was not sufficiently credible to support a finding that Powell be terminated. n20 The mere fact that a witness lied, absent evidence of a scheme to procure such false testimony, does not compel the inference that the lie was suborned by the person soliciting the testimony. Indeed, no other witnesses claimed to have seen Powell strike Smith, severely undermining any claim that there was a conspiracy to support Smith's charges. n21 Nor is there any basis for a claim that Con Ed or other Defendants violated § 1985 by causing or acquiescing in Powell's arrest. Assuming arguendo that Smith made a false accusation against Powell, **[\*55]** there is no evidence that anyone else conspired with him to do so, or indeed played any role at all in Powell's arrest. Nothing in the record casts any doubt on Defendants' evidence that Con Ed followed appropriate and non-discriminatory procedures in responding when the police arrived to question and ultimately arrest Powell on Smith's complaint. (See Carey Aff. Exs. G & H.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n20 The arbitrator also found that Powell's testimony "was not necessarily wholly credible." (Jackson Aff. Ex. V at 15.)

n21 Defendants also argue that Powell's conspiracy claim is barred, as a matter of law, by the intra-corporate conspiracy doctrine which states that a corporation may not conspire with its own agents or employees acting within the scope of their employment. See Girard, 530 F.2d at 70. However, Powell has properly alleged a conspiracy which, if it existed, would not be barred as an intra-corporate conspiracy since the knowing solicitation of false witness testimony clearly falls outside the defendants' scope of employment, however broadly that scope is defined. Powell's claim fails, not because of a failure to state a viable claim, but because he has failed to provide a shred of credible evidence in support of his theory of conspiracy.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*56]**

Since Powell has failed to provide even colorable evidence of conspiracy, summary judgment in favor of the defendants is warranted on his § 1985 claim.

V. Americans with Disabilities Act

In responding to the summary judgment motion, Plaintiff seems to have abandoned his claim of disability discrimination. Powell suffers from AIDS, and the Complaint alleges in general terms that the various adverse treatment to which he claims to have been subjected was attributable to hostility to that condition as well as to his race. More specifically, it alleges (1) that Powell was suspended for refusing to remove a "medically prescribed" facial cream and (2) that he was the target of offensive comments and drawings because of his medical condition.

Defendants point out, however, that there is no evidence that any of the individual defendants, or any relevant decision maker at Con Ed, actually knew of Powell's HIV-positive status at any time before the filing of this lawsuit, and both Thompson and O'Donnell have testified that they did not have such knowledge. (See Carey Aff. Ex. F P 2, O'Donnell Dep. at 41-43.) n22

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n22 See note 5 above.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[\*57]**

Defendants also challenge the Court's jurisdiction to consider the ADA claim. *HN17* Under the ADA, as under other discrimination statutes, a Court only has jurisdiction if "a plaintiff [has] filed an administrative charge with the EEOC and exhaust[ed] the administrative remedies available by this route." Hogarth v. New York City Health and Hospitals Corp., 2000 U.S. Dist. LEXIS 4590, \*9, 97 Civ. 0625, 2000 WL 375242, \*4 (S.D.N.Y. April 12, 2000). See also 42 U.S.C. §§ 2000e-5(e), 12117 (ADA); Butts v. City of New York Department of Housing Preservation and Development, 990 F.2d 1397, 1402 (2d Cir. 1993) (interpreting the same provision in a Title VII case). Thus, this Court may only adjudicate those allegations contained in a timely charge of discrimination, or acts that are "reasonably related" to such allegations. See Butts, 990 F.2d at 1401. Powell's original complaint to the EEOC, timely filed on October 28, 1993, made no claim of discrimination on the basis of disability. His narrative statement in support of that charge stated that he was disciplined excessively as compared to "non Black/American" co-workers, but nowhere even refers **[\*58]** to AIDS or HIV. Where the form asks the complaining party to identify the claimed basis for discrimination, Powell checked "race" and "national origin," but not "disability." (See Carey Aff. Ex. I.) n23 Thus, the ADA claims are not properly before this Court

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n23 At some point, apparently in June 1996, at the time of a hearing on his EEOC complaint, Powell appears to have advised the New York State Division of Human Rights, to whom the EEOC had delegated the investigation of his complaint, that he also believed his termination had also been the result of having AIDS. (See Carey Ex. I at CE43.) This notification was untimely, and failed to alert the agency to any charge that the various other employment actions and hostile environment incidents were claimed to be related to disability.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Finally, Powell has conspicuously failed to tie any of the hostile acts he complains of to any perception by anybody that he suffered from AIDS. Powell has never claimed that the face cream was, or was perceived by anyone **[\*59]** to be, a treatment for any AIDS-related condition. In contrast to the racial invective he specifically cites, he refers to no incident in which anyone taunted him for being ill or disabled or for having AIDS. Vulgar graffiti ("Dwight sucks cock") (Jackson Aff. Ex. U) are unfortunately such a common form of abuse of the unpopular that they can barely be taken literally as an imputation of homosexuality, even if they were, in the absence of any other evidence, there is no basis to infer that such abuse is connected to Plaintiff's HIV-positive status. n24

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n24 The catch-all nature of the claim is indicated by Powell's reference to an erotic magazine featuring photos of black women that was apparently left in a work area used by Powell as well as by others. (See Jackson Aff. Ex. U). There is no direct evidence that the magazine was intended for Powell at all, and only extremely strained speculation can construe it as a taunt related to AIDS.

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 2706          Page 24 of 24

Case 1:05-cv-00205-SLR     Document 46     Filed 03/21/2006     Page 40 of 40

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Powell's failure even to respond to these powerful arguments that his **[*60]** disability discrimination claim is jurisdictionally-barred and meritless constitutes an abandonment of those claims, making summary judgment appropriate.

CONCLUSION

Defendants' motion for summary judgment is granted with respect to Plaintiff's claims of discrimination based on disability, violation of 42 U.S.C. §§ 1981, 1985(3), and racially-discriminatory adverse employment actions, as well as with respect to all claims against Defendants O'Donnell and Thompson. Defendants' motion is denied as to plaintiff's Title VII claims alleging hostile work environment.

SO ORDERED

Dated: New York, New York

March 12, 2001

GERARD E. LYNCH

United States District Judge


Service: **Get by LEXSEE®**
Citation: **2001 us dist lexis 2706**
View: **Full**
Date/Time: Tuesday, March 21, 2006 - 2:04 PM EST

**\* Signal Legend:**

● -   Warning: Negative treatment is indicated

Q -   Questioned: Validity questioned by citing refs

△ -   Caution: Possible negative treatment

◆ -   Positive treatment is indicated

Ⓐ -   Citing Refs. With Analysis Available

❶ -   Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.

 **LexisNexis®**     About LexisNexis  | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.