EXHIBIT B

Source: Legal > / . . . / > DE State Cases, Combined 🛈
Terms: name(pritchett and delmarva) (Edit Search | Suggest Terms for My Search)

✔Select for FOCUS™ or Delivery
☐

*1998 Del. Super. LEXIS 102, \**

SANGSTON **PRITCHETT**, JR., MICHELLE RAFAIL, AMY FAIL, a minor by her next friend Linda Sue Thomas, and LINDA SUE THOMAS, Plaintiffs, v. **DELMARVA** BUILDERS, INC., COLLINS MECHANICAL, INC., and JOHN MCFARLAND, Defendant.

C.A. No. 97C-03-011

SUPERIOR COURT OF DELAWARE, KENT

1998 Del. Super. LEXIS 102

September 24, 1997, Submitted
February 27, 1998, Decided

**SUBSEQUENT HISTORY: [\*1]**

Released for Publication by the Court on May 29, 1998.

**DISPOSITION:** Consideration of Defendants' Motion to Dismiss GRANTED in part, DENIED in part.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff homeowners brought suit against defendant contractors for emotional distress sustained when plaintiffs witnessed a fire in their home. Plaintiffs argued that defendants negligently installed electrical fixtures that caused the fire. Defendants filed a motion to dismiss for failure to state a claim, arguing that no cause of action arose from plaintiffs' witnessing the fire from a safe distance.

**OVERVIEW:** Defendant contractors repaired fire damage to plaintiff homeowners' residence. After a second fire, plaintiffs brought suit, charging that defendants negligently installed electrical fixtures that caused the second fire and plaintiffs suffered emotional distress from witnessing the fire. Defendants filed a motion to dismiss for failure to state a claim, arguing that no cause of action arose from plaintiffs' witnessing the fire from a safe distance. The court dismissed the claim, holding that recovery for damages for the negligent infliction of emotional distress was permitted only if the negligence damaged property and if the plaintiffs were in the zone of danger so that there existed a risk of physical injury to plaintiffs. The court ruled that intentional infliction of emotional distress was an independent tort action which did not require an underlying impact or physical injury, but the conduct complained of had to have been extreme and outrageous, performed intentionally or recklessly. In the absence of such allegations, the court held that plaintiffs had no cause of action for emotional distress arising out of merely witnessing the negligent destruction of property.

**OUTCOME:** The court granted defendant contractors' motion to dismiss plaintiff homeowners' complaint for negligent infliction of emotional distress. The court held that plaintiffs failed to state a cause of action in alleging that as a result of defendants' negligent electrical work they sustained emotional harm from witnessing their home burn

from a safe distance.

**CORE TERMS:** infliction of emotional distress, emotional distress, zone of danger, vase, mental distress, damage to property, physical injury, mental anguish, negligent act, cause of action, reckless conduct, foreseeability, consciously, reckless, property damage, order to recover, cause emotional distress, destruction of property, injury to property, outrageous conduct, independent tort, mental suffering, physical impact, direct injury, negligently, culpability, witnessing, electrical, recklessly, bystander

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action 

*HN1* ⊥ Dismissal for failure to state a claim on which relief can be granted is appropriate only where is appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle him to relief. More Like This Headnote

Torts > Negligence > Duty > Negligent Infliction of Emotional Distress

*HN2* ⊥ One can recover damages for the negligent infliction of emotional distress if the negligence damages property and if the plaintiff is in the zone of danger so that there exists a risk of physical injury to the plaintiff. More Like This Headnote

Torts > Negligence > Duty > Negligent Infliction of Emotional Distress

*HN3* ⊥ There can be no cause of action for emotional distress arising out of merely witnessing the negligent destruction of property. More Like This Headnote

Torts > Intentional Torts > Intentional Infliction of Emotional Distress

*HN4* ⊥ The intentional infliction of emotional distress is an independent tort action which does not require an underlying impact or physical injury. The conduct complained of must be extreme and outrageous; it must be performed intentionally or recklessly; and it must cause emotional distress to another. The emotional distress must be severe but there is no requirement that it result in physical injury. The tort includes reckless conduct and where reasonable minds might differ the issue will be resolved by a jury. More Like This Headnote | *Shepardize:* Restrict By Headnote

**COUNSEL:** William D. Fletcher, Jr., Esq., Attorney for Plaintiffs.

Ralph K. Durstein, III, Esq., Attorney for Defendant Collins Mechanical, Inc.

Steven F. Mones, Esq., Attorney for Defendants Delmarva Builders, Inc., and John McFarland.

**JUDGES:** N. Maxson Terry, Jr., Resident Judge.

**OPINIONBY:** N. Maxson Terry, Jr.

**OPINION:**

TERRY, Resident Judge

*Upon Consideration of Defendants' Motion to Dismiss*

*ORDER*

Three of the plaintiffs in this case are a mother and her two daughters. Their house caught on fire in 1994 and the damage was repaired by Delmarva Builders, Inc., who in turn sub-contracted with another defendant, Collins Mechanical, Inc., to do the electrical work. After the home was remodeled, the three plaintiffs resumed living there. However, it caught fire again in March 1995. Luckily the three were not home at the time, but they were notified of the event and returned only to see their house ablaze for the second time.

Because they had to escape out of a window during the 1994 fire they **[*2]** had found it emotionally difficult to return to their house after it was remodeled in 1994. When they witnessed the home on fire again in 1995, the complaint alleges that the trauma caused emotional and psychological injuries with physical sequelae.

According to the complaint, the defendants caused the fire when Collins put insulation around light fixtures which had clear written warnings not to do so. It is further alleged that the defendant McFarland, an agent of Delmarva, falsely represented that the home had passed an electrical inspection. The complaint alleges that the defendants acted negligently and recklessly and that McFarland misrepresented the facts.

The defendants have filed a motion to dismiss counts I, II and III of the complaint pursuant to Rule 12(b)(6) on the theory that these counts fail to state a claim upon which relief can be granted. As the Supreme Court has recently said *in Ramunno v. Charles M. Cawley et al., n1*

*HN1*

Dismissal for failure to state a claim on which relief can be granted is appropriate only where is appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle him to relief.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 *Ramunno v. Cawley, et al.,* Del. Supr., 705 A.2d 1029, 1998 Del. LEXIS 41, *10-11 (1998).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*3]**

In this context all well-pleaded allegations must be accepted as true and all reasonable inferences must be drawn in favor of the non-moving party, the plaintiffs.

In this case the question to be decided is straightforward. Are the people who allegedly caused the house to catch on fire liable for the emotional distress which a mother and her two daughters sustained as a result of watching the house burn from a safe distance?

NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Until the Delaware Supreme Court decided *Robb v. Pennsylvania Railroad Company,* n2 the rule in this jurisdiction was that no recovery could be had for emotional distress unless the plaintiff also sustained a physical impact as a result of the accident. This requirement was

deemed necessary to weed out false and fraudulent claims. It was thought that the existence of an impact would import a sense of genuineness to a mental anguish claim. However, as time went on and our understanding of psychology developed, people began to recognize that genuine psychological injury or emotional distress could result from a negligent event even though no physical impact accompanied it. Further, it was perceived that courts **[*4]** were stretching the impact requirement to absurd lengths in order to avoid dismissing emotional distress claims.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n2 _Robb v. Pennsylvania Railroad Co.,_ Del. Supr., 58 Del. 454, 210 A.2d 709 (1965).


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The _Robb_ court took these problems into consideration as well as the concept that, "it is the duty of the Courts to afford a remedy and redress for every substantial wrong." The result was the promulgation of an expanded standard where recovery could be had for the negligent infliction of emotional distress if the plaintiff was within "the immediate area of physical danger from that negligence" and if the emotional distress caused fright "which in turn produced physical consequences." In that case the plaintiff escaped from her car just before it was demolished by a train.

_Robb_, then, stands for the proposition that $^{HN2}$ one can recover damages for the negligent infliction of emotional distress if the negligence damages property and if the plaintiff is in the zone of danger so that there exists a risk of **[*5]** physical injury to the plaintiff.

Subsequent to _Robb_ the Superior Court held in _Drainer v. O'Donnell_ n3 that an action for the negligent infliction of emotional distress requires that the plaintiff be "within the immediate zone of danger of the negligent act." That case did not involve damage to property but rather alleged a direct injury to the plaintiff by way of slander. The zone of danger rule was followed in _Mancino v. Webb_ n4 where parents sought damages for the emotional distress which they endured when someone injured their child. In _Lupo v. The Medical Center of Delaware_ n5 the zone of danger rule was not applied in a negligent infliction of emotional distress claim, but that case involved the allegation of a direct injury to the plaintiffs by the alleged misrepresentations made to the plaintiffs by the hospital in the context of a malpractice action involving the termination of a pregnancy via an induced delivery. n6 That case did not involve emotional distress caused by witnessing damage to property.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -


n3 _Drainer v. O'Donnell,_ Del. Super., C.A. No. 94C-08-062, Alford, J. (July 28, 1995). Slip Opinion at 2. **[*6]**


n4 _Mancino v. Webb,_ Del. Super., 274 A.2d 711 (1971).


n5 _Lupo v. The Medical Center of Del.,_ 1996 Del. Super. LEXIS 46, Del. Super., C.A. No. 94C-09-049, Terry, J. (Feb. 7, 1996) (Mem. Op.).


n6 In fact, at trial the jury was not charged on the negligent infliction of emotional distress

but rather on medical malpractice and the intentional-reckless infliction of emotional distress.
*Id.*

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In order to recover for the negligent infliction of emotional distress both *Robb* and
Restatement (Second) of the Law of Torts, 436A, require that the emotional distress must
result in physical injury. For the purposes of this Rule 12(b)(6) motion I find that this
element has been sufficiently alleged in the complaint. *See Lupo,* Opinion at 5-6.

There is no decision in Delaware which holds that a recovery for the negligent infliction of
emotional distress can be made by one who witnesses damage to property outside the zone
of danger. In the case at bar the complaint does not allege that the plaintiffs were in the
zone of danger. They were not at home when the fire began and they simply saw the
firemen **[*7]** fighting the fire when they returned. There is no allegation that they were
exposed to any risk of physical injury from the fire. It is alleged that the mental distress
sustained as a result of the fire caused physical consequences.

The courts have grappled with the concept of the negligent infliction of emotional distress
and some have held that it is an independent tort and that its applicability to any particular
case should be determined by ordinary tort principles of proximate cause and foreseeability.
The Hawaii Supreme Court did just that in *Rodrigues v. State* n7 where it held in a case,
where the defendant negligently caused damage to the plaintiffs' home, that the defendant is
liable for the negligent infliction of serious mental distress if "it was a reasonably foreseeable
consequence of the defendant's act." This rule appears to apply in Mississippi under *First
National Bank v. Langley.* n8

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 Rodrigues v. State, Haw. Supr., 52 Haw. 156, 472 P.2d 509 (1970).

n8 First National Bank v. Langley, Miss. Supr., 314 So. 2d 324 (1975).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*8]**

However, courts have generally been reluctant to allow a plaintiff to recover damages for
mental distress caused solely by damage to the plaintiff's property absent an impact or zone
of danger risk even if such mental distress produces significant physical consequences or
injuries. n9 This is the law in Maryland which has abolished the impact rule but which denies
any recovery for mental suffering resulting from damage done to property under ordinary
circumstances. *See H & R Block, Inc., v. Testerman*. n10 However, if the damage is inflicted
on property under circumstances "inspired by fraud, malice or like motives, mental suffering
is a proper element of damages . . . an injury to property alone will not support a recovery
for fright occasioned by such injury". In the earlier case of *Zeigler v. F Street Corporation*
n11 the Maryland Court of Appeals dismissed a complaint for mental anguish caused by
injury to property because it didn't allege that the defendants were warned that their acts
were causing mental distress or that the acts were calculated to cause mental distress or that
plaintiff's personal safety was placed in jeopardy.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 Comment Note, *Recovery for mental shock or distress in connection with injury to or interference with tangible property,* 28 A.L.R. 2d 1070 (1953). **[*9]**

n10 *H & R Block, Inc., v. Testerman,* Md. Ct. App., 275 Md. 36, 338 A.2d 48 (1975).

n11 *Zeigler v. F Street Corp.,* Md. Ct. App., 248 Md. 223, 235 A.2d 703 (1967).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Thus, Maryland, along with many other jurisdictions, has refused to allow a recovery for the negligent infliction of emotional distress when the mental anguish arises from negligent acts causing damage to property. n12 These jurisdictions have refused to apply a foreseeability analysis to each specific case. Instead, they have afforded a recovery for mental distress arising out of damage to property where there is no impact or zone of danger element only in aggravated circumstances where intentional or reckless conduct is involved.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n12 This subject is discussed in Scott A. Mirsky, Note, *Negligently Inflicted Emotional Distress Resulting Solely from Property Damage is not a Compensable Injury,* 28 U. Balt. L. Rev. 225 (1996).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

No Delaware decision has been **[*10]** found which would permit an award of damages to one who as a bystander outside of the zone of danger witnesses the destruction of property as the result of a negligent act and who suffers mental distress with physical consequences as a result. The *Lupo* and *Drainer* cases are not on point because there the alleged negligent acts were directed specifically toward the plaintiff and there was no damage to the plaintiff's property. In *Rea v. Midway Realty Corp.* n13 on the other hand, the Superior Court in a property damage case held that in order to recover for the negligent infliction of emotional distress there must be an allegation that the act would have caused the plaintiffs to fear for their own safety.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n13 *Rea v. Midway Realty Corp.,* 1989 Del. Super. LEXIS 322, Del. Super., C. A. No. 88C-JL6, Lee, Jr. (Aug. 23, 1989).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The issue boils down to whether the blanket prohibition against recovering damages for a negligent act which damages property and thereby causes mental distress to a bystander who is not impacted by the **[*11]** act and who is not in the zone of physical danger should be abrogated in favor of a foreseeability standard. That standard would require that each case be analyzed under its own facts to see whether the foreseeable consequences of the negligent act would include the infliction of emotional distress regardless of whether there was an impact or a near miss within the zone of danger.

If such a standard were adopted, a person would be liable for unusual and extraordinary damages which would not ordinarily be expected to flow from an act which merely damages property. Furthermore, we must remember that a negligent act is generally one of omission. An act is done which the actor should have, but did not, perceive as creating an unreasonable risk of harm.

Take, for instance, a property damage situation involving a vase on a table. The vase is a family heirloom of great sentimental value to the owner. A friend is well aware of the owner's feelings toward the vase and has been for years. One day the friend comes over for a visit, doesn't pay attention to where he is going, negligently bumps into the table and knocks the vase off. The owner sinks into a depression at her loss and suffers serious **[*12]** physical consequences. Under these facts, it is clear that the friend is on notice of the value of the vase to its owner and could foresee the mental anguish which the owner would suffer if the vase were to be destroyed. But would not the damage exposure in this case be out of all proportion to the culpability of the friend in respect to a momentary, inadvertent act of omission?

The cases which hold that *HN3*there can be no cause of action for emotional distress arising out of merely witnessing the negligent destruction of property represent the better rule in my view.

Therefore, the allegations in counts I, II and III of the complaint which seek damages for the negligent infliction of emotional distress do not state a cause of action and are dismissed.

EMOTIONAL DISTRESS

The complaint does not allege an intentional act on the part of the defendants to cause emotional distress to the plaintiffs so what we are concerned with here is reckless conduct. Reckless conduct includes an element of consciousness. The actor consciously ignores a risk of harm; he is consciously indifferent to the rights of others. As the Court held in *Jardel Co., Inc. v. Hughes* n14 the harm must have been **[*13]** reasonably apparent but consciously ignored. Under these circumstances, it is not unreasonable or illogical to allow damages for emotional distress when property is damaged by the reckless act of another which rises to extreme and outrageous conduct.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n14 *Jardel Co., Inc. v. Hughes,* Del. Supr., 523 A.2d 518 (1987).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

A line of cases in Delaware has established the rule that *HN4*the intentional infliction of emotional distress is an independent tort action which does not require an underlying impact or physical injury. These cases follow the view expressed in *Restatement (Second) of Torts §* 46(1) (1965) which sets out the elements of the action. The conduct complained of must be extreme and outrageous; it must be performed intentionally or recklessly; and it must cause emotional distress to another. *See Mattern v. Hudson.* n15 The emotional distress must be severe but there is no requirement that it result in physical injury. n16 As the court noted in *Rea v. Midway Realty Corp.* n17 the tort includes **[*14]** reckless conduct and where reasonable minds might differ the issue will be resolved by a jury.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n15 *Mattern v. Hudson,* Del. Super., 532 A.2d 85 (1987).

n16 Cummings v. *Pinder,* Del. Supr., 574 A.2d 843 (1990); *Brzoska v. Olson,* Del. Supr., 668 A.2d 1355 (1995).

n17 *Rea v. Midway Realty Corp.,* 1989 Del. Super. LEXIS 322, Del. Super., C.A. No. 88C-JL6, Lee, J. (Aug. 23, 1989).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Returning to our vase example, suppose the friend comes over for a visit and decides to scare the vase's owner by picking up the vase and tossing it up and down in the air. The friend drops the vase by mistake and it breaks. The culpability of the friend for the conscious disregard of a known risk should reasonably subject him to damages for all the mental anguish which results.

Therefore, a cause of action does lie for damages for emotional distress which is caused by the reckless, extreme and outrageous conduct of another. The complaint does not allege all of the elements of this cause of action and so counts **[*15]** I, II and III will be dismissed pursuant to Rule 12(b)(6) unless the plaintiffs file a motion to amend the complaint within 30 days of the date of this opinion.

IT IS SO ORDERED.

N. Maxson Terry, Jr.

JUDGE


Source: Legal > / . . . / > **DE State Cases, Combined** ⓘ
Terms: **name(pritchett and delmarva)** (Edit Search | Suggest Terms for My Search)
View: **Full**
Date/Time: Tuesday, March 21, 2006 - 12:31 PM EST

* Signal Legend:
🔴 -   Warning: Negative treatment is indicated
Ⓠ -   Questioned: Validity questioned by citing refs
⚠ -   Caution: Possible negative treatment
➕ -   Positive treatment is indicated
Ⓐ -   Citing Refs. With Analysis Available
ⓘ -   Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 **LexisNexis®**    About LexisNexis  | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT C

Get a Document - by Citation - 95 Fair Empl. Prac. Cas. (BNA) 461    Page 1 of 8

Case 1:05-cv-00205-SLR    Document 46-2    Filed 03/21/2006    Page 11 of 40

Service:  **Get by LEXSEE®**
Citation:  **2005 us dist lexis 1843**

*2005 U.S. Dist. LEXIS 1843, \*; 95 Fair Empl. Prac. Cas. (BNA) 461*

Semyon Klyuch, Plaintiff v. Freightmasters, Inc., Defendant

Civil No. 03-6135 (PAM/RLE)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

2005 U.S. Dist. LEXIS 1843; 95 Fair Empl. Prac. Cas. (BNA) 461

February 9, 2005, Decided

**PRIOR HISTORY:** Klyuch v. Freightmasters, Inc., 2005 U.S. Dist. LEXIS 352 (D. Minn., Jan. 10, 2005)

**DISPOSITION:** Defendant's Motions in Limine granted in part and denied in part.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee sued defendant employer for race, religion, and national origin discrimination under Title VII and 42 U.S.C.S. § 1981. The case was set for trial. Defendant filed numerous motions in limine seeking to strike plaintiff's punitive damages claim and his claims for back and front pay, to exclude a variety of evidence and testimony, and to amend its exhibit list. Plaintiff moved for a forensic examination of defendant's computer.

**OVERVIEW:** The court ruled as follows: (1) a stray remark referring to plaintiff as a "fat, Jew friend" was relevant to bias or animus; (2) whether to strike the punitive damages claim was premature; (3) plaintiff could not rely on Minn. Stat. § 363A.15, but his failure to provide an authorization for a release of information from his current employer did not preclude his back and front pay claims; (4) plaintiff's witnesses' testimony that related to job performance and the work environment, his evidence attacking one of defendant's employees as biased, and the personnel files of comparator employees were probative of discrimination; (5) Minn. Stat. § 268.205, subd. 5(c), did not prevent the admission of unemployment findings in federal court, but the standard for unemployment benefits was distinct from that for employment discrimination and to avoid prejudice to either party, they were excluded; (6) evidence of defendant's failure to follow its termination policy was probative; (7) evidence of past discrimination suffered by plaintiff was irrelevant; (8) although untimely, defendant was allowed to amend its exhibit list; (9) a forensic examination of defendant's computer was unwarranted.

**OUTCOME:** The court granted in part and denied in part defendant's motions in limine. Defendant was allowed to amend its exhibit list, and the findings that defendant sought to exclude from the unemployment insurance proceedings were excluded, but so too were all findings excluded; the motions were otherwise denied. The court denied plaintiff's request for a forensics inspection of defendant's computer system.

**CORE TERMS:** termination, disclosure, punitive damages, unemployment, discriminatory, hiring, summary judgment, introduce evidence, exclude evidence, front, discriminated, authorization, probative, discovery, wage, state law, binding, unemployment insurance,

Get a Document - by Citation - 95 Fair Empl. Prac. Cas. (BNA) 461          Page 2 of 8

Case 1:05-cv-00205-SLR    Document 46-2    Filed 03/21/2006    Page 12 of 40

circumstances surrounding, national origin, direct evidence, forensic, stray, post-termination, decisionmaker, supplemented, prejudicial, precluding, electronic, derogatory

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Labor & Employment Law > Discrimination > Actionable Discrimination

Torts > Damages > Punitive Damages

*HN1* Under Title VII and 42 U.S.C.S. § 1981, the standard for punitive damages is the same: malice or reckless indifference to a federally protected right. Under the Minnesota Human Rights Act, punitive damages requires clear and convincing evidence that the acts of the defendants show deliberate disregard for the rights or safety of others. Minn. Stat. § 549.20.  More Like This Headnote

Evidence > Privileges

Evidence > Procedural Considerations > Limited Admissibility

Labor & Employment Law > Disability & Unemployment Insurance > Unemployment Compensation > Claim Procedures

*HN2* See Minn. Stat. § 268.205, subd. 5(c).

Civil Procedure > State & Federal Interrelationships > Federal Common Law

Evidence > Procedural Considerations > Rulings on Evidence

Labor & Employment Law > Disability & Unemployment Insurance > Unemployment Compensation > Claim Procedures

*HN3* A state legislature cannot purport to make binding pronouncements of law concerning what evidence may be privileged or otherwise admissible in a federal action involving claims based on federal law. As the Federal Rules of Evidence require, privilege must be governed by the principles of common law as they may be interpreted by the courts of the United States. Fed. R. Evid. 501. Thus, state privilege law is only binding in actions where state law controls the merits of the claims at issue.  More Like This Headnote

**COUNSEL:**  **[\*1]**  For Semyon Klyuch, Plaintiff: Andrea R Gesellchen, Beth Bertelson, Bertelson Law Office, Mpls, MN

For Freightmasters, Inc, Defendant: James F Baldwin, Julia M Dayton, Philip J Young, Moss & Barnett, Mpls, MN

**JUDGES:** Paul A. Magnuson, United States District Court Judge

**OPINIONBY:** Paul A. Magnuson

### OPINION: MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motions in Limine. Trial in this case is scheduled to begin on Monday, February 14, 2005. For the following reasons, the Motions are granted in part and denied in part.

Plaintiff Semyon Klyuch brings claims of race, religion and national origin discrimination. The Court previously denied the Motion for Summary Judgment filed by Defendant Freightmasters, Inc. ("Freightmasters"), and determined that Klyuch had presented sufficient probative evidence to create a genuine issue of fact for trial. Thus, the issue for trial is whether the evidence demonstrates that Freightmasters discriminated against Klyuch based on his race, religion, and national origin. Klyuch may use any kind of evidence, direct or indirect, to prove that Freightmasters intentionally discriminated against him.

## DISCUSSION

### A. Alleged Post-Termination  [*2]  Stray Remark

Freightmasters seeks to exclude an alleged remark made by Freightmasters' employee Timothy Beltz. Klyuch asserts that Beltz allegedly referred to Klyuch as a "fat, Jew friend," to fellow Freightmasters employee, Timothy Kroska. Both Beltz and Kroska deny that Beltz made the statement. This alleged statement was also made after Klyuch was terminated. Freightmasters seeks to exclude this statement as irrelevant. Klyuch disagrees.

The Court agrees with Klyuch. The Court has determined that this allegedly discriminatory comment is a stray remark, and insufficient to mandate a direct evidence analysis. However, even as a stray remark made after the decision to terminate Klyuch, this alleged comment is relevant to show bias or animus by Beltz towards Klyuch. Indeed, this is the ultimate issue that remains for trial. Thus, Freightmasters' Motion on this point is denied.

### B. Claim for Punitive Damages

Freightmasters seeks to strike Klyuch's claim for punitive damages.[HN1] Under Title VII and 42 U.S.C. § 1981, the standard for punitive damages is the same: malice or reckless indifference to a federally protected right. See e.g., Kim v. Nash Finch Co., 123 F.3d 1046, 1063 (8th Cir. 1997). [*3]  Under the Minnesota Human Rights Act ("MHRA"), punitive damages requires "clear and convincing evidence that the acts of the defendants show deliberate disregard for the rights or safety of others." Minn. Stat. § 549.20.

Freightmasters claims that the alleged discriminatory remarks are insufficient to support a claim for punitive damages. Indeed, these alleged discriminatory remarks, without more, may be insufficient. However, Klyuch intends to present other evidence to support his discrimination claims, including Freightmasters' failure to transfer him to a day shift position and the circumstances surrounding his termination. The Court finds Freightmasters' Motion premature at this juncture. However, depending on the evidence presented at trial, Freightmasters may renew its Motion on this point.

### C. Klyuch's Back Pay and Front Pay Claims

Klyuch seeks damages that include both back pay and front pay. Freightmasters contends that Klyuch has failed to permit discovery on his post-termination employment and wages. Specifically, Freightmasters contends that because Klyuch refuses to sign an authorization to release his employment information from his current employer, dismissal [*4]  of these claims is appropriate. Klyuch acknowledges that he has failed to sign this release, but represents that he has nonetheless provided all relevant wage and benefit information regarding his current employer. He further argues that signing an authorization to release his current employment information violates Minn. Stat. § 363A.15.

Freightmasters cites no authority for the proposition that a formal authorization for a release of information from an employer is the only means possible to evaluate front and back pay damages. However, Klyuch's reliance on Minn. Stat. § 363A.15 is also misplaced. Indeed,

this lawsuit is a matter of public record precluding the existence of the privilege that Klyuch claims exists. Regardless, Klyuch represents that he has supplemented all discovery requests and provided Freightmasters with all relevant wage and benefit information pertaining to his current employer. Absent some evidence that this information is inaccurate or otherwise incomplete, the Court declines to dismiss Klyuch's claims for back and front pay. However, the Court requires that Klyuch supplement his tax record disclosures to include the 2004 tax year.

## [*5]  D. Testimony of Witnesses Identified by Plaintiff

On January 23, 2004, Klyuch issued his initial Rule 26 disclosures, and on December 17, 2004, Klyuch supplemented these disclosures by identifying specific witnesses. Freightmasters objects to the testimony of five witnesses that were identified for the first time in the supplemental disclosures: John Munson, Tom Ralke, Arcadio Torres, Alexander Klyuch, and Jake Dvoksin. Freightmasters contends that it is unduly prejudiced by the late disclosure of these witnesses, and that their purported testimony is irrelevant.

First, these witnesses are no surprise to Freightmasters. Torres, Klyuch and Dvoksin were all referred to in some capacity during summary judgment briefing. Further, Freightmasters has had all witness contact information for nearly two months, and has failed to take any initiative to inquire of these witnesses. These witnesses have information that relate to Klyuch's job performance and the work environment at Freightmasters, which is relevant and may be probative of discrimination. The Court disagrees with Freightmasters that exclusion of these witnesses is appropriate. Freightmasters' Motion is denied on this point.  **[*6]**

## E. Attacks Against Tim Beltz

Freightmasters seeks to exclude evidence that is purportedly irrelevant and attacks Freightmasters' employee, Tim Beltz. At summary judgment, the Court assumed that Beltz was the decisionmaker, as Klyuch asserted. However, the Court notes that this assumption was strictly for purposes of that Motion, and that whether or not Beltz was indeed a decisionmaker is an issue that remains for trial. Thus, the evidence that Freightmasters seeks to exclude in this Motion is relevant to this issue and will not be excluded.

Freightmasters further seeks to exclude evidence regarding the allegedly derogatory comments made by Beltz. Although the Court has held that these comments are insufficient as a matter of law to mandate a direct evidence analysis, these allegedly derogatory comments may nonetheless be probative of discrimination. Whether such statements were made and whether such statements indicate a discriminatory animus is an issue that is disputed and therefore remains for the trier of fact. Freightmasters' Motion on this point is also denied.

## F. Exhibits from Plaintiff's Exhibit List

Freightmasters seeks to exclude Freightmasters' personnel **[*7]**  files of Ken Wood and Steve Hatcher. Freightmasters apparently disclosed these files during discovery and Klyuch now includes these documents in his exhibit list. Klyuch contends that this evidence is relevant to his claim for discrimination, because these documents demonstrate that Freightmasters treated Klyuch different than his non-Jewish and non-Russian colleagues, in regards to the terms and conditions of his employment. Klyuch does not intend to produce either Wood or Hatcher as witnesses, and because Freightmasters produced these files to Klyuch, Klyuch claims that there is no prejudice. The Court agrees with Klyuch, because this evidence may also be probative of discrimination. Thus, Freightmasters' Motion on this point is denied.

## G. Findings from Plaintiffs Unemployment Insurance Claim

Klyuch obtained unemployment insurance benefits after his termination. Throughout these unemployment proceedings, Freightmasters allegedly characterized Klyuch's termination as a voluntary termination. Freightmasters seeks to introduce evidence of this, characterization in an effort to rebut Klyuch's allegation that Freightmasters has offered inconsistent explanations for termination. **[*8]** However, Freightmasters seeks an Order that this reference will not "open the door for Klyuch to introduce evidence about the unemployment findings."

Minn. Stat. § 268.105, subd. 5(c) states:

> $^{HN2}$Testimony obtained [in an unemployment benefit evidentiary hearing] may not be used or considered for any purpose, including impeachment, in any civil, administrative, or contractual proceeding, except by a local, state, or federal human rights agency with enforcement powers, unless the proceeding is initiated by the department.

According to Klyuch, the evidence that Freightmasters seeks to present is prohibited by this statute. However, this Court has noted that$^{HN3}$ "a state legislature cannot purport to make binding pronouncements of law concerning what evidence may be privileged or otherwise admissible in a federal action involving claims based on federal law." Robertson v. Federal Express Corp., File No. 02-4161 (D. Minn. Aug. 20, 2004) (Magnuson, J.) (citing Baldwin v. Rice, 144 F.R.D. 102, 106 (E.D. Cal. 1992)). As the Federal Rules of Evidence require, privilege must be "governed by the principles of common law as they may be interpreted by the courts **[*9]** of the United States." Fed. R. Evid. 501. Thus, state privilege law is only binding in actions where state law controls the merits of the claims at issue.

In this case, Klyuch's claims are premised on federal discrimination laws, and the existence of pendent state law claims does not change this analysis. Thus, the Court is not required to comply with the "unemployment information privilege." See e.g., Freed v. Grand Court Lifestyles, Inc., 100 F. Supp. 2d 610 (S.D. Ohio 1998). However, the Court notes that Freightmasters proposes to tailor the evidence solely to its advantage.

The Court denies Freightmasters' Motion on this point and will not issue an Order as it requests. It is unfairly prejudicial to allow Freightmasters to introduce this evidence for substantive purposes while precluding Klyuch from using the same evidence. Furthermore, the standard for unemployment benefits is distinct from the standard for employment discrimination, and permitting the introduction of such evidence would only confuse the jury. Therefore, to avoid undue prejudice to either party, the Court excludes evidence from the unemployment insurance benefits hearing.

## H. Alleged Termination [*10] Policy

Freightmasters seeks to exclude any evidence about particular hiring and termination procedures at Freightmasters. Freightmasters disputes that its hiring and termination policy is a condition of employment and rather that it is merely "aspirational" in nature. Thus, according to Freightmasters, evidence regarding the policy is irrelevant and prejudicial. Klyuch contends that he is entitled to present evidence that Freightmasters chose to disregard its hiring and termination procedures as evidence of discrimination.

The Court agrees with Klyuch. Although the hiring and termination procedures may not be formal conditions of employment, Freightmasters' failure to follow its termination procedures in this instance may support Klyuch's claim for discrimination. Whether or not Freightmasters consistently followed these policies is an issue for the fact finder and is highly relevant to Klyuch's claims. Freightmasters' reliance on various cases is unpersuasive to the Court. In fact, Freightmasters' arguments demonstrate that issues of fact relating to the procedures remain for trial, rather than support is Motion to Exclude. Thus, Freightmasters' Motion is also denied on this **[*11]** point.

## I. Evidence of Past Discrimination Suffered by Plaintiff

Klyuch moved to the United States in the early 1980s from the Soviet Union, to escape both the racial and religious discrimination. Klyuch seeks to introduce evidence of this past discrimination, to demonstrate how this past discrimination has influenced Klyuch's propensity for severe emotional distress damages. Freightmasters seeks to exclude evidence of past discrimination, because it is irrelevant to the discrete allegations in this case. The Court agrees with Freightmasters. Evidence of past discrimination, nearly twenty-five years ago, is irrelevant to the allegations in the instant case. Thus, Freightmasters' Motion is granted on this point.

## J. Exhibit List

Freightmasters seeks to amend its exhibit list to include three recently discovered electronic documents. According to Freightmasters, these documents are "germane to the outstanding issues" set to be tried. As soon as Freightmasters discovered this evidence, it provided them to opposing counsel. There is no evidence of bad faith on behalf of Freightmasters, and indeed the documents are relevant to the issues that are contested by the parties. **[*12]**

Klyuch contends that this late disclosure is unduly prejudicial and should be prohibited. The Court disagrees. Although the Court acknowledges the untimeliness of this disclosure, the probative value of this evidence outweighs any prejudice to Klyuch. Indeed, the issues for trial focus on the circumstances surrounding Klyuch's termination, and these documents are at the heart of this issue. Further, Klyuch will have an opportunity at trial to examine witnesses as to both the authenticity and content of these documents. Thus, Freightmasters' Motion on this point is granted.

## K. Forensic Inspection

Klyuch contends that a forensic examination of Freightmasters' computer system is necessary to ensure that Freightmasters has disclosed all relevant documents that relate to this newly disclosed evidence. The Court also disagrees with Klyuch on this point. There is no evidence of bad faith on behalf of Freightmasters, and ordering a forensic inspection at this late juncture is unnecessary. Rather, the Court orders Freightmasters to produce any other documents that pertain or relate to these recently produced documents.

## CONCLUSION

The issue for trial is whether Freightmasters **[*13]** discriminated against Klyuch, and the burden is on Klyuch to prove, by a preponderance of the evidence, that such discrimination occurred. Klyuch is entitled to use any evidence, direct or circumstantial, to prove his case. Accordingly, based on all the files, records and proceedings herein, **IT IS HEREBY** ORDERED that:

> 1. Defendant's Motion in Limine Regarding Alleged Post Termination Stray Remark (Clerk Doc. No. 48) is **DENIED;**

2. Defendant's Motion in Limine to Strike Claim for Punitive Damages (Clerk Doc. No. 50) is **DENIED;**

3. Defendant's Motion in Limine to Strike Plaintiff's Back Pay and Front Pay Claims (Clerk Doc. No. 52) is **DENIED;**

    a. Plaintiff must supplement his disclosures to include his 2004 tax information;

4. Defendant's Motion in Limine to Strike Witnesses from and/or Limit Testimony of Witnesses Identified by Plaintiff (Clerk Doc. No. 54) is **DENIED;**

5. Defendant's Motion in Limine Regarding Irrelevant and Unsupported Attacks Against Tim Beltz (Clerk Doc. No. 56) is **DENIED;**

6. Defendant's Motion in Limine to Strike Exhibits from Plaintiff's Exhibit List (Clerk Doc. No. 58) is **DENIED; [*14]**

7. Defendant's Motion in Limine to Exclude Findings from Plaintiffs Unemployment Insurance Claim (Clerk Doc. No. 73) is **DENIED in part and GRANTED in part;**

8. Defendant's Motion in Limine to Preclude Alleged Termination Policy (Clerk Doc. No. 75) is **DENIED;**

9. Defendant's Motion in Limine to Preclude Evidence of Past Discrimination Suffered by Plaintiff (Clerk Doc. No. 79) is **DENIED;**

10. Defendant's Motion in Limine to Amend the Exhibit List (Clerk Doc. No. 88) is **GRANTED;** and

11. Plaintiffs Motion Requesting a Forensics Inspection of Freightmasters' Computer System (Clerk Doc. No. 94) is **DENIED;**

    a. Freightmasters must produce any other documents that directly pertain or relate to the three recently discovered electronic documents.

Dated: February 9, 2005

Paul A. Magnuson

United States District Court Judge

Service: **Get by LEXSEE®**
Citation: **2005 us dist lexis 1843**
View: Full
Date/Time: Tuesday, March 21, 2006 - 12:34 PM EST

**\*** Signal Legend:
- Warning: Negative treatment is indicated

[Q] - Questioned: Validity questioned by citing refs

⚠ - Caution: Possible negative treatment

✚ - Positive treatment is indicated

Ⓐ - Citing Refs. With Analysis Available

ⓘ - Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.



About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT D

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 17567          Page 1 of 13

Case 1:05-cv-00205-SLR     Document 46-2     Filed 03/21/2006     Page 20 of 40

Service: **Get by LEXSEE®**
Citation: **2001 us dist lexis 17567**

*2001 U.S. Dist. LEXIS 17567, \**

JOSEPH G. ABBONDANZO, Plaintiff, -against- HEALTH MANAGEMENT SYSTEMS, INC., Defendant.

00 Civ. 4353 (LMM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2001 U.S. Dist. LEXIS 17567

October 24, 2001, Decided
October 25, 2001, Filed

**DISPOSITION:** **[\*1]** Defendant's motion for summary judgment was granted.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendant employer, alleging reverse racial discrimination, retaliation in response to his complaints, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq. The employer moved for summary judgment.

**OVERVIEW:** The employee, a white male, worked for the employer for 10 months. He was hired for the night shift, which needed his experience. Within a few months, he (unsuccessfully) sought transfer to the day shift. The employee had numerous altercations with co-workers, culminating in a fight, resulting in his discharge and denial of unemployment compensation. The court assumed, without deciding, that white people as a class were protected from discrimination against them as a class. However, the employee did not show that his termination gave rise to an inference of racial discrimination. Denial of his transfer request did not itself show impermissible animus. The employer gave legitimate, non-discriminatory reasons for placing an employee in need of training on the day shift and keeping a more experienced employee on the more cleanly staffed evening shift. The employee's short tenure in his position gave rise to an inference that the motive was not discriminatory. The employee could not establish a causal connection between his complaint and any of the alleged retaliatory measures; nor could he show severe and pervasive offensive conduct to establish a hostile work environment.

**OUTCOME:** The district court granted the employer's motion for summary judgment.

**CORE TERMS:** co-worker, termination, summary judgment, hired, protected activity, retaliation, prima facie case, hostile work environment, altercation, retaliatory, evening, prong, fight, causal connection, supervisor, fired, staged, material fact, white male, pro se, discriminatory, unemployment, terminated, workplace, promotion, non-discriminatory, female, firing, animus, warned

### LexisNexis(R) Headnotes ✦ Hide Headnotes

Civil Procedure > Joinder of Claims & Parties > Self-Representing Parties 🖳

*HN1*⚓A court will afford a plaintiff the "special solicitude" given to pro se litigants when confronted with motions for summary judgment. More Like This Headnote

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 17567          Page 2 of 13

Case 1:05-cv-00205-SLR     Document 46-2     Filed 03/21/2006     Page 21 of 40

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN2* Summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. If reasonable minds could differ as to the import of the evidence, summary judgment is inappropriate.  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN3* In evaluating the record to determine whether there is a genuine issue as to any material fact, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor. If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN4* Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. The mere existence of factual issues--where those issues are not material to the claims before the court--will not suffice to defeat a motion for summary judgment.  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN5* For a dispute to be genuine requires more than "metaphysical doubt." If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  More Like This Headnote

Civil Procedure > Summary Judgment > Supporting Papers & Affidavits

*HN6* In employment discrimination actions, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue, because an employer's documents will rarely reveal intentional discrimination. Affidavits and depositions must be carefully analyzed in an attempt to ascertain circumstantial evidence showing discrimination.  More Like This Headnote

Civil Procedure > Summary Judgment > Summary Judgment Standard

*HN7* Summary judgment may be appropriate where a party seeking to defeat a summary judgment motion relies upon conclusory allegations or denials. Mere speculation or conjecture as to the true nature of facts cannot overcome the motion. The responding party must show the existence of a disputed material fact in light of the substantive law.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN8* Under the basic framework for Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., discrimination claims, the plaintiff bears the initial burden of

establishing a prima facie case of unlawful racial discrimination by showing that the plaintiff: (1) is a member of a protected class, (2) who was qualified for his position, (3) who suffered an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. If the defendant is able to articulate such a reason, the burden shifts back to the plaintiff to show that the reason proffered by the defendant is pretextual. The plaintiff must demonstrate both that the proffered reason was false, and that discrimination was the real reason for the termination.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN9* To satisfy the second prong of the McDonnell Douglas framework for employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., the plaintiff must offer some evidence from which a reasonable fact finder could conclude that he was qualified for his position.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN10* In the context of alleged discrimination in employment, generalizations about the allegedly tolerated misbehavior of others are insufficient to allow a jury to make a finding of improper motivation, where the record contains no evidence that specific events leading to disciplinary action were sufficiently comparable to episodes involving others.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Discrimination > Disparate Treatment

*HN11* When a plaintiff cannot make out a prima facie case of discrimination under the McDonnell Douglas analysis, he will also fail under the Price Waterholes "mixed-motives" burden shifting analysis, because the plaintiff fails to produce evidence creating an inference of discrimination. In short, to warrant a mixed-motive burden shift, the plaintiff must be able to produce a "smoking gun" or at least a "thick cloud of smoke" to support his allegations of discriminatory treatment.  More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 

*HN12* To establish a claim for retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., a plaintiff must show that: (1) the employee was engaged in an activity protected under Title VII; (2) the employer was aware of the employee's participation in the protected activity; (3) there was an employment action that disadvantaged the plaintiff; and (4) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. The plaintiff's discrimination claim need not be valid to establish a claim for retaliation. If the plaintiff succeeds in making a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. If the defendant succeeds in making such a showing, the plaintiff has an opportunity to prove by a preponderance of the evidence that the reasons proffered were a pretext for retaliation.  More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation 

*HN13* In the context of an employment discrimination claim based on retaliation, a causal connection may be established either indirectly by showing that the protected

activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant. More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation

*HN14* In the context of an employment discrimination claim based on retaliation, criticisms that precede the protected activity are relevant to a finding that there was no causal nexus. More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Disability & Unemployment Insurance > Unemployment Compensation > Eligibility 

*HN15* If an employee is terminated based on workplace misconduct, he is disqualified from receiving unemployment benefits, under N.Y. Lab. Law § 593 (3). More Like This Headnote

Labor & Employment Law > Discrimination > Title VII

*HN16* A hostile work environment is a workplace that is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's environment and create an abusive working environment. A plaintiff must show either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment. Courts consider the following factors in determining if a work environment is hostile: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or only an offensive utterance; (4) if the conduct unreasonably interferes with an employee's work performance. The plaintiff must show that there are circumstances giving rise to an interference of discriminatory intent behind the abusive conduct. More Like This Headnote

**COUNSEL:** JOSEPH G. ABBONDANZA, plaintiff, Pro se, Convent Station, NJ.

For HEALTH MANAGEMENT SYSTEMS, INC., defendant: Richard L. Steer, Jones Hirsch Connors & Bull PC, New York, NY.

**JUDGES:** Lawrence M. McKenna, U.S.D.J.

**OPINIONBY:** Lawrence M. McKenna

**OPINION:** MEMORANDUM AND ORDER

McKENNA, D.J.,

Plaintiff, Joseph G. Abbondanzo ("Abbondanzo"), *pro se*, brings the present litigation against his former employer, Health Management Systems, Inc. ("HMS"), alleging reverse racial discrimination, retaliation in response to his complaints, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* Defendant moves for summary judgment. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Defendant moves to strike incompetent evidence upon which plaintiff bases his opposition. The Court has only considered matters relevant and competent in its decision on this motion.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Court has liberally construed Abbondanzo's papers in opposition to defendant's [*2] motion for summary judgment. In so doing, the $^{HN1}$ Court has afforded plaintiff the "special solicitude" given to *pro se* litigants when confronted with motions for summary judgment. Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998); Hanlin v. Mitchelson, 794 F.2d 834, 838-39 (2d Cir. 1986); Shepherd v. Sanchez, 2000 U.S. Dist. LEXIS 10161, No. 96 Civ. 9012, 2000 WL 1010829 (S.D.N.Y. July 21, 2000) (collecting cases). However, despite this generous standard, defendant's motion for summary judgment is granted for the reasons stated below.

## STATEMENT OF FACTS

Except as noted, all facts are either undisputed or construed most favorably to plaintiff. Plaintiff has failed to submit a counter-statement of disputed material facts as required by Local Rule 56.1. Therefore, the facts set forth in HMS's Rule 56.1 Statement are deemed admitted. Monahan v. N.Y.C. Dep't of Corrections, 214 F.3d 275, 292 (2d Cir. 2000); Carr v. Health Ins. Plan of Greater N.Y., Inc., 111 F. Supp. 2d 403, 404 n.1 (S.D.N.Y. 2000).

HMS employed Abbondanzo as a Senior Production Specialist in the Data Processing Operations Unit ("DPO") from January 1999 [*3] through October 28, 1999. (Def.'s 56.1 PP 2-3.) Plaintiff, a white male, was hired for the evening shift. (Def.'s 56. 1 P 3.) Abbondanzo was hired for this shift because he had a good technical background and an experienced person was needed for that shift because fewer employees and supervisors were on site in the evening. (Def.'s 56. 1 P 4.) According to plaintiff, he was unhappy about being hired for this shift and sought a transfer to the day shift a few months after he was hired.

Plaintiff alleges that shortly after he started the job, Sonya McDonald, a black co-worker, made comments suggesting that as a white male Abbondanzo should not have a received a job in the department. According to plaintiff, Dwayne Wilson, another black co-worker, also made rude comments. (Pl.'s Aff. at 5.)

Plaintiff does not dispute that he had numerous altercations with his co-workers. (Def.'s 56. 1 P 6.) On or about April 5, 1999, Abbondanzo had a verbal confrontation with a co-worker, Jorge Fernandez, in which plaintiff screamed at Fernandez over the phone, "Don't you know how to read English?" (Def.'s 56. 1 P 6.) Plaintiff was reprimanded by his supervisor, [*4] George Macrelli ("Macrelli"), after this incident. (Id.)

Approximately one week after this altercation, plaintiff alleges that he first met with Shelly Breuggeman ("Breuggeman") of the Human Resources Department of HMS to complain about the hostile work environment and the denial of his request for a day shift. (Pl.'s Aff. at 9.) After a subsequent meeting with Breuggeman on May 14, 1999, where plaintiff voiced the same complaints, he was called into a meeting with Warren G. Wright ("Wright"), Macrelli's supervisor, regarding a profane outburst by plaintiff that day. (Def.'s 56. 1 P 7.) At this meeting, according to plaintiff, he complained about the hostile work environment and how he had been denied a day shift job. According to plaintiff, Wright told plaintiff, "You're not a minority, go back to work," and slammed the door in his face. (Pl.'s Aff. at 11.)

Plaintiff was called into a conference on May 18, 1999 with Wright, Anna Hynes, ("Hynes") an assistant in the Human Resources department of HMS, and Macrelli, at which time the parties warned him about his performance. According to plaintiff, plaintiff told Hynes that "if I hear

the words white female and day shift **[*5]** in the same breath I will sue you and ruin the person who hired [you]." (Pl.'s Aff. at 12.)

On May 24, 1999, Audry McHugh, a white woman, was hired for the day shift. (Pl.'s Aff. at 13.)

Wright sent a memo to plaintiff on May 25, 1999, detailing his concerns about plaintiff's performance, describing the two incidents in which plaintiff had been involved, and warning plaintiff that his behavior was unacceptable. Plaintiff was warned that failure to improve could lead to termination. (Def.'s 56. 1 P 8.)

Plaintiff called the EEOC office for advice about filing a complaint on May 19, 1999 and filed a formal complaint on June 9, 1999, and notified Wright and Macrelli about the complaint. (Pl.'s Aff. at 16.) Abbondanzo met with Lewis Levetown ("Levetown"), the Vice President of Human Resources and Hynes on or around June 10, 1999, and according to plaintiff, he was promised the next day shift job that became available. (Pl.'s Aff. at 17.)

Plaintiff sent an unprofessional e-mail message to a project manager on or about September 28, 1999, and was warned in a memo dated October 8, 1999 that "If an incident like this occurs again, it will result in your immediate termination. **[*6]** " (Def.'s 56. 1 P 9.) Plaintiff alleges that he was ordered to write this e-mail by John O'Connors, the Vice President of the DPO. (Compl. at 30.)

Plaintiff alleges that in late October HMS staged an incident in which a co-worker, Joseph Williamson, Jr. ("Williamson") tried to pick a fight with plaintiff, but attacked a handicapped black co-worker instead. (Compl. at 13-14.) On October 27, 1999, Abbondanzo and Williamson became involved in a physical altercation. (Def's 56.1 PP 12, 14.) Plaintiff argues that this fight was staged. (Compl. at 13.) According to plaintiff, the original incident report stated that Williamson attacked plaintiff, but a security guard later tampered with the report to read "mutual fight." (Pl.'s Aff. at 38-39.)

HMS decided to terminate Abbondanzo because, according to the company, he was a "clear and present danger to our employees." (Levetown Aff. P 15 & Exh. H.) It is HMS's position that the termination was for cause, based on plaintiff's pattern of losing control of his emotions and, in particular, the final physical altercation. (Def.'s 56. 1 P 16.) Levetown advised plaintiff of his termination by e-mail on October 28, 1999. (Def. **[*7]** 's 56. 1 P 15.)

Plaintiff's application for unemployment benefits was denied because HMS advised the Department of Labor that plaintiff was discharged for misconduct. (Def.'s 56. 1 P 17.) Plaintiff appealed to the New York State Department of Labor Unemployment Insurance Appeal Board, and at the hearing, the Administrative Law Judge upheld the Department of Labor's determination. Plaintiff appealed to the Appellate Division, Third Department, and filed disciplinary charges against the ALJ. The Appellate Division affirmed, noting that fighting with a co-worker constituted a disqualifying act of misconduct regardless of which party initiated the fight. Plaintiff's application for leave to appeal was denied, and plaintiff has moved in the Court of Appeals for leave to appeal. (Def.'s 56.1 PP 17-19.)

## SUMMARY JUDGMENT STANDARD

*HN2*Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). **[*8]** A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). "If reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. Id. at 250.

*HN3*In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Anderson, 477 U.S. at 255 (1986). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

*HN4*"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). [*9] "The mere existence of factual issues -- where those issues are not material to the claims before the court -- will not suffice to defeat a motion for summary judgment." Quarles v. General Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985).

*HN5*For a dispute to be genuine requires more than "metaphysical doubt." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

*HN6*In employment discrimination actions, a trial court must be particularly cautious about granting summary judgment when the employer's intent is at issue, because an employer's documents will rarely reveal intentional discrimination. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994). Affidavits and depositions must be carefully analyzed in an attempt to ascertain circumstantial evidence showing discrimination. Gallo, 22 F.3d at 1224.

*HN7*Summary judgment may be appropriate where a party seeking to defeat a [*10] summary judgment motion relies upon "conclusory allegations or denials." R.G. Group, Inc., v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984). "Mere speculation or conjecture as to the true nature of facts cannot overcome the motion." Ricks v. Conde Nast Publ'ns, Inc., 92 F. Supp. 2d 338, 343 (S.D.N.Y. 2000). The responding party "must show the existence of a disputed material fact in light of the substantive law." Peer Int'l Corp. v. Luna Records, Inc., 887 F. Supp. 560, 564 (S.D.N.Y. 1995).

## DISCUSSION

A. Racial Discrimination

The Supreme Court articulated *HN8*the basic framework for Title VII discrimination claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). The plaintiff bears the initial burden of establishing a prima facie case of unlawful racial discrimination by showing that the plaintiff: (1) is a member of a protected class, (2) who was qualified for his position, (3) who suffered an adverse employment action, (4) under circumstances giving rise to an inference of discrimination. Id. at 802.

If the plaintiff establishes [*11] a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment decision. Id. If the defendant is able to articulate such a reason, the burden shifts back to the plaintiff to show that the reason proffered by the defendant is pretextual. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993). The plaintiff must

demonstrate "both that the [proffered] reason was false, and that discrimination was the real reason" for the termination. Id.

Some courts in this district have applied a slightly altered test when the claim is of reverse discrimination, following the D.C. Circuit's holding in Parker v. Baltimore & Ohio R.R. Co., 209 U.S. App. D.C. 215, 652 F.2d 1012 (D.C. Cir. 1981). See, e.g., Umansky v. Masterpiece Int'l Ltd., 1998 U.S. Dist. LEXIS 11775, No. 93 Civ. 2367, 1998 WL 433779 (S.D.N.Y. July 31, 1998); Olenick v. New York Tel., 881 F. Supp. 113 (S.D.N.Y. 1995). The D.C. Circuit reasoned that the McDonnell Douglas criteria were not always appropriate to analyze the situation where the plaintiff is not a member of a **[*12]** racial minority, stating, "it defies common sense to suggest that the promotion of a black employee justifies an inference of prejudice against white co-workers in our present society." 652 F.2d at 1017. The D.C. Circuit held that "when background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority," a plaintiff alleging reverse discrimination may rely on the McDonnell Douglas criteria. Id. The Second Circuit has not yet addressed whether this modified test should be adopted, and this court declines to adopt it at this time. Instead, following other courts in this district, who have interpreted McDonald v. Santa Fe Trail Transp. Co. literally, this Court will assume that white people as a class are protected from discrimination against them as a class. 427 U.S. 273, 279, 49 L. Ed. 2d 493, 96 S. Ct. 2574 (1976) ("a Title VII case is a Title VII case on the 'same terms' for plaintiffs of all races"); Berkowitz v. County of Orange, 120 F. Supp. 2d 386, 397 (S.D.N.Y. 2000). Therefore, plaintiff meets the first prong of the McDonnell Douglas test. Plaintiff was terminated on October 28, 1999, thereby satisfying **[*13]** the third prong.

*HN9* To satisfy the second prong, plaintiff must offer some evidence from which a reasonable fact finder could conclude that he was qualified for his position. McDonnell, 411 U.S. at 802; Thornley v. Penton Publ'g, 104 F.3d 26, 29 (2d Cir. 1997). Plaintiff has met this burden. Defendant concedes that plaintiff had the technical expertise and skill to perform his position. (Def.'s Mem. of Law Supp. S.J. at 5.) Plaintiff had experience and could work independently. Defendant offers undisputed evidence of plaintiff's numerous disciplinary problems and his failure to interact civilly with his co-workers, including a verbal altercation with a co-worker on April 5, 1999, and a profane outburst on May 14, 1999. Although it may be highly unlikely that plaintiff's performance was entirely satisfactory given this record, since defendant does not set forth evidence of HMS's particular criteria of assessing satisfactory performance, it is possible that plaintiff's performance, taken as a whole, was satisfactory. Thornley, 104 F.3d at 30.

Plaintiff fails to make out a prima facie case, however, because he does not come forward with **[*14]** evidence to satisfy the fourth prong -- that his termination gave rise to an inference of discrimination. Although plaintiff alleges that he was treated differently than his black or female co-workers, the record does not support these contentions.

Plaintiff was denied a transfer he sought from the evening shift to the day shift approximately four months after he was initially hired, and alleges that blacks and women received this preferred assignment. Defendant argues that under HMS policy and practices, employees were not eligible for shift changes until six months after hiring. (Def.'s 56. 1 P 24 & Levetown Aff. Exh. J.) Plaintiff argues that this policy applies to changes between departments rather than shifts. However, even assuming the policy is as plaintiff describes, plaintiff does not show that similarly situated black or female employees were granted transfers. Cynthia Bowen ("Bowen"), a black woman, received a transfer in July 1999. Defendants offer undisputed evidence that Bowen had been with the company since June 1995. (Def.'s 56.1 PP 24, 26.) Furthermore, plaintiff does not allege that Bowen had a similar disciplinary record to plaintiff. Although plaintiff **[*15]** makes allegations that Bowen behaved improperly, those allegations are not supported by evidence.

As another example of disparate treatment, plaintiff alleges that a white female, Audrey

McHugh ("McHugh"), was hired to work on the day shift after plaintiff was denied a transfer to that shift. Plaintiff argues that HMS could have assigned McHugh, as a new hire with lesser expertise, to the evening shift, and plaintiff to the preferred day shift. (Pl.'s Aff. at 16.) However, the fact that such a reassignment could have been made and was not, does not establish that the failure to reassign was motivated by impermissible animus. Furthermore, defendant states legitimate, non-discriminatory reasons for placing an employee in need of training on the day shift and keeping a more experienced employee on the more leanly staffed evening shift. As another instance of preferential treatment, plaintiff states that HMS granted McHugh's request that her hours be changed from 9-6 to 8-5. (Pl.'s Aff. at 16.) However, plaintiff does not allege that he requested a change in his own hours.

The fact that plaintiff was the only white male non-supervisory employee in the DPO at the time of his termination **[\*16]**  (Wright Dep. at 6), does not support an inference that plaintiff was treated differently than his black and female counterparts. Any inference of discrimination is further discredited by the undisputed fact that many of the management level employees were white men, including all of the managerial employees who interacted with Abbondanzo, namely, Macrelli, plaintiff's immediate supervisor; Wright, Macrelli's supervisor; and O'Connors, the Vice-President of the DPO. Furthermore, plaintiff was both hired and fired by white males within ten months. His short tenure in his position gives rise to an inference that the motive was not discriminatory. See Ricks, 92 F. Supp. 2d 338, 346-47 (where employer both hired and fired plaintiff within period of three months gives rise to inference of nondiscrimination). It is difficult to impute an invidious motivation to the overwhelmingly white male management who hired plaintiff in the first place.

Plaintiff further alleges that HMS gave preferential treatment to Bowen by giving her supervisor training. However, plaintiff and Bowen are not similarly situated, as evidenced by Bowen's longer tenure at the company and plaintiff's disciplinary **[\*17]** record. Similarly, plaintiff alleges that he was discriminated against because Bowen received a promotion even though she was unqualified. However, he cannot state a claim for failure to promote because he never alleges that he applied for a promotion, an element of a prima facie case of discriminatory failure to promote. Brown v. Coach Stores, Inc., 163 F.3d 706, 708 (2d Cir. 1998). Furthermore, as a new hire, plaintiff was not eligible for a promotion. (Def.'s 56.1 PP 26-27.) Similarly, plaintiff alleges that black employees were allowed to bring their children into work, and when he requested to bring abused and disadvantaged children from broken homes into work he was not permitted to do so. (Pl.'s Aff. at 28.) Plaintiff presents no evidence to support this allegation, and in addition, plaintiff never alleges that he attempted to bring his own children to the workplace.

As another example of disparate treatment, plaintiff alleges that many black employees had complaints lodged against them, or said unprofessional things or sexually harassed co-workers but that HMS did not reprimand them for their actions. (Compl. at 23-24.) His only support for this contention **[\*18]** is his allegation that his performance review was good, but that the last section "complained about things no one would ever or no one else ever got warned for." (Pl.'s Aff. at 13.) Such unsupported allegations will not withstand a motion for summary judgment. *HN10*➤"Generalizations about the allegedly tolerated misbehavior of others are insufficient to allow a jury to make a finding of improper motivation, where the record contains no evidence . . . that specific events leading to disciplinary action were sufficiently comparable to episodes involving others." Powell v. Consolidated Edison Co. of N.Y., 2001 U.S. Dist. LEXIS 2706, No. 97 Civ. 2439, 2001 WL 262583, at \*12 (S.D.N.Y. 2001).

*HN11*➤Because plaintiff cannot make out a prima facie case of discrimination under the McDonnell Douglas analysis, he will also fail under the Price Waterhouse "mixed-motives" burden shifting analysis because plaintiff fails to produce evidence creating an inference of discrimination. Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989). "In short, to warrant a mixed-motive burden shift, the plaintiff must be able to

produce a 'smoking gun' or at least a 'thick cloud **[\*19]** of smoke' to support his allegations of discriminatory treatment." <u>Raskin v. Wyatt Co., 125 F.3d 55, 60-61 (2d Cir. 1997).</u>

Even assuming that Abbondanzo could make out a prima facie case, he cannot show that the non-discriminatory reason articulated by HMS for firing him was a pretext. Plaintiff fails to rebut defendant's evidence in support of its articulated reason for firing him, namely his frequent altercations with co-workers which culminated in a fight, and there is no evidence to support the claim that someone tampered with the incident report. Most importantly, plaintiff produces no concrete evidence from which a jury could conclude that defendant's real reason for firing plaintiff was his race and sex. As discussed above, plaintiff's allegations of discrimination are conclusory and not supported by the record. As plaintiff provides no evidence of employees with similar disciplinary records who engaged in physical violence and were not terminated, and as numerous undisputed incidents in the record establish plaintiff's behavior, such a record is a more than adequate non-discriminatory justification for terminating plaintiff's employment.

For all of the reasons **[\*20]** discussed above, plaintiff has failed to raise a triable issue of fact with respect to his claim that his termination was discriminatory.

B. Retaliation

*HN12* To establish a claim for retaliation under Title VII a plaintiff must show that: (1) the employee was engaged in an activity protected under Title VII; (2) the employer was aware of the employee's participation in the protected activity; (3) there was an employment action that disadvantaged the plaintiff; and (4) there was a causal connection between the employee's protected activity and the adverse action taken by the employer. <u>Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995).</u> The plaintiff's discrimination claim need not be valid to establish a claim for retaliation. <u>Sumner v. United States Postal Serv., 899 F.2d 203,</u> 209 (2d Cir. 1990).

If the plaintiff succeeds in making a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. <u>Tomka, 66 F.3d at 1308.</u> If the defendant succeeds in making such a showing, the plaintiff has an opportunity to prove by a preponderance of the evidence that the reasons **[\*21]** proffered were a pretext for retaliation. Id.

In this case, plaintiff can establish the first three elements of a prima facie case of retaliation, but fails to come forward with evidence establishing a causal connection between his protected activity and the retaliatory events. Plaintiff spoke and wrote to Anne Schrage of the EEOC in May 1999 and allegedly complained to the Human Resources division of HMS about a hostile work environment in mid-April and again on May 14, 1999. (Pl. Opp'n at 10-11, 16-17 & Compl. at 3.) Such complaints qualify as protected activity. <u>Gilani v. National Ass'n of Securities Dealers, Inc., 1997 U.S. Dist. LEXIS 12287,</u> No. 96 Civ. 8070, 1997 WL 473383, at \*7 (S.D.N.Y. Aug. 19, 1997). Defendant was made aware of plaintiff's EEOC complaint and plaintiff's discussions with Human Resources employees in mid-May. On October 28, 1999, plaintiff was terminated from his employment, satisfying the third prong of a claim for retaliation.

However, plaintiff fails to satisfy the fourth prong of a prima facie case because he cannot establish a causal connection between his complaint and any of the alleged retaliatory measures. *HN13* A causal connection may be established either "indirectly **[\*22]** by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." <u>Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991)</u> (quoting <u>DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987)</u> (citations omitted)).

As noted above, plaintiff does not provide evidence to make a showing of disparate or discriminatory treatment. Plaintiff makes a variety of allegations of retaliatory animus, among them that HMS denied him a change in shifts, had him trailed as he left the building one evening, fired him, and contested his claim for unemployment benefits. Abbondanzo cannot link HMS's refusal to move him to the day shift to his protected activity, because defendant denied plaintiff's request to change shifts before plaintiff engaged in the protected activity.

Plaintiff's allegation that two men followed plaintiff as he left the lobby of his office building in May in an attempt to intimidate him is without evidentiary basis **[*23]** and cannot be linked to HMS. (Pl.'s Aff. at 13-14.)

Nor can plaintiff link his termination to his protected activity. Plaintiff had been given warnings by his employers after each precipitating event that his behavior could lead to his termination. His first reprimand, following the Fernandez incident, preceded his complaints to the EEOC and Human Resources. *HN14*⇟Criticisms that precede the protected activity are relevant to a finding that there was no causal nexus. Lawson v. Getty Terminals Corp., 866 F. Supp. 793, 804 (S.D.N.Y. 1994). All of the facts indicate that plaintiff's termination was the direct result of his physical altercation with a co-worker rather than a retaliatory measure. Insubordination and disruptive conduct are "legitimate reasons for firing an employee." Matima v. Celli, 228 F.3d 68, 79 (2d Cir. 2000), (quoting Holt v. KMI-Continental, Inc., 95 F.3d 123, 130 (2d Cir. 1996)).

As for the alleged retaliation by HMS's decision to contest plaintiff's claim for unemployment benefits, plaintiff fails to show any nexus here as well. *HN15*⇟If an employee is terminated based on workplace misconduct, he is disqualified from receiving **[*24]** benefits, under New York Labor Law § 593(3). Matter of the Claim of Perry, 222 A.D.2d 924, 635 N.Y.S.2d 364 (3d Dep't 1995). Plaintiff provides no evidence to show that defendant's decision to contest plaintiff's benefits claim was anything less than standard practice following a termination under the circumstances. Plaintiff's comparison to Tuckston Garnes, a black male employee at HMS who obtained unemployment benefits after being fired, is unavailing, because it is undisputed that Garnes was fired not for fighting in the workplace, but for absenteeism and lateness, circumstances that distinguish his situation from plaintiff's. (Def.'s 56. 1 P 35.)

Plaintiff makes a variety of other allegations of retaliatory animus, none of which find any basis in evidence, including claiming that HMS staged, encouraged, or provoked false complaints about him and staged incidents to induce him to respond (Compl. at 10); that HMS acted in retaliation when HMS made efforts to depose Abbondanzo's sister in connection with this lawsuit (Pl.'s Aff. at 48); and that after plaintiff served HMS with interrogatories, he began to receive harassing phone calls. (Pl.'s Aff. at **[*25]** 49.) Plaintiff alleges that HMS further retaliated against him by suborning perjury by orchestrating the testimony of witnesses at an Unemployment Insurance Board hearing before the Administrative Law Judge. Plaintiff also alleges that various HMS employees committed perjury at the hearing. However, plaintiff provides no evidence to support these claims.

Because of his failure to establish a causal connection between his protected activity and the alleged actions of HMS, plaintiff's retaliation claim is not sustainable.

C. Hostile Work Environment

The Supreme Court has described *HN16*⇟a hostile work environment as a "workplace [that is] permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's environment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct.

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 17567    Page 12 of 13

Case 1:05-cv-00205-SLR    Document 46-2    Filed 03/21/2006    Page 31 of 40

367 (1993) (internal references omitted). Plaintiff must show "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment. **[*26]** " Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000). Courts consider the following factors in determining if a work environment is hostile: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or only an offensive utterance; (4) if the conduct unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23. The plaintiff must show that there are circumstances giving rise to an interference of discriminatory intent behind the abusive conduct. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998).

Plaintiff has failed to make a sufficient showing that the alleged offensive conduct was severe and pervasive. Plaintiff alleges two instances, shortly after he was hired, in which his co-workers voiced resentment against him because of his race. (Compl. at 8-9.) However, plaintiff makes no allegations that racial remarks were frequently directed at him. Plaintiff's other allegations, including that HMS staged incidents to induce his termination, such as the fight with Williamson, and **[*27]** that black and hispanic employees were angry over his hiring, are mere speculation. The fact that a majority of Abbondanzo's co-workers were black or hispanic does not establish a hostile work environment. Because plaintiff has not offered evidence of pervasive, offensive, discriminatory conduct that altered the conditions of his employment, defendant's motion for summary judgment is granted as to plaintiff's hostile work environment claim.

## CONCLUSION

For the foregoing reasons, HMS's motion for summary judgment is granted, and the Clerk is directed to enter judgment dismissing the complaint. n2

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 Since plaintiff appears *pro se*, the Court notes that the taking of an appeal from this decision requires the filing of a notice of appeal within a period of time limited by law. If plaintiff wishes to appeal, he may wish to consult with the Court's *pro se* office.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Dated: October 24, 2001

New York, New York

SO ORDERED.

Lawrence M. McKenna

U.S.D.J.

Service: Get by LEXSEE®
Citation: 2001 us dist lexis 17567
View: Full
Date/Time: Tuesday, March 21, 2006 - 12:35 PM EST

Get a Document - by Citation - 2001 U.S. Dist. LEXIS 17567      Page 13 of 13

Case 1:05-cv-00205-SLR     Document 46-2     Filed 03/21/2006     Page 32 of 40

**\* Signal Legend:**

-   Warning: Negative treatment is indicated
-   Questioned: Validity questioned by citing refs
-   Caution: Possible negative treatment
-   Positive treatment is indicated
-   Citing Refs. With Analysis Available
-   Citation information available

**\*** Click on any *Shepard's* signal to *Shepardize*® that case.

 LexisNexis®

About LexisNexis  |  Terms & Conditions    Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT E

Get a Document - by Citation - 32 Fair Empl. Prac. Cas. (BNA) 1879          Page 1 of 6

Case 1:05-cv-00205-SLR    Document 46-2    Filed 03/21/2006    Page 34 of 40

Service: **Get by LEXSEE®**
Citation: **1983 us dist lexis 17086**

*1983 U.S. Dist. LEXIS 17086, \*; 32 Fair Empl. Prac. Cas. (BNA) 1879*

GOLDSMITH v. E. I. duPONT de NEMOURS & COMPANY, INC.

No. 81-275

United States District Court for the District of Delaware

1983 U.S. Dist. LEXIS 17086; 32 Fair Empl. Prac. Cas. (BNA) 1879

May 9, 1983

**CORE TERMS:** referee, retaliation, probation, collateral estoppel, doctor, judicata, unemployment compensation, discharged, played, deputy, state agency, prior suit, unemployment, claimant, Civil Rights Act, collateral estoppel effect, actually litigated, summary judgment, cause of action, relitigation, collateral, litigated, partial, privity, defer, circumstantial evidence, discriminatory conduct, decision to discharge, collaterally estopped, causes of action

**COUNSEL:** [\*1]

Bayard Marin, (Marin and Hudson), Wilmington, Del., for plaintiff.

Richard D. Allen, (Morris, Nichols, Arsht & Tunnell), Wilmington, Del., and Jerry H. Brenner, Wilmington, Del., for defendant.

**OPINIONBY:** STAPLETON

**OPINION:** STAPLETON, District Judge: -- This action was filed by plaintiff John A. Goldsmith ("Goldsmith") against defendant E.I. duPont de Nemours & Company, Inc. ("DuPont") on June 25, 1981. Goldsmith alleges that DuPont unlawfully discriminated against him in violation both of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, et seq. and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Currently before the Courtis defendant's motion for partial summary judgment claiming that (1) Counts I and II of the complaint are barred by limitations, and (2) Count III is barred under principles of res judicata and/or collateral estoppel.

The complaint includes allegations against defendant covering the period June 1977 through September 1980. Count I alleges that plaintiff filed a charge with the EEOC on June 20, 1977 and thereafter suffered "harassment and physical abuse and menacing", and the assignment of "menial" rather than "technical" jobs. Count I also alleges **[\*2]** that plaintiff filed a charge with the Office of Federal Contract Compliance Programs ("OFCCP") on December 18, 1978, and thereafter suffered retaliation consisting of being told "not to complain to the government so much" and being given "false information" concerning a particular test in December 1979. Count II alleges that "defendant's Disability Wage Plan was discriminatorily applied to plaintiff in retaliation for filing charges with the EEOC and OFCCP" in that plaintiff was not paid for certain absences from work during June and July of 1979. Count III alleges that plaintiff suffered further retaliation as a result of filing the previously described charges with the EEOC and OFCCP, as well as a later charge with the EEOC, in that he was placed on probation and thereafter "discriminatorily and retaliatorily discharged" for violation of that probation.

The plaintiff was employed by DuPont from February 17, 1969 to September 10, 1980. The

plaintiff suffered from various medical problems during his employment with DuPont, and had apparently been to see the Company doctor many times. At the same time, however, plaintiff was being treated for his medical problems by his private **[*3]** physician.

In mid-January 1980 problems apparently arose between the plaintiff and DuPont over the plaintiff's visits to the Company doctor. Allegedly due to the plaintiff's refusal to see the Company doctor and due to unauthorized absenteeism, the plaintiff was placed on six months probation on January 28, 1980. This probation was extended for another six month period on July 28, 1980, and the conditions of probation included improvement in overall attendance and compliance with all reasonable work-related requests, including visits to the Company doctor.

On September 5, 1980, plaintiff reported to the Company nurse for arthritis pain and for pain in his left eye due to a previous accident. Plaintiff had been under the care of his private physician for both conditions. Plaintiff asked to go home and was told to see the Company doctor for a pass. It appears that the plaintiff saw the doctor, but according to the defendant, the plaintiff refused to allow an examination. In any case, no pass was issued, the plaintiff was sent home for allegedly failing to cooperate, and was subsequently discharged.

Prior to filing this action, plaintiff filed three charges of discrimination **[*4]** with the EEOC dated May 31, 1980, June 20, 1980, and September 19, 1980, which set forth the factual allegations in the complaint.

Following his discharge, Goldsmith also filed a claim for unemployment compensation with the Delaware Department of Labor. Pursuant to 19 Del. C. § 3318, that claim initially was reviewed by a claims deputy. A hearing de novo was held on November 18, 1980 before an appeals referee of the Department of Labor. At the hearing, plaintiff was represented by counsel. Testifying as witnesses were plaintiff and three employees of defendant, one of whom plaintiff had subpoenaed; all testimony was under oath. Cross-examination was permitted, rules of evidence were applied, and compulsory process was available.In an opinion of December 9, 1980, the Referee denied plaintiff's claim for unemployment compensation.

Following the decision of the Referee, plaintiff, pursuant to 19 Del. C.§ 3320, appealed to the Unemployment Insurance Appeal Board. The appeal was heard by the Board on February 4, 1981. Following the hearing, the Board adopted the decision of the Referee, and affirmed that decision.

Plaintiff thereafter sought judicial review on the adverse **[*5]** determination of the Board. On March 9, 1982, the Superior Court of the State of Delaware affirmed the decision of the Board. n1 By order of October 26, 1982, the Supreme Court of the State of Delaware affirmed the decision of the Superior Court. n2

n1 Goldsmith v. Unemployment Insurance Appeal Board and E.I. duPont de Nemours & Co., Inc., No. 81A-FE-11 (Del. Super. March 9, 1982) (Slip Op. at 5).

n2 Goldsmith v. Unemployment Insurance Appeal Board and E.I. duPont de Nemours & Company, No. 101, 1982 (Del. Supr. Oct. 26, 1982).

I. LIMITATIONS.

The defendant raises limitations defenses to the plaintiff's claim under Count I of the complaint, stating that plaintiff may not assert claims of discrimination under § 1981 based on actions which occurred more than three years prior to the date the complaint was filed. n3

Similarly, the defendant argues that Counts I and II allege under Title VII discriminatory conduct occurring more than 240 days prior to the date that plaintiff filed charges with the EEOC. n4 While the plaintiff does not argue with the applicable time periods, he claims that defendant's discriminatory conduct constituted "continuing violations" of the federal **[*6]** statutes.

n3 The three year statute of limitations under 10 Del. C. § 8106 is applicable here. See Burris v. Wright Const. Co., 459 F.Supp. 157, 159, 18 FEP Cases 522 (D.Del. 1978).

n4 Since Delaware qualifies as a "deferral State" (meaning the EEOC must first defer to the Delaware Department of Labor for 60 days), a complaint must be filed with the State agency within 240 days to preserve the right to federal relief. See Mohasco Corp. v. Silver, 447 U.S. 807, 23 FEP Cases 1 (1980).

It may be true that liability in this case cannot be predicted upon conduct occurring outside the applicable limitations periods. However, evidence relating to the prior periods would appear to be admissible at trial as relevant to the claims based on defendant's conduct falling within the limitations periods. In light of this fact, I consider it wiser to defer decision on the limitations issues, as they related to plaintiff's "continuing discrimination" theory, until these matters are presented at trial.

II. RES JUDICATA AND COLLATERAL ESTOPPEL.

The defendant further argues that Count III is barred by the application of res judicata and collateral estoppel. In support of this argument, **[*7]** defendant relies on the recent decisions in Kremer v. Chemical Construction Corp., 456 U.S. 461, 102 S.Ct. 1883, 28 FEP Cases 1412 (1982) and Davis v. U.S. Steel Supply, Etc., 688 F.2d 166, 29 FEP Cases 1202 (3d Cir. 1982). In Kremer, the Supreme Court held in the context of a Title VII suit that 28 U.S.C. § 1738 requires federal courts to give the same full faith and credit to a state court judgment upholding a state agency's rejection of an employment discrimination claim that would apply in that state's own courts. Similarly, in Davis, the Third Circuit, applying Pennsylvania res judicata rules, held in a § 1981 suit that a U.S. District Court of that state must give full faith and credit to a prior state court judgment vacating an administrative decision on an unemployment discrimination claim.

The Delaware Courts recognize the principles of res judicata and collateral estoppel and have applied them as follows:

Under the doctrine of res judicata, a judgment in a prior suit involving the same parties, or persons in privity with them, bars a second suit on the same cause of action.Under the doctrine of collateral estoppel, on the other hand, a judgment in a prior suit does **[*8]** not operate to bar a subsequent cause of action but rather precludes in a subsequent suit on a different cause of action the relitigation of a factual issue which was litigated and decided in the prior suit between the same parties or persons in privity with them.See Tyndall v. Tyndall, Del. Supr., 238 A.2d 343 (1968). A further distinction between the two doctrines is that the bar of res judicata extends to all issues which might have been raised and decided in the first suit as well as to all issues that actually were decided whereas the bar of collateral estoppel is limited solely to those issues which were actually litigated and decided in the first suit.

Folz v. Pullman, Incorporated, 319 A.2d 38 (Del.Super.1974).

In Folz, the court gave collateral estoppel effect to a decision of a state agency even though that decision was not appealed to and reviewed by any state court. Id. at 42. See 19 Del. C.

§ 2349. It follows, a fortiori, from Foltz that a decision of a state coaurt rendering final judgment to an appeal from a state agency decision would be given res judicata and collateral estoppel effect in the Delaware courts.

Applying these principles to the present case, **[\*9]** I conclude that res judicata is not applicable here. Although the parties that are before the Court are the same parties that litigated the unemployment compensation claim, it cannot be said that the two "causes of action" are the "same."

This does not mean, however, that collateral estoppel does not apply. As noted above, collateral estoppel may operate to preclude the relitigation of issues -- even when the causes of action are different -- when those issues are "actually litigated and decided in the first suit." Foltz, 319 A.2d at 40.

The question before the state agency in our case was whether Goldsmith was entitled to unemployment compensation benefits. The claims deputy determined that Goldsmith was not entitled to benefits because he was discharged for "just cause" in connection with his work, within the meaning of 19 Del. C. § 3315(2). n5 "Just cause" under this statute has been defined as a "willful or wanton act in violation of either the employer's interest, or of the employee's duties, or of the employee's standard of conduct." Starkey v. Unemployment Insurance Appeal Board, 340 A.2d 165, 166 (Del.Super. 1975).

n5 The statute provides:

An individual shall be disqualified for benefits --

(2) For the period of unemployment next ensuing after the claimant has been discharged from his work for just cause in connection with his work. . . .  **[\*10]**

Plaintiff appealed the decision of the claims deputy to the appeals referee of the Department of Labor. After a full adversary hearing, the referee affirmed the deputy's decision stating:

[Goldsmith] had once again failed to cooperate with the company doctor in violation of the conditions of his probation. . . . His action and inaction must be considered misconduct that rose to the level of the willfulness or wantonness required to support such cause for his dismissal within the meaning of the law. Since there was just cause for his discharge the claimant is not entitled to benefits.

Thereafter, the plaintiff filed subsequent appeals to the Unemployment Insurance Appeal Board, to the Delaware Superior Court, and finally, to the Delaware Supreme Court. In each instance, the decision to deny unemployment benefits was upheld on the ground that there was "just cause" for discharging Goldsmith. n6

n6 As the Superior Court held:

Claimant has admitted that he refused to allow the doctor to examine him. The Board found this refusal to be a deliberate violation of the terms of his probation, constituting just cause for his discharge. The Court will not substitute its judgment for that of the Board.

The Supreme Court adopted this analysis in affirming the Superior Court's finding that there was substantial competent evidence in the record to support the Board's decision.  **[\*11]**

The foregoing review of the proceedings in the State agencies and in the State courts leads me to the conclusion that plaintiff is not collaterally estopped from raising here claims that discrimination and/or retaliation played a role in his discharge.Although Goldsmith suggested during the State unemployment compensation proceedings that retaliation for his EEOC complaint played a role in his discharge, n7 there is no indication in the opinions of the Board or in the affirming opinions of the State courts that this contention was ruled upon by any tribunal and, contrary to defendant's assumption, such a ruling is not inherent in the determination that there was just cause for plaintiff's discharge. Assuming that this determination constitutes a finding that plaintiff's willful violation of the terms of his probation was a factor in DuPont's decision to discharge, n8 it would not negate the possibility that race or retaliation may have also played a role in that decision. Plaintiff may be able to convince the trier of fact, for example, that a caucasian person would not have been discharged for such conduct.

n7 Goldsmith's appeal from the Referee's adverse decision stated:

I wish to appeal the Referee's decision dated 12-09-80 (Mr. Joseph A. Julian, Jr.) for the following reasons:

(a) I was fired from E.I. duPont de Nemours and Company on September 10, 1980 in retaliation for my having filed charges to the EEOC and other U.S. Government Agencies.

(b) my rights were violated under State and Federal statutes. (c) my rights were violated under the 5th and 14th amendments to the U.S.

Also, Goldsmith's attorney had made references to his client's EEOC complaints during the course of the hearing before the Referee.

n8 The "just cause" determination arguably can be regarded as a finding that just cause for discharge existed and not as a finding concerning the factors which actually motivated the employer's decision. [*12]

Because there was no determination in the State proceedings as to whether race or retaliation played a role in plaintiff's discharge, plaintiff is not collaterally estopped from pressing the Title VII and Section 1981 claims which he has made as a result of his discharge. I realize that this does not exhaust the possibility that the State judgment may be entitled to some collateral effect here. Depending on how one reads the State findings, it can be argued that plaintiff should be estopped (1) to deny that he willfully violated his probation by refusing to be examined or (2) to deny that his refusal to be examined was a factor which motivated DuPont's decision to discharge. Evidence concerning the probation and plaintiff's refusal to be examined will, of course, be admissible as circumstantial evidence bearing on the issue of whether race or retaliation played a role in the discharge and DuPont may choose to assert that the State court judgment should have collateral effect in this context. Counsel have not briefed the issues relating to the applicability of collateral estoppel in the context of such circumstantial evidence, and I, accordingly, decline to rule on those issues [*13] now.

DuPont should advise the Court at the pre-trial conference whether or not it anticipates relying on collateral estoppel at trial. If it does, I will determine how the issues thus raised will be approached.

CONCLUSION

For the reasons stated above, the defendant's motion for partial summary judgment is

Get a Document - by Citation - 32 Fair Empl. Prac. Cas. (BNA) 1879      Page 6 of 6

Case 1:05-cv-00205-SLR    Document 46-2    Filed 03/21/2006    Page 39 of 40

denied.

SO ORDERED.

Service: **Get by LEXSEE®**
Citation: **1983 us dist lexis 17086**
View: Full
Date/Time: Tuesday, March 21, 2006 - 12:35 PM EST

\* Signal Legend:

-  -   Warning: Negative treatment is indicated
- Q  -   Questioned: Validity questioned by citing refs
- △  -   Caution: Possible negative treatment
- ◆  -   Positive treatment is indicated
- A  -   Citing Refs. With Analysis Available
- i  -   Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis®    About LexisNexis | Terms & Conditions

Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

## CERTIFICATE OF SERVICE

I, Sarah E. DiLuzio, hereby certify this 21st day of March, 2006, I caused the foregoing **ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the U.S. District Court District of Delaware via CM/ECF (Official Court Electronic Document Filing System) and served two (2) true and correct copies upon *pro se* Plaintiff via overnight mail, to the following address:

> George Witcher, *Pro Se*
> 2621 Jessup Street
> Wilmington, Delaware  19802

Sarah E. DiLuzio (I.D. #4085)
POTTER ANDERSON & CORROON LLP
1313 North Market Street—6th Floor
Post Office Box 951
Wilmington, Delaware  19899-0951
 (302) 984-6279 - Telephone
 (302) 658-1192 - Facsimile
sdiluzio@potteranderson.com - Email

724540