IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GEORGE WITCHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 05-205-SLR |
| | ) |
| SODEXHO, INC., | ) |
| | ) |
| Defendant. | ) |

George Witcher, Wilmington, Delaware. Pro se Plaintiff.

Sarah Elizabeth DiLuzio, Esquire, Potter Anderson & Corroon, LLP, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated: March المركز, 2007
Wilmington, Delaware

ROBINSON, Chief Judge

## I. INTRODUCTION

On April 8, 2005, George Witcher, a pro se plaintiff proceeding in forma

pauperis, filed suit against his employer,[1] Sodexho, Inc. ("defendant"), alleging that

defendant was discriminating against him in violation of the Age Discrimination in

Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., and the Delaware Discrimination

in Employment Act ("DDEA"), 19 Del. C. §§ 710 et seq..[2,3]  (D.I. 2)  Plaintiff amended

his complaint on April 25, 2005; three days later, he filed a document identified as his

"2nd Amendment to [the] Complaint," which the court construed as a supplement to the

---

[1] Although he was still working for defendant at the time he filed the complaint, plaintiff voluntarily left defendant's employ on or about July 8, 2005.  (D.I. 41, ex. D)

[2] The DDEA states, in pertinent part, that

[i]t shall be an unlawful employment practice for an employer to:

(1) . . . discriminate against any individual with respect to compensation, terms, conditions or privileges of employment because of such individual's . . . age . . . ; or

(2) Limit, segregate or classify employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect the individual's status as an employee because of such individual's . . . age . . . .

19 Del. C. § 711(a).

[3] On the initial complaint form, plaintiff wrote that the allegedly discriminatory acts of which he was complaining concerned "Age/Harassment." (D.I. 2 at 2, 3)  Plaintiff's October 7, 2004 charge to the Delaware Department of Labor lists "Harassment" as the employment harm being suffered in violation of Title VII of the Civil Rights Act of 1964; however, plaintiff also checked the box on the form labeled "Retaliation," which related to his age discrimination claim.  (Id. at 8)  It is unclear whether plaintiff was attempting to make a hostile work environment or constructive discharge claim under Title VII; however, the court declines to infer such and will only discuss plaintiff's age discrimination and retaliation claims.

amended complaint. (D.I. 3, 4) On March 7, 2006, after the close of discovery but prior

to the March 14, 2006 deadline for dispositive motions, plaintiff filed his "response to

The Summary Judgement [sic]" (D.I. 41); however, no dispositive motions were pending

at that time.[4] Currently before the court is defendant's motion for summary judgment,

which was filed on March 14, 2006; plaintiff has not filed a responsive brief. (D.I. 42)

The court has jurisdiction over the matter at bar pursuant to 28 U.S.C. § 1331.[5]

## II. BACKGROUND

Plaintiff, born on August 29, 1944, was 58 years old when he began working for

defendant in April 2003, and had turned 60 by the time he resigned. (D.I. 2)

Defendant, a food service provider, employed plaintiff as a delivery driver based out of

its Barley Mills location. (D.I. 45 at A5). Plaintiff avers that, during a typical workday, he

"would report to the kitchen at Barley Mills . . . , [where he] prepared the food and then

made delivery" to two branches of the New Castle County Library. (Id. at A5-A6) If

plaintiff returned from his delivery run early enough, he would then do additional work in

the kitchen. (Id. at A13)

---

[4]Because the court is unable to discern plaintiff's motivation for submitting this document, it will not construe the filing entitled "Plaintiff's response to The Summary Judgement [sic]" to be a motion for summary judgment in plaintiff's favor.

[5]Plaintiffs filing claims under the DDEA "shall elect a Delaware or federal forum to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A charging party is barred by this election of remedies from filing cases in both [State] Superior Court and the federal forum." 19 Del. C. § 714(c). This court has held that a plaintiff who files claims under the ADEA is precluded from concomitantly pursuing state law claims under the DDEA, pursuant to 19 Del. C. § 714(c). Wilcoxon v. Red Clay Consol. Sch. Dist., 437 F. Supp. 2d 235, 246-47 (D. Del. 2006). Plaintiff, having elected to prosecute his age discrimination and retaliation claims under the ADEA, is barred from simultaneously seeking remedies provided by the DDEA.

During his tenure with defendant, plaintiff lodged two complaints with the Delaware Department of Labor ("DDOL"). The first, filed July 7, 2004, alleged that defendant had discriminated against plaintiff based on his age.[6] (Id. at 5-6) On October 7, 2004, plaintiff lodged another complaint with the DDOL, this time alleging that he had suffered retaliation (in plaintiff's words, "harassment") at work as a result of his original age discrimination charge. (Id. at 8) On June 23, 2005, plaintiff tendered his letter of resignation from defendant's company (effective July 8th), stating that he could "no longer work for a company that supports and encourages [d]iscrimination, retaliation and harassment of their employees." (Id. at A96) Shortly thereafter, on or about July 6, 2005, plaintiff received a letter from Gordon Ellis ("Ellis"), defendant's Human Resources Director. (See id. at A97) Ellis, on defendant's behalf, stated that he "hope[d] that [plaintiff would] reconsider and remain within [defendant's] employ." (Id.) Ellis further stated that his letter "serve[d] as an unconditional offer of reinstatement to your current position with the same terms and conditions of employment, including the same duties, assignment and rate of compensation." (Id.) Ellis assured plaintiff that defendant "[did] not tolerate workplace discrimination," and [took] complaints of such behavior "very seriously"; consequently, Ellis wrote to plaintiff, "[t]o the extent that your letter raises new allegations of discrimination not previously asserted in your EEOC charge or pending lawsuit ([defendant] has already conducted

---

[6]According to plaintiff, between April 9, 2003 and June 10, 2004, "[he] was suspended for using profanity" even though defendant "tolerate[d] the use of such language by it[s] younger employees"; and defendant's management personnel "made comments to [plaintiff] . . . that gave [him] the impression that they felt [he] was too old to perform [his] job" despite the fact that plaintiff "[had] never had any problem in the past performing [his] assigned tasks because of [his] age." (D.I. 2 at 5-6)

3

comprehensive investigations of those claims), please contact me immediately so that I may investigate any new claims of which we are not aware."  (Id.)  Plaintiff did not respond to Ellis' letter, in part because he "[did not] believe that there was any sincerity attached to it."  (Id. at A66)

After receiving administrative dismissals and a Notice of Right to Sue letter from the DDOL for each of his charges (id. at 4, 10), plaintiff filed the present lawsuit under the ADEA, seeking "sums in excess of [$150,000], plus attorney fees and punitive damages" (D.I. 3).  The court will discuss the factual underpinnings of each of plaintiff's allegations in turn.

## A. Age Discrimination[7]

### 1. Gary Rogers' comment

In late 2003, plaintiff's supervisor, Gary Rogers ("Rogers"), called plaintiff into his office and, during the course of a conversation, made somewhere between four and

---

[7]At plaintiff's deposition, defendant's counsel recited three of the incidents described in plaintiff's various filings: (1) Gary Rogers' comment about plaintiff's age, which occurred in either August or October 2003; (2) Mark Teoli's March 2004 comment about plaintiff's age; and (3) an incident on June 10, 2004, wherein plaintiff cursed at work and was subsequently suspended for a week.  (D.I. 45 at A5)  When defendant's counsel asked plaintiff whether "these three incidents [constituted] the whole universe of things that support[ed] [his] claim that [he was] discriminated upon based upon his age," plaintiff replied in the affirmative.  (Id.)  Later in the deposition, plaintiff was again asked whether he could point to "any other incidents or events," outside of the comments by Gary Rogers and Mark Teoli and the June 10, 2004 cursing incident, that would support his claim of age discrimination.  Plaintiff replied, "No.  None that I can think of offhand."  (D.I. 45 at A37)  Accordingly, the court will focus its age discrimination inquiry on the following three events.

4

seven references to plaintiff's age.[8]  (D.I. 45 at A7, A10)  Plaintiff, who did not understand why his age was relevant to the conversation, was offended by Rogers' remarks and complained to another supervisor named Mark Teoli ("Teoli"), who said he would forward the complaint to the general manager, Juanita Congo ("Congo").  (Id. at A7-A8)  Soon after, Congo met with plaintiff in order to go over his complaint; Congo, who apologized to plaintiff on behalf of the company, told plaintiff she would contact him again after speaking with Rogers.  (Id. at A8-A9)  The evidence of record indicates that Congo met with Rogers on October 3, 2003 and told him of plaintiff's complaint.  (Id. at A72)  According to Congo's notes from the meeting, she "asked [Rogers] if he was aware that he could not make statements or assumptions referencing age, race, gender, or religion when speaking to associates"; Rogers said that he was.  (Id.)  Congo "left [Rogers] with the expectation that the next time [plaintiff] and [Rogers] met at the library that [Rogers] would apologize to [plaintiff] for his inappropriate comment."  (Id.)  Congo followed up with Rogers on October 7th, but Rogers stated that he had not yet seen plaintiff and, therefore, had not had a chance to apologize.  (Id. at A73)  Plaintiff maintains that he did not hear anything further from Congo on the matter, nor did Rogers ever offer an apology (id. at A8);[9] Rogers, however, did receive a written constructive counseling notice as a result of the incident (id. at A71).

---

[8]Plaintiff testified at his deposition that Rogers' comments, in general, "made reference to the fact . . . [that plaintiff was] the older person [that was] working in the kitchen," and that plaintiff was "old enough to know better."  (D.I. 45 at A7)

[9]Defendant points out that, soon after the incident with plaintiff, Rogers was forced to take a medical leave of absence; it maintains that this was the only reason that Rogers failed to apologize to plaintiff as planned.  (D.I. 43 at 8; D.I. 45 at A17)

5

## 2. Mark Teoli's comment

In March 2004, Teoli and his supervisor, Chad Street ("Street"), called plaintiff

into the office in order to help them put together a job description for plaintiff's position.

(D.I. 45 at A11-A12) When Street stated his opinion that plaintiff was taking too long to

make his deliveries, plaintiff

> responded by saying . . . driving conditions change, especially on I-95,
> there's accidents, there's construction. I am not a fast driver, number one.
> You know, [my] eyesight is not what it used to be, so I am more cautious
> in driving. When I was younger, . . . caution wasn't a factor, a big factor.

(Id. at A13) Teoli then asked plaintiff whether he was "just too old for the job." (Id. at

A14) Plaintiff stated that he was not too old to perform his job, and the conversation

ended soon thereafter without further incident. (Id. at A14) Plaintiff did not report

Teoli's remark to any of defendant's management personnel.

## 3. The cursing incident and suspension

On the morning of June 10, 2004, plaintiff, who claims he was frustrated about

something, cursed several times in front of his coworkers over the course of a few

hours.[10] (D.I. 45 at A17) Donna Haughney ("Haughney"), the supervisor, told plaintiff to

stop cursing; plaintiff felt singled out, claiming that Houghney had never reprimanded

anyone else in the kitchen for cursing at work.[11] (Id.) Plaintiff then told Haughney,

---

[10]Specifically, plaintiff believes that he said "damn," "shit," and "bitch," and "thinks
at one time [he] made reference to the 'F' word." (D.I. 45 at A19) While plaintiff admits
using the word "bitch" in reference to a coworker who had just called the Barley Mill
kitchen on the phone, he maintains that he "did not say it in a derogatory manner," and
that he "was just saying it in reference in a joking kind of way." (Id.)

[11]According to plaintiff, he and his coworkers "did a lot of joking and kidding
around. Erica [Knight], a young lady, cussed more than anybody in the kitchen. So we
did a lot of cussing as far as in the kitchen is concerned." (D.I. 45 at A19)

6

"'You are just prejudice[d]. That's all.'" (Id. at A21)  Haughney ordered plaintiff to go to the office, where he was eventually joined by Teoli and another manager named Mark Pisano.[12]  (Id. at A21-A22)  Plaintiff apologized for cursing and acknowledged that he had called Haughney prejudiced, whereupon Teoli informed plaintiff that he was being suspended, pending an investigation into the incident. (Id. at A22-A23)  Plaintiff avers that Teoli then "ordered [him] to sit in the corner until security [came]" to escort him out of the building. (Id. at A23)  Plaintiff felt threatened by this order, and did not feel free to leave the office. (Id. at A23-A24)  He was eventually escorted out of the building by a security guard. (Id. at A26)

On June 17, 2004, plaintiff met with General Manager Carol Sexton ("Sexton"), a coworker named John Lewis ("Lewis"), and several other management officials. (Id. at A27, A85)  At that meeting, Sexton allowed plaintiff to give his version of events, after which she "read the information that was given to her by the parties," including statements by Lewis, Vanessa, and Haughney. (Id. at A28, A85)  Sexton then stated that the use of abusive language was unacceptable at work and would not be tolerated. (Id. at A85)  Plaintiff was reinstated to his job the following day after a week of paid suspension, and suffered no further disciplinary consequences as a result of the incident. (Id. at A28)  After the confrontation with Haughney, management suggested that plaintiff consider transferring to defendant's Chestnut Run facility; plaintiff

_____

[12]At some point between arguing with Haughney and speaking with the two managers, plaintiff got into a verbal altercation with another coworker, Vanessa, who was a friend of Haughney's. (D.I. 45 at A29)  Plaintiff states that Vanessa was the aggressor (id.); however, defendant, citing written statements by Haughney and Vanessa, contends that plaintiff's attitude during the exchange was threatening and confrontational (D.I. 43 at 10-11; D.I. 44, exs. A, C).

7

acquiesced, although he later stated that he did so because he felt he had no other choice. (Id.) Neither plaintiff's job duties nor his salary were affected by this change in location. (Id.)

On June 25, 2004, plaintiff met with Patty Weik ("Weik"), the Senior Human Resource Manager, in order to relay his impressions of the June 10th incident; Weik promised to conduct an investigation into plaintiff's claim that Haughney was prejudiced, as well as plaintiff's failure to receive a pay raise on his one year anniversary with defendant in April 2004. (D.I. 41, ex. C at 5) On July 7, 2004, Weik sent plaintiff a letter detailing the results of her investigation into plaintiff's claim that he had been "treated differently by supervisor Donna Haughney because of [his] gender and [his] age."[13] (D.I. 45 at A86) Weik's investigation, which included interviewing seven front line employees and four managers about Haughney's demeanor, "found no support for [plaintiff's] claim." (Id.) "Nonetheless," Weik wrote, "[Houghney] will be coached and reminded of our company policies of fair and consistent treatment for all

---

[13]Weik also addressed plaintiff's assertion that he was "'illegally imprisoned' on June 10, 2004 when Mark Teoli and Mark Pisano asked [him] to remain in the office until they got someone from security to escort [him] from the building." (D.I. 45 at A87) Weik disputed plaintiff's characterization of the incident, stating:

It is a requirement by our client [the owner of the Barley Mills facility] that a member of their security escort an employee that was being suspended or terminated. [Mark Teoli and Mark Pisano] indicated that it was only a matter of approximately 2 minutes that you remained in the office, that you did not ask to leave the office, and if you did they would have certainly allowed you to leave. Further, the door was not locked, no one blocked the door or your path to it, and you were never restrained in any manner.

(Id.) Plaintiff admits that he did not try to leave the office, seek help, or express his discomfort with the situation, but attributes this to the fact that he felt physically intimidated and threatened. (Id. at A23-A26)

8

employees . . . ."  (Id.)  Haughney received a constructive counseling notice reminding

her that "[a]ll managers and supervisors are expected to treat all employees with

respect and dignity regardless of race, gender, age, etc."  (Id. at A89)  Plaintiff filed his

charge of age discrimination with the DDOL the day after receiving Weik's letter, July 8,

2004.  (Id. at A90)

## B. Retaliation/"Harassment"[14]

### 1. Failure to promptly receive pay raise

Plaintiff did not receive a pay raise on his one year anniversary of working for

defendant.[15]  Despite mentioning this discrepancy to Weick in June 2004, plaintiff heard

nothing further on the matter for the next eight months, during which he filed charges of

age discrimination and retaliation with the DDOL.  On March 28, 2005, almost two years

after he began working for defendant, plaintiff's job performance was finally evaluated

for the period between April 7, 2003 (his start date) and April 7, 2004.  (D.I. 20, ex. B)

On the review form, defendant indicated that,

> [d]ue to the change in management over the last year in the various
> locations where [plaintiff] ha[d] worked, [it would] be giving [plaintiff] a
> 2.5% increase [in salary] retro[active] from 4/7/04 to 3/28/05.  A full
> performance and developmental appraisal [would] occur going forward on
> [plaintiff's] upcoming anniversary date 4/7/05 for the period 4/7/04 to
> 4/7/05.

(Id.)  As a result of that April 2005 performance review, plaintiff received another 3%

increase in pay.  (D.I. 41, ex. C at 3-4)

---

[14]Plaintiff affirmed, at his deposition, that the following four events serve as the
bases for his claim of retaliation.  (D.I. 45 at A52-53)

[15]Defendant does not dispute the premise that plaintiff was entitled to such a
raise at that time.

9

## 2. Being required to work while cafeteria was under construction

In support of his allegations of retaliation, plaintiff points to the events of

September 23 and 24, 2004, when he was required to report to work in the Chestnut

Run kitchen area even though the cafeteria was undergoing renovations; plaintiff avers

that none of his coworkers were required to come to work on those days. (Id. at A44-

A45) According to plaintiff,

> [i]t was clearly marked outside of the kitchen area, the loading dock area,
> "danger asbestos." And I was forced to go in and to work under
> hazardous conditions to prepare food that was served to the public. . . . As
> a result, I did suffer from some eye irritation and which I had to go to the
> doctor for.

(D.I. 45 at A44) Plaintiff also claims that the renovators "had all kinds of equipment"

blocking most of the loading dock, forcing plaintiff to "load [his truck] on a very small

landing, step landing, which was extremely dangerous." (Id.)

## 3. Written warning for failure to attend work

On February 25, 2005, plaintiff received a written constructive counseling notice

for having failed to attend work on February 21st. (D.I. 45 at A94) Plaintiff, who

refused to sign the counseling notice, claims that he did not know he was expected to

work that day, as it was a holiday and he believed that the County Government Building

in which the kitchen facility was located would be closed as a result. (Id. at A41)

## 4. Failure to repair plaintiff's company van

The final basis upon which plaintiff's claim of retaliation rests is his allegation that

defendant failed to repair his delivery van for seven weeks, even after plaintiff reported

a number of mechanical problems and near-accidents. (D.I. 3) On or about February

10

9, 2005, plaintiff told his supervisor that the "check engine" light in his delivery van had

come on. (D.I. 45 at A39) Later, after the van had stalled while plaintiff was driving, the

supervisor called Teoli, and told plaintiff that Teoli "relayed the fact that they were

working on getting another van. But, again nothing ever happened." (Id.) Plaintiff

maintains that the engine light "stayed on from February until the end of March whe[n]

[he] almost had an automobile accident with a school bus." (Id.) At that point, plaintiff

states, he "was very emotional, [and] distraught," which led two supervisors to call

Sexton about getting the van fixed. (Id.) The van was replaced the following week.

(Id.) Plaintiff claims that defendant's failure to repair the delivery van for seven weeks

was an act of retaliation "[b]ecause [he] was the only person that drove that van."

Plaintiff pointed to two instances in the year 2003, "prior to these charges [of age

discrimination] – when there was a problem with the vehicle they immediately pulled it

off and had it serviced." (Id.) Plaintiff could not say for certain, however, that no one

had inspected the van during the time period in question, although he believed he

would have been informed had that happened. (Id. at A41)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears

the burden of proving that no genuine issue of material fact exists. See Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that

could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from

11

which a rational person could conclude that the position of the person with the burden
of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co.,
57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has
demonstrated an absence of material fact, the nonmoving party then "must come
forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita,
475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts
and all reasonable inferences therefrom in the light most favorable to the party
opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The
mere existence of some evidence in support of the nonmoving party, however, will not
be sufficient for denial of a motion for summary judgment; there must be enough
evidence to enable a jury reasonably to find for the nonmoving party on that issue. See
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails
to make a sufficient showing on an essential element of its case with respect to which it
has the burden of proof, the moving party is entitled to judgment as a matter of law.
See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). With respect to summary
judgment in discrimination cases, the court's role is "to determine whether, upon
reviewing all the facts and inferences to be drawn therefrom in the light most favorable
to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact
as to whether the employer intentionally discriminated against the plaintiff." Revis v.
Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple
Univ., 829 F.2d 437, 440 (3d Cir. 1987)).

12

## IV. DISCUSSION

### A. Plaintiff's Failure to Defend

Plaintiff has not filed a response to defendant's motion for summary judgment. The court's revised scheduling order of October 5, 2005 set forth the deadlines for summary judgment motions and briefs: "All summary judgment motions and an opening brief and affidavits, if any, in support of the motion, shall be served and filed on or before **March 14, 2006**. Answering briefs and affidavits, if any, shall be filed on or before **March 28, 2006**." (D.I. 18 at ¶ 4 (emphasis in original)) Plaintiff had adequate notice of the due date for his answering brief in opposition to defendant's motion for summary judgment, but failed to file such a response. "[E]ven when a nonmoving party chooses the perilous path of failing to submit a response to a summary judgment motion," however, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial. If it has not, summary judgment is inappropriate, for '[n]o defense to an insufficient showing is required.'" Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 161 (1970)). Consequently, the court will subject defendant's motion to a traditional summary judgment analysis in order to determine whether defendant has met the requisite burden of proof.

13

## B. Analysis

### 1. Age Discrimination

The ADEA prohibits an employer from "discriminat[ing] against any individual

with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's age[.]" 29 U.S.C. § 623(a)(1). Because plaintiff has not

provided direct evidence of age discrimination, this court analyzes his claim under the

familiar burden shifting approach of McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973). See Fakete v. Aetna, Inc., 308 F.3d 335, 337-39 (3d Cir. 2002);[16] accord

Wishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007). The burden shifting analysis under

the ADEA requires that plaintiff first establish a prima facie case of age discrimination.

See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).

> In order to establish a prima facie case of discrimination, the plaintiff must
> demonstrate that (1) s/he is over forty, (2) is qualified for the position in
> question, (3) suffered from an adverse employment decision, and (4) that
> his or her replacement was sufficiently younger to permit a reasonable
> inference of age discrimination.

Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004) (citing Duffy v.

Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001)). Once plaintiff has

established a prima facie case, the burden shifts to the defendant to produce evidence

of a legitimate nondiscriminatory reason for the adverse decision. See McDonnell

---

[16]In Fakete, the United States Court of Appeals for the Third Circuit noted that,
"[w]hile our Court has held that the McDonnell Douglas framework applies in ADEA
cases, see, e.g., [Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir.
1997)], the Supreme Court has not decided this question, though it has assumed
arguendo that our approach is correct." Fakete 308 F.3d at 338 n.3 (citing Reeves v.
Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); O'Connor v. Consol. Coin
Caterers Corp., 517 U.S. 308, 311 (1996)).

14

Douglas, 411 U.S. at 802. If defendant carries this burden, the presumption of

discrimination drops from the case, and plaintiff must "cast sufficient doubt" upon

defendant's proffered reasons to permit a reasonable fact finder to conclude that the

reasons are fabricated. See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d

1061, 1072 (3d Cir. 1996) (en banc).

Defendant does not challenge the first two factors identified by the Third Circuit,

to wit, that plaintiff is over forty years of age and was qualified for his job. Defendant

denies, however, that plaintiff suffered an adverse employment action, or that plaintiff

was treated differently than younger employees. (D.I. 43 at 24) For the following

reasons, the court concurs with defendant that plaintiff has failed to establish a prima

facie case of age discrimination.

### a. Adverse employment action

Essentially, plaintiff is claiming that Rogers' and Teoli's comments about his age,

as well as his suspension for cursing at work, constituted adverse employment actions

resulting from age discrimination. The court finds this contention unpersuasive; by all

accounts, Rogers' and Teoli's comments were isolated incidents which occurred

months apart from each other. When notified of Rogers' comment, defendant spoke to

Rogers and took remedial action; plaintiff never notified defendant of Teoli's comment,

denying it the opportunity to take corrective measures. With regard to his suspension,

plaintiff acknowledges that he violated company policy by using profanity at work.[17]

---

[17]Defendant's company handbook, which plaintiff signed on September 27, 2003,
states that "[a]ny disorderly conduct, such as profanity or yelling, including the use of
vulgar, abusive, or obscene language, while on Company/client premises" is "so severe
that [it] may warrant termination without any prior constructive counseling options." (D.I.

(D.I. 45 at A20)  Defendant, therefore, had a legitimate reason to suspend him pending

an investigation into the incident and, in accordance with company policy, could have

immediately terminated plaintiff for such behavior.  Plaintiff was paid for his week-long

suspension, and suffered no additional consequences as a result of the incident.

Plaintiff has adduced no objective evidence to support his claim that he was

"illegally imprisoned" in the Barley Mills office, or that he was unjustly suspended;

likewise, he has failed to show that the Rogers or Teoli comments were anything more

than isolated incidents, or that they were not adequately addressed by defendant.

Consequently, plaintiff cannot show that he suffered an adverse employment action as

a result of age discrimination.

### b.  Less favorable treatment than younger employees

Other than plaintiff's conclusory statements and subjective feelings, there exists

no record evidence that plaintiff's age played a factor in the conditions of his

employment.  The mere fact that plaintiff was older than his coworkers does not make

the actions of which plaintiff complains age-related.

Plaintiff having failed to meet his burden of proof with respect to the third and

fourth prongs of the prima facie test, the court finds that defendant is entitled to

judgment as a matter of law with respect to plaintiff's claim of age discrimination.

---

45 at A78, A80)  In addition, the handbook warns that "[e]mployees may be placed on
investigatory suspension to allow [defendant] time to investigate facts surrounding a
serious performance or conduct problem."  (Id. at A78)

16

### 2. Retaliation

The ADEA provides, in pertinent part, that

[i]t shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d). According to the Third Circuit,

in order to establish a prima facie case of illegal retaliation under the anti-discrimination statutes [including the ADEA], a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."

Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-68 (3d Cir. 2002) (quoting Krouse v.

Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)). The Third Circuit "[has]

previously recognized that Title VII and [the ADEA] are comparable in many contexts."

Curay-Cramer v. Ursuline Academy of Wilmington, Del., Inc., 450 F.3d 130, 135 n.4 (3d

Cir. 2006) (citing Geary v. Visitation of the Blessed Virgin Mary Parish Sch., 7 F.3d 324,

331 (3d Cir. 1993) (comparing the retaliation provisions of Title VII and the ADEA)).

See also Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 787 (3d Cir. 1998)

(noting the similarity of the retaliation provisions in Title VII and the Americans with

Disabilities Act ("ADA")). In both Title VII and ADA cases, the Third Circuit has stated

that a complainant alleging retaliation must show that he or she has suffered a

**materially** adverse employment action, see Moore v. City of Philadelphia, 461 F.3d

331, 332 (3d Cir. 2006); Mondzelewski, 162 F.3d at 787; consequently, it seems

prudent to use the same standard in ADEA claims as well.

17

Plaintiff's decision to file a discrimination charge with the DDOL was unquestionably a protected activity; therefore, the court must analyze the four incidents of which plaintiff complains under the final two prongs of the prima facie analysis.

### a. Materially adverse employment action

The first allegedly retaliatory act that plaintiff has identified is defendant's approximately ten month delay in raising his salary (which, the court notes, began three months before plaintiff filed his charge of discrimination). When plaintiff finally received the raise, however, it was made retroactive to the date it should have been granted – plaintiff's first anniversary of working for defendant. Likewise, less than one month later, plaintiff received another raise stemming from a positive performance review conducted on his second anniversary with defendant. The delay in receiving a pay raise, which defendant contends was caused by turnover in its management personnel, was corrected retroactively and did not affect plaintiff's ability to receive future, timely pay raises. As such, the court finds that it was not a materially adverse employment action.

Plaintiff claims that it was an act of retaliation for defendant to require him, but none of his coworkers, to work in the kitchen while there were potentially hazardous activities going on nearby. (D.I. 45 at A44-A45) Those employees, however, "work[ed] in the kitchen to support the cafeteria," which was closed for renovations (id. at A45); plaintiff, meanwhile, used the kitchen to prepare food and deliver it to libraries, and was the only person assigned to such duties (id. at A44-A45). When asked whether it was accurate that, "[o]ther than, perhaps, some cleaning that could have been done . . . the cafeteria was closed; there was no need for there to be kitchen staff preparing food

18

when the cafeteria was closed," plaintiff answered, "Exactly." (Id. at A46)  Plaintiff

acknowledged that, according to one of his coworkers, "some of the [other kitchen]

employees did work at the other sites.  I think they had the option of working the other

sites or taking the day off, according to what I was told.  Again, this is hearsay."  (Id. at

A45)

Plaintiff maintains that he told Sexton about the debris and lack of access to the

loading dock caused by the cafeteria construction, and that she did not pay attention to

his complaint.  (Id. at A46-47)  The following exchange, however, took place at plaintiff's

deposition:

> Q.  . . . [W]ere you aware of whether or not there was someone you could
> contact at Sodexho to complain about safety concerns?
>
> A.  At the time, I wasn't thinking.  I am sure I was aware of it, but I wasn't
> thinking of it under those terms.  Because by the time I didn't feel like I
> could because I felt there was conspiracy and it was all about retaliation.
>
> Q.  Because that's what you believed, you didn't give Sodexho a chance
> to make things better.  Is that right?
>
> A.  You are correct.

(Id. at A47)  Plaintiff himself has admitted that, because of the renovations and the

nature of his coworkers' job duties, there was not much work for them to do, and some

of them may have worked at other locations on the two days in question.  Plaintiff has

not shown how the events of September 23 and 24, 2004 supposedly constituted an

adverse employment action against him; as such, this allegation is insufficient to

support a prima facie case of retaliation.

19

Plaintiff avers that the constructive counseling notice he received for missing work on February 21, 2005 was unfair and retaliatory. Before he filed a discrimination charge, plaintiff maintains, he had never gotten in trouble for staying home from work on a holiday, and had even been paid for those days off. Likewise, plaintiff asserts, he had previously been told that company policy prohibited employees from working without a manager present, and since he did not believe any managers would be present on that holiday, he was simply adhering to policy by not going in to work. (Id. at A49, A52) Plaintiff, however, has adduced no evidence indicating that his conditions of employment were in any way affected by receipt of this written notice; in fact, as the result of a performance review less than three months later, he was given a 3% raise.

By his own admission, plaintiff voluntarily resigned from defendant's employ and, during the twenty-seven months in which he held that job, he was not demoted, his hours and pay rate were not cut, and his benefits never decreased, even after he filed claims of age discrimination and retaliation. (Id. at A53) In fact, plaintiff received two pay raises during that time period; although the first was ten months late in coming, it was made retroactive to the date on which it should have taken effect. (Id.) Plaintiff was paid for the week he spent on suspension, and the suspension itself did not affect any of the above-named conditions of his employment. (Id.) When he notified defendant that he was resigning, he was offered immediate reinstatement and was asked to inform defendant of any discriminatory acts it needed to investigate, an invitation he declined. Considering these facts, the court cannot find that plaintiff suffered a materially adverse employment action at the hands of defendant.

20

Finally, plaintiff contends that, even after he alerted defendant of the problems he was having with his delivery van, defendant did not repair the van for approximately seven weeks. Essentially, plaintiff believes that the delay in repairing his van must have been retaliatory in nature because: (1) on two occasions in 2003 (the dates of which plaintiff could not recall), defendant repaired the delivery van immediately after mechanical problems arose; and (2) at the time defendant conducted those timely repairs in 2003, defendant was not the van's sole driver, whereas he was the only employee driving the van when the unaddressed problems arose in February 2005. (D.I. 45 at A39-A41) Plaintiff has not, however, proffered any evidence to support these allegations, and has not explained how defendant's alleged delay in fixing his van[18] (which was ultimately replaced) constituted an adverse employment action.[19]

Plaintiff has failed to establish a prima facie case for both his age discrimination and retaliation claims. Therefore, "upon reviewing all the facts [in the case at bar] and inferences to be drawn therefrom in the light most favorable to the plaintiff," the court finds that "there does not exist sufficient evidence to create a genuine issue of material fact as to whether [defendant] intentionally discriminated against . . . plaintiff." Revis v. Slocomb Indus., 814 F. Supp. 1209, 1215 (D. Del. 1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir. 1987)). Defendant's motion for summary judgment (D.I. 42) is thereby granted.

---

[18]Plaintiff could not even definitively state that defendant made no attempts to inspect or repair the van during the seven weeks in question. (D.I. 45 at A41)

[19]Because plaintiff has not shown the existence of an adverse employment action arising out of any of the above allegations, the court need not address the third factor in the prima facie analysis, causation.

21

## V. CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted. An appropriate order shall issue.